# IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
## SOUTHERN DIVISION

| | |
|---|---|
| **DR. PAVEL NAUMOV**  *  <br>**5301 Musket Court**  <br>**Rockville, MD  20853**  * | |
| **Plaintiff**  * | |
| **v.**  * | |
| **McDANIEL COLLEGE, INC.**  *  <br>    **and**  <br>**Martin Hill, Chairman of the**  *  <br>**Board of Trustees**  <br>    **and**  *  <br>**President Roger Casey**  <br>    **and**  *  <br>**Provost Jeanine Stewart**  <br>**2 College Hill**  *  <br>**Westminster, Maryland 21157**  <br>  * | **Case No.:  8:15-cv-00482GJH**  <br>**JURY DEMAND** |
| **Defendants** | |
| **Serve On** | |
| **Albert J. Mezzanotte, Jr., Esq.**  <br>**Whiteford, Taylor & Preston, L.L.P.**  <br>**7 St. Paul Street**  <br>**Baltimore, Maryland  21202**                                                 * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED COMPLAINT

COMES NOW, Dr. Pavel Naumov, ("Dr. Naumov") through counsel, James C. Strouse, Ph.D., J.D., Strouse Legal Services, and states:

1

## I. Jurisdiction and Venue

1. Jurisdiction is proper in Maryland Courts under the Maryland Human Rights Acts, State Gov't, Ann. §20-1001, et seq., as well as the Federal Constitution. This case was removed by Defendants to the Federal District Court for Maryland.

2. Jurisdiction is proper under Maryland tort, and contract law, and constitutional law.

3. Venue is proper in Montgomery County where Dr. Naumov lives and where McDaniel College teaches 20 courses in over 8 locations in Montgomery County, Maryland. The Defendants removed the case to the Federal District Court for Maryland.

## II. The Parties

4. Paragraph 4 includes paragraphs 1 through 3 as if fully stated herein.

5. Dr. Pavel Naumov ("Dr. Naumov") was a Computer Science Associate Professor at McDaniel College ("McDaniel") in Westminster, Md. He was tenured and had taught at McDaniel College since 2005.

6. Dr. Roger Casey ("Dr. Casey") is President of McDaniel College.

7. Dr. Jeanine Stewart ("Dr. Stewart") is Provost and Dean of the Faculty of McDaniel College.

8. Dr. Jeffrey Marx ("Dr. Marx") is Ombudsman (alternate) for McDaniel faculty. Dr. Marx talked to President Casey about the case.

9. The Faculty Affairs Committee is the body that overlooks and intercedes with tenured faculty. ("FAC")

10. Mr. Martin Hill ("Hill") is Chairman of the Board of Trustees of McDaniel College, Inc.

2

Case 8:15-cv-00482-GJH Document 24 Filed 07/08/15 Page 3 of 19
Case 8:15-cv-00482-GJH   Document 21-1   Filed 04/09/15   Page 3 of 19
Case 8:15-cv-00482-GJH   Document 24   Filed 07/08/15   Page 3 of 19

11. McDaniel College and the individual Defendants were served through McDaniel's resident agent, Albert J. Mezzanotte, Jr., Esq.

### III. Facts

12. Paragraph 12 includes paragraphs 1 through 11 as if fully stated herein.

13. McDaniel College, Inc. is a not-for-profit institution of higher learning located in Westminster, Maryland.

14. Dr. Naumov is a highly published author and was Chair of the Department of Math and Computer Science in 2013.

15. He stepped down after one year and supported Dr. Sara More ("Dr. More") for the position, which she held for one year.

16. On August 25, 2014, Provost Jeanine Stewart suspended Dr. Naumov after he refused to resign. She told him about a complaint against him for stalking Dr. More. She suspended him during the meeting and gave him 21 days to resign.

17. She did this after an investigation took place, but without the party harassed making the complaint, or Dr. Naumov being interviewed.

18. In fact, Provost Stewart filed the Title IX Complaint against Dr. Naumov by herself on September 8, 2014.

19. The investigator failed to interview Dr. Naumov or get any feedback in any manner from Dr. Naumov.

20. The Provost asked Dr. Naumov to resign his position at McDaniel College, in direct violation of the American Association of University Professors ("AAUP") Institutional Regulations on Academic Freedom and Tenure which state, "Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures,

administration will consult with the Faculty Affairs Committee concerning the propriety, the length, and other conditions of the suspension".

21. In addition, the investigation never contacted Dr. Naumov in any manner for his response to the charges.

22. It was wrong for the Provost to sign the complaint against Dr. Naumov after she initiated the investigation and was no longer an unbiased individual and was supposed to be on the Appeals Committee.

23. The Complaint should have been made by the individual alleged to be harmed by Dr. Naumov.

24. Without this individual, who was Dr. Sara More, there is no direct testimony against Dr. Naumov, only hearsay evidence gathered by the investigator.

25. Dr. More never made any complaint nor did she give any testimony before the Grievance Committee.

26. After Dr. Naumov refused to sign the resignation paperwork, the Provost banned him from campus, shut down his email account, and changed the locks to his office and the Math/Computer Science/Physics/Sociology office suite. She also locked his National Science Foundation account and refused to reimburse him for conference travel that happened before the suspension.

27. Such actions are contrary to the Faculty Handbook, as The Faculty Affairs Committee was not involved in any of these actions. These actions also prevented Dr. Naumov from developing his defense to the charges. The investigative report was never given to Dr. Naumov.

28. Dr. Naumov was not allowed to hear the formal charges or the witness testimony. He was not given any information on the investigator's report until the day of the Grievance Committee hearing.

29. The Grievance Committee report was never given to Dr. Naumov. He only received a summary of the hearing by Human Resources.

4

Case 8:15-cv-00482-GJH Document 21-1 Filed 04/09/15 Page 5 of 19

30. The blocking of Dr. Naumov's email account restricted Dr. Naumov from refuting charges about emails he sent to Dr. More. The emails were part of the charges against Dr. Naumov.

31. The initiation of the Title IX filing contradicts McDaniel's Title IX policy.

32. Later, the Director of HR told Dr. Naumov that the aforementioned meeting between the Provost and Dr. Naumov was the informal resolution meeting.

33. It was wrong for the person filing the complaint (Dr. Stewart) to also be the one in charge of the "informal" resolution meeting.

34. McDaniel Title IX policy states: "The advisor will discuss with the complainant the appropriate responses to discrimination or harassment, the feeling of the complainant about the problem, and whether the respondent is aware that his or her actions were perceived as discrimination or harassment".

35. The complaints against Dr. Naumov were filed after the 90 day deadline as stipulated in McDaniel's Title IX policy. McDaniel's Title IX policy states: "Any complaint must be reported to an advisor within 90 days of the occurrence". McDaniel College, Title IX, at 10.

36. The Provost filed the complaint on September 8, 2014, after her August 25, 2014 meeting with Dr. Naumov. She filed the complaint after she suspended him. There was no reason for the suspension as Dr. Naumov was a threat to no one, nor had he ever been charged previously with such actions.

37. The alleged actions happened well before 90 days of September 8, 2014 which would be June 8, 2014.

38. The dates for the specific charges are as follows:
"stalking behavior": approximately 2006 to 2014
"walking to the car": Spring 2007

5

"physical appearance": No specific dates

"I would marry you": Spring 2007

"weekend e-mails": No specific dates

"longer-than-needed conversations": No specific dates

"make friendly work environment rules": Spring 2007

"3-page personal letter": September 9, 2013

"Sitting in the department lobby": no specific dates

"Four cards": none during the last academic year

"weird email" to a faculty job candidate: Spring 2013

"another email string": No specific dates

"watching at work": no specific dates

"blocking doorway": no specific dates

39. Dr. Naumov was given no evidence related to the complaints and he was limited in his ability to contact members of the campus community because of his suspension and prohibition from campus. This situation severely limited his ability to mount a defense.

40. Dr. Naumov was not allowed in the room while witnesses and the investigator presented evidence against him. This violates rules on how a proper and fair hearing is conducted.

41. This Grievance Committee violated Dr. Naumov's due process rights. Dr. Naumov should have had access to all of the evidence, testimony, and issues before the hearing. He should have been allowed to stay in the hearing room to observe and refute all evidence presented against him.

42. Dr. Naumov's accuser never testified against him. Only the provost and the investigator testified against him.

6

43. In Title IX actions, there must be a complainant against whom unjust actions were taken. The alleged original accuser, Dr. Sara More, never initiated a complaint, nor did she testify against him.

44. An administrator, in this case the Provost, is prohibited from being a complainant based on hearsay evidence developed by an investigator. There must be a complainant who is actually injured by Dr. Naumov.

45. There was no complainant who was allegedly injured by Dr. Naumov's actions. Therefore, there should be no case.

46. All listed allegations against Dr. Naumov provided in the summary of the Grievance Committee were described as stalking. That charge was dismissed by the committee. There are no allegations listed as "harassment" or "hostile environment" in the committee summary.

47. The committee then found Dr. Naumov responsible for creating a "hostile work environment, harassment, and retaliation". The Appeals Committee dropped retaliation because Dr. Naumov filed no counter-charge against Provost Stewart.

48. Dr. Naumov's alleged accuser neither testified against him nor initiated the complaint. Only the Provost and the investigator testified against him.

49. In Title IX actions there must be a complainant against whom unjust actions were taken. The alleged original accuser, Dr. Sara More, never initiated a complaint, nor did she testify against him.

50. Correspondence between Dr. Naumov and the institution has not followed policy in that nothing was delivered in person to Dr. Naumov despite his request. Dr. Naumov never received the decision of the Grievance Committee, only the HR Summary of the decision, which was not signed by the committee chair or any other member of the committee as required by McDaniel's Title IX policy. *Id. at 12.*

7

51. McDaniel's Title IX policy states explicitly that the written decision of the Grievance Committee will be delivered in person to both parties. This was not done.

52. Nothing was delivered in person to Dr. Naumov from the Appeals Panel either. Written notification shall be delivered to both parties in person by the chair of the Grievance Committee and the Title XI Coordinator within 48 hours of the appeals decision. *Id. at 14.*

53. The structure of the Appeals Committee had several issues. McDaniel's Title IX Policy states: "The appeal panel shall consist of the Provost, the Vice President of Finance, and the Vice President/Dean of Student Affairs". *Id. at 14.*

54. The Provost recused herself since she was the complainant, so the committee only had 2 members. A third member should have been appointed from the faculty.

55. There was neither staff nor faculty on the Appeals Committee. The Grievance Committee did have faculty representation, but the Appeals Committee had none, making it non-representative of the McDaniel's community.

56. One of the members of the Appeals Committee, the CFO, was present when the Provost confronted Dr. Naumov with the initial charges and asked Dr. Naumov to sign the resignation paper.

57. Dr. Naumov did not ask the CFO to be at the meeting, so he was there at the request of the Provost to support the Provost. The CFO was a member of the Appeals Committee and appeared to be biased against Dr. Naumov. He should have recused himself as well as the Provost because of the appearance of bias.

58. The final decision concerning sanctions was made by the President, who was not involved in any of the proceedings leading up to making the

8

sanctions. Title IX policy states that the sanctions will be leveled by the Grievance Committee, such that the findings and sanctions come as a package. *Id. at 13*.

59. McDaniel's Title IX policy states that "If the Grievance Committee finds that discrimination, harassment, or sexual assault occurred, the sanctions may include, but are not limited to, reprimand, suspension, or dismissal, according to the seriousness of the offense".

60. The decision to dismiss Dr. Naumov is inconsistent with the incremental recommendation outlined in McDaniel's Title IX policy. "Sanctions may be incremental in nature; e.g., a first offense would have the least severe sanction".

61. The President decided to terminate Dr. Naumov's employment at McDaniel without any involvement of the Faculty Affairs Committee, in direct contrast with American Association of University Professors' ("AAUP") policies to which McDaniel College subscribes. *Id. at 11*.

62. The President's recommendation to dismiss Dr. Naumov is contrary to McDaniel's Title IX policy which states "In cases in which it is recommended that a faculty member be dismissed (by the Grievance Committee), the President will seek the additional recommendations of the Faculty Affairs Committee; this is consistent with the role and function of that committee as indicated in the Faculty Handbook". *Id. at 13*.

63. As required by Title IX policy, there was no informal process, no discussion of the complainant with the advisor and no complaint reported to any advisor within 90 days of the occurrence. *McDaniel Title IX policy,* at 10.

64. The time for informal resolution is 30 days. In this case, there was no informal process as required by Title IX policy. *Id. at 10*.

65. If there is no resolution of the matter, the complainant may choose to drop the complaint or file a grievance form with the Title IX coordinator.

66. In this case, the complainant refused to file a grievance form, but the Provost did the filing instead. According to McDaniel policy, there is no policy for anyone other than the complainant filing a grievance form.

67. The Provost had no right to file a complaint, as she was not the complainant and had no authorization from the complainant to file the grievance form in the complainant's stead.

68. In fact, the alleged complainant refused to be a witness in the Grievance Committee hearing indicating that she wanted nothing to do with the formal or informal grievance.

69. The Title IX policy states, "in the event that the complainant is unwilling to be identified, the formal hearing will be dismissed, no action will be taken, and no report of any action will be filed". *Id. at 11*.

70. In this case, the complainant refused to testify before the Grievance Committee and refused to file a grievance form. These actions indicate an unwillingness to be identified and the complaint should have been dismissed. *Id. at 11*.

71. The respondent will be provided ample opportunity to prepare for a hearing. *Id. at 11*. This did not happen as Dr. Naumov was prohibited from campus, his email locked, and his office and all facilities denied him. He was also prohibited from contacting anyone in the University community to assist him in this matter.

72. All hearings with the complainant, respondent, and witnesses were to be recorded. These recordings were never given to Dr. Naumov, if they were made. He made repeated requests for these recordings which are required by Title IX policy to be given to him. *Id. at 11*.

73. The Faculty Affairs Committee ("FAC") will receive a copy of the record of the Grievance Committee's investigation. *Id. at 13*. The FAC received a

10

copy of the Grievance Committee's investigation only after President Casey recommended dismissal.

74. The Faculty Affairs Committee will conduct proceedings in accordance with AAUP guidelines. The witnesses will not be required to testify again. *Id.* Dr. Naumov should have been allowed to testify before the FAC.

75. A recommendation will be made by the FAC as to whether the faculty member should be dismissed. *Id.* The President asked the FAC to consider the matter only after President Casey had recommended dismissal.

76. The President transmitted a full report of the FAC stating its recommendation to the Board of Trustees. *Id.* The FAC recommended dismissal on a 2-1 vote with 2 members absent.

77. The Board of Trustees shall either affirm the decision of the FAC or require further hearings at its discretion. The Board of Trustees did affirm the dismissal decision by President Casey.

78. The Board of Trustees shall make the final decision regarding dismissal of the faculty member. The FAC was only asked to affirm or deny President Casey's dismissal decision. It was supposed to have a hearing and make a recommendation to Dr. Casey.

79. This is a faculty handbook violation as well as a violation of McDaniel's Title IX policy.


**Count I**  **Violation of the Title IX Contract (McDaniel College, Inc. only)**

80. Paragraph 80 includes paragraphs 1 through 79 as if fully stated herein.

81. The Title IX policy of McDaniel College constitutes a contract between the college and faculty members as well as students and staff members.

11

82. There was a deliberate violation of the procedures set forth in the Title IX policy by McDaniel College.

83. There was no complainant who was allegedly injured by Dr. Naumov's actions. The person involved, Dr. Sara More, refused to complain, and refused to testify as to any complaints against Dr. Naumov.

84. According to Title IX policy, the complaint should be dismissed if the complainant was unwilling to be identified or testify, such that no action will ensue.

85. There was no involvement of the Faculty Affairs Committee as to sanctions. The FAC conducted no proceeding in accordance with AAUP guidelines and made no recommendation to the President as to recommendations for sanctions.

86. The Grievance Committee made no recommendations on sanctions as required by Title IX. *Id.* at 13.

87. Dr. Naumov should have been allowed to hear all testimony and evidence against him. He was not allowed to do so. He was allowed to testify on his behalf and have witnesses testify. He was not allowed to testify before the Appeals Committee or President Casey.

88. The Provost was the complainant, which was impossible because she was not involved in any way with any of the alleged activities of Dr. Naumov.

89. Further, she and the Vice President for Finance initiated the matter by suggesting that Dr. Naumov resign before any formal or informal charges were made.

90. There were no informal or formal charges made by a bonafide complainant without directly observing offensive behavior or by being the subject of offensive behavior.

12

WHEREFORE, Dr. Naumov demands judgment and prays this Honorable Court award him:

    A.    Compensatory damages of future wages at $100,000 per year for ten years, or $1 million;

    B.    Loss of Tenure at $2 million (20 years);

    C.    Court Costs and legal costs;

    D.    Loss of Tuition for Children – 2 x $160,000 or $320,000 (approximately $500,000 because it is non-taxable)

    E.    Such other and further relief as the Courts deem justified.

**Count II     <u>Intentional Infliction of Emotional Distress (IIED) (All Defendants)</u>**

91.    Paragraph 91 includes paragraphs 1 through 90 as if fully stated herein.

92.    The tort of intentional infliction of emotional distress consists of four elements. They are:

    1.    That the conduct was intentional or reckless;

    2.    That the conduct was extreme and outrageous;

    3.    That there is a causal connection between the wrongful conduct and plaintiff's emotional distress; and

    4.    That the conduct caused emotional distress of a severe nature.

93.    There is little question that the conduct of Provost Stewart and later President Casey was intentional and reckless.

94.    Provost Stewart initiated the complaint by filling out the grievance form as a complainant. The real complainant, Dr. More, refused to fill out a complaint form or cooperate in any way.

13

95. She cannot be a complainant because nothing happened to her and she received only second hand hearsay evidence concerning Dr. Sara More and Dr. Naumov.

96. The items in the specific charges happened over 90 days previous to the complaint, so the complaint should have been dismissed.

97. The real complainant refused to file a grievance or cooperate with the investigation, or testify at the Grievance Committee meeting.

98. The actions by Provost Stewart were reckless and intentional because there was no complainant.

99. The actions by President Casey were reckless and intentional as he failed to involve the Faculty Affairs Committee and gave sanctions not recommended by the Grievance Committee, which failed to recommend any sanctions.

100. The conduct of Provost Stewart was extreme and outrageous in that she proceeded to investigate Dr. Naumov without a complainant, contrary to Title IX policy.

101. The actions of President Casey were extreme and outrageous as he recommended dismissal of Dr. Naumov without a legitimate complainant and without any input from the Faculty Affairs Committee.

102. The actions of Provost Stewart and President Casey were causal connections between the wrongful conduct of both the Provost and the President and Plaintiff's emotional distress over being fired.

103. The conduct has caused severe emotional distress because Dr. Naumov's career as a professor is in jeopardy.

104. Both the Provost and the President knew or should have known that there was no complainant and none of the alleged acts occurred within 90 days of the complaint by Provost Stewart.

105. The deliberate and outrageous actions by Provost Stewart and President Casey in proceeding with a false charge, out of date and without a legitimate complainant, was extreme and outrageous and caused Dr. Naumov extreme emotional distress.

106. Dr. Naumov was distraught as a result of actions by Dr. Stewart and Dr. Casey, and became very upset and fearful for the future.

WHEREFORE, Dr. Naumov demands judgment and prays this Honorable Court award him:

- A. Compensatory damages of future wages at $100,000 per year for ten years, or $1 million;
- B. Punitive damages of $2 million;
- C. Loss of Tenure at $2 million (20 years);
- D. Court Costs and legal fees;
- E. Loss of Tuition for Children – 2 x $160,000 or $320,000 (approximately $500,000 because it is non-taxable); and
- F. Such other and further relief as the Courts deem justified.

**Count III** **Violation of Due Process – (McDaniel College, Inc. only)**

107. Paragraph 107 includes paragraphs 1 through 106 as if fully stated herein.

108. McDaniel College violated Dr. Naumov's right to Due Process under the 14th Amendment to the U.S. Constitution.

109. There was no legitimate complainant in this Title IX matter, so the matter should have been dismissed, as required in McDaniel's Title IX policy.

110. There was no informal hearing as required by Title IX policy. *Id. at 11*.

15

111. The complaint should have been dismissed since the policy states "In the event that the complainant is unwilling to be identified, the formal hearing will be dismissed and no action will be taken and no report of any action will be filed". *Id. at 11*.

112 Dr. Naumov has not been able to receive all information about complaints against him, nor was he allowed to confront or interview any of the witnesses against him.

113. All information presented against Dr. Naumov was hearsay evidence. The complainant was the Provost against whom nothing was done by Dr. Naumov.

114. The Provost had no standing to make a complaint against Dr. Naumov.

115. All Grievance hearings will be recorded. Such recordings, if done, were never given to Dr. Naumov. He made repeated requests, in writing, for these recordings.

116. The Grievance Committee never issued sanctions for Dr. Naumov.

117. President Casey recommended Dr. Naumov be dismissed without any recommendations from the Grievance Committee, nor from the Faculty Affairs Committee as required under Title IX policy. *Id. at 13*.

118. Dr. Naumov was suspended from campus before any complaint was made against him.

119. Dr. Naumov was not allowed on campus since August, 2014, making it difficult for him to contact witnesses and prepare his defense.

120. The Appeals Committee consisted of 2 persons after the Provost recused herself. Another person from the McDaniel community should have been appointed in her stead.

WHEREFORE, Dr. Naumov demands judgment and prays this Honorable Court award him:

- A. Compensatory damages of future wages at $100,000 per year for ten years, or $1 million;
- B. Punitive damages of $2 million;
- C. Loss of Tenure at $2 million (20 years);
- D Court Costs and legal fees;
- E. Loss of Tuition for Children – 2 x $160,000 or $320,000 (approximately $500,000 because it is non-taxable); and
- F. Such other and further relief as the Courts deem justified.

**Count IV** <u>**Violation of Faculty Handbook**</u> **(McDaniel College, Inc. only)**

121. Paragraph 121 includes paragraphs 1 through 120 as if fully stated herein.

122. McDaniel College hired Dr. Naumov in 2005.

123. The job offer letter stated that the Faculty Handbook was part of the offer.

124. Specifically, the Faculty Handbook at pages 12, 13 states:

"Termination for cause of a continuous appointment, or the dismissal for cause of a teacher previous to the expiration of a term appointment, should, if possible, be considered by both a faculty committee and the governing board of the institution. In all cases where the facts are in dispute, the accused teacher should be informed before the hearing in writing of the charges and should have the opportunity to be heard in his or her own defense by all bodies that pass judgment upon the case. The teacher should be permitted to be accompanied by an advisor of his or her own choosing who may act as

counsel. There should be a full stenographic record of the hearing available to the parties concerned".

125. Dr. Naumov was not informed in writing about allegations against him. The Human Resources summary of the Complaint (the only document given to him) was incomplete. For example, he never heard of "sweater with circles" until the Grievance Committee raised this question.

126. He was not given an opportunity to be heard in his own defense by (i) the appeal board (ii) the President, (iii) the FAC, and (iv) the board of trustees. Yet, all these bodies passed judgment upon the case.

127. He was not given an opportunity to be accompanied by an advisor of his own choosing who may act as counsel. He only was told that he can be accompanied by an ombudsman.

128. In spite of repeated requests, he was never given a stenographic record of any of the meetings.

WHEREFORE, Dr. Naumov prays this Honorable Court award him:

A. Compensatory damages of future wages at $100,.000 per year for ten years or $1 million;
B. Loss of Tenure at $2 million (20 years);
C. Court Costs and legal costs.
D. Loss of Tuition for Children – 2 x $160,000 or $320,000 (approximately $500,000 because it is non-taxable)
E. Such other and further relief as the Courts deem justified.

## Jury Trial Demanded

Dr. Naumov demands a jury trial in this matter.

18

Dated:  April 8, 2014

                                              Respectfully Submitted,

                                              /s/  James C. Strouse  09557
                                              Strouse Legal Services
                                              5401 Twin Knolls Rd., Ste. 7
                                              Columbia, Maryland  21045
                                              (410) 730-7600
                                              sstrousejc@aol.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of April, 2015, a copy of the foregoing Amended Complaint and a copy of the redlined Amended Complaint was sent via the court's CM/ecf system to:

Gil A. Abramson
Katherine Levy
JACKSON LEWIS, P.C.
2800 Quarry Lake Drive
Suite 200
Baltimore, Maryland  21209

                                              /s/  James C. Strouse,#09557