## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAVEL NAUMOV,

        Plaintiff,

    v.

MCDANIEL COLLEGE, INC. *et al.,*

        Defendants.

Civil Action No. 8:15-cv-00482 GJH

## MEMORANDUM IN SUPPORT OF DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>

Gil A. Abramson (Fed. Bar No. 01240)
Eileen Carr Riley (Fed. Bar No. 23758)

JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Phone: (410) 415-2000
Facsimile: (410)415-2001
Email: gil.abramson@jacksonlewis.com
       eileen.riley@jacksonlewis.com

*Counsel for Defendants,*
*McDaniel College, Inc.*
*Dr. Roger Casey*
*Martin Hill*
*Dr. Jeanine Stewart*

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1
II.   SUMMARY .................................................................................................... 3
III.  STATEMENT OF UNDISPUTED FACTS ..................................................... 6
      A.    Parties ................................................................................................. 6
      B.    The McDaniel Faculty Handbook Refers to the AA/EEO Manual and the
            Title IX Policy for Dealing with Complaints of Harassment or Discrimination .... 7
      C.    McDaniel College Title IX Policy ........................................................ 8
      D.    Female Faculty Member Complains to the Provost, Dr. Stewart, about
            Plaintiff ............................................................................................... 8
      E.    Provost Stewart Explained To Dr. More That She Felt Obligated to File a
            Title IX Claim and that an Investigation Would Follow ....................... 10
      F.    An Investigation was Conducted Which Revealed Evidence of Possible
            Violation of the College's Title IX Policy .......................................... 11
      G.    Formal Title IX Grievance was Filed Against Plaintiff and a Grievance
            Committee was Appointed to Consider the Complaint ........................ 13
      H.    Plaintiff Appeals the Grievance Committee Decision to an Appeal Panel ........... 15
      I.    Defendant Casey Recommends the Sanction of Dismissal, Which Plaintiff
            Appeals ............................................................................................... 16
      J.    The Elected Faculty Affairs Committee Considers the Dismissal
            Recommendation ................................................................................ 16
      K.    The Board of Trustees Upholds the Sanction of Dismissal; Plaintiff is
            Terminated ......................................................................................... 18
      L.    Plaintiff's Employment Following Dismissal from McDaniel ............... 19
      M.    Other Admissions ............................................................................... 19
IV.   LEGAL STANDARDS .................................................................................. 20
V.    LEGAL ARGUMENT ................................................................................... 21
      A.    COUNT I – Defendant McDaniel College Is Entitled to Summary Judgment
            Because Plaintiff Has Failed To Provide Any Evidence That McDaniel
            Discriminated Against Him Because of His Gender. ........................... 21
      B.    COUNT II – Defendants Are Entitled to Summary Judgment on Plaintiff's
            Intentional Infliction of Emotional Distress Claim Because Plaintiff Cannot
            Prove any of the Elements of that Tort ............................................... 24
      C.    COUNT III – Defendant McDaniel is Entitled to Summary Judgment on
            Plaintiff's Claim under the Fourteenth Amendment to the U.S. Constitution for
            Violation of Due Process Because The Evidence Fails to Show Any State
            Action ................................................................................................. 28
      D.    COUNT IV – Defendant McDaniel is Entitled to Summary Judgment On
            Plaintiff's Claim for Breach of the Faculty Handbook Because McDaniel
            Complied with All of the Procedures for Addressing Harassment Complaints
            Against Faculty Members Contained in its Title IX Policy, As Required by
            the Faculty Handbook ........................................................................ 31
            1.    McDaniel Was Required to Adopt Title IX Grievance Procedures In
                  Order to Comply with Federal Law ........................................... 33

2. McDaniel Complied with the Title IX Procedures Contained in its Title IX Policy, and Plaintiff Offers No Evidence to the Contrary ....................... 34

    a. Alleged Violations which do not Exist in any McDaniel Policy ......... 35

    b. Alleged Violations which are Not Contained in the Applicable Title IX Policy................................................................................. 36

    c. Alleged Violations with which McDaniel Fully Complied................. 40

VI. CONCLUSION............................................................................................. 44

## List of Exhibits

| Exhibit No. | Description |
| --- | --- |
| 1. | Excerpt from Deposition of Pavel Naumov with exhibits 2, 3, 6, 9, 24 |
| 2. | Grievance Committee Hearing Excerpts |
| 3. | Jeanine Stewart Answers to Interrogatories Excerpt |
| 4. | Jeanine Stewart Notes (D0001-0008) |
| 5. | Excerpt from Deposition of Elena Safarina with exhibits 1, 5 |
| 6. | Excerpt from Deposition of Jeanine Stewart |
| 7. | Excerpt from Deposition of Roger Casey |
| 8. | Title IX Complaint dated Sept 8, 2014 |
| 9. | Affidavit of Jennifer Glennon |
| 10. | Naumov 2011 Promotion letter |
| 11. | Excerpt from Deposition of Jennifer Glennon |
| 12. | McDaniel June 2014 Title IX policy |
| 13. | Roger Casey Answers to Interrogatories Excerpts |
| 14 | Jennifer Glennon letter dated September 12, 2014 |
| 15. | Jennifer Glennon letter dated September 29, 2014 |
| 16. | Affidavit of Anna Susarina |
| 17. | Excerpt from Deposition of Florence Hines |
| 18. | Grievance Committee Preliminary Hearing Findings |
| 19. | Witness Lists and Proposed Questions for Grievance Committee |
| 20. | Grievance Committee Decision |
| 21. | Jennifer Glennon letter to Jeanine Stewart dated Oct. 28, 2014 |
| 22. | Jennifer Glennon letter to Pavel Naumov dated Oct. 28, 2014 |
| 23. | Pavel Naumov email to J. Glennon dated Oct 28, 2014 |
| 24. | Appeals Panel Decision dated Nov. 21, 2014 |
| 25. | Sanctions Assignment |
| 26. | Plaintiff's Appeal of Sanctions |
| 27. | Appeals Panel Decision dated Dec. 3, 2014 |
| 28. | Jennifer Glennon letter dated Dec 4, 2014 |
| 29. | Faculty Affairs Committee Recommendation |
| 30. | Pavel Naumov letter to Board of Trustees |
| 31. | Minutes of Executive Committee Meeting, January 14, 2015. |
| 32. | Pavel Naumov Answers to Interrogatories Excerpts |
| 33. | Dear Colleague Letter of the Department of Education Office of Civil Rights |
| 34. | Jennifer Glennon email to Pavel Naumov dated Sept 13, 2014 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **PAVEL NAUMOV,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 8:15-cv-00482 GJH** |
| **MCDANIEL COLLEGE, INC.** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Defendants, McDaniel College, Inc. ("McDaniel" or the "College"), Martin Hill, Chairman of the Board of Trustees, Dr. Roger Casey, and Dr. Jeanine Stewart (collectively "Defendants"), by and through undersigned counsel, submit the following Memorandum in Support of Defendants' Motion for Summary Judgment, and states as follows:

### I.   INTRODUCTION

Plaintiff, Dr. Pavel Naumov ("Plaintiff"), brings four claims against McDaniel College, his former employer, for alleged violation of Title IX (Count I), Intentional Infliction of Emotional Distress (Count II), violation of Constitutional due process (Count III), and violation of the McDaniel Faculty Handbook (Count IV). Plaintiff also asserts his claim of Intentional Infliction of Emotional Distress against three individual defendants, Dr. Roger Casey (McDaniel College President), Martin Hill (Chairman of the Board of Trustees), and Dr. Jeanine Stewart (former McDaniel College Provost). A review of the undisputed facts establishes that Plaintiff cannot prevail on any of these claims.

Any claim by Plaintiff for violation of his rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX"), must fail because he has provided no evidence (and made no allegations) to establish that he was investigated, charged or dismissed from the College because of *gender bias,* which is a requirement for any private right of action under Title IX.   To the contrary, Plaintiff admits, variously, that he does not know what motivated College officials to take actions against him; or that he believes College officials took action against him because of his undesirable comments during faculty meetings, totally unrelated to gender.

Plaintiff's claim for intentional infliction of emotional distress, against all Defendants, is equally flawed because Plaintiff has provided no evidence to prove any of the elements of that tort, including the requirement that Defendants' conduct be intentional or reckless, as well as extreme and outrageous; or that Plaintiff suffered severe emotional distress.

Plaintiff also has no facts to support his due process claim since McDaniel College is a private institution, while the constitutional protections afforded by the Fourteenth Amendment restrain only the actions of the state.   In this case, there are no facts to establish that McDaniel College's alleged infringement on Plaintiff's constitutional rights constituted state action.

Finally, Plaintiff cannot prove any claim for breach of the Faculty Handbook because McDaniel complied with the Faculty Handbook.   Specifically, the Faculty Handbook directs faculty to separate procedures for complaints of harassment or discrimination against faculty. McDaniel's grievance procedures for adjudicating allegations of discrimination, harassment or sexual assault are found in the College's Title IX policy, with which McDaniel fully complied. Because McDaniel complied with all requirements of its Title IX policy – the policy referenced

by the Faculty Handbook for the adjudication of complaints of discrimination, harassment or sexual assault – McDaniel cannot be liable for breach of contract.

## II. SUMMARY

This case arises out of a troubled working relationship between Plaintiff (male) and his former female colleague, Dr. Sara More, who were, for many years, the only two Computer Science professors in the McDaniel College Mathematics and Computer Science Department. Although Plaintiff now describes his relationship with Dr. More as one of "very close friends" and "research partners" (Deposition of Plaintiff at 45-46, hereafter "Pl. Dep." and attached as Ex. 1), Plaintiff admits that he previously thought about dating Dr. More and wrote in his journal that he would probably do so if he were not married; even writing, "I seem to be more and more excited about Sara." (Pl. Dep. 307-308, 310-311.)  Plaintiff further admits telling Dr. More when they started working together, "I would marry you" – even though both Plaintiff and Dr. More were married to others.  (Plaintiff's Grievance Committee testimony excerpts, attached as Ex. 2.) Plaintiff later attempted to explain this comment by explaining, "Obviously, I was not going to marry her." *Id.*

Not surprisingly, Dr. More had a very different view of the relationship with Plaintiff.  In April 2014, Dr. More announced to the College Provost (Dr. Stewart) that she was resigning her tenured position at McDaniel and accepting a non-tenure track position at Johns Hopkins University; and that she would probably not have considered leaving McDaniel if Plaintiff were not still present.  (Ex. 3, Stewart Ans. Interr. 1.)  Dr. More explained to Dr. Stewart that Plaintiff drove her crazy with his inappropriate comments about her appearance and his intense interactions which defied social boundaries. (*Id.*; Stewart notes, attached as Ex. 4.)

Dr. More provided several examples of Plaintiff's conduct which she found offensive, including his repeated comments upon her appearance, unnecessary attention, overly frequent emails and marriage comments, among others. *Id.*   Dr. More allowed Dr. Stewart to read a letter she had received from Plaintiff, which Dr. Stewart described as "overly personal".   (*Id.* at D0005-0006.)  Plaintiff himself admitted the letter was "very emotional". (Pl. Dep. at 265.)

Dr. More also shared a series of emails she received from Plaintiff in 2012 when she was considering leaving McDaniel for another position. (Ex. 4 at D00005.)  In one such email, Plaintiff wrote to Dr. More, "Sara, Please stay.   I will make you happy again. Pavel." (Deposition of Elena Safirova at 39-42, hereafter "Safirova Dep." and attached as Ex. 5; Safirova Dep. Ex. 5.)

Although Dr. More shared the letter and emails with Dr. Stewart, she would not allow Dr. Stewart to photocopy or retain the documents in her possession (Ex. 4 at D0005), explaining that she was afraid of what Plaintiff might do to her if he were to find out that she had contributed to a claim against him.  (*Id.* at D0007.)

Based on this complaint, McDaniel College understood that it had an obligation under Title IX law and its own policy to investigate a potential Title IX violation, even in Dr. More's absence. (Deposition of Jeanine Stewart at 23, hereafter "Stewart Dep." and attached as Ex. 6; Deposition of Roger Casey at 18, 20, hereafter "Casey Dep." and attached as Ex. 7.)  After the College conducted an investigation, it concluded there was sufficient evidence of a possible Title IX violation to proceed.  After an attempt at informal resolution failed, Dr. Stewart filed the Title IX complaint against Plaintiff, in the absence of Dr. More, alleging harassment and other violations of the McDaniel Title IX policy. (*See* Title IX Complaint dated September 8, 2014, attached as Ex. 8.)

4

The evidence described below establishes that McDaniel closely adhered to its Title IX policy, and to its understanding of Title IX law as articulated in an April 4, 2011 "Dear Colleague" letter from the U.S. Department of Education. Dr. Stewart recused herself from any other review of the complaint to avoid any real or apparent conflict. The College provided Plaintiff (and Complainant Dr. Stewart) with equal rights to notice and appeal at each step of the process. The Title IX claims against Plaintiff were considered by numerous separate bodies within the College:

- A Grievance Committee of five College faculty and staff conducted hearings, at which Plaintiff had a full opportunity to testify and to present witnesses and documents in his defense, and found Plaintiff responsible for violation of the McDaniel Title IX policy, including harassment and creating a hostile environment;

- Plaintiff was allowed to, and did appeal the Grievance Committee's decision to a separate Appeal Panel, which heard further testimony and considered Plaintiff's written submission, and upheld the decision;

- After the President (Dr. Casey) recommended the sanction of dismissal, Plaintiff appealed the sanction recommendation to the Appeal Panel, which upheld the recommendation;

- The recommendation for Plaintiff's dismissal was reviewed by the elected Faculty Affairs Committee, which also upheld the recommendation of dismissal; and finally

- The Executive Committee of the Board of Trustees considered the recommendation of dismissal and voted to dismiss Plaintiff from the College.

Although Plaintiff criticizes McDaniel's Title IX procedures, and does not agree with the outcome, Plaintiff has not alleged any private cause of action under Title IX because he has advanced no evidence that McDaniel College reached any erroneous outcome or selectively

enforced its Title IX policy *because of any gender bias*.  In his only other federal charge, Plaintiff has no claim for constitutional due process since McDaniel is not a state actor.

In his state law claims, Plaintiff cannot satisfy any of the requirements to sustain a claim of Intentional Infliction of Emotional Distress.  Notably, he sought no treatment for any emotional distress, and secured new employment teaching at another university.

Plaintiff also cannot prove any claim for breach of the Faculty Handbook, since the Faculty Handbook itself provides that complaints of harassment are governed by different procedures, with which McDaniel fully complied.  To the extent that Plaintiff may be claiming breach of the McDaniel Title IX Policy, he cannot prove such a claim since McDaniel fully complied with its Title IX policy, which governs complaints of harassment.

As discussed below, Plaintiff has no legal or factual basis to proceed in this case on any of his claims.  Accordingly, summary judgment should be granted to each of the Defendants on Plaintiff's entire Complaint.

### III.   STATEMENT OF UNDISPUTED FACTS

**A.    Parties**

McDaniel is a liberal arts college located in Westminster, Maryland.  (Affidavit of Jennifer Glennon at ¶3, hereafter "Glennon Aff.", attached as Ex. 9; Am. Cp. ¶14.)

Plaintiff joined the faculty at McDaniel College in 2005 as an Assistant Professor of Computer Science. (Am. Cp. ¶5; Glennon Aff. at ¶4.)  In 2011 Plaintiff was awarded tenure and promoted to Associate Professor of Computer Science. (Ex. 10, Plaintiff 2011 Promotion letter.) Plaintiff was dismissed from McDaniel on January 20, 2015.  (Pl. Dep. Ex. 3.)

Defendant Dr. Roger Casey (Dr. Casey) is President of McDaniel College, appointed by the Board of Trustees. (Casey Dep. at 5.)

Defendant Dr. Jeanine Stewart (Dr. Stewart) served as Provost and Dean of Faculty for McDaniel College for two years, until the end of the 2014-2015 academic year when she resigned from that position.  (Casey Dep. at 7; Stewart Dep. at 4-5.)  Dr. Stewart currently is on sabbatical leave from McDaniel College and scheduled to return in fall 2016. (Glennon Aff. at ¶5.)

Defendant Martin Hill is Chairman of the Board of Trustees of McDaniel College.  (Am. Cp. ¶10.)

**B.**  **The McDaniel Faculty Handbook Refers to the AA/EEO Manual and the Title IX Policy for Dealing with Complaints of Harassment or Discrimination**

Three different McDaniel Faculty Handbook editions were in place during the period from April 2014 and January 2015 when the events complained of in this litigation occurred: a February 2014 edition, an August 2014 edition and a December 2014 edition.  (Glennon Aff. at ¶6.)  However, all three handbook editions contain the same Equal Opportunity Statement, and Policy on Sexual Harassment and Sexual Discrimination, which direct faculty to the College "Affirmative Action/Equal Opportunity Manual, available on the Portal" for a complete guide to College policies on equal employment.  *Id.*  Additionally, each of the three handbooks provide in Section 4.4.7 (Grievances, Complaints), that, "[w]hen a grievance is alleged to be discrimination or harassment, procedures outlined in the Affirmative Action Manual will be followed*.*"  *Id.*[1]

The referenced Affirmative Action Manual (or AA/EEO Manual) included the McDaniel Title IX policy as Appendix B.  (Glennon Aff. ¶7.) The Title IX policy was periodically updated (even while the AA/EEO Manual was not) and the June 2014 Title IX policy was the version which was in effect at the time that a Title IX complaint was filed against Plaintiff in September 2014. (*Id.*;

---

[1]Similarly, each of the three Handbooks provides that "when prejudice or discrimination in the decision-making process [related to the appeal of Renewal, Tenure or Promotion decisions] is alleged, individuals should refer to the College's Title IX policy. (Glennon Aff. ¶6.)

Deposition of Jennifer Glennon, at 9-10, hereafter "Glennon Dep.", attached as Ex. 11; McDaniel June 2014 Title IX policy, attached as Exhibit 12.)[2]

**C.    McDaniel College Title IX Policy**

McDaniel College initially addressed Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681 *et seq.,* and its implementing regulations in the body of its AA/EEO Manual. (Glennon Aff. ¶8.) However, beginning in approximately 2012, McDaniel College enacted a separate Title IX policy, which was then appended to its AA/EEO Manual as Appendix B. *Id.* The McDaniel College Title IX policy subsequently was updated several times, including in September 2013, March 2014, June 2014, December 2014, March 2015 and August 2015. *Id.*

McDaniel scheduled a Title IX workshop for faculty in November 2012. (Glennon Aff. at ¶9.) McDaniel notified all faculty of critical changes to Title IX by email on April 1, 2013. *Id.* McDaniel required faculty and staff to participate in annual Title IX training beginning on June 5, 2014. *Id.*

The June 2014 Title IX policy provides, in pertinent part, with regard to the sanctioning of tenured faculty, that "if the respondent is a faculty member, his/her tenure status is not a protection, since discrimination, harassment and sexual assault violate basic human rights guaranteed by law, and tenure is not a guarantee against sanction due to either established academic principles or civil or criminal laws." (Ex. 12 at 13.)

**D.    Female Faculty Member Complains to the Provost, Dr. Stewart, about Plaintiff**

On April 28, 2014, Dr. Sara More, an Associate Professor of Computer Science at McDaniel, informed Dr. Stewart that she planned to resign her tenured position at McDaniel and accept a non-

---

[2] Exhibit 12 is identical to the Title IX policy document used as an exhibit at the deposition of Jennifer Glennon, but without handwritten notations from Plaintiff's counsel.

tenure-track position at Johns Hopkins University for the upcoming year.  (Ex. 3, Ans. No. 1.)  Dr. More stated that she would probably not have considered leaving McDaniel's employment if her colleague, [Plaintiff] Pavel Naumov, were not still present. *Id.* Dr. Stewart asked Dr. More for the opportunity to speak with her again to hear anything she may wish to share. *Id.*  Dr. More met with Dr. Stewart again on May 5 and May 28, 2014 when she complained further to Dr. Stewart about Plaintiff's behavior toward her. *Id.*

Dr. Stewart took notes of her meetings with Dr. More on May 5 and 28, 2014.  (*Id.*; Ex. 4 at D0001-D0003.)  During the May 5, 2014 meeting, Dr. More brought up Title IX and stated that Plaintiff would comment daily upon her appearance, even though she asked that he not do so.  (*Id.* at D0001.)  Dr. More offered as an example that on one occasion while she was wearing a sweater with circles, Plaintiff stared at her chest and said, "I'll be thinking of circles all day." *Id.* Dr. More also stated that Plaintiff would try to walk her to her car at the end of each day, even though she repeatedly requested he not do so. *Id.*  Dr. More advised Dr. Stewart that she had to repeatedly request that Plaintiff not comment upon her appearance or walk her to her car. *Id.*

Dr. More further described to Dr. Stewart how Plaintiff had "promised to change" and offered to "make her happy here" when Dr. More previously had considered taking another job.  (*Id.* at D0002.)  Dr. More did not claim that Plaintiff had touched her inappropriately, only that he had defied social boundaries and had been intense in his interactions with her, telling her for example, that "If I weren't married I would marry you." *Id.*

On May 28, 2014, Dr. More shared with Dr. Stewart a lengthy letter, emails and cards that she had received from Plaintiff. (Ex. 4 at D0004-0008; Pl. Dep. Ex. 24.)  Dr. Stewart described the letter as "overly personal and presumptuous" and "smack[ing] of adolescent intensity." (Ex. 4 at D0006.)  Plaintiff himself described the letter he sent to Dr. More as "very emotional," explaining

his view that, "we had emotional bond," "and it—it—it broke at some point, and I just was trying to understand what is happening." (Pl. Dep. at 265-267; Pl. Dep. Ex. 24.) In the letter, Plaintiff apologized to Dr. More at length, writing,

> "Sara, I am sorry for what has happened. When I look at the last six years now, it appears to me that all conflicts that we had and all deep confusions that I had about irrationality of your reactions could be explained by my ignorance of these differences between us. I think that the first time in six years I understand you, but only time can be the ultimate judge of this.
>
> Not being able to understand your reaction has often been hard for me and led to many irrational responses on my part. I do understand, however, that this my ignorance made your life even more unpleasant than mine. If I would see these differences earlier, none of them would have been an issue. I do not have an innate need to intrude into personal spaces, ignore people, or to resolve issue on emotional rather than rational level.
>
> Please, forgive me."

(Pl. Dep. Ex. 24.)

On May 28, 2014, Dr. More further complained to Dr. Stewart that she had recently received unwelcome communications from Plaintiff who was asking Dr. More to join him for lunch prior to leaving McDaniel. (Ex. 4 at D0004.) Dr. More explained to Dr. Stewart that this request troubled her because it was not a suggestion to meet for a meal with the entire department (which she would find appropriate) but a request for her to meet with him alone. *Id.*

### E.     Provost Stewart Explained To Dr. More That She Felt Obligated to File a Title IX Claim and that an Investigation Would Follow

At the conclusion of Dr. Stewart's May 5, 2014 meeting with Dr. More, she told Dr. More that she felt obligated to file a Title IX claim on behalf of McDaniel, that she would ask a Title IX advisor to speak with Dr. More, and that an investigation would follow. (Ex. 4 at D0002-D0003.) Dr. Stewart recorded in her notes that "[Dr. More] is comfortable with this (assuming confidentiality and hoping to be gone before conclusion;" and "she will share documentation from her file with DOCS (Department of Campus Security) investigators." *Id.* According to Dr. Stewart, Dr. More

understood that a Title IX claim could be filed and agreed to speak with the investigator. (Ex. 3, Ans. No. 2.)

Dr. Stewart believed that she had an obligation imposed by the Department of Education "Dear Colleague" letter, dated April 4, 2011, to pursue a complaint on behalf of Dr. More and McDaniel College. (Stewart Dep. at 23, 57-59.) Dr. Stewart explained that it was not her role to assess the credibility of Dr. More or to decide if comments were unwelcome. (Ex.3, Ans. 12, 14, 15-16, 18-19.)

Similarly, President Casey understood that any member of the College community or administration who becomes aware of issues involving sexual assault or sexual harassment allegations had a responsibility to come forward with that information so that appropriate action can be taken (Casey Dep. at 18, 20.) He and Dr. Stewart agreed in their understanding that the U.S. Department of Education Office of Civil Rights "Dear Colleague" letter required the College to pursue the Title IX action notwithstanding that the faculty member wished to remain as anonymous as possible. (Ex. 13, Casey Answers to Interrogatories, Ans. No. 2.)

**F.    An Investigation was Conducted Which Revealed Evidence of Possible Violation of the College's Title IX Policy**

Dr. Stewart reported Dr. More's complaint to McDaniel College Title IX advisor, Dr. Julia Jasken, as Dr. Stewart believed she had an obligation to do. (Stewart Dep. at 20, 23)  Dr. Jasken then ordered that an investigation into the allegations be conducted by the Office of Campus Safety. (Glennon Dep. at 51-52).  An investigation was conducted by Campus Safety Detective Eric Immler. (*Id.;* Stewart Dep. at 29.)

After reviewing the investigation report, the Title IX Coordinator, Jennifer Glennon, with investigator Immler and Dr. Stewart, decided that the College had an obligation to move forward

with the Title IX process. (Glennon Dep. at 57-58.) Glennon explained that her role was not to find an individual responsible but, rather, to determine if the allegations fell under the Title IX policy, and then to facilitate the process so that any possible violations could be evaluated. (Glennon Dep. at 23-25.)

Dr. Stewart met with Plaintiff on August 25, 2014, at which time she explained the charges against him, informed him of the Title IX policy, gave him the option to resign from the College before any formal hearing went forward, gave him access to the Human Resources Department, and encouraged him to speak with his own counsel. (Glennon Dep. at 18, 97; Stewart Dep. at 32-33.) The severance agreement which Dr. Stewart provided to Plaintiff for his consideration provided him several weeks in which to make his decision. (Stewart Dep. at 33.) During the meeting, Plaintiff was informed that he was suspended with full pay, and was to remain away from campus until further notice. (Stewart Dep. at 53-54.) However, Plaintiff was invited by Dr. Stewart to contact the Title IX Coordinator (Glennon) if he needed any assistance. *Id.* Additionally, even though Plaintiff had no access to send campus email[3], he had permission to speak to any witnesses. (Glennon Dep. at 14.)

On August 29, 2014, Plaintiff declined the severance agreement that had been offered to him and requested that the College proceed with the formal grievance procedures specified by the College policy. (Pl. Dep. Ex. 9.) Dr. Casey discussed with Dr. Stewart the need for her to remove herself from the typical role of Provost in order to serve as the Complainant in a Title IX proceeding against Plaintiff. (Ex. 13, Casey Answers to Interrogatories, Ans. No. 2.)

---

[3] It is undisputed that Plaintiff could still access his *existing* campus email since he provided many pages of such email to the Grievance Committee, and produced thousands of pages from his McDaniel email during discovery. (Glennon Aff. at ¶22.)

**G.  Formal Title IX Grievance was Filed Against Plaintiff and a Grievance Committee was Appointed to Consider the Complaint**

On September 8, 2014 Dr. Stewart filed a formal Title IX grievance against Plaintiff. (Ex. 8.) In accordance with the McDaniel Title IX policy, on September 12, 2014, Plaintiff was notified that a preliminary hearing would take place during the week of October 6, 2014 to decide whether to schedule a formal hearing. (Ex. 14, Jennifer Glennon letter, dated Sept. 12, 2014.) Plaintiff was invited to contact a faculty ombudsman to act as his advisor. *Id.* Plaintiff admits he had regular meetings, and exchanged e-mails and phone conversations with faculty ombudsman Jeff Marx, who Plaintiff found to be helpful. (Pl. Dep. at 49.) Plaintiff never requested counsel nor to be accompanied by an advisor of his own choosing other than the ombudsman. (Glennon Aff. at ¶10.)

After the formal grievance was filed, in accordance with the McDaniel Title IX policy, the Title IX Coordinator appointed five faculty or staff members to sit as the Grievance Committee to consider the charges against Plaintiff. (Glennon Dep. at 21.) On September 29, 2014, Glennon sent an update letter to Plaintiff, notifying him of the composition of the Grievance Committee and the hearing details. (Glennon Aff. ¶11; Ex. 15, Jennifer Glennon letter dated Sept. 29, 2014.) Plaintiff made no objection to the composition of the Grievance Committee, and wrote in his journal on October 2, 2014 about the Committee, "I finally received the date of the hearing and the list of commission members. There are two women: Florence Hines and Martin. **I doubt I could have found better candidates myself.**" (emphasis added.) (Safirova Dep. Ex. 1; Ex. 16, Affidavit of Anna Susarina with English translation for October 2, 2014 entry.[4] [5])

---

[4] Some diary pages produced by Plaintiff are hand-written in Russian. A translation for the October 2, 2014 entry number 3 is provided as Exhibit 16.

[5] Elena Safirova, Plaintiff's spouse, identified Safirova Deposition Exhibit 1 as Plaintiff's personal log or diary which Plaintiff requested she bring to her deposition. (Safirova Dep. at 9-11; Safirova Dep. Ex. 1.)

In accordance with the McDaniel Title IX policy, the Grievance Committee held a preliminary hearing at which the Committee reviewed the Title IX complaint without knowing the identities of the complainant or respondent.  (Deposition of Florence Hines at 22-23, hereafter "Hines Dep.", attached as Ex. 17.)  The Grievance Committee decided to institute a formal hearing. (Ex. 18, Grievance Committee Preliminary Hearing Findings.)   On October 7, 2014, Glennon notified both Plaintiff and Dr. Stewart of the results of the preliminary hearing, via email.  (Glennon Aff. at ¶12.)

The Grievance Committee held several meetings, including hearings on October 11 and 15, 2014. (Hines Dep. at 77-78; Glennon Aff. at ¶13.)  In advance of the hearings, both Plaintiff and Dr. Stewart presented lists of witnesses to the Committee, and Plaintiff provided the Committee with a list of suggested questions to ask the witnesses. (Ex. 19, Witness Lists and Proposed Questions.) After hearing testimony, and receiving documents from the parties, the Committee reached a decision on October 27, 2014 that Plaintiff was responsible for harassment, hostile environment and retaliation, in violation of McDaniel's Title IX policy, but that he was not responsible for the offense of stalking. (Ex. 20, Grievance Committee decision.)   This decision was communicated to both Plaintiff and Dr. Stewart by letters dated October 28, 2014, which were emailed to both.  (Ex. 21, Jennifer Glennon letter to Stewart; Ex. 22, Jennifer Glennon letter to Naumov; Pl. Dep. at 220.) Plaintiff was told of the procedures for appeal. (Ex. 22.)

On October 28, 2014, Plaintiff acknowledged that he had received the results of the Grievance Committee proceeding, but complained that the results were delivered by email, and not delivered in person, and that he had not received a decisional document which contained the Grievance Committee signatures. (Glennon Aff. at ¶14; Ex. 23 Plaintiff email to J. Glennon dated Oct 28, 2014.)

**H.    Plaintiff Appeals the Grievance Committee Decision to an Appeal Panel**

On October 31, 2014 Plaintiff filed an appeal of the Grievance Committee decision, which included a letter and multiple enclosures. (Glennon Aff. at ¶15.)  The McDaniel Title IX policy provides that the Complainant and Respondent have the right to appeal; and that the Appeal Panel shall consist of the Provost, the Vice President for Finance and the Vice President/Dean of Student Affairs. (Ex. 12 at p. 14.)  However, since the Provost (Dr. Stewart) was the Complainant in this action, she recused herself from all consideration of this appeal, and no one was appointed in her stead. (Stewart Dep. at 42; Glennon Dep. at 44, 96.)  The Title IX policy provides that "Appeals will be based upon the record of the hearings created by the Grievance Committee;" and that "at the discretion of the Appeal Panel, additional proceedings may be held, the form and nature of which is at the discretion of the appeal panel." (Ex. 12 at p. 14.)  No member of the Appeal Panel had served on the Grievance Committee that considered Plaintiff's case. (Glennon Aff. at ¶16.)

The Appeal Panel met several times to consider Plaintiff's appeal (Glennon Dep. at 99.)  Plaintiff submitted his written appeal documents for consideration by the Appeal Panel. (Glennon Dep. at 47-48.)   Additionally, the Appeal Panel was provided with all documents which were considered by the Grievance Committee as well as the transcripts of the Grievance Committee hearings. (Glennon Aff. at ¶17.)   On November 21, 2014, the Appeal Panel issued its decision, in which it affirmed the Grievance Committee decision that Plaintiff was "responsible for the complaint of harassment;" and was "responsible for the complaint of hostile environment;" but overturned the decision that Plaintiff was "responsible for the action of retaliation through filing a counterclaim." (Ex. 24, Appeals Panel Decision dated Nov. 21, 2014.)

**I.      Defendant Casey Recommends the Sanction of Dismissal, Which Plaintiff Appeals**

Following this Appeal Panel decision, Defendant President Casey reviewed the details of the case, without speaking to anyone else, believing that both sides had presented their information adequately. (Casey Dep. at 65-66.) On November 24, 2014, Dr. Casey recommended that Plaintiff be dismissed from the College for reasons of serious professional misconduct consistent with moral turpitude and for deliberate violation of the rights and freedoms of fellow faculty members. (Ex. 25, Sanctions Assignment.) The College Title IX policy also afforded Plaintiff the opportunity to appeal the sanction recommendation, which he did. (Ex. 26, Plaintiff's Appeal of Sanctions.) On December 3, 2014, the Appeal Panel rendered the decision to uphold the recommended sanction of dismissal. (Ex. 27, Appeals Panel Decision dated Dec. 3, 2014.) On December 4, 2014, Plaintiff and Dr. Stewart both were notified in writing that the Appeal Board voted to uphold the sanction assigned to Plaintiff. (Glennon Aff. at ¶18; Jennifer Glennon letter dated Dec. 4, 2014.)

**J.      The Elected Faculty Affairs Committee Considers the Dismissal Recommendation**

Additionally, Plaintiff was notified by this same communication that, in accordance with the College's Title IX policy, President Casey would seek the additional recommendation of the Faculty Affairs Committee ("FAC"). *Id.* In fact, President Casey's recommendation of dismissal caused the FAC to become involved since whenever the President makes a recommendation for the termination of a tenured faculty member, the FAC is the body that examines the evidence and determines whether that recommendation should be brought to the Board of Trustees. (Casey Dep. at 31, 37-38). The FAC is an elected committee each of whom is elected by the faculty for a five year term. (Pl. Dep. at 234.) No member of the FAC had served on either the Grievance Committee or Appeal Panel that considered Plaintiff's case. (Glennon Aff. ¶19.)

On December 22, 2014, Plaintiff submitted a letter with exhibits to the FAC for its consideration. (Pl. Dep. 76-78; Pl. Dep. Ex. 2.)  In the opening paragraphs of the letter, Plaintiff asserts that [Defendant] President Casey was dissatisfied with Plaintiff in the Spring of 2013 when Plaintiff requested secret paper ballots for the faculty to vote on the appointment of the new Provost, [Defendant] Stewart. *Id.*  According to Plaintiff, "a year later, the Provost and the President decided to retaliate against me and force me to leave the College" and that the "pretext that they found was the departure from the College" of Dr. More. *Id.* Plaintiff claims that his request for a secret ballot in Spring 2013 was a motive for Defendants Casey and Stewart to retaliate against him. (Pl. Dep. at 79, 85.)  Plaintiff added that "there might have been other motives as well" but that "I don't know about this." *Id.*

At deposition, Plaintiff speculated that Dr. Stewart may have been motivated by her very aggressive feminist publications and beliefs, but admitted that "I don't know this" and offered no evidence to support this speculation. (Pl. Dep. at 80, 364-365.)  In fact, Plaintiff testified that Dr. Stewart told him "she doesn't care one way or the other how this case will turn out," which he interpreted to mean that she was impartial. (Pl. Dep. at 351.)  Additionally, Plaintiff offered that another reason Dr. Stewart might have retaliated against him related to his work on the Faculty Development Committee and his discussions about travel budgets and funding. (Pl. Dep. at 350.)  Similarly, Plaintiff testified that Dr. Casey made an unjustified and vindictive decision to dismiss him, but that he does not know why. (Pl. Dep. at 89-90.)

Neither Dr. Casey nor Dr. Stewart were involved in the recommendation by the FAC. (Casey Dep. at 39-40; Stewart Dep. at 41-44.)  Dr. Casey gave a PowerPoint presentation to the FAC about the process, after which he left the meeting. (Casey Dep at 39-40.)  Dr. Stewart, who is normally a member of the FAC, recused herself from their work on this case. (Stewart Dep. at 41, 61-62.)  Two

other members of the FAC were also recused.   One member recused herself because of prior involvement in the case.  (Stewart Dep. 45-46.)  Dr. Stewart exercised her option under the AAUP (American Association of University Professors) policy to remove another member without cause. (Stewart Dep. at 62; Pl. Dep. at 239.)  Stewart testified that she recused this FAC member because the member's mother had been diagnosed with a terminal illness a few days earlier and the individual was involved in arranging hospice care, and that the recusal had nothing to do with Plaintiff.  (Stewart Dep. at 45, 61-62.)  Dr. Stewart explained that the FAC is an elected committee without alternates, and that there is no existing process to replace members.  (Stewart Dep. at 62.) Three members[6] of the FAC remained to consider the recommended dismissal of Plaintiff. *Id.*

On December 23, 2014, the FAC voted by majority vote that the recommended sanction of dismissal was appropriate.  (Ex. 29, Faculty Affairs Committee Recommendation.)  However, both Dr. Casey's recommended sanction and the vote by the FAC were only recommendations, since the Board of Trustees had the final decision whether to terminate faculty.  (Casey Dep. at 35, 65; Ex. 12 at p. 13-14).  Defendant Casey transmitted a full report of the FAC to the Board of Trustees.  (Am. Cp. ¶76.)

### K.    The Board of Trustees Upholds the Sanction of Dismissal; Plaintiff is Terminated

On January 13, 2015, Plaintiff wrote to the Members of the McDaniel College Board of Trustees, alleging that the College administration initiated a McCarthyism-style campaign to force [him] to leave under a completely made up pretense, and attaching the letter he prepared for the FAC. (Ex. 30, Plaintiff letter to Board of Trustees.)

---

[6] No evidence was introduced that Plaintiff requested any recusals or objected to the composition of the FAC until Plaintiff filed his Complaint. (Cp. ¶76.)

At a meeting of the Executive Board of the Board of Trustees McDaniel College, held on January 14, 2015, the Board upheld the sanction of dismissal of Plaintiff. (Casey Dep. at 35; Ex. 31, Minutes of Executive Committee Meeting, January 14, 2015.) Plaintiff's employment was terminated effective January 20, 2015. (Pl. Dep. Ex. 3.)

**L.    Plaintiff's Employment Following Dismissal from McDaniel**

Following Plaintiff's dismissal from McDaniel, he became employed by William Patterson University as a Visiting Associate Professor, beginning on September 1, 2015, earning a salary of $82,177.28 plus benefits. (Ex. 32, Naumov Ans. to Interr. Nos. 7.) Plaintiff's salary at William Patterson exceeded the last salary he earned at McDaniel, which was roughly $77,000. (Pl. Dep. at 123-124, 142.) Plaintiff subsequently resigned from his position at William Patterson and accepted a position as a Visiting Associate Professor at Illinois Wesleyan University for the spring semester of 2016 and the 2016-2017 academic year. (Pl. Dep. 144-147; Pl. Dep.Ex. 6.) Furthermore, the Illinois Wesleyan University February 2015 Faculty Handbook provides that faculty have tuition benefits for their dependent children at Illinois Wesleyan University and at approximately 400 other colleges and universities, available immediately upon hire. (Glennon Aff. at ¶20.)

**M.    Other Admissions**

Plaintiff makes several other significant admissions[7] at deposition and/or in his answers to interrogatories, including the following:

---

[7] Also of significance are the following factors which Plaintiff *omits* in his complaint, interrogatories and deposition:
 ● Plaintiff makes no allegations whatsoever against Defendant Martin Hill who is never mentioned in the Amended Complaint beyond his identification as a party in ¶10;
 ● Plaintiff never attributes any of the actions taken against him to his gender;
 ● Plaintiff offers no facts suggesting that any government compelled the actions about which he complains.

●Plaintiff admits that he neither sought nor received treatment for any kind of emotional distress arising out of his employment at McDaniel College.  (Pl. Dep. at 18; Ex. 32, Naumov Ans. to Interr. Nos. 10, 11, 12.)  Plaintiff states only that, "I clearly was very upset." (Pl. Dep. at 18.)

●Plaintiff admits that McDaniel College is a private institution.  (Pl. Dep. at 248-249.)

## IV.   LEGAL STANDARDS

A party is entitled to summary judgment if the evidence in the record "show[s] that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Supreme Court has emphasized that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Trial courts should enter summary judgment "against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  Where the plaintiff fails to meet this burden "a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial." *Hayes v. Hambruch*, 841 F. Supp. 706, 708 (D. Md. 1994) (Harvey, J.) *aff'd* 64 F.3d 657 (4th Cir. 1995).  The Fourth Circuit has emphasized that trial judges have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.,* 818 F. 2d. 1126, 1128 (4th Cir. 1987).

A party responding to a motion for summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  He must submit evidence that is

"significantly probative" to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive a motion for summary judgment. *Id.* at 252; *see also Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 182 (4th Cir. 1998).

## V.   LEGAL ARGUMENT

**A.**    **COUNT I – Defendant McDaniel College Is Entitled to Summary Judgment Because Plaintiff Has Failed To Provide Any Evidence That McDaniel Discriminated Against Him Because of His Gender.**

Title IX of the Education Amendments of 1972 ("Title IX") prohibits sex discrimination in education programs and activities of colleges receiving Federal financial assistance. 20 U.S.C. §§ 1681 et seq.; 34 C.F.R. § 106. Within its regulations, Title IX requires an educational institution receiving federal funds to "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints" alleging any action which would be prohibited by Title IX. (*See* 34 C.F.R. § 106.8(b); *see also* Dear Colleague Letter of April 2011.[8]) Colleges are informed to "conduct investigations and hearings to determine whether sexual harassment or violence occurred" and to use a preponderance of the evidence standard to evaluate complaints. (*See* Ex. 33 (Dear Colleague Letter) at 10). Despite these general requirements "allegations that an educational institution failed to promulgate a grievance procedure or comply with other Title IX administrative requirements, with nothing

---

[8] On April 4, 2011, the Department of Education Office of Civil Rights ("OCR") issued a Dear Colleague letter on student-on-student sexual harassment and violence ("Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf and attached hereto as Ex. 33), which the OCR determined to be a "significant guidance document". (*Id.* at p.1, note 1.) While the Dear Colleague Letter focuses on students, it made clear in footnote 21 that "Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination." *Id.*

further, do[es] not give rise to a private cause of action." *Doe v. Case Western Reserve Univ.*, 2015 U.S. Dist. LEXIS 123680, *9 (N.D. Ohio Sept. 16, 2015) (*citing Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998)).   Rather, courts have recognized that a faculty member has an implied private right of action to enforce his Title IX rights on employment discrimination only if he has evidence that he has been discriminated against on the basis of sex. *See Preston v. New River Comm. College*, 31 F.3d 203, 206 (4th Cir. 1994) (Fourth Circuit recognizes an "implied right [of action under Title IX] extends to employment discrimination on the basis of gender by educational institutions receiving federal funds."); *see also Hooper v. North Carolina*, 2006 U.S. Dist. LEXIS 72268, *50-52 (M.D. N.C., Oct. 3, 2006).   "Title IX claims [...] arising from disciplinary hearings are analyzed under [several different standards, including] the 'erroneous outcome' standard, 'selective enforcement' standard, 'deliberate indifference' standard, and 'archaic assumptions' standard." *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (*citing Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003)).   Regardless of the theory or standard used by the faculty member, he must sufficiently allege material facts that demonstrate an impermissible bias based upon sex.

In this matter, McDaniel understands Plaintiff's Count I to assert that McDaniel violated Title IX by allegedly failing to follow its own procedures in resolving the harassment claims filed against him . (Am. Cp. at ¶¶ 82-90.)  To the extent that Plaintiff is not intending to assert a private cause of action under Title IX, and is only asserting a breach of contract action against McDaniel for alleged violation of its Title IX Policy, McDaniel will address that claim in Part D of its argument. *See* Part D, at page 30 of Memorandum in Support.  The Title IX Policy is the

procedure which governs complaints of harassment and sexual harassment against faculty, and which was followed in this case.[9]

However, even if this Court *were* to accept Plaintiff's allegations of procedural violations as true, which they are not, Plaintiff's failure to provide any evidence that *gender bias* was a motivation for McDaniel's alleged procedural violations is fatal to any Title IX claim. To the contrary, instead of providing evidence that gender bias was the reason for McDaniel's actions, Plaintiff instead claims that McDaniel's President and Provost retaliated against him because Plaintiff had previously requested secret paper ballots during a vote for the appointment of new Provost, Dr. Stewart.[10] (Pl. Dep. 76-78; Pl. Dep. Ex. 2.)

Although not entirely clear, Plaintiff appears to be alleging a Title IX violation based on an "erroneous outcome" theory because Plaintiff asserts that the complaint should have been dismissed against him and that his dismissal was unjust. (Am. Cp. at ¶¶60, 84.) Under this theory, a plaintiff must allege not only sufficient facts to demonstrate he was innocent of the charges and that the college wrongly found he committed the offense, but a plaintiff must also allege that the college's actions "were motived by sexual bias" or that its "disciplinary hearing process constitutes a 'pattern of decision-making' whereby the [...] disciplinary procedures governing [harassment] claims is 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'"  *Case Western Reserve Univ.*, 2015 U.S. Dist. LEXIS 123680, at *12-13 (citations omitted).

--------

[9] McDaniel denies Plaintiff's litany of allegations for the reasons set forth, in detail, in Section D, below.

[10] Plaintiff also speculated at his deposition that Dr. Stewart may have been motivated by her very aggressive feminist publications and beliefs. (Pl. Dep. at 80.) However, he immediately admitted that "[he] d[idn]'t know this" to be true and offered no evidence to support this speculation. *Id.*  Plaintiff's mere belief or summary assertion that McDaniel unlawfully discriminated against him is insufficient. *See Foreman v. Weinstein*, 485 F. Supp. 2d 608, 612 (D. Md. 2007) ("In the employment discrimination context, a subjective, even if genuine, belief of discrimination will not shield a nonmoving plaintiff from a grant of summary judgment.").

Here, Plaintiff does neither.  He offers no facts to demonstrate he was innocent of the charges, and alleges only that McDaniel failed to follow the procedures under its policy. Plaintiff offers nothing but one speculative statement regarding Dr. Stewart's "feminist" beliefs, which is not sufficient to support a claim of gender bias.  Moreover, Dr. Stewart had no role in making a decision on Plaintiff's claims.  Plaintiff admits that Dr. Stewart advised him that she did not care about the result of the investigation, and Plaintiff believed from this statement that Dr. Stewart was impartial.  (Pl. Dep. at 351.)

As a result, McDaniel is entitled to judgment as a matter of law on Count I because Plaintiff cannot produce any evidence that gender bias was a motivating factor in McDaniel's processing of the grievance and ultimate decision against Plaintiff.  *See Bleiler v. College of the Holy Cross*, 2013 U.S. Dist. LEXIS 127775, at *19 (D. Mass. Aug. 28, 2013) (Court granted summary judgment in favor of the College on plaintiff's Title IX claims because plaintiff "failed to show a genuine dispute of material fact as to the presence of impermissible bias based upon sex."); *Doe v. University of the South*, 687 F. Supp. 2d 744, 753-58 (E.D. Tenn. 2009) (Court granted university's motion to dismiss on plaintiff's Title IX claim because plaintiff failed to "allege any facts to support a finding that the University's actions were at all motivated by John Doe's gender or sex…")

**B.      COUNT II – Defendants Are Entitled to Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim Because Plaintiff Cannot Prove any of the Elements of that Tort**

Plaintiff has presented no evidence to support any of the elements for his intentional infliction of emotional distress claim and, as a result, Defendants are entitled to summary judgment on this count.  In order for Plaintiff to assert a viable claim for intentional infliction of

emotional distress, he must provide proof that: (1) the conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Caldor v. Bowden*, 330 Md. 632, 641 (1993) (quoting *Harris v. Jones*, 281 Md. 561, 566 (1977)).

First, Plaintiff has no evidence that Defendants *intended* to inflict emotional distress upon him or that Dr. Stewart or Dr. Casey's acted recklessly in response to Dr. More's complaints, or in administering McDaniel's Title IX policy. (*See* Am. Cp., ¶¶ 94-98.) It is undisputed that Dr. Stewart understood she had an obligation to bring forward Dr. More's complaint for investigation once it was brought to her attention, particularly because Dr. More reported that she was resigning her tenured position because of Plaintiff's conduct. (Glennon Dep. at 14, 71; Stewart Dep. at 23.) As to President Casey, it is evident that Dr. Casey did not act recklessly and intentionally by "fail[ing] to involve the Faculty Affairs Committee" since it is undisputed that the Faculty Affairs Committee *was involved* in reviewing Dr. Casey's sanction recommendation. (Casey Dep. at 31, 37-38.) Thus, there is no evidence that either Dr. Casey or Dr. Stewart acted intentionally or recklessly to inflict severe emotional distress upon Plaintiff.[11]  *See Foor v. Juvenile Services*, 78 Md. App. 151, 175 (1989) (Court held that plaintiff's intentional infliction of emotional distress claim fails as a matter of law because "[t]here is no suggestion that any of the defendants acted out of a desire to inflict distress upon the Foors, or that they knew that such distress was substantially certain to result, or that they knew and acted in deliberate disregard of their knowledge that there was a high degree of probability that such distress would follow.")

Second, Plaintiff's claims against Dr. Stewart and Dr. Casey – i.e. that Dr. Stewart decided  to proceed with Dr. More's complaint, and that Dr. Casey recommended dismissal of

---

[11] Notably, Plaintiff makes no allegations whatsoever against Defendant Martin Hill.

Plaintiff - are grossly insufficient to constitute "extreme and outrageous" conduct. A school's investigation of an alleged victim's allegations of sexual harassment does not constitute extreme or outrageous conduct. *See Yu v. Vassar College*, 97 F. Supp. 3d 448, 483-484 (S.D. N.Y. 2015.) (Court held that "there [wa]s nothing extreme or outrageous about [the college's] actions" when it investigated sexual harassment complaints made by an alleged victim.) Even to the extent that Plaintiff were to claim that Dr. More's complaints were false, courts have found that "[e]ven a false charge of sexual harassment does not rise to the level of outrage required to recover on an intentional infliction of emotional distress." *Routh v. University of Rochester*, 981 F. Supp. 2d 184, 214 (W.D. N.Y. 2013).

McDaniel's discipline of Plaintiff does not change this Court's analysis. Such disciplinary action falls far short of the level of "outrageousness" required to support a claim for intentional infliction of emotional distress. *See Lewis v. Schmidt Baking Co., Inc.*, 16 F.3d 614, 615 (4th Cir. 1994) (even though the employer "knew of the importance of the job to him because of his need to support a family, and knew of the stress that would result if he were fired," firing the plaintiff did not constitute the type of outrageous conduct necessary for an intentional infliction of emotional distress claim); *Kiraly v. Bd. of Education*, 2012 U.S. Dist. LEXIS 106027, at *22-23 (D. Md. July 30, 2012) (Court held that plaintiff's allegation that he had been "unfairly criticized, intentionally misled, and falsely accused of wrongdoing in an attempt either to create a pretextual cause for h[is] termination or to force h[is] resignation" did not "come close to alleging extreme and outrageous conduct supporting a claim for intentional infliction of emotional distress.") (citations omitted.)

Finally, Maryland courts have applied a stringent standard for proving "severe" emotional distress and have readily dismissed claims where the plaintiff's emotional injuries

were not sufficiently disabling to satisfy that element.  Here, Plaintiff only claimed to be "very upset" as a result of the termination of his employment with McDaniel.  (Pl. Dep. at 18.)  That allegation clearly falls short of the severely disabling standard.  *See Doe v. Salisbury Univ.*, 2015 U.S. Dist. LEXIS 110772, *17-18, fn. 6 (D. Md. Aug. 21, 2015) (in the context of a Title IX matter, the Court held that plaintiffs' "anxiety, depression, suicidal feelings, nightmares, poor concentration, and panic attacks," that they "sought assistance from a health care professional," and that they now feel "mistrustful and emotionally distant from most females" "d[id] not rise to the level of severity required under Maryland law.")  Here, Plaintiff's admission that he never sought or required any medical or psychological treatment resulting from this matter is fatal to his claims.  (Pl. Dep. at 18.)  *See Robinson v. Cutchin*, 140 F. Supp. 2d 488, 494 (D. Md. 2001) ("Proof of severe emotional distress d[id] not exist in this case…when [t]here [wa]s no indication in the record here that [plaintiff] ever treated [with] a physician for her mental anguish or that she was ever hospitalized because of her allegedly severely disabling emotional condition.")

Significantly, Plaintiff admitted that, notwithstanding any alleged emotional distress, he was able to work after his employment with McDaniel ended, finding a higher paying job than the one he had at McDaniel.  (Pl. Dep, 123-124, 142.)  Moreover, Plaintiff's spouse testified that during the period from January until August 2015, Plaintiff continued to research and author articles, including work with a co-author.  (Safirova Dep. at 78-80.)  As Plaintiff must prove that he was unable to function or tend to everyday affairs, his claim of intentional emotional distress is not supported by any fact.  *See Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007) (Court held that plaintiff's intentional infliction of emotional distress claim is not viable because even though she suffered from "severe depression, anxiety, sleeplessness, headaches and [being] sick to her stomach," she was able to function on a daily basis and work.)  Accordingly,

Defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim because he has no evidence to support a viable claim on any of the elements.

**C.    COUNT III – Defendant McDaniel is Entitled to Summary Judgment on Plaintiff's Claim under the Fourteenth Amendment to the U.S. Constitution for Violation of Due Process Because The Evidence Fails to Show Any State Action.**

In Count III of the Amended Complaint, Plaintiff sues McDaniel College for alleged violation of his due process rights under the Fourteenth Amendment to the U.S. Constitution. The Supreme Court has firmly established that the constitutional protections afforded by the Fourteenth Amendment restrain only the actions of the state and not those of private individuals or entities. *Rendall-Baker v. Kohn,* 457 U.S. 830, 837 (1982) (private school not a state actor despite public funding and "close relationship" with state); *Blum v. Yaretsky,* 457 U.S. 991, 1005-1012 (1982) (private nursing home not a state actor despite state regulation and state and federal funding.)  In this case, there are no facts to establish that McDaniel College's alleged infringement on Plaintiff's constitutional rights constitute state action.

It is undisputed that McDaniel College is a private school.  Plaintiff concedes this fact, stating, "I think McDaniel is commonly classified as a private institution." (Pl. Dep. at 248-249.) There are limited circumstances in which a private entity such as McDaniel may be deemed a state actor if its alleged unconstitutional conduct is said to be "fairly attributable" to the government. *Am. Mfgs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999).  In evaluating whether an entity's conduct is "fairly attributable" to the government, the courts have developed various tests.  While there is no specific formula for defining state action, courts typically consider the following factors in deciding whether a defendant's conduct is sufficiently attributable to the state: (1) the extent and nature of public funding to the defendant; (2) whether the private entity performs a "public function;" (3) the extent and nature of governmental regulation of the

defendant; and (4) whether there is a "symbiotic relationship" between the defendant and the state." *Rendall-Baker v. Kohn, supra; Hicks v. Southern Maryland Health Systems Agency,* 737 F. 2d 399, 402 (4th Cir. 1984.) None of those factors are present in the case at bar.

In *Rendell-Baker v. Kohn, supra,* the Supreme Court applied the above "state action" tests to facts similar to those presented in this case and found that a private school was not a state actor despite its receipt of federal funding. The Court observed that the receipt of federal funding alone does not transform an otherwise private entity into an entity of the state. *Id. at 840.* This was so even when "virtually all of the school's income was derived from government funding." *Id.* Thus, the fact that McDaniel College may receive some federal funding does not transform the College into an entity of the state.

Another means of showing state action is if the private entity performs a "public function." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352 (1974). While McDaniel College performs a public function in the literal sense as a liberal arts college, the Supreme Court has made clear that the question is whether the function is one that has been "traditionally the exclusive prerogative of the State." *Id.* The provision of schooling in and of itself is not such a prerogative. *Rendell-Baker,* 457 U.S. at 842.

Yet another possible means of showing state action is if the government, through extensive regulation, has compelled or coerced a private entity to act in a given way. *Rendell-Baker,* 457 U.S. at 841; *S. P. v. City of Takoma Park, Md.,* 134 F. 3d 260, 269 (4th Cir. 1998). However, the courts which have considered this issue appear to agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures. *See, e.g. Doe v. Washington & Lee University,* 2015 U.S. Dist. LEXIS 102426 (W.D. VA. Aug. 5, 2015); *Doe v. Columbia University,* 2015 U.S. Dist. LEXIS 52370 (S.D.N.Y. April 21, 2015); *Vu v. Vassar*

*College*, 2015 U.S. Dist. LEXIS 43253 (S.D.N.Y. Mar. 31, 2015).  In order to establish state action under this test, Plaintiff would have to show that the government compelled the act of which Plaintiff complains. *Doe v. Washington & Lee University, supra at \*23.*

Just as the court in *Doe v. Washington & Lee University* found, in the case at bar, there is no evidence that the government deprived McDaniel College of its autonomy to investigate and adjudicate charges.   Furthermore, there is no evidence that the government participated in McDaniel's decision making process at any stage of the proceedings.  Both of these factors are crucial to the determination of whether a school's actions are attributable to the government. *Id.* at \*24.  Plaintiff cannot make such a showing.

Still another means of demonstrating that state action exists is when there is a "symbiotic relationship" between the defendant and the state—i.e. when "[t]the State has so far insinuated itself into a position of interdependence [with the private party] that it must be recognized as a joint participant in the challenged activity. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961) (finding a private restaurant located on public land that received public support was a state actor when it refused to serve African Americans.)  However, the relationship must be extensive and intertwined enough that it could be said that the government is responsible for the private entity's conduct. *Id. at 724.*   A symbiotic relationship can be shown only when the state has profited from the challenged actions of the defendant. *Hicks v. Southern Maryland, 737 F. 2d 399, 402* (4th Cir. 1984.).  A defendant's fiscal relationship with the state, without more, does not establish state action.

In this case, there are no facts which show a symbiotic relationship between McDaniel College and the state.  Such a relationship cannot be inferred from the fact that McDaniel may receive some level of federal funding. See *Rendell-Baker*, 457 U.S. at 842-843.

Plaintiff cannot satisfy any of the various tests to establish that McDaniel College is a state actor, thus McDaniel College should be awarded summary judgment on Count III.

**D.     COUNT IV – Defendant McDaniel is Entitled to Summary Judgment On Plaintiff's Claim for Breach of the Faculty Handbook Because McDaniel Complied with All of the Procedures for Addressing Harassment Complaints Against Faculty Members Contained in its Title IX Policy, As Required by the Faculty Handbook**

It is clear from a review of the McDaniel Faculty Handbook that the College and its faculty agreed that complaints of harassment or discrimination against faculty members were to be handled by specific procedures which were different than those generally contained in the Faculty Handbook.  The procedures that were to be followed were those found in the McDaniel Title IX policy, which specifically governed complaints of harassment and discrimination, and which included consideration of the sanction of dismissal.   McDaniel did not breach the Faculty Handbook in its investigation and dismissal of Plaintiff, since McDaniel followed the specific procedures called for in the Faculty Handbook for dealing with complaints of harassment against faculty members, i.e. the McDaniel Title IX policy.

Although the Faculty Handbook admittedly contains somewhat different procedures for addressing other types of complaints against faculty (e.g. those complaints which are not related to harassment or discrimination,) this does not nullify the separate complaint procedure directed by the Faculty Handbook for harassment and discrimination complaints.[12]

---

[12]Under Maryland law, there is a well-established rule of contractual construction that where two provisions of a contract are seemingly in conflict, they must, if possible, be construed to effectuate the intention of the parties as collected from the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design. And, if a reconciliation can be effected by a reasonable interpretation, such interpretation should be given to the apparently repugnant provisions, rather than nullify any. *Heist v. E. Sav. Bank, FSB*, 165 Md. App. 144 (Md. App. 2005), citing *Chew v. DeVries*, 240 Md. 216, 220-21 (1965.)  Also, where two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it. *Heist, supra, citing, Fed. Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 472, 341 A.2d 399 (1975) (citations omitted).

McDaniel College does not claim that Plaintiff was an at-will employee who could be terminated with or without cause or notice.  Admittedly, as a tenured faculty member, Plaintiff was entitled to the application of certain policies and procedures in the consideration of the harassment complaint filed against him, and in consideration of the sanction of dismissal.   However the procedures to which Plaintiff was entitled were those found in the McDaniel Title IX policy, and not the general dismissal procedures described in the Faculty Handbook or as described by the American Association of University Professors ("AAUP") (as Plaintiff would have the Court find.)   The conclusion is evident from a review of the Faculty Handbook itself.

Each of the three McDaniel College Faculty Handbooks[13] which were in effect from April 2014 through January 2015 contained the identical Equal Opportunity Statement, and a Policy on Sexual Harassment and Sexual Discrimination, which direct faculty to the College "Affirmative Action/Equal Opportunity Manual, available on the Portal" for a complete guide to College policies on equal employment. (Glennon Aff. ¶6.)   Each of the Handbooks further provide in Section 4.4.7 (Grievances, Complaints), that, "[w]hen a grievance is alleged to be discrimination or harassment, procedures outlined in the Affirmative Action Manual will be followed." *Id.* The referenced Affirmative Action, or AA/EEO, manual included the McDaniel Title IX policy as Appendix B. (Glennon Aff. ¶7.) The Title IX policy was periodically updated (even while the AA/EEO Manual was not) and the June 2014 Title IX policy was the version which was in effect at the time that a Title IX complaint was filed against Plaintiff in September 2014. (Glennon Aff. ¶8; Glennon Dep. at 9-10; Ex. 12.)

---

[13] The February 2014, August 2014 and December 2014 Faculty Handbooks were in place between April 2014 and January 2015.  (Glennon Aff. at. ¶6.)

Plaintiff cannot deny that the McDaniel Title IX policy was distributed to all faculty and that all faculty were required to complete training on the policy. (Glennon Aff. at ¶9.) Nor can he dispute that the Provost (Dr. Stewart) and the College Title IX Coordinator (Glennon) advised him that the Title IX complaint against him would be governed by the McDaniel Title IX policy. (Stewart Dep. at 32; Ex. 34, Jennifer Glennon email to Plaintiff dated Sept.13, 2014.)  Furthermore, it is beyond dispute that the McDaniel June 2014 Title IX policy provided procedures for the sanctioning of offending employees, up to and including dismissal, following a finding of a Title IX violation. (Ex. 12 at p. 13.)  Since the Faculty Handbook expressly refers faculty to the separate policy for the adjudication of discrimination and harassment complaints, and since that policy includes the College's specific "Title IX Policy" for the adjudication of harassment grievances (including the sanction of dismissal,) it is evident that the procedure which was contractually guaranteed to Plaintiff in this case was the McDaniel Title IX policy – and not the general dismissal policy found in the Faculty Handbook.

Accordingly, McDaniel did not owe Plaintiff a duty to follow the general dismissal procedures contained in the Faculty Handbook (or in the referenced AAUP guidelines), but rather owed him a duty to follow the more particularized procedures, including dismissal procedures, contained in the Title IX policy for consideration of harassment grievances.

### 1.    McDaniel Was Required to Adopt Title IX Grievance Procedures In Order to Comply with Federal Law

Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq., is a federal civil rights law that prohibits discrimination on the basis of sex in federal funded education programs and activities.  Public and private schools receiving any federal assistance must comply with Title IX. Title IX's implementing regulations and guidance requires that schools "adopt and publish grievance

procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited." 34 C.F.R. § 106.8(b).  *See also* the April 4, 2011, Dear Colleague letter (Ex. 33) issued by the Department of Education Office of Civil Rights.

The Dear Colleague Letter announced a number of requirements that must be included in a school's grievance procedure in order to be compliant with Title IX.  For example, the letter directed that schools "must use a preponderance of the evidence standard;" and that grievance procedures that use the higher "clear and convincing evidence standard" are inconsistent with the standard of proof established for violation of the civil rights laws, and are thus not equitable under Title IX. *Id* at p. 11.

In other areas, the Dear Colleague Letter provided guidance, for example, by strongly discouraging schools from allowing parties personally to question or cross examine each other during the hearing.  *Id.* at p. 12.

It is beyond dispute that McDaniel, as the recipient of federal funding, was required to comply with Title IX and to adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited." 34 C.F.R. § 106.8(b).

## 2.    McDaniel Complied with the Title IX Procedures Contained in its Title IX Policy, and Plaintiff Offers No Evidence to the Contrary

Plaintiff repeats, over and again, the alleged procedural violations which he claims McDaniel committed.  However, upon examination, it is evident that all of the alleged violations about which he complains either (a) do not exist in any McDaniel policy; (b) are not contained in the applicable McDaniel Title IX policy; or (c) were fully complied with by McDaniel College:

a.   **Alleged Violations which do not Exist in any McDaniel Policy**

•Plaintiff's most frequent complaint (repeated in various forms no less than 14 times) is that only Dr. More was entitled to serve as the Complainant against him (*See* Am. Cp. ¶¶23, 25,  43, 44, 45, 48, 49, 66, 67, 88, 90, 94, 95, 97.)  However, Plaintiff cannot identify any McDaniel policy that *requires* that the purported victim (in this case, Dr. More) must serve as the Complainant in a Title IX complaint.  In fact, the McDaniel Title IX policy is silent about the procedures the College was to follow if a purported victim requested not to testify.  (Ex. 12.)  In light of the 2011 Dear Colleague letter, McDaniel understood that it had a responsibility, imposed by the federal government, to bring forward any complaint of sexual harassment or sexual assault of which the administration became aware.  (Casey Dep. at 18-20; Stewart Dep. at 23, 57, 59.); *see Karasek v. Regents of the Univ. of Cal.*, 2015 U.S. Dist. LEXIS 166524, *14-15 (N.D. Cal. Dec. 11, 2015) (Court noted that, according to the Dear Colleague Letter, once a school has knowledge of harassment, it "must take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.").   "In other words, [McDaniel] may be liable if they were "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *See HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 U.S. Dist. LEXIS 141252, *48-49 (S.D. N.Y. Sept. 27, 2012) (citation omitted.)  Moreover, since McDaniel policies do not contain any prohibition against another individual serving as the Complainant in such instances, it follows that McDaniel was not in breach of any contract for allowing Dr. Stewart to serve as the Complainant in  Dr. More's absence.

•Plaintiff complains that the investigator never interviewed him. (Am. Cp. ¶19, 21.) Plaintiff can identify no policy which provided him with the right to an interview.

35

•Plaintiff complains that he was banned from campus, the lock to his office was changed, and he was shut out of campus emails, which prevented him from refuting charges.  (Am. Cp. ¶¶26, 30, 39, 71.) Plaintiff can identify no policy which provided him with the right to remain on campus, continue to use College email, or to access his office.  In fact, Plaintiff was advised that he could return to campus with prior notice; and that Glennon could assist him in contacting witnesses. (Glennon Aff. at ¶21.)  Additionally, it is evident that Plaintiff had full access to his existing email since he produced extensive email from his campus email account to the Grievance Committee and during discovery. (Glennon Aff. at ¶22.)  Plaintiff was only restricted from *future* use of the College email server.  *Id.*  Since Plaintiff also admits that he copied all relevant documents (including email) from his McDaniel college computer to Dropbox before he returned the computer to the College it is evident that he had full access to his history of emails.  (Pl. Dep at 100-103.)  Plaintiff also offered witnesses at the Grievance Committee and participated at all levels of appeal.  (Glennon Aff. at ¶ 23.)

•Plaintiff claims it was wrong for Dr. Stewart to preside over the informal resolution meeting and also serve as the Complainant. (Am. Cp. ¶33.) However, no policy dictates otherwise and in neither position was Dr. Stewart acting as the decision maker.  Additionally, after Dr. Stewart served as the Complainant on September 8, 2014, she recused herself from all further consideration of this case (Stewart Dep. at41-42, 61-62), thus eliminating any potential bias.

**b.    Alleged Violations which are Not Contained in the Applicable Title IX Policy**

•Plaintiff repeatedly complains that Dr. More did not testify against him. (Am. Cp. ¶¶25, 42, 43, 48, 49, 97.)  Similarly, he claims he had no right to confront witnesses and remain in the hearing room. (Am. Cp. ¶¶40, 41, 87, 112.)   The relevant Title IX does not require that the purported victim

testify against the respondent, nor does it allow the parties an opportunity to question one another, or to cross-examine or confront witnesses. (Ex. 12.) To the contrary, the McDaniel Title IX policy provides that the Grievance Committee will pursue its investigation in "separate hearings". *Id.* at p. 11. (This procedure is consistent with the guidance found in the Dear Colleague Letter that strongly discouraged schools from allowing parties personally to question or cross examine each other during the hearing. (Ex. 33, at p. 12.) Although the AAUP dismissal procedures provide faculty with the right, within reason, to question all witnesses who testify, that right is not contained in the Title IX policy, and cannot serve as the a basis for a breach of contract claim in this case.

- Plaintiff claims that only hearsay evidence was presented against him. (Am. Cp. ¶24.) While Defendant disputes this claim, it is immaterial since Title IX does not apply the rules of evidence to either party. (Ex. 12.) Moreover, Plaintiff cannot dispute that he also presented hearsay evidence in his submissions to the Grievance Committee, Appeals Panel, FAC and Board of Trustees.

- Plaintiff alleges that Dr. Stewart asked him to resign, without consulting the FAC, in alleged violation of the AAUP. (Am. Cp. ¶20.) The Title IX policy contains no requirement that McDaniel consult the FAC before offering Plaintiff the opportunity to voluntarily resign with severance. (Ex.8.)

- The Title IX policy does not provide that an employee can be suspended only where he poses a threat or has been previously charged. (Am. Cp. ¶36.)

- Plaintiff complains that he should have been allowed to testify before the Appeals Committee and Dr. Casey. (Am. Cp. ¶87.) However, the Title IX policy provides that "Appeals will be based on the record of the hearings created by the Grievance Committee," and that "at the

discretion of the appeals panel, additional proceedings may be held." (Ex. 12 at p. 14.)   The Title IX policy contains no right to a hearing before the President. *Id.*

●Similarly, Plaintiff complains that he should have been allowed to testify before the Faculty Affairs Committee ("FAC").   (Am. Cp. ¶74.)   However, it is undisputed that Plaintiff provided a lengthy written submission to the FAC.   (Pl. Dep. Ex. 2.)   Even if Plaintiff were entitled to be "heard in his own defense," as he asserts, Plaintiff cannot point to any requirement that the elected FAC must afford him an in-person hearing, as part of its proceedings.   Nor is Plaintiff correct when he alleges the FAC was improperly limited in its role to affirm or deny, or when he alleges that the FAC was required to hold a hearing (Am. Cp. ¶78,85.)   The Title IX policy provides only that in cases in which it is recommended that a faculty member be dismissed, the President will seek the additional recommendation of the Faculty Affairs Committee. (Ex. 12 at p. 13.)   There is no language in the Title IX policy which requires that the FAC play a greater role, or which mandates that the FAC hold hearings. *Id.*

●Plaintiff complains that all hearings with the complainant, respondent, and witnesses were to be recorded.   (Am. Cp. ¶72.) In fact, the Title IX policy requires only that the Formal Hearings of the Grievance Committee will be recorded.   (Ex. 12 at p. 11.) It is undisputed that the Formal Hearings of the Grievance Committee were recorded in this case.   (Glennon Dep. at 84-85.) However, the Title IX Policy provisions on Appeals and review by the Faculty Affairs Committee and Board of Trustees do not contain any requirement for a recording. (Ex. 12 at pp.13-15.)   Nor does the Title IX policy provide that recordings were to be provided to the parties. *Id.*

●Plaintiff incorrectly alleges that the Grievance Committee was to have recommended sanctions. (Am. Cp. ¶¶58, 59, 86.)    In fact, the McDaniel Title IX policy is silent about which individual or body is to make the recommendation for sanctions.   (Ex. 12 at p. 13.)

• Plaintiff appears to complain that the Grievance Committee should have only considered the narrative portion of the Grievance complaint as an allegation of stalking (and not in support of the claims of harassment or hostile work environment,) and should have dismissed the entire complaint once it found him not responsible for stalking. (Am.Cp. at ¶46.)  No language in the McDaniel Title IX policy or in its related forms suggests such a narrow reading of the policy. (Ex. 12.)

• Plaintiff also complains that after Dr. Stewart recused herself from the Appeals Panel, no one was appointed to replace her.  (Am. Cp. ¶54.)  The McDaniel Title IX policy is silent about the procedure should a member of the Appeals Panel be recused. (Ex. 12.) Regardless, two members of the Appeals Panel remained, who voted to uphold the Grievance Committee finding (except for retaliation) and upheld the sanction recommendation.  (Ex. 24, Appeals Panel Decision dated Nov. 21, 2014; Ex. 27, Appeals Panel Decision dated Dec. 3, 2014.)

• Nor can Plaintiff assert a breach of contract claim because the Appeal Panel had no faculty representation.  (Am. Cp. ¶55.)   The Title IX policy provided for the composition of the Appeals Committee, by title, and did not include faculty. (Ex. 12 at 14.)  Plaintiff has no contractual right to have faculty representation on the Appeal Panel.

• Plaintiff complains that a member of the Appeal Panel (the Chief Financial Officer "CFO") was present when Dr. Stewart provided him with the opportunity to resign, and appeared to be biased. (Am. Cp. ¶56-57.) However, the Title IX Coordinator testified that the Chief Financial Officer, Tom Phizacklea, was only present as a witness when Dr. Stewart met with Plaintiff in August 2014; and she denied that Phizacklea possessed other information which was possibly prejudicial. (Glennon Dep at 97.)  Moreover, since Plaintiff has offered no evidence, beyond mere

suspicion, to support his claim that the CFO "appeared to be bias," that allegation should be disregarded.

     c.     **Alleged Violations with which McDaniel Fully Complied**

     ●Plaintiff repeatedly claims, in error, that the complaint against him should have been denied on the basis that Dr. More was unwilling to be identified. (Am.Cp. ¶¶69, 70, 84, 111.)  Plaintiff relies on the Title IX provision which provides that,

> "If a formal hearing is instituted, the name of the complainant will be disclosed to the Grievance Committee; however, the formal hearing may be postponed until such time as the complainant is willing to be identified (e.g., until final grades are in or appointment renewals made), at the discretion of the chairperson of the Grievance Committee.  In the event that the complainant is unwilling to be identified, the formal hearing will be dismissed, no action will be taken and no report of any action will be filed." (Ex. 12 at p. 11.)

Ours is not such a case.  Plaintiff was told during his August 2014 meeting with Dr. Stewart that Dr. More was the individual who had made harassment allegations against him.  (Safirova Dep. at 34.)  Following the Grievance Committee Preliminary Hearing on October 7, 2014, Plaintiff was told by Ms. Glennon that the Provost, Dr. Stewart, was serving as the Complainant.  (Glennon Aff. at ¶25.)  Thus, this is not a situation where an unknown complainant is unwilling to be identified.

     ●Plaintiff incorrectly alleges bias on the part of the Provost, Dr. Stewart (Am. Cp. ¶22.)  After Dr. Stewart filed her complaint on September 8, 2014, she recused herself from any other consideration of this case (Stewart Dep. at 41-42, 61-62,) thus eliminating any potential bias.

     ●Plaintiff complains the investigation report was not given to him; and that the information in the report was not given to him until the day of the hearing. (Am. Cp. ¶¶27, 28.) However, the Title IX policy provides only that the written notification will include the "basic nature of the charge and allegations," which were provided to Plaintiff by letter on September 15, 2014 when the Title IX Coordinator forwarded Dr. Stewart's complaint to Plaintiff. (Ex. 12 at p. 11; Glennon Aff. at ¶24.)

• Plaintiff claims that he was provided with only a summary of the Grievance Committee findings. (Am. Cp.¶29.)  He explained that the letter he received with the Grievance Committee findings did not have the signatures of the members, lacked the word "Decision" and did not state that the decision was made by a majority. (Pl. Dep. at 208-212.)   However, the Title IX policy requires only "written notification of the decision," with no requirement that the notification include member signatures, the title "Decision," or the fact that the decision was by majority vote. (Ex. 12.)

• Plaintiff repeatedly alleges that the complaints against him were filed after the 90 day deadline stipulated in the Title IX policy. (Am. Cp. ¶¶35, 37, 38, 96.)  [In fact, the Title IX policy provides that, "Any complaint must be reported to an advisor within 90 days of the occurrence." (Ex. 12 at p. 10.)]  In this case, it is undisputed that some of the complaints which Dr. More reported to Dr. Stewart (e.g. that Dr. More was resigning her tenured position because of unwanted attention from Plaintiff, and that Plaintiff continued to invite her to dine privately with him prior to her departure) occurred in the spring of 2014 and were reported to an advisor (Julie Jasken) in the spring of 2014, within 90 days of the occurrence.  (Glennon Dep. at 15; Stewart Dep. at 20.)  Several other complaints made by Dr. More about Plaintiff contained no specific dates.  (Ex. 8.)   Since some of the alleged violations were timely filed, Plaintiff has no basis for a claim for breach of contract.

• Plaintiff's complaint that there was no informal process (Am.Cp. ¶63, 64, 110) is contradicted by his own allegation that Dr. Stewart presided over the "informal resolution" meeting (Am. Cp. ¶34.)

• Plaintiff complains that he was not given the opportunity to be accompanied by an adviser of his own choosing who may act as counsel. (Am. Cp. ¶27.)   Since the Title IX policy is silent about the right to counsel, Plaintiff had no contractual right to be accompanied by counsel.  (Ex. 12.)

Moreover, Plaintiff never requested counsel nor to be accompanied by an advisor of his own choosing other than the ombudsman. (Glennon Aff. at ¶10.)

●Finally, Plaintiff alleges that the Grievance Committee decision was not personally hand-delivered to him. (Am. Cp. ¶¶50, 51, 52.) Plaintiff admits that that he and the Complainant (Dr. Stewart) both received the decision by email (Pl. Dep. at 220), but complains that he wanted the decision to be hand-delivered to "guarantee that whatever is delivered is proper." *Id.* The Title IX policy provides that,

> "[w]ithin 48 hours of a decision by the Grievance Committee, the Grievance Committee chair and the Title IX Coordinator will attempt to deliver written notification of the decision in person to both parties. In the event that attempts to notify the parties in person within 48 hours of the decision are unsuccessful, the Title IX Coordinator shall email a copy of the decision to both parties."

(Ex. 12 at p. 12.)

The Title IX Coordinator explained that because Plaintiff was not on campus, email was the most expedient way to honor the obligation to provide the decision within 48 hours. (Glennon Dep. at 94-95.) In fact, Plaintiff did not even reside in the Westminster community (where hand-delivery might have been feasible), but resided in Rockville, Maryland in a different county. (Glennon Aff. at ¶26.) Defendant McDaniel maintains that its successful efforts to provide notice of the Grievance Committee outcome satisfies the requirements of the notice provision. Even in the event that the Court might view this trivial deviation as a technical breach of the McDaniel Title IX policy, Plaintiff has identified no damage he suffered as a result of the method of delivery, nor does he claim that he was treated unequally with regard to notice.

Accordingly, since McDaniel complied with all of its contractual obligations under the applicable Title IX policy, and because Plaintiff is not entitled to the general dismissal procedures provided by the Faculty Handbook, Plaintiff's claim for Breach of the Faculty

Handbook (Count IV) should be dismissed. Further, to the extent that Plaintiff may be claiming breach of the McDaniel Title IX policy, that claim also should be rejected since McDaniel fully complied with the terms of the McDaniel Title IX policy.

Since McDaniel complied with its own stated Title IX policy and procedures for investigating, sanctioning and reviewing claims of harassment, the Court should not second guess the decisions of the many McDaniel College committees and other entities which evaluated and affirmed the charges against Plaintiff and the sanction of dismissal. Courts in Maryland hold that employers, not the judiciary, should have the authority to make personnel decisions regarding their employees, without intervention from the Court, provided those judgments are lawful. "[A]n employer does not contract away his core function as ultimate fact-finder with regard to an employee's workplace performance" especially when a separate agreement grants the employer that authority. *Towson Univ. v. Conte*, 384 Md. 68, 84-87, 101 (2004); *see also Britton v. Tech., Automation & Mgmt., Inc.*, 2008 U.S. Dist. LEXIS 47411, *11-12 (D. Md. June 16, 2008.) (Court held that the employer's provision granting the Board of Directors with the sole and absolute discretion to determine whether to terminate an employee for cause ("'termination for cause' shall be . . . determined in the sole and absolute discretion of a majority of the Board of Directors voting at a duly authorized meeting of Directors . . . .") was not substantively unconscionable, and is permitted under Maryland law.)

## VI.    CONCLUSION

For the foregoing reasons, Defendants McDaniel College, Dr. Roger Casey, Dr. Jeanine Stewart and Mr. Martin Hill, respectfully submit that they are entitled to summary judgment with respect to all claims asserted by Plaintiff in his Amended Complaint.

Dated:  April 4, 2016                         Respectfully submitted,

                                              _____/s/_____
                                              Gil A. Abramson (01240)
                                              Eileen Carr Riley (23758)
                                              JACKSON LEWIS P.C.
                                              2800 Quarry Lake Drive, Suite 200
                                              Baltimore, MD  21209
                                              Phone:  (410) 415-2000
                                              Fax:     (410) 415-2001
                                              Gil.Abramson@jacksonlewis.com
                                              Eileen.Riley@jacksonlewis.com

                                              *Counsel for Defendants,*
                                              *McDaniel College, Inc.*
                                              *Dr. Roger Casey*
                                              *Martin Hill*
                                              *Dr. Jeanine Stewart*

4846-5973-1502, v. 10

44