# Exhibit 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3

 4                                     )
 5   PAVEL NAUMOV,                     )
                                       )
 6            Plaintiff,               )
                                       )
 7      -vs-                           ) No. 8:15-cv-00482-GJH
                                       )
 8   MCDANIEL COLLEGE, INC., et al.,   )
                                       )
 9            Defendants.              )
                                       )
10

11

12

13

14            DEPOSITION OF PAVEL NAUMOV

15               DECEMBER 4, 2015

16              BALTIMORE, MARYLAND

17      REPORTED BY:   LAURA MAES, CSR NO. 9836

18

19

20

21   JOB NO. WDC-066265

22   PAGES: 1 - 379
```

```
 1        A.    Yeah.

 2        Q.    Was that a skin thing?

 3        A.    Yeah.

 4        Q.    All right.  You've had no treatment

 5   for any kind of emotional distress; is that

 6   correct?

 7        A.    This is correct.

 8        Q.    And you have -- you've had no

 9   treatment about -- for any condition, medical

10   or psychological, arising out of your

11   employment or the termination of your

12   employment with McDaniel; is that correct?

13        A.    Well, I clearly was very upset, and

14   everyone who talk -- talks to me is -- says

15   it.  But I don't -- I don't know if it

16   qualifies as a medical condition.  I'm not an

17   expert to decide.

18        Q.    Okay.  Just the sort of normal upset

19   that one would feel if they -- when they lost

20   their job?

21        A.    I don't have experience to compare it

22   to.
```

```
 1    details of this, including dates when hormones

 2    would be administered.  Which is --

 3    coincides -- which is a function of menstrual

 4    cycle, so she would report to me those details

 5    as well.

 6              That's what I mean by being close

 7    friends.

 8       Q.   Okay.  Did you think that, on the

 9    basis of those types of conversations, that

10    you had a -- some sort of a special

11    relationship with Dr. More?

12       A.   "Special" is very vague and unclear

13    to me.

14              Can --

15       Q.   Yes.

16              How would you characterize your

17    relationship?

18       A.   I think our relation is very

19    complicated as everything else changes with

20    time.

21              If you ask me for an overarch

22    statement, I would describe her as my very
```

```
 1    close friend, as my co-author of 12 papers,

 2    and so a very close research partner -- I

 3    haven't published papers -- more papers with

 4    anyone else than I did with her -- and, of

 5    course, a colleague in one of two people in a

 6    two-person program.

 7         Q.   That's it?

 8         A.   Yes.

 9         Q.   Okay.  So let's go back to

10    August 30th, 2014.

11              What conversations did you have with

12    Carol Boner?

13              B-o-n-e-r, is that how you spell it?

14         A.   I believe so.

15              I contacted her and I asked her to

16    testify in the hearing committee.

17         Q.   And tell me your conversations, what

18    you can remember.

19         A.   Well, she asked, "What exactly I want

20    to testify?"

21              And I said that "You always leave --

22    on the days when you are in, you always leave
```

1        A.    I had very regular meetings and

2    e-mails and phone conversations with Jeff.  I

3    first started it with after Jeff -- Jenny

4    suggested me to contact him.

5        Q.    Okay.  And he was -- what was his

6    position?

7        A.    He is -- well, okay.  He is Ombudsman

8    Alternative, I believe.  I don't know if he

9    still holds this title or not.

10       Q.    Okay.  And he helped you with your

11   claims?  He helped you with -- not your

12   claims.

13             He helped you with your defenses?

14       A.    I think we just talked.  You know,

15   when you are in a position like this, it's --

16   it's important some -- to talk to somebody.

17   But it was more than him giving me any...

18       Q.    And did you find that helpful to you?

19       A.    Yes.

20       Q.    Did -- do you know if he wrote any

21   documents on your behalf or about you?

22       A.    Yes, he is one of my references.  And

```
 1    computer.

 2         Q.   All right.  All right.  When you

 3    filed your original complaint in this case

 4    last December, what documents did you review

 5    in order to help prepare that complaint?

 6         A.   All those documents have been

 7    produced.

 8         Q.   Well, what are they?

 9         A.   My correspondence with Ms. Glennon,

10    my letter -- well, letters that I received

11    from Defendant Casey, the copy of decisions of

12    committees -- appeal committees, also -- let

13    me think.

14         Q.   Okay.

15         A.   Oh, also the letter from Ombudsman

16    Dr. Marx to Defendant Casey.

17         Q.   How about your December 22nd, 2014,

18    to the Faculty Affairs Committee?

19              Do you remember that one?

20         A.   Yes.

21         Q.   Okay.

22         A.   But I -- I don't think I reviewed it
```

1    in preparing the lawsuit.

2        Q.    Okay.  Did you give it to your

3    attorney?

4        A.    Of course.

5        Q.    All right.  Before the lawsuit got --

6    the complaint got drafted?

7        A.    It was somewhere in the midst of it.

8    I don't remember in which order, I think,

9    specific.

10             MR. ABRAMSON:  Let's mark this as

11   Exhibit 2.

12             (Exhibit 2 was marked for identification.)

13   BY MR. ABRAMSON:

14       Q.    This is the letter (indicating)?

15       A.    So to answer your question now after

16   -- given different information, given the date

17   of this letter, I believe it was already

18   after -- after I talked to my counselor about

19   lawsuit.

20       Q.    Okay.  All right.  So this a letter

21   that you wrote?

22       A.    Mm-hmm.

```
 1        Q.    All right.   In the letter, you

 2   indicated that something happened at the

 3   spring 2013 faculty meeting when the president

 4   of the college asked the faculty to affirm the

 5   appointment of a new provost; correct?

 6        A.    That's correct.

 7        Q.    And you asked for a paper ballot?

 8        A.    That's correct.

 9        Q.    You mean a secret ballot?

10        A.    Yes.

11        Q.    All right.   And the president

12   wouldn't do that?

13        A.    I don't think that the president had

14   any react- -- I think the president said that

15   that would break the purpose of this because

16   -- I am not quoting directly because it has

17   been too many times -- years ago -- but he

18   said that the goal of this vote is to -- to

19   have unanimous support, and if we do paper

20   ballots, then it destroys the purpose.

21        Q.    So he didn't do it?

22        A.    Huh?
```

```
 1        Q.    So that did not happen?

 2        A.    It did happen.

 3        Q.    It did happen, okay.

 4              Then you write that a year later, the

 5    provost and the president retaliated against

 6    you and forced you to leave the college?

 7        A.    Yeah.

 8        Q.    Okay.  And --

 9        A.    Yes.

10        Q.    All right.

11              -- and that those are the people you

12    believe who retaliated against you by forcing

13    you to leave?

14        A.    I believe so.

15        Q.    Okay.

16        A.    Well, you're asking me about the

17    motives.  That is the most motive on the

18    surface.  They might --

19        Q.    Of course --

20        A.    This is a motive on the surface.  I

21    don't -- there might have been other motives

22    as well.  I don't know about this.
```

1      Q.   All right.  This is what you believe

2   the motives were.  To your knowledge, these

3   were the motives.

4           You -- you think there might be

5   others, but you don't know that; is that

6   correct?

7      A.   Well, I believe we had interactions

8   with Defendant Stewart, and her motives might

9   come from those interactions.  I also believe

10   that she --

11      Q.   Don't say "she."  Tell me

12   "Dr. Somebody" or use a last name.

13      A.   I also believe that Defendant Stewart

14   had lots of very aggressive feminist

15   publications, and she might have taken this

16   side due to her beliefs.

17      Q.   "Might"; so you don't know that for a

18   fact?

19      A.   I don't know this.  So you're asking

20   me if maybe other reasons?  I don't know.  I'm

21   --

22      Q.   Okay.  So if you don't know, say you

```
 1    know.

 2        Q.    Okay.  So when the provost herself,

 3    in her own name, filed a complaint -- initial

 4    complaint against you, that was part of this

 5    retaliation?

 6        A.    That appears so.

 7        Q.    Okay.  And all the proceedings after

 8    that, part of the retaliation -- appears to be

 9    part of the retaliation to you?

10        A.    It appears to be part of a plan to

11    me.  Again, it's hard to talk about people's

12    motives.  I...

13        Q.    Right.  And that's a plan between the

14    president and the provost, as stated there?

15        A.    Yes.

16        Q.    Okay.  And this letter you wrote all

17    by yourself, Exhibit 2?

18        A.    I wrote a draft, my wife read it, and

19    I believe my counselor looked at it.

20        Q.    You were represented at the time?

21              You had a lawyer at the time that you

22    wrote this?
```

```
 1    time sitting at Panera Breads in Westminster

 2    and talking before my ceremony -- before my

 3    testimony at the hearing.  So eventually they

 4    had just kicked us out from Panera.

 5          Q.   What, if anything, did -- is it

 6    Dr. Marx?

 7          A.   Correct.

 8          Q.   -- Dr. Marx tell you about when --

 9    when he presented his list of 18 concerns to

10    the president?

11          A.   Dr. Marx told me that Defendant Casey

12    listened to him and said that "He will leave

13    you his concerns," and Defendant Casey is in

14    touch with his legal representative who

15    believes everything is okay.

16          Q.   Okay.  Then ultimately, in your

17    words, "The president made an unjustified and

18    vindictive decision" to dismiss you.

19               Do you agree with what you wrote

20    here?

21          A.   Yes.

22          Q.   Okay.  Vindictive in retaliation
```

```
1    for..?

2         A.    Correct, because I see absolutely no

3    other reason.  I had very little interaction

4    with Defendant Casey.  I just -- we didn't

5    cross anywhere.  I can go -- just a couple of

6    times when we talked.  I remember once at the

7    end of a faculty meeting, but...

8         Q.    Okay.

9         A.    So I don't see any other reasons

10   where we could have stepped on each other's

11   toes.

12        Q.    Right.  So then it would be correct

13   to say that that's your view of what happened

14   and why it happened; correct?

15        A.    My view is that this is what

16   happened.

17        Q.    Got it.  Okay.

18        A.    However, I -- it's very hard for me

19   to speculate about people's motives.

20        Q.    Right.  So you don't know why it

21   happened as a fact?

22        A.    Correct.
```

```
 1        A.    I never took hard drive out of it.    I
 2   returned the whole thing as it is.
 3        Q.    All right.  Prior to returning it,
 4   did you wipe that hard drive clean?
 5        A.    Yes.
 6        Q.    All right.  Did you make a copy of
 7   the entire hard drive to any kind of external
 8   device?
 9        A.    As I said, I served -- saved all
10   relevant documents.  I did not copy the whole
11   hard drive to external device.
12        Q.    Define "relevant"?
13        A.    That have anything to do with -- so
14   basically -- okay.  My life on computer
15   consisted of me leaving in a Dropbox.
16              You know what Dropbox is; right?
17        Q.    Huh-uh, I don't.
18        A.    Its -- its online service
19   synchronizes multiple computers.  Okay?  So I
20   have a laptop, I have --
21        Q.    Oh, Dropbox?  I know that.  Okay.
22        A.    Yeah.
```

1           -- my own -- my own desktop, and

2      there's the Cloud, and all this information is

3      shared between those things.  And I also use

4      some other places where I store information

5      online, and it's shared in a similar way.

6           So if -- e-mails are shared on the

7      server; they are not stored locally.  They're

8      cached locally, but they're supported on the

9      server.  So when I returned your computer,

10     there was no nothing really to preserve

11     because everything was mirrored in the

12     Dropbox.

13         Q.   All right.  Did you produce

14     everything that's in your Dropbox that relates

15     to the claims you're making in this case?

16         A.   There might be some -- some documents

17     related to Sara in our communication with her.

18     But also -- personal communication.  But also,

19     you know, we published 12 papers together.  We

20     had shared Dropbox folder where would -- and

21     have enormous of information about computer

22     science program and -- and our papers, which

```
 1    were edited simultaneously from two different

 2    sites.  I did not produce those.

 3         Q.   Okay.  What else did you not produce,

 4    if you can recall?

 5              But they're all in your Dropbox;

 6    right?

 7         A.   Yes.

 8         Q.   Okay.  What -- what file wiping

 9    software did you use to wipe the hard drive

10    clean?

11         A.   The one that comes with Marques

12    (phonetic).

13         Q.   Okay.  And you would agree that that

14    hard drive was part of the computer and that

15    was the college's property; correct?

16         A.   Yes.

17         Q.   Okay.  So by what right do you claim

18    you had the ability to wipe that hard drive

19    clean before returning it to the college?

20         A.   That actually was my obligation under

21    college policy for mobile devices.

22         Q.   To wipe it clean when you returned
```

```
 1    it?

 2        A.   Yes.

 3        Q.   Okay.  But you saved everything;

 4    correct?

 5        A.   Yes.

 6        Q.   When did you do that wiping?

 7        A.   I think the morning I returned it.

 8        Q.   What day was that, around?

 9        A.   I don't remember.

10        Q.   2015; correct?

11        A.   I think so.

12        Q.   All right.  After you filed your

13    initial complaint in federal court?

14        A.   That's correct.

15        Q.   Okay.

16             MR. STROUSE:  The initial complaint

17    was filed in Montgomery County.

18             MR. ABRAMSON:  Oh, in state court.

19    Okay.

20    BY MR. ABRAMSON:

21        Q.   All right.  What's your current

22    address?
```

```
 1        A.   -- emotions six years ago, and it's

 2   hard for me to -- but, yes, I...

 3        Q.   I mean, it's a big deal to -- to lose

 4   tenure?

 5             Would it be considered a big deal --

 6        A.   Probably, yeah.

 7        Q.   -- in your vernacular, I guess?

 8        A.   "A big deal," it depends; right?

 9             I mean, if you lose your wife or --

10        Q.   Yeah, I was talking --

11        A.   -- or daughter, it would be a bigger

12   deal.

13        Q.   -- in terms of tenure or not tenure.

14   I mean, when you're on a tenure-track position

15   and you don't have tenure, that's a big deal.

16        A.   As I listened and learned, there is

17   not a big difference between tenured and

18   non-tenured faculty.

19        Q.   Okay.  And for a person to give up

20   tenure, that would be a big deal, too; right?

21        A.   Yes.

22        Q.   Okay.  What was your last salary at
```

1    McDaniel, if you remember?

2        A.    Roughly, very roughly, somewhere

3    around 77,000.  I do not...

4        Q.    Okay.  And you were let go -- well,

5    you were notified that you were let go from

6    McDaniel in a letter from President Casey?

7        A.    Mm-hmm.

8              MR. ABRAMSON:  So let's mark this as

9    3.

10             (Exhibit 3 was marked for identification.)

11   BY MR. ABRAMSON:

12       Q.    And I'm showing you Exhibit 3.

13   That's the letter that you got?

14       A.    Let me familiarize myself with it.

15             That sounds like one.  I -- I mean,

16   again, it's almost a year ago, but, yes.

17       Q.    Mm-hmm.

18             All right.  And in the letter in the

19   third paragraph, it says that:

20                  "Any college-owned equipment

21                   that have not been returned

22                   previously should be returned

```
 1    whatever it says here -- September 1st,

 2    correct.

 3        Q.   Okay.  And that position is through

 4    June 30th, 2016?

 5        A.   Correct.

 6        Q.   So the fall and spring semester?

 7        A.   Yes.

 8        Q.   And you're working there, what, four

 9    days a week?

10        A.   I'm teaching four days a week, yeah.

11        Q.   Okay.  And your salary is 82,000 and

12    change?

13        A.   Something like this.

14        Q.   More than you were making at

15    McDaniel?

16        A.   That's correct.

17        Q.   Okay.

18        A.   The standards of living -- well, the

19    living standards are --

20            MR. STROUSE:  There's no question.

21    BY MR. ABRAMSON:

22        Q.   There's no question here.
```

1      A.   I -- I just wanted to say that I

2   don't think there is a, you know, line in the

3   sand between teaching and research places.

4   There are places which are more teaching

5   focused and more research focused.

6           And so, yes, for all places we just

7   discussed, very much more research -- teaching

8   focused, and so they could be called teaching.

9      Q.   Slow down a little bit.

10          (Exhibit 6 was marked for identification.)

11  BY MR. ABRAMSON:

12     Q.   Okay.  So Illinois Wesleyan, this is

13  your letter of employment from them, dated

14  October 21, 2015?

15     A.   That sounds right.

16     Q.   Well, if you look at the upper left?

17     A.   Yeah.  Mm-hmm.

18     Q.   All right.  And this is for a

19  position for the spring semester 2015 and '16

20  and the whole academic year of '16 and '17,

21  correct --

22     A.   Yes.

1       Q.    -- as a visiting associate professor?

2       A.    Yes.

3       Q.    And did you get any kind of written

4    agreement following this letter, you know,

5    confirming your employment, or is this it?

6       A.    I believe this is it.  I -- I can

7    check, but I don't -- I think this is -- this

8    is the letter which I -- there was something

9    to sign somewhere.

10           Ah, okay.  There were two papers.

11   One paper describing first semester, and they

12   asked me to sign in -- there was this paper

13   (indicating) that describes first semester and

14   the whole year.  So they didn't want me to

15   sign for the whole year because I think the

16   paper for semester, it included health

17   benefits.  They describe that, in addition to

18   salary, I get such-and-such health and

19   retirement benefits, and those probably vary

20   from year to year --

21      Q.    Right.

22      A.    -- so they didn't want me to -- to

```
 1    sign too much.

 2         Q.   All right.  So I don't have that

 3    document.

 4         A.   If you want it, I can get.

 5         Q.   Yes, we do.

 6         A.   Okay.  Mm-hmm.

 7         Q.   We asked for it, and I think we need

 8    it.

 9         A.   I thought this was over -- covering

10    everything, but so -- I would be happy to

11    provide.

12         Q.   All right.  This is a full-time job

13    at Illinois Wesleyan, you're teaching?

14         A.   This is normal full -- I -- I don't

15    know what full-time in respect to faculty is,

16    but --

17         Q.   All right.  How many days a week are

18    you going to teach there?

19         A.   I believe my classes for the spring

20    are scheduled to be three times a week.

21         Q.   All right.  And three different days?

22         A.   Three -- three different -- three
```

```
 1    different days a week.  Monday -- there are
 2    three classes I will be teaching, and they are
 3    all Monday, Wednesday, Friday.
 4        Q.   Okay.  And then you're also going to
 5    be working at William Paterson same period of
 6    time; correct?
 7        A.   No.  No, I resigned from William
 8    Paterson.
 9        Q.   You resigned?
10        A.   Yes.
11        Q.   Was that in writing?
12        A.   Yes.
13        Q.   Okay.  I -- that's not produced
14    either.
15        A.   It would have been probably done,
16    really, after everything was produced, but we
17    can produce it.  It's no --
18        Q.   I mean, you -- when did you resign?
19        A.   I resigned maybe two weeks ago,
20    something like this.
21        Q.   All right.  Well, that is before I
22    got your production of documents, so...
```

1      Q.    Okay.

2            MR. ABRAMSON:   Number..?

3            THE REPORTER:   12.

4            (Exhibit 12 was marked for identification.)

5    BY MR. ABRAMSON:

6      Q.    This is Exhibit No. 12.   It's a

7    document letter dated October 28th, 2014;

8    correct?

9            You got it?   This is a decision of

10   the grievance committee that you received.

11     A.    Well, it's not a decision.   It's a --

12   it's a summary of a decision.

13     Q.    And why do you say it's a "summary"

14   of the decision?

15     A.    Because, in my opinion, a decision of

16   a committee should come from the committee.

17     Q.    You've got to slow down.   Say it

18   again.

19     A.    Because, in my opinion, the decision

20   of a committee should come from the committee

21   and be signed by the committee members, not by

22   a third person.

```
1        Q.    Any other reason that you regard this

2   as a summary?

3        A.    I think it also is factually

4   incomplete.

5              Yes, I believe the decision of the

6   committee that you have produced says the

7   decision was made by a majority.  This

8   document doesn't mention majority and,

9   therefore, clearly is not original document.

10  It's a summary.

11       Q.    Any other reason?

12       A.    Well, it's not titled "Decision."

13  It's titled "The decision rendered is for

14  following..."  It seems to be just a letter --

15  letter from college and from Director of Human

16  Resources informing me about a decision, but

17  it's not a decision.

18       Q.    But it does say "The decision

19  rendered is as follows..."

20       A.    Yeah, I can write similar to my dad

21  and say somebody decided something, but

22  doesn't mean that what I wrote is a decision.
```

1       Q.   Do you think she would be lying

2  that -- that Ms. Glennon would be lying in

3  this letter if she said, "This is the decision

4  that was rendered"?

5       A.   But it's not a decision itself.

6  It's -- it's a summary of a decision, as I

7  said.  I'm not saying she's lying.  When you

8  provide somebody -- if I send an e-mail to my

9  dad saying the decision is such-and-such, I'm

10  not lying.  I'm just providing my -- providing

11  my summary.

12            MR. ABRAMSON:  Let's mark this as 13.

13            (Exhibit 13 was marked for identification.)

14  BY MR. ABRAMSON:

15       Q.   This is the formal hearing decision,

16  is it not, of the grievance committee?

17       A.   Yes.  And please note it says

18  "Decision" on the top.

19       Q.   Okay.  So it says that they evaluated

20  the grievance and that they deliberated and

21  they determined by a majority vote that you're

22  responsible for four things; correct?

1          A.    Well, yes, it does.

2          Q.    All right.   However, Ms. Glennon's

3    October 28 letter doesn't say that the vote

4    was a majority or not.   It just says here's

5    the decision?

6          A.    That's correct.

7          Q.    All right.   Does it matter that it

8    was a majority vote and not unanimous, in your

9    view?

10         A.    In my view, everything matters.

11         Q.    How does it matter?

12               It's still the decision; right?

13               It doesn't take away that it's --

14    it's the decision of the grievance committee;

15    correct?

16         A.    In my opinion, this is decision and

17    this is summary of decision (indicating).

18               If I publish --

19         Q.    I understand --

20         A.    -- an article in a newspaper that

21    describe decision, it still will be just a

22    summary of a decision.   It will not be

```
1    decision unless it's -- you produce something

2    verbatim.  And the summary doesn't reproduce

3    anything verbatim, doesn't claim to reproduce

4    verbatim.

5              Furthermore, if you look at the

6    summary, it's not -- it never says that this

7    all that they have decided.  They might have

8    decided something more.  It doesn't say here.

9         Q.   Did they decide more?

10        A.   I don't know.  According to

11   Ms. Glennon, the committee was investigating

12   whether behavior of Defendant Stewart was

13   proper or not.  And so I would expect them to

14   come to some kind of decision on this.  It's

15   not here.

16        Q.   That's not part of the grievance

17   against you, though; right?

18        A.   Right.  But I --

19        Q.   So --

20        A.   I don't -- you are --

21        Q.   Stop.

22        A.   Mm-hmm.
```

```
 1        A.    I --

 2        Q.    "Dear Pavel..."

 3        A.    Yes, yes.  Mm-hmm.

 4        Q.    All right.  So you both got it by

 5   e-mail?

 6        A.    Yes.

 7        Q.    Okay.  And then it says that:

 8              "Our policy does not allow for

 9               the chairperson of the

10               committee to be questioned by

11               either the Complainant or

12               Respondent regarding the

13               decision of the committee."

14              Did you want to question the chairman

15   of the grievance committee?

16        A.    I would like to question her.  I

17   don't think that there is any written policy

18   against me questioning her.  But the -- most

19   importantly, I believe the idea of delivering

20   something in person exists to guarantee that

21   whatever is delivered is proper thing, and

22   there's no erroneous mistakes or intentional
```

```
 1      Q.    I didn't -- I didn't mean that.

 2      A.    -- whether we filed lawsuit before or

 3   --

 4      Q.    Okay.  What is the competition of

 5   the -- comp- -- composition of the Faculty

 6   Affairs Committee?

 7      A.    Faculty Affairs Committee consists of

 8   tenured faculty and pro- -- I call it

 9   offensive term -- but provost as well.

10      Q.    Who elects the Faculty Affairs

11   Committee?

12            They're elected; right?

13      A.    Yes, they're elected for five years

14   by faculty.

15      Q.    Five years or one year?

16      A.    Five-year terms.

17      Q.    Okay.  Who elects them?

18            By the faculty?

19      A.    Yes.

20      Q.    So the Faculty Affairs Committee that

21   would have considered any appeal by you would

22   have consisted of people who were elected when
```

```
1    guidelines?

2    BY MR. ABRAMSON:

3        Q.    You've got to slow down.

4        A.    Sorry.  Sorry.

5              THE WITNESS:  Where did you stop?

6              THE REPORTER:  Go back to the

7    A-something rules.

8              MR. ABRAMSON:  It's the AAUP rules.

9              THE WITNESS:  So there's a reference

10   to AAUP rules under which Defendant Stewart

11   recused one of the members of FAC.  And I'm

12   saying that if she has the right to recuse --

13   which I'm not sure if she does -- but if she

14   does, then I should have the same right as

15   well.  Nobody ever given me this right, nobody

16   offered me this.

17            So I don't really think that, in

18   reservation, this is a legitimate decision of

19   a Faculty Affairs Committee.

20   BY MR. ABRAMSON:

21       Q.    In your amended complaint, you allege

22   that you wanted to, quote, "confront the
```

1    I do, but I want you to say it.

2        A.    Right.

3              Bottom fell out of the economy and --

4    and then it was a very tough economic

5    situation for the next two years.

6        Q.    Were you planning to leave to go to

7    private industry or to some private or public

8    university?

9        A.    I was thinking about applying to more

10   research-oriented institutions.

11       Q.    All right.  Were you thinking of

12   applying to a public university?

13       A.    To a more research-focused

14   institution.  I was not distinguishing between

15   public and private.

16       Q.    All right.  McDaniel's a private

17   institution; right?

18       A.    But partially supported by --

19       Q.    Answer the question.

20             Is it a public or private

21   institution, to your knowledge?

22       A.    I think McDaniel is commonly

```
 1    classified as a private institution.

 2        Q.   Okay.  So did you have that meeting

 3    with -- with Dr. More about --

 4        A.   I think so.

 5        Q.   -- asking her for a recommendation?

 6        A.   I think so.

 7        Q.   All right.  But on the face of it, it

 8    -- it says you want to talk about personal

 9    stuff; right?

10        A.   Right.  This is not related to my

11    teaching.

12        Q.   Okay.  Got it.

13             MR. ABRAMSON:  20.

14             (Exhibit 20 was marked for identification.)

15    BY MR. ABRAMSON:

16        Q.   This is an e-mail from you to

17    Dr. More, November 7th, 2011.  You say:

18                  "It was insanely great to talk

19                   to you today."

20             Is that a term, "insanely great,"

21    that you would use to a business colleague?

22        A.   Yes.
```

```
 1              It's a long letter.  It's emotional;

 2   right?

 3        A.   When you have --

 4        Q.   "Yes" or "no"?

 5        A.   It's very emotional because I was --

 6   you know, I was very upset about this

 7   situation and I -- I -- I wanted --

 8        Q.   Okay.  And you just said this has

 9   been going on for six years, and in the last

10   paragraph, you say, "This has led to many

11   irrational responses on my part."

12              What are you talking about

13   "irrational responses" on your part?

14        A.   Well, you see, I'm known for

15   sometimes very brash behavior and not thinking

16   straight too much, and that's what I mean.

17   I -- I agree that -- that tone of the letter

18   is apologetic and it's by -- by good reason.

19   I -- I always felt that by apologizing to

20   somebody, you can find agreement much quicker

21   than trying to disagree with the person.

22              So I tried to blame myself for
```

```
 1    whatever happened, and I suggested, you know,

 2    just not to have close interaction.  That

 3    seems to be what I understood is what she

 4    wanted.

 5         Q.   Okay.  You acknowledge right off the

 6    bat the pain that this has caused you, the

 7    mistake you made caused her pain?

 8         A.   Yes, I think it -- because both pains

 9    to both sides.

10         Q.   Okay.  And that you have different

11    personalities.

12              Which would mean you see things and

13    she sees things differently from one another;

14    right?

15         A.   Yes.

16         Q.   Okay.  You tell her that it's not --

17    "You're not easy about establishing emotional

18    bonds with other people."

19              Were you trying to establish an

20    emotional bond with her?

21         A.   I think we had emotional bond.

22         Q.   Okay.
```

```
 1      A.   And it -- it -- it broke at some

 2  point, and I just was trying to understand

 3  what is happening.

 4      Q.   Why would you have an emotional bond

 5  with a co-worker?

 6      A.   Because, again, I don't think that

 7  you talk about history of your pregnancies and

 8  your infertility treatment to a co-worker; you

 9  talk to a personal friend.  And I think Sara

10  was, for many years, my personal friend, and

11  she was my very close co-author with whom I

12  worked.

13      Q.   That's your -- your take on the

14  relationship; right?

15      A.   Right.

16      Q.   Okay.

17           MR. ABRAMSON:   26.

18           THE REPORTER:   25.

19           MR. ABRAMSON:   25.  I'm sorry.

20           (Exhibit 25 was marked for identification.)

21  BY MR. ABRAMSON:

22      Q.   So, again, this is a May 28th, 2013
```

```
 1         A.    I don't remember what I have been

 2    thinking about.  I don't -- you asked me if I

 3    had been romantically involved, and I presume

 4    that the definition of this is having dates

 5    and things like this.  We did not have this.

 6         Q.    Did you -- did you wish that you

 7    could date her?

 8         A.    Did I wish I could date her?

 9         Q.    Mm-hmm.

10         A.    I don't remember having such a wish.

11         Q.    Okay.  Look at Page 2 here, first

12    full paragraph:

13               "Am I romantically attached to

14                her?  Hard to say without

15                specifying exactly

16                romantically attached means.

17                Would I date her if we were

18                both married, probably" --

19         A.    Not married.

20         Q.    -- "yes."

21               -- "probably not married?  Probably

22    yes."
```

```
 1             So you were thinking about dating

 2    her?

 3        A.   Apparently I was.

 4        Q.   Then you -- a couple of lines later:

 5                  "It's hard to predict how our

 6                   relations will be developing,

 7                   but I'm ready to do what it

 8                   takes to preserve to --

 9                   intellectual bond that we've

10                   developed together.  She's

11                   really an exciting thing."

12             Thing?

13             MR. STROUSE:  It -- you misread that.

14    BY MR. ABRAMSON:

15        Q.   "It is really an exciting thing."

16             What's the exciting thing in the same

17    paragraph where you're thinking about dating

18    her?

19        A.   Where's it "exciting"?

20             "It is really" -- what -- what -- I

21    don't understand.

22        Q.   Neither do I.  That's why I'm asking.
```

```
 1      A.    Yes.

 2      Q.    Thirteen lines down, you write:

 3                  "I don't know if this is just a

 4                   spring factor."

 5            What do you mean "spring factor"?

 6            You mean spring fever, maybe?

 7      A.    What is spring fever?

 8      Q.    Okay.  Maybe you don't know.

 9            But what do you mean by "spring

10      factor"?

11      A.    People have -- I don't know.  I don't

12      know what I meant by "spring factor" in 2007.

13      Q.    Okay.  You say:

14                  "I seem to be more and more

15                   excited about Sara."

16            What are you excited about?

17      A.    I -- I believe I just wrote on the

18      previous page that I'm excited about

19      intellectual bond that we have built.

20      Q.    That's it?

21            Well, let's see what the next

22      sentence says.
```

```
 1                    "I'm not sure if I have ever

 2                     been that much excited about

 3                     someone in the last 20 years."

 4             That precedes your time at McDaniel;

 5     correct?

 6        A.   Yes.

 7        Q.   And then you write:

 8                    "I think that if we were both

 9                     not married, I would start

10                     dating her by now."

11             Again, you're still thinking about --

12     fantasizing about dating her; correct?

13             MR. STROUSE:  Well --

14             THE WITNESS:  I would take my concern

15     about "fantasizing."  I -- I am --

16     BY MR. ABRAMSON:

17        Q.   Okay.  You write here that "I think."

18             You're thinking --

19        A.   I'm thinking, but --

20        Q.   -- that "If we weren't married, I

21     would start dating here by now"?

22        A.   Right.
```

```
 1    with her at Faculty Development Committee.

 2             I was a member of Faculty Development

 3    Committee that is in charge of distributing

 4    travel budget and, you know, other funding for

 5    scholarship and teaching on campus.  And she

 6    came trying to change the whole system in some

 7    very uncomprehendable(sic) to me way, and I

 8    think most of the members of the Faculty

 9    Development Committee were unhappy.  We had

10    couple of meetings with her, and I explicitly

11    was telling her about the issues what she's

12    doing.

13        Q.   And what does that have to do with

14    the claims you're making in this case as

15    another reason that she's --

16        A.   She might be -- that's another reason

17    for her potentially might be retaliating

18    against me.

19        Q.   I got it.

20             Okay.  Have you told me everything

21    about your meeting with Defendant Stewart and

22    Tom Phizacklea on August 25th, 2014?  That's
```

1    the meeting where they offered you the

2    release.

3         A.    Yes.

4         Q.    Anything to add to that?

5         A.    Let me think.

6         Q.    Okay.

7         A.    Yes.

8         Q.    Go ahead.

9         A.    I -- when talking about Sara, I

10   mentioned to Defendant Stewart that Sara has a

11   very complicated personality.  And Defendant

12   Stewart said she doesn't care one way or the

13   other how this case will turn out.

14        Q.    That who doesn't care?

15        A.    Defendant Stewart.

16        Q.    She doesn't care one way or the other

17   how it turns out?

18        A.    Yes.

19        Q.    Okay.  Would you interpret that to

20   mean she's impartial?

21        A.    Yes.

22        Q.    Okay.  All right.  Anything else?

1   she.  Helped you write these things?

2       A.   Last year she was working at Bryn

3   Mawr College.

4            THE REPORTER:  At where?

5            THE WITNESS:  Bryn Mawr College.

6   BY MR. ABRAMSON:

7       Q.   B-r-y-n M-a-h-r(sic); right?

8       A.   Sounds good.

9       Q.   Okay.  Okay.  No. 24, so you have an

10  answer here about a publication by

11  Dr. Stewart.  Please tell me how that relates

12  to any claim or issue of -- or requested

13  relief involved in the lawsuit.

14      A.   Let me read the question and answer

15  once again.

16      Q.   Because it really doesn't make sense.

17  I'm just trying to figure out what it is.

18      A.   So I think that Defendant Stewart's

19  feminist -- belligerent feminism might have

20  prevented her from unbiased and just

21  consideration of this case.  I also --

22      Q.   Stop.  What factual basis do you have

```
 1   for that statement, that it might have
 2   prevented her?
 3              Do you have a factual basis for that,
 4   or are you just thinking that?
 5       A.   I -- I -- I'm thinking that.
 6       Q.   Okay.  No facts; right?
 7       A.   I don't know what happened in her
 8   head.
 9       Q.   Okay.
10       A.   Would you like me to finish my
11   answer?
12       Q.   Yeah.  Go ahead.
13       A.   And I think her desire to create hard
14   structures and creating hard structures and
15   flow out to soft structures, it -- it always
16   involved scaring people.
17              THE REPORTER:  Wait, creating hard
18   structures?
19              THE WITNESS:  Hard structures.  She
20   talked about hard structures in academia.
21              MR. ABRAMSON:  It involved scaring --
22   scaring people.
```

# Letter to Faculty Affairs Committee

## Pavel Naumov

### December 22, 2014



Dear Donna, Lauren, Maggie, Mona, and Sharon,

As you might remember, at a Spring 2013 Faculty meeting the President of the College asked faculty to "affirm" appointment of the new Provost. In full compliance with the existing rules, I asked the President for paper ballots on this issue to give untenured faculty members a chance to express their position without administrative pressure. The President immediately expressed his dissatisfaction with my request, saying that it likely to make the affirmation not "unanimous", as he would like it to be, but he felt obligated to follow the rules.

A year later, the Provost and the President decided to retaliate against me and force me to leave the College. The pretext that they found was the



Δ π EXHIBIT  2
Deponent Naumov
Date 12.4.15  Rptr. LM
WWW.DEPOBOOK.COM

departure from the College of our colleague ████████████ and I were
the only two Computer Science faculty at the College. We co-authored 12 peer-
reviewed publications, organized two summer research sessions with students,
and jointly sponsored CREU grant that promotes Computer Science research
to female undergraduate students, ███ and her family visited my house several
times and my family visited hers.

As far as I know, ███ did not file any complaint and did not testify against
me at the grievance committee hearing. As per McDaniel Title IX Policy, "In
the event that the complainant is unwilling to be identified, the formal hearing
will be dismissed, no action will be taken and no report of any action will be
filed." This outcome, however, would not satisfy the Provost and the President.
So, they decided that the Provost herself will file the complaint against me.
The Provost has no legal standing to file this complaint because she is neither
a victim nor a witness of the alleged actions. The events that she refers to
happened many years prior to her arrival to McDaniel. The Provost's words is
a hearsay testimony that has no legal value.

All accusations against me that are listed in the complaint summary are ei-
ther outright false or are preposterous. Two-way weekend email exchange about
College-related issues is not "stalking" under even the most liberal definition.
Neither is sitting in the department lobby where many faculty and students
sit. Neither is "longer than needed conversations" between two colleagues who
co-authored 12 publications. The Provost knew this, yet she put these items in
the complaint clearly demonstrating malicious intent. Furthermore, the Provost
intentionally did not state dates of the alleged events, because she knew that
McDaniel Title IX Policy says that "Any complaint must be reported to an
advisor within 90 days of the occurrence." and the events that she labeled as
"stalking" took place many years ago.

Not only the Provost filed a Title IX complaint against me, she also ordered
investigation of her complaint by a campus safety officer. The campus safety
officer, on the order of the Provost, found my fellow department members who
have seen me sitting in the department lobby, yet this officer failed to even talk to
me. Based on the results of the investigation of her own complaint, the Provost
decided to suspend me and to ban me from being on campus and from contacting
my colleagues and students. She also blocked my College email account. By
doing so, the accuser made it significantly harder for me to approach potential
witnesses. In addition, the Provost accused me of sending "unwanted" emails on
weekend and maliciously blocked my access to McDaniel email trying to make it
impossible for me to produce the emails in question for the grievance committee.
These actions of the Provost violated AAUP Statement on Procedural Standards
in Faculty Dismissal Proceedings:

> Suspension of the faculty member during the proceedings is justified
> only if immediate harm to the faculty member or others is threatened
> by the faculty member's continuance.

not only because ███ was no longer on campus, but also because none of the
listed allegations from remote past, even if true, were threatening immediate

2

harm to anyone. Additionally, to the best of my knowledge, these Provost's actions were not approved by the FAC, which is against AAUP Recommended Institutional Regulations on Academic Freedom and Tenure:

> Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, the administration will consult with the Faculty Committee on Academic Freedom and Tenure [or whatever other title it may have] concerning the propriety, the length, and the other conditions of the suspension.

By taking these actions the Provost abused her power and put herself in a conflict of interest position as she simultaneously was the accuser, the decision maker, and the one who ordered and interpreted the results of the investigation. The Provost never informed me about this conflict of interest situation in our August 25th meeting. I have only learned about this in October, when the name of the accuser was finally revealed to me. This violates April 4th, 2011 "Dear Colleague" letter of the Office for Civil Rights of the United States Department of Education – the very same document that imposed on colleges Title IX investigations:

> Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Not only the accuser ordered the investigation, the results of the investigation have been reported back to her. Since I have never been given a copy of the investigator's report and the report was made available to the grievance committee, this violated another requirement of the "Dear Colleague" letter:

> The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.

The events that followed my suspension are even more outrageous. The summary of the complaint, the only document about the accusations that was made available to me, has checkmarks against "harassment", "hostile environment", and "stalking". Yet, the summary only includes events under "stalking" allegation. As far as I was told by the HR, the grievance committee found me not responsible for "stalking". Given that no examples of "harassment" and "hostile environment" are even listed in the Provost's unlawful and malicious complaint, one would expect the case to be closed at that point.

This, however, would go against the Provost's and the President's goal. So, in truly kafkaesque style, the HR was instructed not to give me the actual decision of the grievance committee. Instead, I was emailed an HR summary of the decision, not signed by any member of the committee. This is a clear violation of Title IX Policy:

3

Within 48 hours of a decision by the Grievance Committee, the
Grievance Committee chair and the Title IX Coordinator will
attempt to deliver written notification of the decision in person
to both parties. In the event that attempts to notify the parties in
person within 48 hours of the decision are unsuccessful, the Title IX
Coordinator shall email a copy of the decision to both parties.

I contacted the HR director and asked her to adhere to the policy, but she
refused and the actual decision of the grievance committee has never been given
to me. This is very troubling, especially given that I have received from the
HR copies of all other decisions signed by the people who made these decisions.
According to the HR's interpretation, the committee found me not responsible
for "stalking", but responsible for "harassment" and "hostile environment" —
the charges that had no single supporting event listed on the summary of the
original complaint. Furthermore, I have been informed by the HR that the
"sanctions" will be assigned later. It has never been explained to me who and
why decided to "uncouple" the decision and the sanctions. This "uncoupling"
goes against Title IX Policy since the decision and the sanction are mentioned
in this document together, they appear together on the appeal form, and thus
should be assigned together at the same time by the same body. It has been
unclear to me for a while who decided to uncouple the committee's decision
from the sanctions and what the committee actually decided. All my doubts
and illusions disappeared when the sanctions were assigned by the President,
who had not been present at the hearings and is likely to be familiar with the
details of the case only based on the information given to him by Provost, the
unlawful accuser.

The President never met with me before assigning the sanctions. Since he
has chosen to assign "recommend for dismissal" sanctions, he had an obligation
to meet with me and to hear my side of the story. Indeed, the Faculty Handbook
states:

Termination for cause of a continuous appointment, or the dismissal
for cause of a teacher previous to the expiration of a term appoint-
ment, should, if possible, be considered by both a faculty committee
and the governing board of the institution. In all cases where the
facts are in dispute, the accused teacher should be informed before
the hearing in writing of the charges and should have the oppor-
tunity to be heard in his or her own defense by all bodies
that pass judgment upon the case.

and so does AAUP Statement of Principles on Academic Freedom and Tenure
from which the language of the Faculty Handbook is taken verbatim.

Furthermore, the President, essentially, gave no justification for his decision.
He wrote only "I recommend that Dr. Naumov be dismissed (i) for reasons
of serious professional misconduct consistent with moral turpitude (ii) for de-
liberate violation of the rights and freedoms of fellow faculty members." These

4

unsubstantiated allegations, that, for the record, I strongly reject, violate AAUP Statement on Procedural Standards in Faculty Dismissal Proceedings:

a statement with reasonable particularity of the grounds proposed for the dismissal should then be jointly formulated by the president and the faculty committee; if there is disagreement, the president or the president's representative should formulate the statement.

Commencement of Formal Proceedings. The formal proceedings should be commenced by a communication addressed to the faculty member by the president of the institution, informing the faculty member of the statement formulated, and also informing the faculty member that, at the faculty member's request, a hearing will be conducted by a faculty committee at a specified time and place to determine whether he or she should be removed from the faculty position on the grounds stated. In setting the date of the hearing, sufficient time should be allowed the faculty member to prepare a defense. The faculty member should be informed, in detail or by reference to published regulations, of the procedural rights that will be accorded.

The whole process surrounding my suspension and recommended dismissal has been conducted with gross violations of the Title IX Policy, the Faculty Handbook, the Department of Education regulations, and the AAUP documents. The examples that I gave are not exhaustive by any count. In fact, on December 5th, 2014, Jeffrey Marx, as a faculty ombudsman, met with the President and gave him a list of 18 concerns (see attached document) that he has about policies and procedures the College has used while handling this situation. Instead of addressing these concerns, raised by an elected faculty representative, the administration decided to ban Jeff from sharing his concerns with the Faculty Affairs Committee.

Additionally, in conducting the hearing, the College violated the United States Constitution. The 14th Amendment states that "... nor shall any state deprive any person of life, liberty, or property, without due process of law ...". McDaniel College receives state funding through Sellinger Fund and, therefore, is subject to due process clause of the 14th Amendment. This fact has been specifically emphasized to the College in the April 2011 "Dear Colleague" letter from the US Department of Education:

Public and state-supported schools must provide due process to the alleged perpetrator.

The courts mostly settled on the standard of "due process" that has been captured in the article "Some Kind of Hearing" written by late Judge Henry Friendly. This standard remains highly influential and is used in due process

5

legal arguments[1]. The standard consists of the following ten due process rights roughly in order of their perceived importance:

1. An unbiased tribunal.

2. Notice of the proposed action and the grounds asserted for it.

3. Opportunity to present reasons why the proposed action should not be taken.

4. The right to present evidence, including the right to call witnesses.

5. The right to know opposing evidence.

6. The right to cross-examine adverse witnesses.

7. A decision based exclusively on the evidence presented.

8. Opportunity to be represented by counsel.

9. Requirement that the tribunal prepare a record of the evidence presented.

10. Requirement that the tribunal prepare written findings of fact and reasons for its decision.

The College violated my constitutional right to unbiased tribunal because (i) three out of four voting members of the grievance committee report to the accuser; (ii) two-member appeals panel consisted of two close colleagues of the accuser; (iii) my appeal of the President's decision has been handled by the same appeals panel consisting of two people, both of whom report to the President and serve at his pleasure; and (iv) one of the members of the appeals panel was present at our August 25th meeting with the accuser on the invitation of the accuser, presumably to support the accuser, and thus was no longer unbiased.

The College violated my constitutional right to present reasons why the proposed action should not be taken because I was never given a chance to explain to the grievance committee my position on the bogus retaliation charge, which later was overturned by the appeals panel.

The College violated my constitutional right to present evidence, including the right to call witnesses, because (i) I never was able to present evidence to defend against the retaliation charge; (ii) I never was able to call witnesses to defend against the retaliation charge; (iii) the President has never heard me; and (iv) the President has never heard my witnesses.

The College violated my constitutional right to know opposing evidence because (i) the original complaint has never been given to me; (ii) the campus safety investigator's report has never been given to me; (iii) the HR director's accusation of retaliation by me against the accuser has never been given to me; (iv) I have not been allowed to hear witnesses' testimonies at the hearing; and (v) I have not been allowed to hear witnesses' testimonies at the appeal;

---

[1] http://www.law.cornell.edu/wex/due_process

6

The College violated my constitutional right to cross-examine adverse witnesses.

The College violated my constitutional right to be represented by counsel.

The College violated my constitutional right to a record of the evidence presented because (i) in spite of my request, I have never been given records of the grievance hearing; (ii) I have never been given records of the appeal hearing.

The College violated my constitutional right to written findings of fact and reasons for decisions because (i) grievance committee did not provide written findings of fact and reasons for their decisions; (ii) the first appeals panel did not provide written findings of fact and reasons for their decisions; (iii) the President did not provide written findings of fact and reasons for his decision; and (iv) the second appeals panel did not provide written findings of fact and reasons for their decisions.

The President's decision to recommend my dismissal violates the Constitution of the United States because it is based on findings of the hearing conducted in violation of the due process clause of the 14th Amendment. His violation of the Constitution is deliberate and outrageous because, as an experienced senior administrator, he must have known that the hearings have been conducted with violations of the due process.

Therefore, the President, who was not even present at the hearings and who likely consulted about the case only with the accuser, made an unjustified and vindictive decision to dismiss me, deliberately violating my constitutional rights, pushing aside the grievance committee, against the objections of a faculty ombudsman, without ever talking to me, for charges that have no supporting evidence, based on an unlawful and malicious complaint filed by a person who had no legal standing to file it.

* * *

Dear members of the Faculty Affairs Committee,

I am now leaving it up to you to decide which of us committed "moral turpitude" and "deliberate violation of the rights and freedoms of fellow faculty members". I also want to bring to your attention that it appears to me that the HR, under the pressure from the Provost and the President, is now trying to break the College rules once again by claiming that I am not entitled to regular FAC hearing under the AAUP rules. This is not true. Neither the Faculty Handbook nor the AAUP dismissal guidelines provide any option for a "special" dismissal procedure. Tenured faculty members are entitled to a full-scale hearing under the AAUP rules, no matter what exactly they are accused of, what the color of their skin and nation of origin are, and if they are friends with the Provost or not. The Title IX Policy, an internal policy created by the administration, can not be used to deny academic freedom and tenure protection guaranteed by the Faculty Handbook. Neither can it be used to amend the constitutional right to due

7

process. The job offer that I received from McDaniel almost 10 years ago states that the Faculty Handbook is a part of my employment contract. Therefore, the College is contractually obligated to adhere to the Faculty Handbook rules.

Thereby, I am asking you to fulfill your fiduciary obligations to the College by conducting a fair hearing that provides due process and follows the complete set of AAUP rules. Additionally, I am asking you to conduct a hearing open to all members of McDaniel community, as AAUP rules allow you to do.

LIST OF ATTACHMENTS.

1. Ombudsman's List of 18 Concerns,

2. Summary of the Complaint,

3. Appeal of the Committee's Decision,

4. Appeal of the President's Decision.

8



McDANIEL
C O L L E G E
*Changing Lives Since 1867*

Office of the President
2 College Hill
Westminster, MD 21157-4390

410/857-2222
410/857-2411 FAX
www.mcdaniel.edu

January 20, 2015

Dr. Pavel Naumov
5301 Musket Court
Rockville, MD 20853

Dear Dr. Naumov,

This is to advise that on January 14, 2015, the Executive Board of the Board of Trustees, acting
on behalf of the Board of Trustees of McDaniel College, met to review the sanction
recommendation of dismissal submitted by the Faculty Affairs Committee.   The Executive
Board has affirmed this recommendation.

Effective immediately, you are hereby released from your employment at McDaniel College.
Your final paycheck covering the period of January 15, 2015, through January 31, 2015, will be
paid to you on January 30, 2015, via the pay method you elected.   COBRA information will be
sent under separate cover to your home address.  Should you have additional questions, you may
contact Jennifer Glennon at 410-857-2205 or at jglennon@mcdaniel.edu.

Any college-owned equipment or items that were not returned previously should be returned by
mail to the Human Resources Department.   Any personal effects that remain in your former
office will be returned to you as well by mail.

As was communicated previously by Mrs. Glennon, you remain strictly prohibited from
attempting to communicate in any form or retaliate against any employee or person otherwise
related to this grievance.   As a former faculty member dismissed for cause, you are prohibited
from being on any property owned by McDaniel College.

Sincerely,

Dr. Roger N. Casey
President

Cc: Jennifer Glennon, MS, PHR
Director of Human Resources

Δ π EXHIBIT 3
Deponent NAUMOV
Date 12.4.15  Rptr. CM
WWW.DEPOBOOK.COM



## Illinois Wesleyan
### U N I V E R S I T Y

October 21, 2015

Mr. Pavel Naumov
5301 Musket Ct.
Rockville, MD 20853

Dear Mr. Naumov:

We are pleased you will be joining the faculty at Illinois Wesleyan University for the spring semester of the 2015-16 academic year, and the 2016-17 academic year as a Visiting Associate Professor of Computer Science.   We look forward to welcoming you to our campus in the spring.

Let me confirm in writing the agreement reached between you and Provost Green. Your salary for the 2015-16 spring semester will be $36,000. Your salary for 2016-17 academic year will be $72,000. We will also provide $2,000 in funds to be used during the spring for research and travel expenses and $2,000 to be used during the 2016-17 academic year. We will also reimburse up to $4,000 in moving expenses defined by the enclosed moving policy. This offer is contingent on the successful completion of your background check.

All employees must complete an employment eligibility verification process within the first three days of employment. Non-citizens must present an appropriate work visa. If you have concerns about your visa status, please contact the International Office (309-556-3190; abroad@iwu.edu).

Enclosed you will find federal form, I-9, entitled "Employment Eligibility Verification." Prior to the start of school you must submit appropriate documentation for inspection by the Human Resource Office, 209 Holmes Hall. Also enclosed are forms for withholding both state and federal taxes. Please bring these forms with you to the Human Resource Office. We will not be able to release your paycheck until all forms are submitted.

For retirement plan eligibility purposes, each year of employment with an eligible institution during the period immediately preceding employment at Illinois Wesleyan provides you with a credit of ½ year of service. When you meet with the Human Resource Office, they will provide you with additional information about retirement and the other University benefit programs.

We look forward to receiving one signed copy of the appointment notice and to having you with us in the spring.

Sincerely,

Richard F. Wilson
President

RFW/ph

Enclosures

pc:     Jonathan Green, Provost and Dean of the Faculty
        Frank Boyd, Associate Provost
        Lynda Duke, Associate Dean of Curricular & Faculty Development
        Catherine Spitz, Associate Vice President for Human Resources
        Joerg Tiede, Chair of the Computer Science Department

Δ π EXHIBIT 6
Deponent NAUMOV
Date 12-4-15   Rptr. LM
WWW.DEPOBOOK.COM

~00305

OFFICE OF THE PRESIDENT

1312 Park St. • PO Box 2900 • Bloomington, IL  61702-2900 • (309) 556-3151 • fax (309) 556-3970 • www.iwu.edu

PAVEL NAUMOV

August 28, 2014
Jeanine S. Stewart, PhD
Provost & Dean of Faculty
McDaniel College

Dear Dr. Stewart,

After reviewing your allegations, I am completely convinced that these allegations are absolutely baseless and without merit. Therefore, I would like to let you know that I reject your "Separation Agreement" offer and request that you proceed with the College formal grievance procedure as specified by the College policy.

Sincerely,

*[signature]*

Pavel Naumov

Δ π EXHIBIT 9
Deponent NAUMOV
Date 4.15   Rptr CM
WWW.DEPOBOOK.COM

September 9, 2013

Dear Sara,

I am writing this letter to apologize for the mistake that I have made and the pain that it caused to you. I think that you will find hard to believe that it took me seven years to realize my mistake and I do not know how I can convince you that I indeed have not seen the obvious all these years.

When you came to McDaniel, I have been so much overwhelmed by similarities in our background, our past, our moral values, and our common views on many issues, that I made a mistake concluding that we are similar in all other ways as well. When interacting with you, I expected you to think, behave, and act as if you were me. When you told me after the convocation that we are different, I first brushed you off insisting that you are wrong. I later started to think about this again trying to understand you and I realized that I have been wrong all these seven years.

I think now that, in spite of all the similarities that we have, we have very different personalities. This difference in personalities leads to you thinking and behaving differently from me. It would not have been a problem if I would I have seen this difference and adjusted for it in my interactions with you. Unfortunately, I did not.

I think there are three differences in our personalities, my ignorance of which made our interaction in the last six years especial painful for both of us.

1. Secrecy/Privacy/Personal Space. I grew up in a family in which people communicated very openly and we have been raised without concept of privacy, personal secrets, and personal space. Elena pointed to me that it has been hard for her to interact with my relatives first years because in her family nothing has ever been said explicitly. I also think that the other part of the problem comes from my upbringing in the Soviet Union, where western concept of personal space has not been much valued.
I now believe that a strong need for personal space and privacy is a very important part of your personality. It is not something that you simply accepted for given as a part of your western upbringing, but something that you have a deep and innate need for. Each time when this issue would come up, I misinterpreted your desire for privacy and personal space as an expression of your negative feelings towards me. My natural reaction to this is to chat with you even more and to establish emotional connection with you. You, on the other hand, interpret this as my further intrusion into your personal space and the situation keeps escalating as a chain reaction. I could have easily prevented



Δ π EXHIBIT 24
Deponent Naymar
Date 12.4.15   Rptr. LM
WWW.DEPOBOOK.COM

D00053

this from happening if I only understood how much personal space and privacy are important to you.

2. Communication. I am very easy in expressing my opinions. If I disagree with someone or do not like something, I would express this instantly often using hyperbole to blow a small issue into a disproportionally large problem. Assuming that we are similar, I naturally expected you to do the same.

As I understand only now, you are very different. You are much more inclined to keep your disagreement or unhappiness to yourself rather than expressing it openly. When negative feelings finally overwhelm you, you do express them loudly, but by that time it is already too late into to fix anything. I, on the other hand, assuming that you would have loudly communicated to me your concerns immediately, are left absolutely confused by your strange and very irrational, as it seems to me, behavior.

Looking back at many case of the described above situation, I realize that you have not actually been silent. You did communicated to me your unhappiness, but in a very gentle way that I ignored due to my expectation that you will express yourself in the same loud manner as I normally do.

My not understanding that you would rather use litotes than hyperbole, looked to you as my complete ignorance of your interests and opinions. As bad as it is by itself, this my behavior also led to all of our joint agenda (from research to teaching) almost completely driven by my interests, my believes, and my desires. I am very sorry about this.

3. Emotional connection. You are not easy about establishing emotional bond with other people. This is probably partially related to your elevated need for privacy and personal space and partially by your desire to avoid being potentially hurt by such connections. I am different. When things were not perfect, I, not understanding this part of your personality, sometimes tried to patch them up by appealing to your emotional side rather than your rational side. Most often this provoked an adverse reaction that I have not been able to comprehend. To make things worse, we did have such emotional connection at some point, but you got hurt, and now you are even less reluctant to allow it again.

I think you have seen these difference between us from the very beginning, tried to communicate them to me, but I have not been able to hear. Eventually, you gave up.

Sara, I am very sorry for what has happened. When I look at the last six years now, it appears to me that all conflicts that we had and all deep confusions that I had about irrationality of your reactions could be explained by my ignorance of these differences between us. I think that the first time in six years I understand you, but only time can be the ultimate judge of this.

2

D00054

Not being able to understand your reaction has often been hard for me and led to many irrational responses on my part. I do understand, however, that this my ignorance made your life even more unpleasant than mine.  If I would see these differences earlier, none of them would have been an issue. I do not have an innate need to intrude into personal spaces, ignore people, or to resolve issues on emotional rather than rational level.

Please, forgive me,

3

D00055