# Exhibit 6

IN THE UNITED STATES
DISTRICT COURT FOR MARYLAND
SOUTHERN DIVISION

DR. PAVEL NAUMOV,              :

  Plaintiff              :   Case No.:
                                8:15-cv-00482GJH

  vs.                    :

MCDANIEL COLLEGE, INC., :
et al.,
  Defendants.            :   December 18, 2015


---------------------


      The deposition of JEANINE STEWART, taken

on Friday, December 18, 2015, commencing at 10:06

a.m., at 2800 Quarry Lake Drive, Suite 200,

Baltimore, Maryland 21209, before Shannon M.

Wright, a Notary Public.


---------------------


Reported by:

Page 4

1      Q    Okay.  What documents did you review

2   for the deposition?

3      A    My answers to the interrogatories.

4      Q    Okay.  And -- and who did you talk to?

5   Did you talk to anyone before in preparation?

6      A    My attorneys.

7      Q    Okay.  I don't want to know what you

8   talked about, but how long did you talk with

9   your attorneys?

10      A    It was a couple of hours.

11      Q    Okay.

12      A    It was maybe two and a half.

13      Q    Okay.  Did you give your name and

14   address for -- for us?

15           What is your name and address?

16      A    My name is Jeanine Stewart.

17      Q    Mm-hmm.

18      A    And my address is 61 Monacan Court,

19   Lexington, Virginia, 24450.

20      Q    Oh, okay.  And what did you do at

21   McDaniel?

1       A    I was the provost and dean of faculty.

2       Q    And for how long were you provost?

3       A    Two years.

4       Q    Two years.

5            And what's your educational background?

6       A    I have a Ph.D. in psychology from the

7    University of Virginia.

8       Q    Mm-hmm.  Okay.  And what about your

9    undergrad degree and such?  Virginia as well?

10      A    No.  My undergraduate degree was a

11   bachelor's degree in psychology from the College

12   of the Holy Cross in Massachusetts.

13      Q    Okay.  And what -- what were your --

14   generally, very briefly, before McDaniel, what

15   were your educational positions?

16      A    You mean my places of employment --

17      Q    Mm-hmm.

18      A    -- in my career?

19      Q    Yeah.

20      A    My academic career started with a

21   postdoctoral fellowship at the University of

1    on behalf of someone who had experienced ---

2         Q    Mm-hmm.

3         A    -- problematic conduct in the

4    workplace.

5              The information was presented to me

6    first that there was an issue at my first

7    meeting with Dr. More, which was in late April

8    2015.

9         Q    Mm-hmm.

10        A    And with details coming forward only at

11   our next meeting, the next meeting that I had

12   with Dr. More.  So within 90 days of my becoming

13   aware of a problem, I did proceed to bring the

14   information forward through the Title IX process

15   as required of me.

16        Q    Mm-hmm.  Okay.  And as required of you?

17        A    Yes.

18        Q    But I was interested in what

19   specific -- there were some specific -- specific

20   things noted with regard to Dr. Naumov's

21   activities.

Page 23

1           MS. RILEY:  I'm going to object again

2     just because the -- I mean, you are defining

3     occurrence for purposes of -- of this witness,

4     but she has not defined occurrence the way

5     you've defined it.

6           Q    Well, what does occurrence mean to you?

7           A    I did not have interactions with

8     Dr. Naumov that led to this complaint.  This

9     complaint came about because another party was

10    aggrieved and had difficulties in interaction

11    with Dr. Naumov that caused her to resign her

12    tenured position.

13          Q    I see.  And so it is true that you have

14    no firsthand knowledge of anything?  Is that

15    true?

16          A    That's true.

17          Q    Okay.  And what gives you the right to

18    stand in place of -- of Dr. More?

19          A    I had the obligation to bring this

20    forward on behalf of Dr. More and the college on

21    the advice of counsel.

1    not?

2          A    On July 1, yes.

3          Q    Okay.  And so do you have any reason

4    why he wouldn't have been interviewed for -- for

5    this matter?

6          A    I was not responsible for the

7    interview.

8          Q    Who -- who -- who told -- well, who is

9    Mr. Immler?

10         A    Mr. Immler is a member of the

11   department of campus safety.

12         Q    Okay.  And who asked him to do this

13   investigation?

14         A    The investigation was launched after I

15   opened or activated the Title IX process.

16         Q    Mm-hmm.

17         A    So people who run the Title IX process

18   would have requested his involvement.

19         Q    Okay.  And what was his charge?  If you

20   know.

21         A    I don't know.

1          And then the next page, page 10, talks

2     about informal resolution.

3          A    Mm-hmm.  And can you restate your

4     question?

5          Q    Yeah.  Why was Dr. Naumov not given an

6     informal meeting to go over what, if anything,

7     he's being charged with or just to inform him of

8     the possibility that he's going to be charged

9     with various activities?

10         A    Those steps occurred during the meeting

11    I had with Dr. Naumov in late August of 2014.

12         Q    In late August of 2014, you offered him

13    a resignation.

14         A    I offered -- I explained to him the

15    charges that had been brought forward.  I

16    informed him of the policy.  I gave him access

17    to the director of human resources for

18    additional information, and I encouraged him to

19    speak with counsel to understand his options

20    under the informal resolution opportunity.

21         Q    Well, that wasn't an informal

Page 33

1    resolution; that was an offer to resign, to

2    resign his tenure, wasn't it?

3         A    He certainly could have chosen to

4    resign his tenure, but that was not a request I

5    was making.  I laid out information and

6    encouraged him to pursue advice or seek advice

7    from counsel and also to speak with the chair

8    of -- or the director of human resources if he

9    had additional need for information.

10        Q    Mm-hmm.  But during that meeting,

11   didn't -- didn't you ask him to sign that

12   document?

13        A    No.

14        Q    You did not?

15        A    I did not.

16        Q    You just offered an alternative to him?

17        A    And the document itself and the

18   information I provided, I believe, had a

19   several-weeks' long time window for his

20   consideration so that he had plenty of time to

21   seek advice.

1      Q    The faculty as a whole are under your

2   aegis as provost; is that correct?

3      A    Correct.

4      Q    And so you, as complainant, would be

5   biased certainly as part of the faculty affairs

6   committee?

7           MS. RILEY:  Objection.

8      Q    Okay.  You would not -- as complainant,

9   it would not be fair to have you as the

10  committee -- as part of the committee to judge

11  your own complaint; is that correct?

12     A    I recused myself from -- from their

13  work on this case.

14     Q    Okay.  And did you appoint anybody else

15  in -- in your place?

16     A    No.

17     Q    Why didn't you do that?

18     A    I don't know why I would have.

19     Q    Well, if you recuse yourself, hopefully

20  there would be, you know, somebody else to add

21  to the committee.

1         MS. RILEY:  Is that a question, Jim?

2    Q    Would there be somebody else -- could

3    you have added somebody to the committee in your

4    place?

5    A    I do not believe I would have made that

6    professional judgment, no.

7    Q    Okay.  Didn't you recuse yourself

8    before in terms of the appeal of the grievance?

9         Weren't you supposed to be part of

10   the -- the process, the appeals of the

11   grievance?

12   A    The provost is designated by policy as

13   a member of the appeals board.

14   Q    Right.

15   A    And I recused myself from that.

16   Q    And there were two other people, vice

17   president of finance and the assistant provost

18   or the dean of faculty -- I mean dean of

19   students.

20   A    Vice president for student affairs.

21   Q    Vice president for student affairs,

1    right.

2            Now, when you recuse yourself on the

3    appeal, that left only two people; that's

4    correct, isn't it?

5        A    (Nods head.)

6        Q    Yeah?

7        A    Yes.

8        Q    Okay.  And why didn't you appoint a

9    third person?

10       A    I was not in charge of that process.

11       Q    You were not in charge?

12       A    No.

13       Q    You're the provost.

14       A    I was not in charge of the Title IX

15   process.  As I've answered before, the Title IX

16   coordinator.

17       Q    But you did recuse because you felt it

18   was wrong for you to be a part of --

19       A    I recused because I was the complainant

20   of record in this case.

21       Q    Okay.  Is there any reason why you

1    didn't appoint somebody to replace you?

2            MS. RILEY:  Objection.  I think that's

3    asked and answered.

4            MR. STROUSE:  Oh, okay.

5       Q   Were you -- when Dr. Casey addressed

6    the faculty affairs committee, were you present

7    at that meeting?

8       A   Yes.

9       Q   And being the complainant, why -- why

10   were you present?  Isn't that --

11      A   I was present when the committee was

12   convened --

13      Q   Uh-huh.

14      A   -- to hear that the president had a

15   charge --

16      Q   Right.

17      A   -- for -- for the committee, and I

18   recused myself before the work began.

19      Q   Okay.  So you were just present right

20   in the beginning?

21      A   Correct.

1  Q I see.

2    Did you give any instructions to the

3 faculty affairs committee?

4  A No.

5  Q Did you give any deadlines to the

6 faculty affairs committee?

7  A No.

8  Q Okay.  Now, there were two faculty

9 affairs committee members that were recused; is

10 that true?

11  A Yes.

12  Q And why were they recused?  If you

13 remember.

14  A One recused because of involvement at

15 another stage of the process.

16  Q Uh-huh.

17  A And one was recused at my request

18 without cause.

19  Q And that was Lauren Dunders?

20  A Lauren Dundes recused herself.

21  Q At your request?

1      A    No.

2      Q    Why did she recuse herself?  Do you

3  know?

4      A    I know that she had other involvement

5  with Sara More related to this case, but I don't

6  know the details.

7      Q    So she felt she -- she had already had

8  information?

9      A    I don't know.

10      Q    Okay.  Okay.  And the members that were

11  recused, they were not replaced; is that

12  correct?

13      A    That's correct.

14      Q    And I'm wondering why they weren't

15  replaced given that you only had five members.

16  Is there any reason why they weren't replaced?

17      A    Again, I was not responsible for this

18  part of this process, and --

19      Q    Dr. Naumov, to your knowledge, was not

20  given a chance to -- to present before the

21  faculty affairs committee; isn't that correct?

1     Q    Okay.  Now, when you offered Dr. Naumov

2   the suspension or the resignation and he chose

3   to go through the process, you banned him from

4   campus, and you banned him from email; you, I

5   believe, directed Human Resources Director

6   Glennon to ban him from the campus as well.

7         Under -- why did you do that?

8     A    First of all, I can't remember whether

9   I took those actions or the director of human

10  resources did.

11    Q    Did you tell her to take those actions?

12    A    I don't recall telling her to take

13  those actions, but all of our actions were taken

14  at that time on the advice of counsel after

15  consulting with counsel.

16    Q    The -- Dr. Naumov was hindered, wasn't

17  he, from mounting a defense of the charges,

18  wasn't he, because he was not on campus?

19    A    It's my understanding that Dr. Naumov

20  could have accessed anything he needed to on

21  campus by communicating with the HR director.

1   That at least was the information that I

2   imparted during the meeting in late August of

3   2014.

4        Q    Right.   Where does it say, if it does,

5   in Title IX policy that you're supposed to ban

6   the individual from campus as a result of

7   charges?

8        A    I believe I referred to advice of

9   counsel, not the Title IX policy.

10       Q    Okay.   Wouldn't you agree this was

11  prejudicial of Dr. Naumov?

12       A    I would not.

13       Q    You would not?

14       A    No.

15       Q    Having no access to his papers; having

16  no access to his office --

17       A    I get --

18       Q    -- having no access to his email?   You

19  would not agree that that was prejudicial of

20  Dr. Naumov in his effort to defend himself?

21       A    Again, Dr. Naumov could have accessed

1        A    I believe this has been asked and

2    answered.

3            I served in place because I understood

4    it to be my obligation to the college to bring

5    forward the information that somebody was being

6    accused of some very serious policy violations.

7    And in the absence of the aggrieved serving as

8    the complainant, the only other option that I

9    was aware of, and one that counsel advised, was

10    that I served as complainant under the policy.

11        Q    And this is in violation of the Title

12    IX policy; isn't that true?

13        A    No, sir, I don't believe it is.

14        Q    In Title IX policy, doesn't it say that

15    if the complainant does not come forward, the

16    matter will be dropped on page 11 of the Title

17    IX policy?

18            MS. RILEY:  Are you quoting from the

19    policy, or are you just giving your own --

20            MR. STROUSE:  No.

21            MS. RILEY:  -- your reading of the

Page 58

1    policy?

2         Q    Let me read it.

3              In the event that the complainant is

4    unwilling to be identified, no formal hearing --

5    the formal hearing will be dismissed.  No action

6    will be taken, and no report of any action will

7    be filed.

8              Why didn't you just drop this matter?

9              The complainant clearly was not coming

10   forward.  You have no firsthand knowledge.

11        A    The aggrieved did not come forward.  I

12   served as the complainant in this case.

13        Q    You had no firsthand knowledge.  How

14   can you -- how can you just -- I mean, anybody

15   can make a complaint about anybody, but -- but

16   this is against the policy.  The person involved

17   does not want to come forward.  The policy says,

18   clearly, that it should be dismissed, and yet

19   you don't follow this.

20             What gives you the right to -- to

21   pursue?

1      A    Again, it was an obligation to pursue

2   as understood by me, the president, and counsel

3   especially in light of the Department of

4   Education's Dear Colleague letters.

5      Q    And what -- where -- I read that --

6   that letter, but I did not see anywhere where it

7   gave you or anybody else the right to stand in

8   place of the complainant.  It, in fact -- well,

9   I'm not going to testify directly.  I do have

10  the letter.

11          Where in that letter gives you the

12  right to stand in place of Dr. Naumov --

13  Dr. More?

14     A    Again, sir, I'm referring to an

15  obligation that I understood to accompany my

16  role as provost in this matter at this time.

17     Q    Now, according to AAU guidelines and

18  AAUP guidelines, where there's a tenured faculty

19  involved, the faculty affairs committee in the

20  McDaniels case is supposed to make the firing

21  recommendation; isn't that true?

Page 61

```
 1              (Whereupon, a recess was taken.)

 2       Q    Just a couple other questions.

 3              You said that you recused somebody

 4    on -- on the faculty affairs committee?

 5       A    (Nods head.)

 6       Q    Who was that?

 7       A    Sharon Craig.

 8       Q    And why -- why did you recuse her?

 9       A    Her mother had been diagnosed with a

10    terminal illness within days of our scheduled

11    meeting.

12       Q    Uh-huh.

13       A    Was in the process of being moved into

14    Sharon's home, and Sharon was arranging hospice

15    care.

16       Q    So it had nothing to do with

17    Dr. Naumov?

18       A    It did not.

19       Q    Why didn't you give another person --

20    put another person in there so it would be three

21    people?
```

1       A    First of all, this was -- I was not

2    responsible for this phase of the process as

3    complainant.  I acted on my option under the

4    policy to remove somebody without cause, and

5    it's an elected committee without -- without

6    elected alternates, so --

7       Q    Without elected alternates?

8       A    So there's no --

9       Q    So you couldn't --

10      A    Well, there's no existing process to

11   replace those people if there's a reduced number

12   of people on the committee.

13           MS. RILEY:  Jim, I think you said there

14   were two people.  There were actually three.

15           MR. STROUSE:  There were three?  I

16   thought there were --

17           PAVEL NAUMOV:  Three.

18           MR. STROUSE:  -- two left?

19      A    There were three.

20      Q    There were three left?

21      A    Three left, mm-hmm.