# Exhibit 7

Page 1

IN THE UNITED STATES
DISTRICT COURT FOR MARYLAND
SOUTHERN DIVISION

DR. PAVEL NAUMOV,           :

  Plaintiff                :    Case No.:
                                       8:15-cv-00482GJH
vs.                         :

MCDANIEL COLLEGE, INC.,     :
et al.,
  Defendants.              :    December 18, 2015


------------------

      The deposition of ROGER CASEY, taken on Friday, December 18, 2015, commencing at 11:41 a.m., at 2800 Quarry Lake Drive, Suite 200, Baltimore, Maryland 21209, before Shannon M. Wright, a Notary Public.


------------------


Reported by:

Shannon M. Wright

```
1      A    Probably two and a half hours.
2      Q    Okay.  Please give your name and
3    address.
4      A    Roger Casey.  One College Hill,
5    Westminster, Maryland.
6      Q    Is that your school?
7      A    That's the college -- the president's
8    house on campus.
9      Q    President's house.
10          And what do you do at McDaniel?
11     A    I'm the president.
12     Q    And, briefly, what are the president's
13   duties?
14     A    The president's appointed by the board
15   of trustees as the chief executive officer of
16   the college.  It's really my responsibility,
17   essentially like the president of an
18   organization, to ensure the financial well-being
19   of the institution.
20          The various vice presidents report to
21   me.
```

1          Okay.  What -- what led to the firing
2     of Provost Stewart?
3          A    Provost Stewart was not fired.
4          Q    The resignation of Provost Stewart?
5          A    Provost Stewart and I had a
6     conversation at the end of the last academic
7     year in which we discussed the realities of
8     the -- for lack of a better way of saying it,
9     the kind of political chips that you need to do
10    the job.  It's -- a provost's job is a very,
11    very difficult one having served in it ten years
12    myself.  And upon conclusion of that
13    conversation, the provost believed that the
14    political capital to continue to serve
15    particularly the president wasn't there, and she
16    resigned.
17         Q    Mm-hmm.  What do you mean by political
18    capital?
19         A    Just the amount of work that you do
20    with faculty, particularly in a time of
21    extraordinary change.  It's -- faculty are very

1    Q    But she has no firsthand knowledge of
2    anything, does she?
3    A    I'm not aware of that being a
4    requirement.
5    Q    You're not aware of it being a
6    requirement --
7    A    No.
8    Q    -- for the complainant?
9    A    No.
10   Q    Where does it say in this policy that
11   the provost or someone else could stand in the
12   place of the person aggrieved?
13   A    It's my understanding through the
14   advice of counsel that, based upon the
15   recommendations made by the federal government
16   in the Dear Colleague letter, that any member of
17   our community or administration that becomes
18   aware of any type of issue that involves sexual
19   harassment or sexual assault has a
20   responsibility to come forward with that
21   information.

1    Q    Uh-huh.  And be a complainant?

2    A    They have the responsibility to come

3 forward with that information.  However that

4 manifests itself, it would -- it could be

5 several ways, I think.

6    Q    Okay.  Here's the Dear Colleague

7 letter.

8    A    Mm-hmm.

9    Q    Give me that one back.  I'll keep that

10 one.

11        And could you tell me where this is?

12 I've looked through that, and I was unable to --

13        MS. RILEY:  I'm going to object.  This

14 witness is not being offered as a legal

15 expert --

16        MR. STROUSE:  No.  I realize that.

17        MS. RILEY:  -- on analyzing the Dear

18 Colleague letter, which is --

19        MR. STROUSE:  But he just --

20        MS. RILEY:  -- oh, 19 pages long.

21        MR. STROUSE:  Yes, I understand that.

1   But he just said that -- that this letter
2   authorizes -- if I can paraphrase you.   --
3   anyone in the college community to stand in the
4   place of a complainant -- of someone aggrieved.
5       A   I'm not sure that's what I said.
6       Q   Oh, I'm sorry.  I don't want to be
7   unfair.
8           What -- what did you --
9       A   I said I believe we have an obligation
10  in the community, when we become aware of any
11  type of situation that involves sexual
12  harassment or sexual assault, to bring forward
13  that information so that appropriate actions can
14  be taken of the organization.
15      Q   Was Dr. Naumov ever charged with sexual
16  harassment or sexual assault?
17      A   He's not charged with sexual assault,
18  no.
19      Q   Was he charged with sexual harassment?
20      A   I'd have to look at the interrogatories
21  to look at the specifics of that.

1       A    I don't know what you mean by came up
2    with.
3       Q    You ordered the sanction of
4    termination?
5       A    I made a recommendation at a point in
6    this process.
7       Q    Okay.  And that point was before the
8    faculty affairs committee took the matter under
9    advisement; is that true?
10      A    My recommendation of dismissal is
11   actually the recommendation that brought the
12   faculty affairs committee to the table to look
13   at the case.
14      Q    Isn't it true that the faculty affairs
15   committee was supposed to be involved before you
16   made a decision as to sanctions?
17      A    That was not the process advice that I
18   received from my attorney.
19           MR. STROUSE:  Okay.  Do you want to
20   take a break now, or --
21           MS. RILEY:  I don't know -- I mean, I

1    of a tenured faculty member case.

2        Q    You gave a due process to him?

3        A    Mm-hmm.  In other words, my

4    recommendation meant now that this material

5    would go to the FAC.

6        Q    Mm-hmm.

7        A    And the FAC would be making a ruling.

8             There were also other appeals processes

9    that were available.  And then that would go to

10   the board of trustees eventually so that they

11   could make a determination.

12       Q    Did they make a determination?

13       A    The board voted to terminate.

14       Q    Now, with regard to the faculty affairs

15   committee, did -- did this go directly to the

16   faculty affairs committee from your

17   resignation -- or -- or not -- recommendation

18   that he be dismissed?

19       A    There were other appeals processes at

20   work, too.

21       Q    And what were they?

1   making that recommendation, I was going to then
2   send this case to yet another faculty committee,
3   a faculty committee of elected appears, so that
4   they could make a judgment so that that could
5   then be brought to the board of trustees.
6           So that's how I remember the
7   decision-making process.  I really need to look
8   at the actual dates of the events so that I
9   could remember what fell when.
10      Q   Okay.  Now, did you -- when you sent it
11  to the faculty affairs committee, how did
12  that -- how did that work?  You just ordered it
13  to be -- to meet?
14          MS. RILEY:  I'm going to object that
15  there hasn't been any testimony that he sent
16  this matter to the faculty affairs committee.
17      Q   How did it go from you to the faculty
18  affairs committee?
19      A   When the president makes a
20  recommendation for the termination of a tenured
21  faculty member, the faculty affairs committee is

1  the body that examines the evidence and
2  determines whether that recommendation should be
3  brought to the board of trustees.
4       Q    Mm-hmm.
5       A    So the specifics of the meeting -- I
6  had -- I have a biannual -- sorry -- a
7  semiannual meeting with the faculty affairs
8  committee so that we can discuss the tenuring
9  promotion cases that I will be bringing forward
10 on their behalf to the board.  At this
11 particular meeting, they had some
12 recommendations for promotion to tenure -- I'm
13 sorry -- promotion to full professor.  And then
14 I asked them to stay because there was an
15 additional matter that I needed to discuss with
16 them and I needed them to be involved in.
17           At -- at that point in time, I was
18 joined by Jenny Glennon in the meeting to come
19 in, and I made a PowerPoint presentation.  I
20 believe we have made that available to you.
21      Q    The PowerPoint presentation?

1    A    To discuss the process that the faculty
2    affairs committee would then undertake to make a
3    recommendation to terminate or not terminate.
4    Q    Mm-hmm.  So you presented that to the
5    faculty affairs committee, the PowerPoint?
6    A    Right.  And the PowerPoint was about
7    process.
8    Q    Oh, it was about process?
9    A    Yeah.  Here's the reason why I'm asking
10   you to do this.
11        And then once that was presented, I
12   actually left the room.  Provost Stewart left
13   the room.  And you have to remember that she is
14   a member of the faculty affairs committee, and
15   she recused herself from the remaining part of
16   that meeting.
17        There were two other recusals.
18        And then I turned the process over to
19   Jenny Glennon so that she could then instruct
20   the committee, you know, here's what we have.
21   And I actually have no idea what happened from

1    that point on until they made their
2    recommendation.
3         Q    Okay.  And did Dr. Naumov get an
4    opportunity to present anything to the faculty
5    affairs committee?
6         A    I have no idea.
7         Q    Do you know whether he was supposed to
8    get -- make a presentation?  Supposed to make it
9    available?
10        A    Supposed to make what?
11        Q    The presentation before the faculty
12   affairs committee.
13        A    I'm not aware of -- of what --
14        Q    Are you aware of any AAUP guidelines
15   for tenured faculty?
16        A    Yes.
17        Q    And are you aware that it says in those
18   guidelines that anybody that is looking at
19   something like termination of a tenured faculty,
20   that the faculty should have the opportunity to
21   present before that group?

1        MS. RILEY: Objection just to the
2   multiple questions. Can you ask just one
3   question at a time.
4        Q   Well, wasn't it true that the faculty
5   affairs committees was obliged to assign
6   sanctions and not you as the final
7   decision-maker?
8        A   I wasn't the final decision-maker.
9        Q   Well, who was the final decision-maker?
10       A   I made a recommendation to the faculty
11  affairs committee, and they made a
12  recommendation to the board of trustees.
13       Q   Why didn't you talk to Dr. Naumov
14  before you made your decision or recommendation?
15       A   I spoke to no one other than to review
16  the details of the case. This had been
17  presented to me at that time.
18       Q   Well, AAUP guidelines, every
19  decision-maker is supposed to talk to the
20  alleged perpetrator; isn't that true?
21       A   I thought that he had presented his

Page 66

1    case or his defense adequately, and -- and

2    others had presented their information

3    adequately.

4         Q    Okay.  You've been just reappointed

5    to -- for McDaniel College?

6         A    I'm on an annual appointment.

7         Q    You're on an annual appointment.

8              Okay.  After you initially talked to

9    Dr. More and -- did you talk to her subsequently

10   after you initially talked to her somewhere

11   around -- I don't know.  I'm not sure exactly.

12   when you talked to her initially.

13             But did you talk to her again about her

14   charges against Dr. Naumov?

15        A    I didn't talk to her at any point in

16   time during the course of -- of the case from

17   the time she spoke to Dr. Stewart on.

18        Q    Okay.

19        A    I don't actually remember when I talked

20   to her last before that.

21        Q    Now, Dr. Stewart actually assembled the