# Exhibit 11

IN THE UNITED STATES
DISTRICT COURT FOR MARYLAND
SOUTHERN DIVISION

DR. PAVEL NAUMOV,            :

  Plaintiff               :   Case No.:
                              8:15-cv-00482GJH

  vs.                     :

MCDANIEL COLLEGE, INC., :
et al.,
  Defendants.             :   December 22, 2015


--------------------


      The deposition of JENNIFER GLENNON, taken

on Tuesday, December 22, 2015, commencing at 1:24

p.m., at 5401 Twin Knolls Road, Suite 7, Columbia,

Maryland 21045, before Shannon M. Wright, a Notary

Public.


--------------------


Reported by:
Shannon M. Wright

1   Title IX guidelines?

2       A    That's not our -- the college's

3   interpretation, nor the interpretation of our

4   attorney.

5       Q    Okay.  With regard to page 11, did you

6   also do away with the paragraph under, "Formal

7   Hearing" in the last sentence in particular, In

8   the event that the complainant is unwilling to

9   be identified, the formal hearing will be

10  dismissed, no action will be taken, and no

11  report of any action will be filed?

12      A    I believe that we have modified it so

13  that there is a -- an opportunity for the

14  complainant to remain confidential.

15      Q    Mm-hmm.  Isn't this in opposition to

16  Title IX guidelines?

17      A    Not in the college's interpretation,

18  nor the interpretation of our attorney.

19      Q    Okay.  Isn't this the Title IX policy

20  under which Dr. Naumov would come under?

21           MS. RILEY:  Referring to Glennon 1?

1          MR. STROUSE:  Glennon 1, yes.

2     A    Yes.

3     Q    Okay.  Now, in your later

4    interpretation -- I think this is the next

5    iteration of your policy.

6          MS. RILEY:  Mr. Strouse, I'm going to

7    interject the same objection that you're

8    providing --

9          MR. STROUSE:  Yeah, that's right.

10         MS. RILEY:  -- only a single page, page

11   10 --

12         MR. STROUSE:  Of a document that's --

13         MS. RILEY:  -- of a multipage policy.

14         MR. STROUSE:  Yes.  Yeah.  I have to

15   get that.  You're right.

16    Q    Well, I'd like you to identify this.

17    A    It looks like a revised policy.

18    Q    Okay.  And on page 10, you define

19   complainant; isn't that right?

20    A    This was a revision after Dr. Naumov's

21   grievance was filed.

Page 14

1      Q    Well, how could he adequately defend

2   himself if his email was dismantled and he was

3   told not to talk to anyone on campus?

4      A    He did have permission to talk with

5   witnesses.

6      Q    Mm-hmm.

7      A    And he did.

8      Q    Okay.  Now, the actual person who --

9   who suggested that Dr. Naumov allegedly did

10  something wrong was Dr. Sara More, wasn't it?

11     A    She was the witness who expressed the

12  concerns.

13     Q    But she never made a complaint, did

14  she?

15     A    She did to Dr. Stewart.

16     Q    She never filled out the form on the

17  complaint?

18     A    I -- to my knowledge, Dr. Stewart

19  filled out the form.

20     Q    Okay.  With regard to this iteration of

21  the Title IX policy, which is updated 6/1/2014,

1   where does it say in this policy that someone

2   else can be the complainant if the actual

3   complainant refuses to cooperate or be

4   identified or make a complaint?

5        A    It was the interpretation of our

6   counsel that allowed that.

7        Q    But where does it say that?  Is there

8   anything in here that says that someone can

9   stand in the shoes of a complainant or the

10  person against whom the activities were

11  directed?

12       A    It's not explicitly indicated or not

13  indicated.

14       Q    Okay.  All right.  Isn't there a 30-day

15  informal process that's supposed to take place

16  before anything starts?

17       A    There is an informal resolution.  Is

18  that what you're referring to?

19       Q    Yes, uh-huh.

20       A    Okay.

21       Q    And mustn't this happen within 30 days?

1    formal complaint is made?

2         A    No.

3         Q    Why do you say that?

4         A    At that time, there was enough

5    information that indicated that a formal

6    grievance could be -- could occur.  And so I

7    believe that Dr. Stewart was giving him the

8    option to resign before that formal hearing went

9    forward.

10        Q    Mm-hmm.  But resignation would end his

11   affiliation with McDaniel College?

12        A    Yes.

13        Q    And give up his tenure?

14        A    Yes.

15        Q    And -- and you don't see anything wrong

16   with that as being the outcome of the informal

17   process?

18        A    No.

19        Q    Isn't there a 90-day window for

20   reporting Title IX violations?

21        A    Where are you reading from?

1    grievance committee.

2           What was your role in setting up the

3    grievance committee?

4           A    I appointed the members.

5           Q    All the members?

6           A    Mm-hmm.

7           Q    Okay.  And how did you go about

8    selecting those members?

9           A    I used the guidance in the policy.

10          Q    Uh-huh.  And why was Ms. Hines put as

11   chair?

12          A    So we are to use members of the

13   president's council.  And Mr. Phizacklea and

14   Ms. Gerl are already involved at the appeal

15   level.  Dr. Stewart was already involved.  And

16   Ms. Hines had the most tenure of those that were

17   left.

18          Q    Okay.  And what about the faculty, why

19   did you choose the faculty that were --

20          A    I chose from individuals that were

21   visitors -- visitors to the board.

Page 23

1          MS. RILEY:  Objection.  Con- --

2      Q   Did you have any consideration or did

3   you talk about any of these actions that were

4   referred to in the footnotes?

5          MS. RILEY:  Are you asking if she

6   drafted it?

7          MR. STROUSE:  No.

8      Q   Did you comment about them?  Did you

9   think about them?  Did -- was that part of your

10  thinking as to why -- why he was able to be

11  charged?

12     A   So are you asking what my role is?

13     Q   No.  When you saw stalking behavior,

14  stalking -- stalling -- yeah, stalking behavior,

15  was this part of your consideration to let him

16  be charged?  Did you have a say as -- I'm sorry.

17         Was stalking behavior part of the

18  reason why you let him be charged?

19     A   I didn't let him be charged.

20         So my job was to look at the complaint

21  and determine if pieces of the complaint fell

Page 24

1    under the Title IX policy.

2        Q    Mm-hmm.

3        A    My decision was not to find him

4    responsible or not responsible, but instead was

5    to facilitate the process so that if any policy

6    violations were -- or had occurred, they could

7    be evaluated.

8        Q    These -- these comments by themselves

9    appear to be pretty innocuous, aren't they?

10            Walking to the car?  I mean, how does

11   that indicate harassment or hostile work

12   environment?

13       A    It wasn't my job to judge those.

14       Q    It wasn't your job to make any judgment

15   as to whether or not the charges were legitimate

16   or not?

17       A    No.

18       Q    You had no role in deciding to let this

19   complaint go forward?

20       A    I received a complaint --

21       Q    Mm-hmm.

```
 1        A    -- and I had to determine what policy

 2    they would fall under and then follow whatever

 3    procedures were prescribed --

 4        Q    So whenever you receive --

 5        A    -- that the policy dictated.

 6        Q    I'm sorry.  I'm sorry I cut you off.

 7             Whenever you receive a complaint, you

 8    decide under what policy it lies, and it goes

 9    forward based on your decision?

10        A    Not solely.

11        Q    Who else would you consult?

12        A    Depending on the issues, it could be

13    counsel.

14        Q    Mm-hmm.

15        A    My supervisor.

16        Q    And counsel, you mean who?

17        A    Al Mezzanotte and Kevin McCormick.

18        Q    Okay.  But did you look at these

19    charges that Dr. Stewart made?

20        A    I read them.

21        Q    Did you have any comment on them?
```

1      Q    Okay.  What was your role, if anything,

2  in the appeals committee regarding the grievance

3  decision?

4      A    I just was the facilitator of giving

5  them the information.

6      Q    Okay.  And the appeals committee was

7  supposed to be made up of Dr. Stewart; the vice

8  president for finance, who was an unusual name;

9  and the dean of students -- or the dean of

10  students; is that correct?  The vice

11  president --

12     A    That's correct.

13     Q    -- of students?

14          And Dr. Stewart recused as she should

15  have, but why was no one appointed in her stead?

16     A    The policy did not call for a panel of

17  three.  It called for members according to their

18  role.

19     Q    Well, I mean, it does make some sense

20  to have a three-person panel; isn't that true?

21  I mean --

1    A    So I don't --

2    Q    Oh, okay.

3    A    -- want to speculate as to what I

4  included and didn't include because I don't

5  recall all of the details.

6    Q    Oh, okay.  Why wasn't Dr. Naumov given

7  the opportunity to appear before the faculty

8  affairs committee?

9    A    He was given the opportunity to give a

10  written defense.

11    Q    A written defense, but he was not able

12  to go before the faculty affairs committee and

13  answer questions, or do any of that, orally

14  defend himself.

15        Why was he not given that opportunity?

16    A    I don't know why they made that

17  decision.

18    Q    Aren't they supposed to, under the

19  faculty affairs handbook -- which, again, is

20  part of page 13, Number 4.

21        Should have the opportunity to be

1    heard -- that last paragraph, number 4 -- in his

2    or her own -- own defense by all bodies that

3    pass judgment upon the case.

4         A    They have the opportunity to submit a

5    written defense to them.

6         Q    Well, that's not the same as being

7    heard to answer questions or do anything, a

8    written -- that's not the same, is it?

9         A    If they had questions for him, they

10   would have posed them.

11        Q    Right, but it's not the same as him

12   being given the opportunity to be heard in his

13   or her own defense.

14        A    I disagree.  He was given the

15   opportunity to give a written argument to them.

16        Q    What does heard mean to you?

17        A    Heard is not implying face to face.

18        Q    Well, it does not imply face to face?

19        A    No.

20        Q    Well, I guess we have to disagree on

21   that one.

Page 51

1    Title IX policy, who approves it?

2         A    President's council.

3         Q    The president's council?

4         A    That's correct.

5         Q    Okay.  To your knowledge, did Title IX

6    policy exist before the April 11th Dear

7    Colleague letter from the U.S. Department of

8    Education?

9         A    I'm not sure.

10        Q    Okay.  Now, when was it that you heard

11   about Dr. Naumov's complaints for the first

12   time?  Was it informal process?

13        A    No.  When Dr. More complained to

14   Dr. Stewart.

15        Q    Do you recall when that was?

16        A    Sometime during the spring of 2014.

17        Q    Okay.  Who ordered the investigation of

18   Dr. Naumov by Mr. Immler?

19        A    It's included in the production

20   summary.  So I believe it was Jasken to Webster,

21   and Webster assigned Immler, I believe.

1      Q    Jasken asked Mr. Webster, who's in

2  charge of security?

3      A    At the time he was the director of

4  campus safety.

5      Q    Okay.

6      A    And he the one who that assigned.

7      Q    Okay.  Were you contacted by Dr. Marx

8  in the beginning of the summer 2014 with faculty

9  concerns about the legitimacy of this

10  investigation?

11      A    In the summer of 2014?

12      Q    Yes.

13      A    No.

14      Q    When -- did you ever talk to Dr. Marx?

15      A    Yes.

16      Q    And when was that?

17      A    Sometime during the fall, but I only

18  agreed to discuss process with him.

19      Q    Just process?

20      A    That's right.  I --

21      Q    No accusations?

Page 57

1      Q   They just order the investigation, and

2  that's it?

3      A   I believe that's part of the process.

4  Yeah.  I don't think that they're entitled to

5  it.

6      Q   If they order it, wouldn't they

7  naturally get it?

8      A   It doesn't expressly state or not state

9  that they should get it.

10     Q   Mm-hmm.  But you know for a fact that

11  she did not get it?

12     A   I don't know for a fact.  I just don't

13  believe.

14     Q   Okay.  Dr. Stewart got it, and you got

15  it; is that correct?

16     A   And Eric Immler, of course, had it, and

17  our counsel had it as well.

18     Q   And then what was the process?  You

19  decided there was sufficient information --

20  information to start the process?

21     A   After reviewing the investigative

1    process -- the investigative report collectively

2    on the advice of counsel, we decided that we had

3    an obligation to move forward.

4         Q    Who else was involved in that decision

5    besides you and counsel?

6         A    Dr. Stewart and Eric were at that

7    meeting as well.

8         Q    Dr. Stewart was at the meeting?

9         A    That occurred in the beginning of July.

10        Q    How could Dr. Stewart be involved in

11   that meeting to go forward when she was

12   purportedly the complainant?

13        A    She was not the complainant at that

14   time.

15        Q    But she subsequently became the

16   complainant?

17        A    She wasn't the complainant until

18   September 8th.

19        Q    Right.  Okay.  Now, there's a Dear

20   Colleague letter.  Are you familiar with that

21   Dear Colleague letter?

1    forward.  She was a witness.

2         Q    She was a witness where?  When?

3         A    She was a witness in the investigative

4    report, so she willingly gave her statement to

5    Eric Immler.

6         Q    But she -- she did not fill out a

7    complainant form, did she?

8         A    Not to my knowledge, but she willingly

9    gave her statement as part of the investigative

10   report.

11        Q    Mm-hmm.  So you're saying that anybody

12   who gave a statement to -- in this matter could

13   have been the complainant or could have been

14   considered the complainant?

15        A    No.

16        Q    But Dr. More refused to come forward

17   and be identified, didn't she?

18        A    She asked that her name not be used.

19        Q    Right.  Okay.  And the Title IX policy

20   says that the complainant, if unwilling to be

21   identified, a formal hearing will be dismissed.

1    procedures?

2         Q    Yes.

3         A    No.  I was not present.

4         Q    Did you -- did you discuss it with

5    anybody, even though it wasn't part of the --

6         A    No.

7         Q    Okay.  Okay.  What was your role, if

8    anything, during the grievance committee

9    process?

10        A    I scheduled the rooms, scheduled the

11   court reporter.  I might have stayed with the

12   witnesses to get them in and out.

13        Q    Mm-hmm.

14        A    But I was not present for the

15   testimony.

16        Q    Okay.  The stenographic record of the

17   hearing, you say you have a copy of that?

18        A    That's correct.

19             MR. STROUSE:  And you said that you

20   gave us that copy of it?

21             MS. RILEY:  It was in our production of

1    documents.  Dr. Naumov has it.

2              MR. STROUSE:  Okay.

3              PAVEL NAUMOV:  He has it.  I saw it.

4              MR. STROUSE:  I've got it.

5    BY MR. STROUSE:

6         Q    Okay.  You weren't involved in the

7    October 15th meeting of the grievance committee

8    at all?

9         A    Again, I scheduled the room, was

10   present, but not for the testimony of the

11   witnesses.

12        Q    Was Julia Jasken present at the

13   October 7th meeting when Dr. Naumov --

14        A    October 7th?  I don't know what the

15   October 7th meeting is.

16        Q    The preliminary hearing.

17        A    Yes.  She presented -- she gave the

18   committee the grievance form.

19        Q    The grievance form filled out by Dr. --

20        A    It was the confidential one, because

21   they didn't have the names.  So I believe it's

Page 94

1    of the grievance committee -- I think we already

2    used my copies.  Let me make a couple more.

3              MR. STROUSE:  Off the record for a

4    second.

5              (Whereupon, discussion was held off the

6        record.)

7              (Whereupon, a recess was taken.)

8        Q    This is -- would you identify this

9    document?

10       A    It's the decision.

11       Q    Decision of the grievance committee,

12   correct?

13       A    Summary of it.

14       Q    Okay.  This was -- this was the only

15   information given Dr. Naumov with regard to the

16   grievance committee decision?

17       A    I believe so.

18       Q    Okay.  This was supposed to be given to

19   him 48 hours by -- in person, wasn't it?

20       A    Within 48 hours.

21       Q    Was it given to him in 48 hours?

1      A    Via email.   Forty-eight hours of when

2   they made their decision.

3      Q    And why wasn't it hand-delivered to

4   Dr. Naumov?

5      A    At the time, he was still prohibited

6   from being on campus, and via email was the most

7   expedient way --

8      Q    Mm-hmm.

9      A    -- to honor the 48-hour obligation.

10          And Dr. Stewart's was emailed as well.

11     Q    Okay.  Who -- who notified members of

12  the appeals panel about the grievance appeal?

13  If you know.

14     A    I believe I would have.

15     Q    Okay.  And wasn't the first panel

16  meeting November 10th, 2014?

17     A    Possibly.

18     Q    Do you know who was present at that

19  meeting?

20     A    It would have been Phizacklea and Gerl

21  and myself.

1      Q    Okay.  And yourself?

2      A    (Nods head.)

3      Q    You were part of the panel?

4      A    No.  I would have given them the

5  information.

6      Q    Uh-huh.  Did you, in fact, give the

7  charge to the panel?

8      A    In terms of?

9      Q    What they were supposed to do.

10     A    I probably reviewed the policy with

11 them.

12     Q    Okay.

13     A    And then gave them the documents that

14 they needed to review, but I don't recall the

15 specific dates.

16     Q    Who recused Dr. -- Dr. Stewart from the

17 appeal panel?

18     A    She recused herself.

19     Q    Okay.  And the reason for the recusal

20 was that she was the complainant.

21          Are you aware that Tom Phiziacea --

1     A    Phizacklea.

2     Q    -- Phizacklea was present during the

3    October -- August 25th meeting, 2014 meeting,

4    between Dr. Naumov and Defendant Stewart?

5     A    Yes.

6     Q    Okay.  Since he was there when

7    Dr. Naumov was given the resignation -- why was

8    he not recused?

9     A    He was there as a witness.

10    Q    Even though he's there as a witness, he

11   had prior knowledge of what was going on; is

12   that fair to say?

13    A    He was there as a witness.

14    Q    So shouldn't he have been recused from

15   the appeals committee as well?

16    A    No.

17    Q    Why not?  He had other information that

18   was possibly prejudicial to Dr. Naumov.

19    A    I disagree.

20    Q    Okay.  Were you ever aware of a

21   complaint on Beth Gerl sent to Dr. Casey by

1        A     I might have updated him on where

2    things today.

3        Q     Did you discuss the case with anyone

4    else during that period?

5        A     I don't believe so, other than counsel.

6        Q     Okay.  Now, the appeals panel, they had

7    a second meeting on November 12th; is that true?

8        A     I don't know the exact dates.

9        Q     They had a second meeting; is that

10   true?

11       A     They met together several times.

12       Q     Okay.

13       A     I don't know the exact dates or the

14   number of times.

15       Q     Was Mr. Immler asked to testify at the

16   meeting of the appeals panel?

17       A     I'm not sure.

18       Q     Okay.  Did anyone testify at their

19   meetings?

20       A     I'm not sure.

21       Q     If you know.