# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAVEL NAUMOV,      *

     Plaintiff      *

                          Civ. Act. No. 8:15-cv-00482 GJH

     *

McDANIEL COLLEGE, INC., et al.

     *

     Defendants

     *

     *

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

James C. Strouse, Ph.D., J.D.
MD Bar No. 09557
Strouse Legal Services
5401 Twin Knolls Road, Suite 7
Columbia, MD 21045
Telephone:  410-730-7600
Facsimile:   410-964-9018
Email:  sstrousejc@aol.com

*Counsel for Plaintiff Pavel Naumov*

# TABLE OF CONTENTS

Page

SUMMARY……………………………………………………… ..   1

STATEMENT OF THE FACTS…………………………………   2

A.   Parties……………………………………………..   2

B.   The McDaniel Faculty Handbook Refers to the Affirmative
Action/Equal Opportunity ("AA/EEO) Manual and the Title
IX Policy for Dealing with Discrimination……………..   3

C.   McDaniel College Title IX Policy………………………   4

D.   A Female Faculty Member Complained to the Provost, Dr.
Stewart, About Plaintiff…………………………………   5

E.   Provost Stewart Explained to Dr. More That She Felt
Obligated to File a Title IX Claim and That an Investigation
Would Follow……………………………………………   8

F.   An Investigation Was Conducted That Revealed Evidence of
Possible Violation of the College's Title IX Policy………   9

G.   A Formal Title IX Grievance Was Filed Against Plaintiff
And A Grievance Committee Was Appointed to Consider the
Complaint………………………………………………   11

H.   Plaintiff Appealed the Grievance Committee Decision to an
Appeal Panel……………………………………………   14

I.   Defendant Casey Recommended the Sanction of Dismissal,
Which Plaintiff Appeals…………………………………   15

J.   The Elected Faculty Affairs Committee Considered the
Dismissal………………………………………………… 16

## Table of Contents Con't

K.  The Board of Trustees Upheld the Sanction of Dismissal; Plaintiff
    Was Terminated............................................................... 17

L.  Plaintiff's Employment Following Dismissal from McDaniel...... 18

STANDARD OF REVIEW...................................................... 19

ARGUMENT

  I.    DR. NAUMOV HAS ESTABLISHED THAT DEFENDANTS
        VIOLATED TITLE IX, OR AT LEAST CREATED
        A GENUINE ISSUE OF MATERIAL FACT REGARDING
        SUCH VIOLATION............................................... 20

  II.   DR. NAUMOV HAS ESTABLISHED THAT DEFENDANTS
        VIOLATED THE MCDANIEL FACULTY HANDBOOK, OR AT
        LEAST CREATED A GENUINE ISSUE OF MATERIAL FACT
        REGARDING SUCH VIOLATION................................ 25

CONCLUSION..................................................................... 27

CERTIFICATE OF SERVICE................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                      **Pages**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242
(1986)..............................................................................................................................19

*Baltimore Univ. v. Colton*, 98 Md. 623, 57 A. 14
(1904)..................................................................................................... 25

*Cannon v. Univ. of Chi.*, 441 U.S. 677
(1979).............................................................................................................................. 21

*Celotex Corp. v. Catrett*, 477 U.S. 317
(1986)............................................................................................................................. 19

*Chan v. Miami Univ.*, 73 Ohio, 3d 52
*(1995)*.........................................................................................................................5,26

*Cleveland Board of Edn. v. Loudermill*, 470 US 532, 530-541, 105 S. Ct. 1407
(1985)..................................................................................................................5

*Davis v. Zahradnick*, 600 F.2d 458 (4th Cir. 1979)............................................19

*Deutsch v. Chesapeake Ctr.*, 27 F. Supp. 2d 642 (D. Md. 1998).....................26

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md.
2015..............................................................................................................................21

*Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL4647996
(W.D. Va (Aug 5
(2015))............................................................................................................... 24

*Fellheimer v. Middlebury College*, 869 F. Supp 238 (D. Vt. 1994).................. 25

## Table of Authorities, Continued

*Franklin v. Gwinnett Cnty Pub. Sch.*, 503 U.S. 60, 75-76, 112 S.Ct. 1028 (1992)............................................................................................................20

*Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 747 A.2d.205 (2000)........................................................................................................…....25

*Jackson v. Birmingham Bd. of Educ.*,544 U.S.167, 125 S.Ct. 1497...................................................................................................…....20

*Kelso v. Corning Cable Sys. Int'l Corp.*, 224 F. Supp. 2d 1052(W.D.N.C. 2002)...........................................................................................................19

*Kirby v. N.C. State Univ.*, No. 5:13-CV-850-FL, 2015 WL 1036946 (E.D.N.C. signed Mar. 10, 2015)..............................................................21

*Krotkoff v. Goucher Coll.*, 585 F.2d 675 (4th Cir. 1978)..................................25

*Merrow v. Goldberg*, 672 F. Supp 766, 774 (D. Vt. 1987)...............................................................................................…........25

*Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638-41(6th Cir., 2003)..................22

*Matutsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.574 (1986)...........................................................................................................19

*Napolitano v. Trustees of Princeton Univ.*, 186 N.J. Super. 548, 453 A.2d 263, 273 1982)...........................................................................................................25

*Oncale v. Sundown Offshore Servs.*, Inc. 523 U.S. 75, 80 (1998).............................................................................................................21

*Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203 (4th Cir.1994)......................................................................................................21

## TABLE OF AUTHORITIES (CONT'D)

*Univ. of Balt. v. Iz*, 123 Md. App. 135, 716 A.2d 1107 (1998)........................26

*Wolfe v. Fayetteville Ark. Sch. Dist.,* 648 F.3d 860, 867 (8th Cir. 2011)...........22

*Yusuf v. Vasser Coll.* 76 Fed. Appx. 634, 638-41 (6th Cir 2003)........................22

**Statutes**                                                         **Pages**

20 U.S.C. § 1681...............................................................   20,21

20 U.S.C. §§ 1681–1688...........................................................4

42 U.S.C. § 2000e ................................................................21

Fed. R. Civ. P. 56.. .............................................................. 19

.

**SUMMARY**

Prior to his dismissal, the Plaintiff Pavel Naumov ("Dr. Naumov" or "Plaintiff") was a tenured faculty member of the Mathematics and Computer Science Department at the Defendant McDaniel College, Inc. ("McDaniel" or the "College"). For several years, Dr. Naumov worked alongside Dr. Sara More ("Dr. More"), the sole other member of the College's Mathematics and Computer Science Department.

Drs. Naumov and More had a very productive professional relationship and produced over 12 joint papers in their collaborative research. As such, they worked closely together and over time developed a friendly social relationship as well. Both Dr. Naumov and Dr. More exchanged social visits with each other's families during their time as colleagues at the College.

The College terminated Dr. Naumov's employment in January 2015 due to allegations filed by the College's Provost, Dr. Jeanine Stewart ("Dr. Stewart"). Notably, however, Dr. Stewart's complaint was not based on anything Dr. Naumov had done to her, but, rather, Dr. Stewart filed the complaint on behalf of Dr. More, who had refused to be a formal complainant. Nevertheless, Dr. Stewart unilaterally filed a formal complaint based on Dr. More's statements to her about Dr. Naumov.

According to the College's Title IX policy, the complainant must come forward or abandon his or her complaint. In this case, Dr. More refused to come forward, and Dr. Stewart became the complainant despite not having any right or obligation to do so. As acknowledged by Jennifer Glennon, the College's Director of Human Resources, McDaniel's Title IX handbook provides that only the person subjected to the alleged behavior can make a formal complaint. Furthermore, Dr. Stewart's position as Provost made the charges sound serious because they came from the second in command at the College.

1

In addition, all complaints regarding Title IX transgressions must be reported within 90 days of their occurrence.   All of the instances that Dr. Naumov is charged with happened many months and even years before the actual complaint was made.  Thus, all the charges are untimely because none were reported within the requisite 90-day window.

As a result of the foregoing, Dr. Naumov commenced the instant litigation, alleging four distinct causes of action:  (1) Title IX; (2) intentional infliction of emotional distress;

(3) due process; and (4) breach of the faculty handbook.  Now, Defendants seek summary judgment on all claims.

## STATEMENT OF THE FACTS

Please note that Dr. Naumov will follow McDaniel's Statement of Facts and explain differences when necessary.

### A.   Parties

McDaniel is a liberal arts college located in Westminster, Maryland.  (Defs.' Mem.  Supp. Mot. Summ. J. ["Defs.' Mem."] Ex. 9 [Glennon Aff.] ¶ 3 [hereinafter "Glennon Aff."];  Am. Compl. ¶ 14.)

Plaintiff joined the faculty at McDaniel College in 2005 as an Assistant Professor of Computer Science.  (Am. Compl. ¶ 5; Glennon Aff. ¶ 4.)  In 2011, Plaintiff was awarded tenure and promoted to Associate Professor of Computer Science.  (Defs.' Mem. Ex. 10 [Naumov 2011 Promotion Ltr.].)  Plaintiff was dismissed from McDaniel on January 20, 2015.  (Pl.'s Dep. Ex. 3.)

Defendant Dr. Roger Casey is President of McDaniel College, appointed by the Board of Trustees.  (Casey Dep. 5.)

Defendant Dr. Jeanine Stewart served as Provost and Dean of Faculty for McDaniel College for two years, until the end of the 2014-2015 academic year,

2

when Dr. Casey asked for her resignation.   (Casey Dep. 7; Stewart Dep. 4-5.)  Dr. Stewart currently is on sabbatical leave from McDaniel and scheduled to return in fall 2016 as a regular faculty member. (Glennon Aff. ¶ 5.)

Defendant Martin Hill is Chairman of the Board of Trustees of McDaniel College.   (Am. Compl. ¶ 10.)   Martin Hill, as Chairman of the Board of Trustees, represents McDaniel and is responsible for its actions. He, along with the Board, makes policy for McDaniel.

**B.     The McDaniel Faculty Handbook Refers To the Affirmative Action/Equal Opportunity ("AA/EEO") Manual and the Title IX Policy for Dealing with Complaints of Harassment or Discrimination**

Three different McDaniel Faculty Handbook editions were in place during the period from April 2014 and January 2015 when the matter was filed and processed; a February 2014 edition, an August 2014 edition, and a December 2014 edition. The August 2014 Handbook is the one which applies here.

However,  all the events in this litigation concerning Dr. Naumov occurred many months before he filed his legal complaint. (Glennon Aff. ¶ 6.)   All three handbook editions contain the same Equal Opportunity Statement and Policy on Sexual Harassment and Sexual Discrimination, which direct faculty to the College "Affirmative Action/Equal Opportunity Manual, available on the Portal" for a complete guide to College policies on equal employment. (Glennon Aff. ¶ 6.) Additionally, each of the three handbooks provide in section 4.4.7 ("Grievances, Complaints") that "[w]hen a grievance is alleged to be discrimination or harassment, procedures outlined in the Affirmative Action Manual will be followed." (Glennon Aff. ¶ 6.)

The referenced AA/EEO Manual is included in the McDaniel Title IX policy as Appendix B. (Glennon Aff. ¶ 7.)   The Title IX policy was periodically updated (even while the AA/EEO Manual was not), and the June 2014 Title IX

policy was the version that was in effect at the time that the Title IX complaint was filed. (Defs.' Mem. Ex. 11 [Excerpt from Jennifer Glennon Dep.], at 9-10 [hereinafter "Glennon Dep.")]; *id.* Ex. 12 [McDaniel June 2014 Title IX Pol'y] [hereinafter "Title IX Pol'y"].) Interestingly, the last version of the Title IX policy, 8/22/2015, includes an extensive section on the College's right to intervene in a case, (Title IX Pol'y, at 10, 8/22/2015). There was no right of the College to stand in place of the complainant in Title IX Pol'y of 06/01/14, when Dr. Naumov's case arose. (Pl. Ex. 1)

## C. McDaniel College Title IX Policy

McDaniel initially addressed Title IX of the Educational Amendments of 1972, 20U.S.C. §§ 1681–1688, and it's implementing regulations in the body of its AA/EEO Manual. (Glennon Aff. ¶ 8.) However, beginning in approximately 2012, McDaniel enacted a separate Title IX policy, which was then appended to its AA/EEO Manual as Appendix B. (Glennon Aff. ¶ 8.) The McDaniel College Title IX policy subsequently was updated several times, including in September 2013, March 2014, June 2014, December 2014, March 2015, and August 2015. (Glennon Aff. ¶ 8.) The June 2014 Title IX policy was the one in which Dr. Naumov's actions were considered.

McDaniel scheduled a Title IX workshop for faculty in November 2012. (Glennon Aff. ¶ 9.) McDaniel notified all faculty of critical changes to Title IX by email on April 1, 2013. (Glennon Aff. ¶ 9.) McDaniel required faculty and staff to participate in annual Title IX training beginning on June 5, 2014. (Glennon Aff. ¶ 9.)

The June 2014 Title IX policy provides, in pertinent part, with regard to the sanctioning of tenured faculty, that "if the respondent is a faculty member, his/her tenure status is not a protection since discrimination, harassment, and sexual assault violate basic human rights guaranteed by law, and tenure is not a guarantee against sanction due to either established academic principles or civil or criminal

4

laws." (Title IX Pol'y 13.) Dr. Naumov was never charged with discrimination or sexual assault. In addition, there is no proper complainant since, according to Title IX policy, the complainant is the individual to whom the bad behavior is directed. (Glennon Dep. at 11),( Stewart Dep. At 27) (Pl. Ex. 7,11)

The harassment charge is not within the 90-day window allowed by Title IX. In addition, Dr. Naumov was fired on a charge of "moral" turpitude and "violating the rights of other faculty members". Dr. Stewart charged neither of these reasons. Finally, as stated by *Chan v. Miami University* (13 Ohio St. 3d 52 (1995), "Tenure has the status of a property right and may be revoked only pursuant to constitutionally adequate procedure defined by the right itself". *Cleveland Bd. of Edn. v. Loudermill,,* 470 U.S. 532, 538-541, (1980) The contract, like in Naumov, provides a separate procedure for disciplinary action resulting in termination of his tenured status in clear violation of the Faculty Handbook. (Pl. Ex. 8, McDaniel Faculty Handbook, Pl. Ex. 2, at 12, 43, D0047)

## D. A Female Faculty Member Complained To the Provost, Dr. Stewart, About Plaintiff

On April 28, 2014, Dr. Sara More, an Associate Professor of Computer Science at McDaniel, informed Dr. Stewart that she planned to resign her tenured position at McDaniel and accept a non-tenure-track position at Johns Hopkins University for the upcoming year. She will be a non-tenure track Associate Teaching Professor. As is well known, Johns Hopkins is a much more prestigious institution than Dr. More was simply attempting to obtain a faculty position at Johns Hopkins. In addition, she would receive more pay and a smaller teaching load. Also, she would have a shorter commute and work with brighter students. At Dr. Stewart's request, Dr. More met with Dr. Stewart again on May 5 and May 28, 2014, when she allegedly complained further to Dr. Stewart about

Plaintiff's behavior toward her. (Def. Mem. Ex. 4)

Dr. Stewart took notes of her meetings with Dr. More on May 5 and 28, 2014. "Defy.' Mem. Ex. 4" [Jeanine Stewart Notes (D0001-0008)], at D0001-D0003.)

During the May 5, 2014 meeting, Dr. Stewart brought up Title IX and Dr. More stated that Plaintiff would comment daily upon her appearance, even though she asked that he not do so. (Defs.' Mem. Ex. 4, at D0001.) Informal remarks such as "I like your outfit" do not constitute harassment. Dr. More offered as an example that on one occasion while she was wearing a sweater with circles, Plaintiff stared at her sweater and said, "I'll be thinking of circles all day". (Defs.' Mem. Ex. 4, at D0001). Dr. Naumov does not recall anything about her sweater or making comments on her sweater. One harmless incident does not make it harassment. Dr. More also stated that Plaintiff would try to walk her to her car at the end of each day, even though she repeatedly requested that he not do so. Dr. Naumov denied that he walked her to her car, although he offered to do so. Dr. Naumov said he remembers only three times that he commented on her outfit. (Naumov Aff. ¶78). Once, she dressed formally for class and he asked her why she dressed that way.

Dr. More further described to Dr. Stewart how Plaintiff has "promised to change" and offered to "make her happy here" when Dr. More previously had considered taking another job. (Defs.' Mem. Ex. 4, at D0002) Dr. Naumov wanted to continue a very productive research collaboration that produced 12 papers. Dr. More never claimed that Plaintiff had touched her inappropriately, only that he had defied social boundaries and had been intense in his interactions with her, marking in his personal diary: "If I weren't married, I would marry you." (Defs.' Mem. Ex. 4, at D0002.) He said that would be impossible and wrote this in his private, personal diary. He did not say that to her; she had no access to his diary.

On May 28, 2014, Dr. More shared with Dr. Stewart a lengthy letter, emails, and cards that she had received from Plaintiff.   (Defs.' Mem. Ex. 4, at D0004-0008; Pl.'s Dep. Ex. 24.)

Dr. Stewart described the letter as "overly personal and presumptuous" and "smack[ing] of adolescent intensity." (Defs.' Mem. Ex. 4, at D0006.) Plaintiff himself described the letter he sent to Dr. More as "very emotional", explaining his view that "we had emotional bond" and "it broke at some point, and I just was trying to understand what is happening." (Pl.'s Dep. 265-67 & Ex. 24.)  In the letter, Plaintiff apologized to Dr. More at length, writing:

> Sara, I am sorry for what has happened.   When I look at the last six years now, it appears to me that all conflicts that we had and all deep confusions that I had about irrationality of your reactions could be explained by my ignorance of these differences between us. I think that the first time in six years, I understand you, but only time can be the ultimate judge of this.
>
> Not being able to understand your reaction has often been hard for me and led to many irrational responses on my part.  I do understand, however, that this my ignorance made your life even more unpleasant than mine.  If I would see these differences earlier, none of them would have been an issue.   I do not have an innate need to intrude into personal spaces, ignore people, or to resolve issue on emotional rather than rational level.
>
> Please, forgive me.

(Pl. Dep. Ex. 24.)  This letter was only an appeal to a colleague to continue their collaborative research.  Dr. Naumov was lamenting that they were breaking up their research interests after 12 research papers.  Dr. Naumov and Dr. More had a personal relationship as well.  She would talk about personal events in her life;

about her medical issues; and, would visit each other with their families. (Naumov. Dep. ¶ 78.)

On May 28, 2014, Dr. More further complained to Dr. Stewart that she had recently received unwelcome communications from Plaintiff, who was asking Dr. More to join him for lunch prior to leaving McDaniel. (Defs.' Mem. Ex. 4, at D0004.) Dr. Naumov invited her to lunch with the department. The Department Members declined to go to lunch with her and Dr. Naumov invited her alone. This is common practice when a colleague is leaving a position and indicates nothing more than wishing a colleague "good luck" for her new venture. Every instance of an alleged harassment occurred well before the 90-day period during which one has the right to make a charge. This matter should have been dismissed because all events happened months and years before the 90 day window for complaints by anyone in the College community.

**E.  Provost Stewart Explained to Dr. More That She Felt Obligated to File A Title IX Claim and That An Investigation Would Follow.**

At the conclusion of Dr. Stewart's May 5, 2014 meeting with Dr. More, she told Dr. More that she felt obligated to file a Title IX claim on behalf of McDaniel, that she would ask a Title IX advisor to speak with Dr. More, and that an investigation would follow. (Defs.' Mem. Ex. 4, at D0002-D0003.) Dr. More refused to be a complainant, and the matter should have been dropped by the College because of her failure to come forward. (Title IX Pol'y at 10) (Pl. Ex. 1). There was never an obligation for Dr. Stewart to pursue a complaint, nor was there a legal right for her to do so. At no point in the "Dear Colleague" letter of April 4, 2011 does the U.S. Department of Education letter say it is appropriate for one member of the faculty to stand in for another member and make a Title IX charge.

8

Similarly, President Casey understood that any member of the College community or administration who becomes aware of issues involving sexual assault or sexual harassment allegations has a responsibility to come forward with that information so that appropriate action can be taken.  (Casey Dep. 18, 20.)  He and Dr. Stewart agreed in their understanding that the U.S. Department of Education Office of Civil Rights "Dear Colleague" letter requires the College to pursue the Title IX action notwithstanding that the faculty member wished to remain as anonymous as possible.  (Defs.' Mem. Ex. 13 [Roger Casey Answers to Interrogs.] Answer No. 2.)  However, the Title IX policy is clear.

The complainant must be the one who experienced the behavior. The behavior must be complained about within 90 days. (Title IX pol'y, 6/2014 At 9,11, ( Pl. Ex. 10)

If the complainant does not come forward, the matter must be dropped. ((Glennon Dep. At 11, (Title IX pol'y at 10, 11. (Pl. Ex. 10))

## F.   An Investigation Was Conducted That Revealed Evidence of Possible Violation of the College's Title IX Policy

Dr. Stewart reported Dr. More's complaint to McDaniel College Title IX advisor, Dr. Julia Jasken, as Dr. Stewart believed she had an obligation to do so. (Stewart Dep. 20, 23.)   Dr. Jasken then ordered that an investigation into the allegations be conducted by Campus Safety Detective Eric Immler.  (Stewart Dep. 20, 23, 29.) Detective Immler never interviewed Dr. Naumov, saying Dr. Naumov was out of the country.  However, Dr. Naumov was at McDaniel in June, asking for a meeting with Dr. Stewart. (Naumov Aff. ¶ 79), Pl. Ex. 4)  He did have a meeting on July 1, 2014 and discussed the Department Chairmanship, his grant application, and the search to replace Dr. More. Dr. Stewart make no comments to Dr. Naumov about any complaints about him.

After reviewing the investigation report, the Title IX Coordinator, Jennifer

Glennon, with Detective Immler and Dr. Stewart, decided that the College had an obligation to move forward with the Title IX process. There was no obligation to move forward, since everything alleged was well beyond the 90-day window required by Title 9 policy. This action became a witch hunt against Dr. Naumov. However, there is an informal resolution process meeting in a Title IX matter. For Dr. Stewart, the informal process consisted of offering Dr. Naumov a resignation or termination on August 25, 2014. (Title IX pol'y at 10, D00982, Pl. Ex. 1) Dr. Stewart became the complainant, and the informal meeting resolution officer at the same time showing extreme bias in the process, especially since she told Dr. Naumov to resign or be terminated in violation of the Faculty Handbook and Title IX policy. (Pl. Ex. 2, McDaniel Faculty Handbook, at 43.)

Dr. Stewart gave Dr. Naumov the option to resign from the College before any formal hearing went forward and gave him access to the Human Resources Department. This was contrary to what is required in the Faculty Handbook, as the Faculty Affairs Committee must act before any tenured faculty is forced to resign or be terminated. (McDaniel Faculty Handbook, at 43, Pl. Ex. 2). At no point did Dr. Stewart provide any charges to Dr. Naumov and simply presented him with an ultimatum: resign his tenured position or be fired. During the meeting, Plaintiff was informed that he was suspended with full pay and was to remain away from campus until further notice, and his email was suspended as well. (Pl. Ex 5, Glennon letter to Naumov, November 17, 2014).

Dr. Stewart made it difficult for Dr. Naumov to mount a defense since he was banned from campus and had no access to campus email and could receive no email from others. Ms. Glennon told Dr. Naumov that she should not help in obtaining any witnesses, as that was "his job". (Pl. Ex. 3, Letter from Glennon to Naumov, October 28, 2014, Naumov Aff. 18, 20, 21, 22. Pl. Ex. 4))

On August 29, 2014, Plaintiff declined the severance agreement that had been offered to him and requested that the College proceed with the formal grievance

procedures specified by the College policy. (Pl.'s Dep. Def. Ex. 9.) The severance agreement was an ultimatum: resign or be terminated. Dr. Casey discussed with Dr. Stewart the need for her to remove herself from the typical role of Provost in order to serve as the complainant in a Title IX proceeding against Plaintiff. (Defs.' Mem. Ex. 13, (Def. Interrog. Answer No. 2). Having a Provost as the complainant was illegal according to Title IX policy and severely biased the process since most of the faculty reported to the Provost and she was second in command at McDaniel. The revised Title IX policy says explicitly that the complainant is the person to whom the behavior was directed. (Pl. Ex 6, Title IX revision, 12/2104 at 10) Thus, McDaniel violated its own Title IX policy because there was no legitimate complainant and all incidents occurred more than 90 days before Dr. Stewart made the formal complaint. (Title IX policy, 6/1/2014, at 9, 11; Pl. Ex. 1). Dr. Stewart admitted in her deposition that no unwanted behaviors were directed towards her by Dr. Naumov. (Pl. Ex. 7, Stewart's Depo. at 27)

### G.   A Formal Title IX Grievance Was Filed Against Plaintiff, And A Grievance Committee Was Appointed To Consider The Complaint

On September 8, 2014, Dr. Stewart filed a formal Title IX grievance against Plaintiff. (Defs.' Mem. Ex. 8 [Title IX Compl., Sept. 8, 2014].) In accordance with the McDaniel Title IX policy, on September 12, 2014, Plaintiff was notified that a preliminary hearing would take place during the week of October 6, 2014 to decide whether to schedule a formal hearing. (Defs.' Mem. Ex. 14 [Jennifer Glennon Ltr., Sept. 12, 2014].) Plaintiff was invited to contact a faculty ombudsman to act as his advisor. (Defs.' Mem. Ex. 14.) Plaintiff admits he had regular meetings and exchanged emails and phone conversations with faculty ombudsman Jeff Marx, whom Plaintiff found to be helpful. (Pl.'s Dep. 49.)

According to the Faculty Handbook, Dr. Naumov should have had his lawyer with him, and he should have had the opportunity to testify before all panels considering the evidence. Dr. Naumov did request counsel for his hearing before the Grievance Committee, as required by the Faculty Handbook. (Pl. Ex. 2, Faculty Handbook at 13,14, 43)

After the formal grievance was filed, in accordance with the McDaniel Title IX policy, the Title IX Coordinator appointed five faculty or staff members to sit as the Grievance Committee to consider the charges against Plaintiff.  (Glennon Dep. 15-21.)

On September 29, 2014, Glennon sent an update letter to Plaintiff, notifying him of the composition of the Grievance Committee and the hearing details. (Glennon Aff. ¶ 11; Defs.' Mem. Ex. 15 [Jennifer Glennon Ltr., Sept. 29, 2014].)

Plaintiff made no objection to the composition of the Grievance Committee and wrote in his journal on October 2, 2014 about the Committee:

"I finally received the date of the hearing and the list of commission members. There are two women: Florence Hines and Martin. I doubt that I could have found better candidates myself." (Safirova Dep. Ex. 1; Defs.' Mem. Ex. 16 [Susarina Aff. with English translation for Oct. 2, 2014 entry].) All members of the Grievance Committee reported to Provost Stewart. This meeting made the Committee biased in favor of Dr. Stewart's charges.

In accordance with the McDaniel Title IX policy, the Grievance Committee held a preliminary hearing at which the Committee reviewed the Title IX complaint without knowing the identities of the complainant or respondent. (Defs.' Mem. Ex. 17 [Hines Dep.], at 22-23 [hereinafter "Hines Dep."].) The Grievance Committee decided to institute a formal hearing. (Defs.' Mem. Ex. 18 [Grievance Comm. Prelim. Hr'g Findings].) On October 7, 2014, Glennon notified both Plaintiff and Dr. Stewart of the results of the preliminary hearing

via email. (Glennon Aff. ¶ 12.)

The Grievance Committee held several meetings, including hearings on October 11 and 15, 2014. (Hines Dep. 77-78; Glennon Aff. ¶ 13.) In advance of the hearings, both Plaintiff and Dr. Stewart presented lists of witnesses to the Committee, and Plaintiff provided the Committee with a list of suggested questions to ask the witnesses. (Defs.' Mem. Ex. 19 [Witness Lists & Proposed Questions for Grievance Comm.].)

After hearing testimony and receiving documents from the parties, the Committee reached a decision on October 27, 2014 that Plaintiff was responsible for harassment, hostile environment, and retaliation, in violation of McDaniel's Title IX policy, but that he was not responsible for the offense of stalking. The retaliation charge was dropped as well later because Dr. Naumov never charged Dr. Stewart formally. (Pl. Ex. 8) (Defs.' Mem. Ex. 20 [Grievance Comm. Dec'n].) This decision was communicated to both Plaintiff and Dr. Stewart by letters dated October 28, 2014, which were emailed to both. (Defs.' Mem. Ex. 21 [Jennifer Glennon Ltr. to Jeanine Stewart, Oct. 28, 2014]; Defs.' Mem. Ex. 22 [Jennifer Glennon Ltr. to Pavel Naumov, Oct. 28, 204]; Pl.'s Dep. 220.) Plaintiff was told of the procedures for appeal. (Defs.' Mem. Ex. 22.)

On October 28, 2014, Plaintiff acknowledged that he had received the results of the Grievance Committee proceeding, but he complained that the results were delivered by email and not delivered in person and that he had not received a decisional document that contained the Grievance Committee signatures. This was a violation of the Title IX policy. (Glennon Aff. ¶ 14; Defs.' Mem. Ex. 23 [Pavel Naumov Email to Jennifer Glennon, Oct. 28, 2014].)

### H.   Plaintiff Appealed the Grievance Committee Decision to an Appeal Panel

On October 31, 2014, Plaintiff filed an appeal of the Grievance Committee decision, which included a letter and multiple enclosures. (Glennon Aff. ¶ 15.) The McDaniel Title IX policy provides that the complainant and respondent have the right to appeal and that the Appeal Panel shall consist of the Provost, the Vice President for Finance, and the Vice President/Dean of Student Affairs. (Title IX Pol'y At 14.) (Pl. Ex. 1)

Both of these other individuals worked closely with Dr. Stewart and worked with her on the President's Council. However, since the Provost (Dr. Stewart) was the complainant in this action, she recused herself from all consideration of this appeal, and no one was appointed in her stead. (Stewart Dep. 42; Glennon Dep. 44, 96.) The Title IX policy provides that "[a]ppeals will be based upon the record of the hearings created by the Grievance Committee" and that "at the discretion of the Appeal Panel, additional proceedings may be held, the form and nature of which is at the discretion of the appeal panel." (Title IX Pol'y 14.) No member of the Appeal Panel had served on the Grievance Committee that considered Plaintiff's case. (Glennon Aff. ¶ 16.)

The Appeal Panel met several times to consider Plaintiff's appeal. (Glennon Dep. 99.)   Plaintiff submitted his written appeal documents for consideration by the Appeal Panel. (Glennon Dep. 47-48.) However, Dr. Naumov was not allowed to address the Appeal Panel (Pl. Ex.2, at 13,14, 43). Additionally, the Appeal Panel was provided with all documents that were considered by the Grievance Committee, as well as the transcripts of the Grievance Committee hearings. (Glennon Aff. ¶ 17.) On November 21, 2014, the Appeal Panel issued its decision, in which it affirmed the Grievance Committee decision that Plaintiff was "responsible for the complaint of harassment" and was "responsible for the complaint of hostile environment", but

14

it overturned the decision that Plaintiff was "responsible for the action of retaliation through filing a counterclaim." (Defs.' Mem. Ex. 24 [Appeals Panel Dec'n, Nov. 21, 2014].) The Appeal Panel refused to hear testimony from Dr. Naumov as mandated by the Faculty Handbook. The charge of stalking was also dropped.

## I. Defendant Casey Recommended the Sanction of Dismissal, Which Plaintiff Appeals

Following this Appeal Panel decision, Defendant President Casey reviewed the details of the case, without speaking to anyone else, believing that both sides had presented their information adequately. (Casey Dep. 65-66.) On November 24, 2014, Dr. Casey recommended that Plaintiff be dismissed from the College for reasons of serious professional misconduct consistent with moral turpitude and for deliberate violation of the rights and freedoms of fellow faculty members. (Defs.' Mem. Ex. 25 [Sanctions Assignment].) Dr. Naumov was never charged with "moral turpitude" and "violation of the rights and freedoms of fellow faculty members." The decision to terminate should have been disallowed on the grounds Dr. Naumov was never charged with moral turpitude or the violation of the rights and freedoms of fellow faculty members. The College Title IX policy also afforded Plaintiff the opportunity to appeal the sanctions recommendation, which he did. (Defs.' Mem. Ex. 26 [Pl.'s Appeal of Sanctions].) On December 3, 2014, the Appeal Panel rendered the decision to uphold the recommended sanction of dismissal. (Defs.' Mem. Ex. 27 [Appeals Panel Dec'n, Dec. 3, 2014].) On December 4, 2014, Plaintiff and Dr. Stewart both were notified by email that the Appeal Panel voted to uphold the sanction of dismissal. (Glennon Aff. ¶ 18; Defs.' Mem. Ex. 28 [Jennifer Glennon Ltr., Dec. 4, 2014].)

15

**J.   The Elected Faculty Affairs Committee Considered the Dismissal Recommendation**

Additionally, Plaintiff was notified by this same communication that in accordance with the College's Title IX policy, President Casey would seek the additional recommendation of the Faculty Affairs Committee ("FAC")

In fact, President Casey's recommendation of dismissal caused the FAC to become involved, since whenever the President makes a recommendation for the termination of a tenured faculty member, the FAC is the body that examines the evidence and determines whether that recommendation should be brought to the Board of Trustees.  (Casey Dep. 31, 37-38.)  The FAC is an elected committee, each member of which is elected by the faculty for a five-year term. (Pl.'s Dep. 234.)  No member of the FAC had served on either the Grievance Committee or Appeal Panel that considered Plaintiff's case. (Glennon Aff. ¶ 19.)

At deposition, Plaintiff speculated that Dr. Stewart may have been motivated by her very aggressive feminist publications and beliefs, but he admitted, "I don't know this" and offered no evidence to support this speculation. (Pl.'s Dep. 80, 364-65.)  He did strongly suspect this, in part because of her harsh treatment of other male faculty. (Naumov Aff. at 81, Pl. Ex. 4).  In fact, Plaintiff testified that Dr. Stewart told him "she doesn't care one way or the other how this case will turn out", which he interpreted to mean that she was impartial. (Pl.'s Dep. 351.)  However, it was clear that she was also making a self-serving statement at Dr. Naumov's deposition.  Additionally, Plaintiff offered that another reason Dr. Stewart might have retaliated against him related to his work on the Faculty Development Committee and his discussions about travel budgets and funding. (Pl.'s Dep. 350.)  Similarly, Plaintiff testified that Dr. Casey made an unjustified and vindictive decision to dismiss him but that he does not know why.

Dr. Stewart had removed the Dean of Graduate Studies previously at the College during the short time she had been at the College.  (Pl. Ex. 4,

16

Naumov Aff. at 80)   Neither Dr. Casey nor Dr. Stewart was involved in the recommendation by the FAC. (Casey Dep. 39-40; Stewart Dep. 41-44.) Dr. Casey gave a PowerPoint presentation to the FAC about the process, after which he left the meeting. (Casey Dep. 39-40.) This was a violation of the Title IX policy and could easily have biased the FAC. Dr. Stewart, who is normally a member of the FAC, recused herself from their work on this case. (Stewart Dep. 41, 61-62.)  Two other members of the FAC were also recused.  One member recused herself because of prior involvement in the case. (Stewart Dep. 45-46.) Dr. Stewart exercised her option as Provost to remove another member without cause. (Stewart Dep. 61; Pl.'s Dep. 239.) Stewart testified that she recused this FAC member because the member's mother had been diagnosed with a terminal illness a few days earlier and the individual was involved in arranging hospice care and that the recusal had nothing to do with Plaintiff. (Stewart Dep. 45, 61-62.) Dr. Stewart explained that the FAC is an elected committee without alternates and that there is no existing process to replace members. (Stewart Dep. 62.) Three members of the FAC remained to consider the recommended dismissal of Plaintiff. (Stewart Dep. 62.) On December 23, 2014, the FAC voted by majority vote that the recommended sanction of dismissal was appropriate.  (Defs' Mem. Ex. 29 [Faculty Affairs Comm. Recommendation].)

However, both Dr. Casey's recommended sanction and the vote by the FAC were only recommendations since the Board of Trustees had the final decision whether to terminate faculty. (Casey Dep. 35, 65; Title IX Pol'y 13-14.)  Defendant Casey transmitted a full report of the FAC to the Board of Trustees.  (Am. Compl. ¶ 76.)

**K.     The Board of Trustees Upheld the Sanction of Dismissal; Plaintiff Was      Terminated**

On January 13, 2015, Plaintiff wrote to the Members of the McDaniel

College Board of Trustees, alleging that the College administration initiated a McCarthyism-style campaign to force him to leave under a completely made up pretense and attaching the letter he prepared for the FAC. (Defs.' Mem. Ex. 30 [Pavel Naumov Ltr. to Bd. of Trs.].)  At a meeting of the Executive Board of the Board of Trustees of McDaniel College, held on January 14, 2015, the Board upheld the sanction of dismissal of Plaintiff. (Casey Dep. 35; Defs.' Mem. Ex. 31 [Minutes of Executive Comm. Meeting, Jan. 14, 2015].)  Plaintiff's employment was terminated effective January 20, 2015.  (Pl.'s Dep. Ex. 3.)

## L.    Plaintiff's Employment Following Dismissal from McDaniel

Following Plaintiff's dismissal from McDaniel, he became employed by William Patterson University as a Visiting Professor, beginning on September 1, 2015, earning a salary of $82,177.28, plus benefits.   (Defs.' Mem. Ex. 32 [Naumov Answer to Interrogs.] Answer No. 7.)  Plaintiff's salary at William Patterson exceeded the last salary he earned at McDaniel, which was roughly $77,000.  (Pl.'s Dep. 123-24, 142.)

Plaintiff subsequently resigned from his position at William Patterson and accepted a position as a Visiting Professor at Illinois Wesleyan University for the spring semester of 2016 and the 2016-2017 academic year.  (Pl.'s Dep. 144-47 & Ex. 6.)   Furthermore, the Illinois Wesleyan University February 2015 Faculty Handbook provides that faculty have tuition benefits for their dependent children at Illinois Wesleyan University and at approximately 400 other colleges and universities, available immediately upon hire. (Glennon Aff. ¶ 20.)  However, Dr. Naumov's contract will expire after one and one-half years, o n e  y e a r before his oldest daughter enters college.

# STANDARD OF REVIEW

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets this burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsuchita Elec. Indus. Co.v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Significantly, when ruling on a motion for summary judgment, the Court must view the evidence and facts in the light most favorable to the nonmoving party. *Id.* at 587-88.

Significantly, when considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252. Accordingly, "[w]hen resolution of issues of fact depends upon a determination of credibility, summary judgment is improper." *Kelso v. Corning Cable Sys. Int'l Corp.*, 224 F. Supp. 2d 1052, 1056 (W.D.N.C. 2002) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)).

19

## ARGUMENT

I.  **DR. NAUMOV HAS ESTABLISHED THAT DEFENDANTS VIOLATED TITLE IX, OR AT LEAST CREATED A GENUINE ISSUE OF MATERIAL FACT REGARDING SUCH VIOLATION**

As recently summarized by this

> Court: Title IX provides that:
>
> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C.A. § 1681(a) (West 2010).  The Supreme Court has held that Title IX's ban on "discrimination" encompasses bans on sexual harassment and retaliation, and that private rights of action are implied for both forms of discrimination under the statute.  *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75-76, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992) (discussing the implied right of action under Title IX for sexual harassment); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-84, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005) (discussing the implied right of action under Title IX for retaliation).  The Fourth Circuit has advised that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." *Preston v. Va. ex rel. New River*

*Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994).

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 764 (D. Md. 2015).

As suggested above, there are just two elements to a Title IX claim: (1) discrimination or denial of benefit or privilege because of sex (2) by an educational institution receiving federal funds. *Preston v. Virginia ex rel. New River Cnty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979)).

In the instant case, the College admittedly receives federal funding. *See* 20 U.S.C. § 1681(c) ("For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education[.]").   Thus, the sole dispute here is whether Dr. Naumov was discriminated against or denied benefits because of sex.

Title VII expressly defines "on the basis of sex" to "include, *but [is] not limited to,* because of or on the basis of pregnancy, childbirth, or related medical conditions". 42 U.S.C.
§ 2000e(k). As emphasized above, sex discrimination clearly goes well beyond pregnancy, childbirth, and related medical conditions.

In one such Title VII case, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), the court noted that the "critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

Likewise, in *Jennings*, the Fourth Circuit stated that a necessary element to a Title IX claim for sexual harassment was that the plaintiff "was subjected to harassment *based on her sex.*" *Jennings*, 482 F.3d at 695 (emphasis added). *Kirby v. N.C. State Univ.*, No. 5:13-CV-850-FL, 2015 WL 1036946, at *4 (E.D.N.C. signed Mar. 10, 2015).

In another Title VII case, "sex stereotyping" was held to be a form of sex discrimination. [T]he Supreme Court recognized that "sex stereotyping" could constitute a ground of sex discrimination in violation of Title VII. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-52 (1989).  The evidence supporting sex stereotyping in that case included comments that the plaintiff was "macho", "overcompensated for being a woman," needed to take "a course at charm school," and could improve her chances for partnership if she would:

"Walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235.  The court found that these comments could constitute "sex stereotyping." *Id.*, at 250-51.  The Eighth Circuit has recognized that a claim under Title IX, as well as Title VII, may lie when harassment is motivated by the plaintiff's "failure to conform to gender stereotypes." *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011). Id. at *5

In the instant case, Dr. Naumov contends that McDaniel's decision to pursue the charge against him, and ultimately terminating him, was an erroneous outcome that was motivated by gender bias. (*See generally* Compl. Count I.) (Naumov Aff., 9, 10,15,81) (Pl. Ex. 4)

To assess whether a school's disciplinary proceedings produced an erroneous outcome in violation of Title IX, courts typically apply a framework first introduced in *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  *See, e.g., Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638-41 (6th Cir. 2003) (citing favorably to *Yusuf*); *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 961-62 (4th Cir. 1997) (same), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *9-10 (W.D. Va. Aug. 5, 2015) (same). In an erroneous outcome case, "the claim is that the plaintiff was

innocent and wrongly found to have committed an offense" on the basis of gender bias. *Yusuf*, 35 F.3d at 715.

To state a claim for erroneous outcome discrimination, a plaintiff must allege (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding". *Id. Doe*, 123 F. Supp. 3d at 765-66. Undisputedly, termination constitutes an adverse outcome, such that only the first and third elements are at issue in this case. Regarding the first element, the procedure to which Dr. Naumov was subjected by McDaniel had numerous procedural defects so as to satisfy the first element of his erroneous outcome claim. *See, e.g., id.* At 766. First, the College Policy unambiguously requires that the purported target of the harassment (here, Dr. More) serve as the complainant, whereas a third party (here, Dr. Stewart) served as the complainant. *See supra* Statement of Facts, Part E. Second, having Dr. Stewart, the College Provost and second highest ranking official at McDaniel, serve as the complainant, which complaint was reviewed and evaluated by her subordinates, was prejudicial and unfair. *See supra* Statement of Facts, Parts F-H. Third, the College Policy unambiguously requires that the charges be filed within 90 days of the alleged harassment, but the charges against Dr. Naumov were instituted and pursued based on alleged happenings well beyond the 90-day window. *See supra* Statement of Facts, Parts C, E & F. Fourth, the College Policy unambiguously requires an informal process meeting before a formal investigation commences, but here the purported informal process was presenting Dr. Naumov with an ultimatum: resign or be terminated.

*See supra* Statement of Facts, Part F. Fifth, the College investigation failed to interview Dr. Naumov despite his availability and eagerness to respond. *See id.* Sixth, the College initially charged Dr. Naumov with "discrimination" or "harassment", but he was ultimately deemed to have committed acts of moral turpitude or to have violated the rights and freedoms of fellow faculty members, offenses for which he was never charged. *See supra* Statement of Facts, Part I. Regarding the third element, that gender bias was a motivating factor behind the erroneous findings,

Dr. Naumov contends that the College has created an environment in, and procedure by, which male faculty accused of sexual harassment are virtually assured of a finding of guilt/responsibility and/or the College is deliberately indifferent to such a culture on its campus. *See, e.g., Doe*, 123 F. Supp. 3d at 768 (government and/or community pressure to aggressively discipline male persons accused of sex-based harassment and/or assault states a plausible claim of erroneous outcome sex discrimination in violation of Title IX); *accord Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015). Dr. Naumov strongly asserts that Dr. Stewart charged him because of her strong feminist views and her bias against male faculty members. (Naumov Aff. ¶ 10, 15, 81)

Therefore, Defendants are not entitled to judgment as a matter of law on the Title IX claim; there is a genuine issue of material fact as to whether Dr. Naumov has established a violation of Title IX in this case.

24

II.     **DR. NAUMOV HAS ESTABLISHED THAT DEFENDANTS VIOLATED THE McDANIEL FACULTY HANDBOOK, OR AT LEAST CREATED A GENUINE ISSUE OF MATERIAL FACT REGARDING SUCH VIOLATION**

As previously noted by the courts:

The relationship between a student and a private university is largely contractual in nature. *See Napolitano v. Trustees of Princeton Univ.*, 186 N.J. Super. 548, 453 A.2d 263, 273 (1982) (citing cases); *see also Baltimore Univ.*
*v. Colton*, 98 Md. 623, 636, 57 A. 14 (1904).
The "terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications'" of a university, and the university is required to conduct its hearings and enforce its policies consistent with the terms. *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 242 (D. Vt. 1994) (quoting *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987)).
*Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 483, 747 A.2d 205, 209 (2000).

Although *Harwood* is framed in terms of the student-university relationship, the same analysis would apply to the professor-university relationship. *See Krotkoff v. Goucher Coll.*, 585 F.2d 675 (4th Cir. 1978) (former professor brought suit against private college, alleging that her discharge violated tenure provision of her contract). Accordingly, this count of Dr. Naumov's complaint is in sum and substance a claim for breach of contract. *See id.* at 682 ("Krotkoff's claims must be resolved by reference to her contract. This involves ascertaining, first, what

contractual rights she had, and second, whether the college breached them.").

In the instant case, it is undisputed that Dr. Naumov was not an at-will employee but, rather, he was tenured and thus could be fired only for cause, and with a formal contract. (Pl. Ex. 8) *See supra* Statement of Facts Part A; (Defs.' Mem. 6). Moreover, it is agreed that the McDaniel Faculty Handbook in relevant part incorporates the McDaniel Title IX Policy for purposes of alleged sex-based discrimination or harassment. *See supra* Statement of Facts, Part B; (Defs.' Mem. 33).

Yet as detailed above, the College failed to abide by several provisions of its Title IX Policy with respect to the allegations, investigation, and process with regard to Dr. Naumov.    *See supra* Part I (citing to Statement of Facts).

As such, Defendants' violations of McDaniel's Title IX Policy constitute a breach of contract.  *See Deutsch v. Chesapeake Ctr.*, 27 F. Supp. 2d 642, 644 (D. Md. 1998) (employee handbooks "require that the employer follow the contract's disciplinary/termination procedures"); *Univ. of Balt. v. Iz*, 123 Md. App. 135, 175-76, 716 A.2d 1107, 1127-28 (1998) (where an employer contracts to review and/or evaluate an employee's action or performance, the employer must do so in good faith).

*Chan v. Miami University,* 73 Ohio 3d 52 (1995*)* is a case remarkably similar to the instant case.  Dr. Chan was fired because of a finding of sexual harassment against him.  However, Dr. Chan was a tenured professor.

The Court found that Dr. Chan, because he was tenured, had the right to a separate procedure to determine whether the finding of sexual harassment constituted "adequate cause" for his termination.  The Court found he was entitled to this additional hearing because tenure has the status of a property right. (Chan at 59)  In addition, Dr. Chan had the right to counsel for all hearings.

The instant case terminated Dr. Naumov's tenure without these additional hearings that were guaranteed by his contract and the McDaniel Faculty

Handbook.

Therefore, it is clear that Defendants are not entitled to judgment as a matter of law on the McDaniel Faculty Handbook claim. At best, there is a genuine issue of material fact as to whether Dr. Naumov has established a violation of the McDaniel Faculty Handbook in this case.

## CONCLUSION

In light of the foregoing arguments and authorities cited, Dr. Naumov respectfully submits that there are genuine issues of material fact and Defendants are not entitled to judgment as a matter of law on the violation of Title IX and the violation of the Faculty Handbook.

WHEREFORE, Dr. Naumov respectfully requests that this Court deny Defendants' Motion for Summary Judgment as to Count I (Violation of Title IX) and Count IV (Violation of Faculty Handbook)

Plaintiff Requests a Hearing in This Matter

Respectfully submitted,


/s/  James C. Strouse No. 09557
Strouse Legal Services
5401 Twin Knolls Road, Suite 7
Columbia, MD  21045 Telephone:
(410)730-76007600
Facsimile:  (410) 964-9018
Email:  sstrousejc@aol.com

*Counsel for Plaintiff Pavel Naumov*        27

# EXHIBITS

1.    McDaniel College- Title IX

2.    McDaniel College- Faculty Handbook

3.    Grievance Committee Decision 10-28-14

4.    Affidavit of Dr. Pavel Naumov

5.    Glennon Letter Prohibiting Naumov from Campus

6.    McDaniel College- Updated Title IX Policy

7.    Jeannine Stewart Depositon – Page 27

8.    McDaniel's Offer of Employment – March 18, 2005

9.    Email from Glennon – October 21, 2014

10.   Deposition of Jennifer Glennon – Page 11

## CERTIFICATE OF SERVICE

I hereby certify that this ___29th___ day of April 2016, I delivered a true and correct copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment to opposing counsel via CM/ECF and as follows:

Gil A. Abramson, Esquire

    and

Eileen Carr Riley, Esquire

Jackson Lewis P.C.

2800 Quarry Lake Drive, Suite 200

Baltimore, MD  21209


via email:   gil.abramson@jacksonlewis.com

               eileen.riley@jacksonlewis.com


               /s/ James C. Strouse

               Bar No. 09557