# EXHIBIT 4

## Affidavit of Dr. Pavel Naumov

My name is Dr. Pavel Naumov and I am over 21 years of age and qualified to testify to the matters below.

1.  Before I was terminated, I was an Associate Professor in the Department of Mathematics and Computer Science at McDaniel College in Westminster, Maryland.

2.  I was tenured and had taught at McDaniel College since 2005.

3.  McDaniel College is a not-for-profit institution of higher learning located in Westminster, Maryland.

4.  I have published numerous articles in peer referred journals and was Chairman of the Department of Math and Computer Science in 2013.

5.  I published 12 peer-reviewed papers with a colleague, Dr. Sara More of the same Department. We became personal friends as well and visited each other with our families.

6.  Dr. More never said anything to anyone about this alleged behavior by me, although she told Dr. Stewart, the Provost, when Dr. More was leaving McDaniel for a non-tenured Associate Professor position appointment at Johns Hopkins University, which is a more prestigious institution at a higher pay and smaller teaching load.

7.  I stepped down after one year as Chairman and supported Dr. Sara More ("Dr. More") for the position, which she held for one year.

8.  On August 25, 2014, Provost Jeanine Stewart suspended me after I refused to resign. She told me about a complaint against me for stalking and hostile work environment and gave me an ultimatum, either resign or be terminated. I was shocked by the charges against me as I considered Dr. More to be a personal friend.

Ex. 4

1

9.     She did this after an investigation took place, but without the party allegedly harassed making the complaint, or me being interviewed by the investigator, Mr. Immler.

10.     In fact, Provost Stewart filed the Title IX Complaint against me by herself on September 8, 2014. I believe she did this because of her strong feminist views and because I am a successful male faculty member.

11.     The investigator failed to interview me or get any feedback in any manner from me.

12.     The Provost asked me to resign my position at McDaniel College, in direct violation of the American Association of University Professors ("AAUP") Institutional Regulations on Academic Freedom and Tenure which state, "Before suspending a faculty member, pending an ultimate determination of the faculty member's status through the institution's hearing procedures, administration will consult with the Faculty Affairs Committee concerning the propriety, the length, and other conditions of the suspension".

13.     In addition, the AAUP dismissal regulations are part of my contract.

14.     It was wrong for the Provost to sign the complaint against me after she initiated the investigation and was no longer an unbiased individual and was supposed to be on the Appeals Committee. She was also the second-in-command at the College.

15.     The Complaint should have been made by the individual alleged to be harmed by me (Dr. More). The complaint was made based upon my gender, male, and because Dr. Stewart is a strong feminist.

16.     Without this individual, who was Dr. Sara More, there is no direct testimony against me, only hearsay evidence gathered by the investigator.

17.     Dr. More never made any complaint, nor did she give any testimony before the Grievance Committee.

2

18.     After I refused to sign the resignation paperwork, the Provost banned me from campus, shut down my email account, and changed the locks to my office and the Math/Computer Science/Physics/Sociology office suite. She also locked my National Science Foundation account and refused to reimburse me for conference travel that happened during the suspension.

19.     Such actions are contrary to the American Association of University Professors ("AAUP"), as The Faculty Affairs Committee ("FAC") was not involved in any of these actions. These actions also made it more difficult for me to develop my defense to the charges.

20.     I was not allowed to hear the formal charges or the witness testimony. I was not given any information on the investigator's report until we received it as part of discovery production.

21.     The Grievance Committee's complete report was given to me several months later. I only received a summary of the hearing by Human Resources initially.

22.     The blocking of my email account restricted me from refuting charges about emails that I supposedly sent to Dr. More. The emails were part of the charges against me.

23.     The initiation of the Title IX filing contradicts McDaniel's Title IX policy.

24.     Later, the Director of HR, Ms. Glennon, told me that the aforementioned meeting between the Provost and me was the informal resolution meeting.

25.     It was illegal for the person filing the complaint (Dr. Stewart) to also be the one in charge of the "informal" resolution meeting. That was a clear case of bias.

26.    McDaniel Title IX policy states, "The advisor will discuss with the complainant the appropriate responses to discrimination or harassment, the feeling of the complainant about the problem, and whether the respondent is aware that his or her actions were perceived as discrimination or harassment". (McDaniel College, Title IX, at 10)

27.    The complaints against me were filed well after the 90 day deadline as stipulated in McDaniel's Title IX policy.  McDaniel's Title IX policy states, "Any complaint must be reported to an advisor within 90 days of the occurrence". (McDaniel College, Title IX, at 10).

28.    The Provost filed the complaint on September 8, 2014, after her August 25, 2014 meeting with me.  She filed the complaint after she suspended me.  There was no reason for the suspension as I was a threat to no one, nor had I ever been charged previously with such actions.

29.    The alleged actions happened well before the 90 days of September 8, 2014, which would be June 8, 2014.

30.    The dates for the specific charges are as follows:

"Stalking behavior"; approximately 2006 to 2014

"Walking to the car"; Spring 2007

"Physical appearance"; no specific dates

"I would marry you"; Spring 2007     (in diary, never said to her)

"Weekend emails"; no specific dates

"Longer than needed conversations"; no specific dates

"Make friendly work environment rules"; Spring 2007

"3 page personal letter"; September 9, 2013

"Sitting in the department lobby"; no specific dates

"Four cards"; none during the last academic year

"Weird Email"; to a faculty job candidate - Spring 2013

4

"Another email string"; no specific dates

"Watching at work"; no specific dates

"Blocking doorway"; no specific dates

None of these alleged actions happened within the 90 day look-back period in which one is supposed to file a complaint.

31.　I was given no evidence related to the complaints and I was limited in my ability to contact members of the campus community because of my suspension and prohibition from campus. This situation severely limited my ability to mount a defense.

32.　I was not allowed in the room while witnesses and the investigator presented evidence against me. This violates rules on how a proper and fair hearing is conducted, according to AAUP rules that were part of my contract.

33.　This Grievance Committee violated my due process rights. I should have had access to all of the evidence, testimony, and issues before the hearing. I should have been allowed to stay in the hearing room to observe and refute all evidence presented against me.

34.　My accuser never testified against me. Only the provost and the investigator testified against me.

35.　In Title IX actions, there must be a complainant against whom unjust actions were taken. The alleged original accuser, Dr. Sara More, never initiated a complaint, nor did she testify against me.

36.　An administrator, in this case the Provost, is prohibited from being a complainant based on hearsay evidence developed by an investigator. There must be a complainant who is actually injured by me. This was stated by Human Resources Director Glennon at her deposition and it was in the Title IX handbook.

37.　There was no complainant who was allegedly injured by my actions. Therefore, there should be no case.

38.    All listed allegations against me provided in the summary of the Grievance Committee were described as stalking. That charge was dismissed by the committee. There are no allegations listed as "harassment" or "hostile environment" in the committee summary.

39.    The committee then found me responsible for creating a "hostile work environment, harassment, and retaliation". The Appeals Committee dropped retaliation because I filed no counter-charge against Provost Stewart.

40.    My alleged accuser neither testified against me nor initiated the complaint. Only the Provost and the investigator testified against me.

41.    In Title IX actions, there must be a complainant against whom unjust actions were taken. The alleged original accuser, Dr. Sara More, never initiated a complaint, nor did she testify against me.

42.    Correspondence between the institution and me has not followed policy in that nothing was delivered in person to me despite my explicit request. I never received the decision of the Grievance Committee, only the HR summary of the decision, which was not signed by the committee chair or any other member of the committee as required by McDaniel's Title IX policy. I did receive the minutes of the Grievance Committee later through discovery.

43.    An administrator, in this case the Provost, is prohibited from being a complainant based on hearsay evidence developed by an investigator. There must be a complainant who is actually injured by me.

44.    There was no complainant who was allegedly injured by my actions. Therefore, there should be no case.

45.    All listed allegations against me provided in the summary of the Grievance Committee were described as stalking. That charge was dismissed by the committee. There is no allegations listed as "harassment" or in the committee summary.

46.     The committee then found me responsible for creating a "hostile work environment, harassment, and retaliation". The Appeals Committee dropped retaliation because I filed no counter-charge against Provost Stewart.

47.     In Title IX actions, there must be a complainant against whom unjust actions were taken. The alleged original accuser, Dr. Sara More, never initiated a complaint, nor did she testify against me.

48.     Correspondence between the institution and me has not followed policy in that nothing was delivered in person to me despite my explicit request.

49.     McDaniel's Title IX policy states explicitly that the written decision of the Grievance Committee will be delivered in person to both parties. This was not done.

50.     Nothing was delivered in person to me from the Appeals Panel either. "Written notification shall be delivered to both parties in person by the chair of the Grievance Committee and the Title IX Coordinator within 48 hours of the decision".

51.     The structure of the Appeals Committee has several issues. McDaniel's Title IX Policy states: "The appeal panel shall consist of the Provost, the Vice President of Finance, and the Vice President/Dean of Student Affairs".

52.     There was neither staff nor faculty on the Appeals Committee. The Grievance Committee did have faculty representation, but the Appeals Committee had none, making it non-representative of the McDaniel's community.

53.     One of the members of the Appeals Committee, the CFO, was present when the Provost confronted me with the initial charges and asked me to sign the resignation paper.

54.     I did not ask the CFO to be at the meeting. He was there at the request of the Provost to support the Provost. The CFO was a member of the

Appeals Committee and appeared to be biased against me. He should have recused himself as well as the Provost because of the appearance of bias.

55.     The final decision concerning sanctions was made by the President, who was not involved in any of the proceedings leading up to making the sanctions. Title IX policy implies that the sanctions will be recommended by the Grievance Committee, such that the findings and sanctions come as a package.

56.     McDaniel's Title IX policy states, "If the Grievance Committee finds that discrimination, harassment, or sexual assault occurred, the sanctions may include, but are not limited to, reprimand, suspension, or dismissal, according to the seriousness of the offense".

57.     The decision to dismiss me is inconsistent with the incremental recommendation outlined in McDaniel's Title IX policy. "Sanctions may be incremental in nature; e.g., a first offense would have the least severe sanction".

58.     The President decided to terminate my employment at McDaniel without any involvement of the Faculty Affairs Committee, in direct contract with "American Association of University Professors" ("AAUP") policies to which McDaniel College subscribes.

59.     The President's recommendation to dismiss me is contrary to McDaniel's Title IX policy which states, "In cases in which it is recommended that a faculty member be dismissed (by the Grievance Committee), the President will seek the additional recommendations of the Faculty Affairs Committee; this is consistent with the role and function of that committee as indicated in the Faculty Handbook."

60.     As required by Title IX policy, there was no informal process, no discussion of the complainant with the advisor, and no complaint reported to any advisor within 90 days of the Occurrence.

61.   The time for informal resolution is 30 days.  In this case, there was no informal process as required by Title IX policy.

62.   If there is no resolution of the matter, the complainant may choose to drop the complaint or file a grievance form with the Title IX coordinator.  The real complainant, Dr. More, refused to formally complain.

63.   In this case, the complainant refused to file a grievance form but the Provost did the filing instead.  According to McDaniel policy, there is no policy for anyone other than the complainant filing a grievance form.

64.   The Provost had no right to file a complaint, as she was not the complainant and had no authorization from the complainant to file the grievance form in the complainant's stead.

65.   In fact, the alleged complainant refused to be a witness in the Grievance Committee hearing indicating that she wanted nothing to do with the formal or informal grievance.

66.   The Title IX policy states, "in the event that the complainant is unwilling to be identified, the formal hearing will be dismissed, no action will be taken, and no report of any action will be filed".

67.   In this case, the complainant refused to testify before the Grievance Committee and refused to file a grievance form.  These actions indicate an unwillingness to be identified and the complaint should have been dismissed.

68.   "The respondent will be provided ample opportunity to prepare for a hearing".  This did not happen as I was prohibited from campus, my campus email locked, and my office and all facilities denied me.

69.   All hearings with the complainant, respondent, and witnesses were to be recorded.  These recordings were never given to me, if they were made.  I made repeated requests for these recordings, which were given to me through discovery, months after my Grievance Committee hearing.

9

70.    The Faculty Affairs Committee ("FAC") will receive a copy of the record of the Grievance Committee's investigation. The FAC received a copy of the Grievance Committee's investigation only after President Casey recommended dismissal.

71.    The Faculty Affairs Committee will conduct proceeding in accordance with AAUP guidelines. The witnesses will not be required to testify again. I should have been allowed to testify before the FAC.

72.    A recommendation will be made by the FAC as to whether the faculty member should be dismissed. The President asked the FAC to consider the matter only after President Casey had recommended dismissal.

73.    The President transmitted a full report of the FAC stating its recommendation to the Board of Trustees. The FAC recommended dismissal on a 2-1 vote with 2 members absent.

74.    The Board of Trustees shall either affirm the decision of the FAC or require further hearings at its discretion. The Board of Trustees did affirm the dismissal decision by President Casey.

75.    The Board of Trustees shall make the final decision regarding dismissal of the faculty member. The FAC was only asked to affirm or deny President Casey's dismissal decision. It was supposed to have a hearing and make a recommendation to Dr. Casey.

76.    This is a Faculty Handbook violation as well as a violation of McDaniel's Title IX policy.

77.    I can think of only three times that I commented about her appearance; once was when she was dressed formally and I asked her way she was dressed that way for class.

10

78.    Besides our professional collaboration, Dr. More and I had a personal relationship.  She would talk about personal events in her life; she would discuss her medical issues with me, and, we exchanged social visits with family.

79.    I was on campus in June, 2014 and available to be interviewed by Mr. Immler.  He never contacted me.

80.    Dr. Stewart had indicated she is a feminist by, among others, abruptly removing beloved male dean of graduate studies in spite of faculty opposition.


I swear under penalty of perjury that the above facts are true to the best of my personal information, knowledge, and belief.

_____

Pavel Naumov

11