## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAVEL NAUMOV,

          Plaintiff,

v.

MCDANIEL COLLEGE, INC. *et al.*,

          Defendants.

Civil Action No. 8:15-cv-00482 GJH

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Gil A. Abramson (Fed. Bar No. 01240)
Eileen Carr Riley (Fed. Bar No. 23758)

JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Phone: (410) 415-2000
Facsimile: (410)415-2001
Email: gil.abramson@jacksonlewis.com
       eileen.riley@jacksonlewis.com

*Counsel for Defendants,*
*McDaniel College, Inc.*
*Dr. Roger Casey*
*Martin Hill*
*Dr. Jeanine Stewart*

**List of Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 1. | Excerpt from Deposition of Pavel Naumov with exhibits 2, 3, 6, 9, 24 |
| 2. | Grievance Committee Hearing Excerpts |
| 3. | Jeanine Stewart Answers to Interrogatories Excerpt |
| 4. | Jeanine Stewart Notes (D0001-0008) |
| 5. | Excerpt from Deposition of Elena Safirova with exhibits 1, 5 |
| 6. | Excerpt from Deposition of Jeanine Stewart |
| 7. | Excerpt from Deposition of Roger Casey |
| 8. | Title IX Complaint dated Sept 8, 2014 |
| 9. | Affidavit of Jennifer Glennon |
| 10. | Naumov 2011 Promotion letter |
| 11. | Excerpt from Deposition of Jennifer Glennon |
| 12. | McDaniel June 2014 Title IX policy |
| 13. | Roger Casey Answers to Interrogatories Excerpts |
| 14 | Jennifer Glennon letter dated September 12, 2014 |
| 15. | Jennifer Glennon letter dated September 29, 2014 |
| 16. | Affidavit of Anna Susarina |
| 17. | Excerpt from Deposition of Florence Hines |
| 18. | Grievance Committee Preliminary Hearing Findings |
| 19. | Witness Lists and Proposed Questions for Grievance Committee |
| 20. | Grievance Committee Decision |
| 21. | Jennifer Glennon letter to Jeanine Stewart dated Oct. 28, 2014 |
| 22. | Jennifer Glennon letter to Pavel Naumov dated Oct. 28, 2014 |
| 23. | Pavel Naumov email to J. Glennon dated Oct 28, 2014 |
| 24. | Appeals Panel Decision dated Nov. 21, 2014 |
| 25. | Sanctions Assignment |
| 26. | Plaintiff's Appeal of Sanctions |
| 27. | Appeals Panel Decision dated Dec. 3, 2014 |
| 28. | Jennifer Glennon letter dated Dec 4, 2014 |
| 29. | Faculty Affairs Committee Recommendation |
| 30. | Pavel Naumov letter to Board of Trustees |
| 31. | Minutes of Executive Committee Meeting, January 14, 2015. |
| 32. | Pavel Naumov Answers to Interrogatories Excerpts |
| 33. | Dear Colleague Letter of the Department of Education Office of Civil Rights |
| 34. | Jennifer Glennon email to Pavel Naumov dated Sept 13, 2014 |
| 35. | Second Affidavit of Jennifer Glennon |
| 36. | McDaniel December 2014 Title IX policy |
| 37. | Department of Education 2014 Questions and Answers on Title IX and Sexual Violence |

**Exhibits which have been previously submitted are not reattached, except to the extent that supplemental pages have been added.**

4836-0054-9935, v. 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

PAVEL NAUMOV,

            Plaintiff,

   vs.

MCDANIEL COLLEGE, INC. et al,

            Defendants.

Case No. 8:15-cv-00482GJH

---

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

It is troubling that Plaintiff Pavel Naumov ("Plaintiff" or "Naumov") now alleges, for the very first time, in his Opposition to Defendants' Motion for Summary Judgement ("Opposition" or "Opp.") that Defendant McDaniel College's (McDaniel) decision to pursue charges against him, and terminate his employment was *motivated by gender bias*.  Plaintiff made no mention of gender bias in his Amended Complaint, and any newly-asserted allegation of gender bias is directly contrary to Plaintiff's prior sworn testimony.  Equally worrisome is the fact that Plaintiff posits as "fact" several self-serving allegations which have no supporting evidence and for which Plaintiff provides no citation whatsoever; and that Plaintiff misrepresents the testimony of a McDaniel witness by referencing excerpts from her deposition testimony in a misleading manner which obscures the meaning of the testimony.   When Plaintiff's contrary, unsupported and/or erroneous allegations are disregarded, it is apparent that no genuine disputes of any material fact exist which would make summary judgment inappropriate.

Since Plaintiff never alleged any claim of gender-based bias in his Amended Complaint, and has offered no evidence (aside from his new affidavit which contains only sheer speculation,

contrary to his prior deposition testimony) that gender bias was a motivating factor in McDaniel's grievance processing or termination decision, Defendant McDaniel is entitled to summary judgment on Count I (Violation of Title IX.)

Because Plaintiff has not opposed Defendants' motion for summary judgment on Count II (Intentional Infliction of Emotional Distress) and Count III (Violation of Due Process), summary judgment should be granted to Defendants for the reasons set forth in their Memorandum in Support of Defendants' Motion for Summary Judgment (ECF 53-1) (hereafter "Opening Brief".) Furthermore, since the *only allegation* Plaintiff made against Defendants Roger Casey, Jeanine Stewart and Martin Hill (the "Individual Defendants"), was his claim for Intentional Infliction of Emotional Distress (Count II), the Individual Defendants should be dismissed from the case, regardless of the Court's ruling on the remaining counts.

Finally, because Plaintiff concedes that the McDaniel Faculty Handbook incorporates the College's Title IX policy for resolution of sex based harassment and discrimination claims, and because McDaniel complied with its own Title IX policy, McDaniel is entitled to summary judgment on Plaintiff's breach of contract claim, Count IV (Violation of Faculty Handbook.)

## II. Plaintiff's New Claim of Gender Bias Does Not Alter the Fact that McDaniel is entitled to Summary Judgment on Count I since Plaintiff has No Evidence that McDaniel Discriminated Against Him Because of his Gender.

### A. Plaintiff Never Before Claimed Gender Bias in his Pleadings or Discovery

Now that Plaintiff realizes that he must allege and prove that McDaniel investigated and terminated him because of gender bias, Plaintiff claims *for the first time* in his Opposition that:

> McDaniel's decision to pursue the charge against him, and ultimately terminate him, was an erroneous outcome that was motivated by gender bias. (*citing* Am. Cp. Count 1.)

(Opp. at 22.)

However, the Amended Complaint which Plaintiff references (ECF 24) contains no allegation or hint of gender bias whatsoever, even though the pleading is twenty-pages in length and includes 128 separate paragraphs. Instead, Plaintiff only complains about what he perceives to be *procedural violations* in McDaniel's compliance with its Title IX policy. (Am. Cp. ¶82.)

Similarly, when asked about the basis for his Amended Complaint at deposition, Plaintiff testified that,

> "My complaint is about not following the procedures. My complaint is not about retaliating... I'm only saying that my claim is about not following procedure."

(Pl. Dep. at 164[1].)

### B.   At Deposition, Plaintiff Discussed Motives for McDaniel's Pursuit of the Harassment Complaint But Does Not Attribute the Action to Gender Bias

Throughout his deposition, Plaintiff confirmed that he believed that McDaniel's motives in pursuing the Title IX complaint against him were related to other factors, unrelated to gender. For instance, in the opening paragraph of a letter which Plaintiff wrote to the McDaniel Faculty Affairs Committee on December 22, 2014, Plaintiff described McDaniel's motivation for pursuing charges against him as follows:

> Dear Donna, Lauren, Maggie, Mona and Sharon,
>
> As you might remember, at a Spring 2013 Faculty meeting the President of the College asked faculty to "affirm" appointment of the new Provost. In full compliance with the existing rules, I asked the President for paper ballots on this issue to give untenured faculty members a chance to express their position without administrative pressure. The President immediately expressed his dissatisfaction with my request, saying that it likely is make the affirmation not "unanimous", as he would like it to be, but he felt obligated to follow the rules.
> A year later, the Provost and the President decided to retaliate against me and force me to leave the College.

(Pl. Dep. 77-79; Pl. Dep. Ex. 2.)

---

[1] Defendants will refer to Exhs. 1-34, previously identified in their Opening Brief, ECF 53-1, and provide supplemental pages to those exhibits, as needed, as well as new Exhibits.

Plaintiff further explained at deposition that the President [Dr. Casey] and Provost [Dr. Stewart] [male and female respectively] retaliated against him to force him to leave the college. (Pl. Dep. at 82.)

When asked if there may have been other motives for the College's actions against him, Plaintiff first answered that he believed Dr. Stewart "has lots of very aggressive feminist publications, and she might have taken this side due to her beliefs". (Pl. Dep. at 80.)   However, Plaintiff conceded immediately thereafter, "I don't know this.  So you're asking me if maybe other reasons? I don't know." *Id.*

At deposition, Plaintiff offered again that the President and Provost retaliated against him to leave the College because Plaintiff had requested paper ballots at the spring 2013 faculty meeting- which was allegedly contrary to Dr. Casey's wishes.  (Pl. Dep. at 77-79.)   Beyond this motivation, Naumov denied knowing why Dr. Casey made the dismissal recommendation:

> Q.    Okay.  Then ultimately, in your words, "The president made an unjustified and vindictive decision" to dismiss you. Do you agree with what you wrote here?
> A.    Yes.
> Q.    Okay.  Vindictive in retaliation for..?
> A.    Correct, because I see absolutely no other reason.  I had very little interaction with Defendant Casey.  I just -- we didn't cross anywhere.  I can go -- just a couple of times when we talked.  I remember once at the end of a faculty meeting, but...
> Q.    Okay.
> A.    So I don't see any other reasons where we could have stepped on each other's toes.
> Q.    Right.  So then it would be correct to say that that's your view of what happened and why it happened; correct?
> A.    My view is that this is what happened.
> Q.    Got it.  Okay.
> A.    However, I -- it's very hard for me to speculate about people's motives.
> Q.    Right.  So you don't know why it happened as a fact?
> A.    Correct.

(Pl. Dep. at 89-90.)

Later in his deposition, Plaintiff offered still another reason, unrelated to gender, why Dr. Stewart might have retaliated against him,

4

> A.    The other thing that I would like to add about her [Stewart] is that we also had a conflict with her at Faculty Development Committee. I was a member of Faculty Development Committee that is in charge of distributing travel budget and, you know, other funding for scholarship and teaching on campus. And she came trying to change the whole system in some very uncomprehendable (sic) to me way, and I think most of the members of the Faculty Development Committee were unhappy. We had couple of meetings with her, and I explicitly was telling her about the issues what she's doing.
>
> Q.    And what does that have to do with the claims you're making in this case as another reason that she's --
>
> A.    She might be -- that's another reason for her potentially might be retaliating against me.

(Pl. Dep. at 349-350.)

Thus, while Plaintiff was given multiple opportunities at deposition to explain McDaniel's motivation for pursuing charges against him, or for terminating him, he **never** claimed that the College was motivated by gender bias against him – as he now claims.

### C.    Plaintiff Cannot Defeat Summary Judgment On Count I by Using An Affidavit Which Contradicts his Deposition Testimony

In his Opposition, now realizing that he has no support for his Title IX claim, Plaintiff relies upon his own sworn affidavit in an attempt to argue for the first time that McDaniel took action against him because of gender bias. (Opp. Ex. 4, ¶¶10, 15, 81.)  However, Plaintiff's new and inconsistent claims of gender bias are contrary to Plaintiff's deposition testimony.  In fact, at deposition, Plaintiff made clear his belief that McDaniel's President and Provost were motivated to retaliate against him for a vote he requested at a Spring 2013 meeting, or because of Plaintiff's disagreement with Dr. Stewart over distribution of the College's travel budget.   (Pl. Dep. 77-79, 349-350; Pl. Dep. Ex. 2.)

At deposition Plaintiff admitted that he had no basis for believing that Stewart took any action against him because of her alleged feminist views:

> A.    So I think that Defendant Stewart's feminist -- belligerent feminism might have prevented her from unbiased and just consideration of this case.  I also --
>
> Q.    Stop.  What factual basis do you have for that statement, that it might have

prevented her?  Do you have a factual basis for that, or are you just thinking that?

A.    I -- I -- I'm thinking that.

Q.    Okay.  No facts; right?

A.    I don't know what happened in her head.

(Pl. Dep. 364-365; *see also* Pl. Dep. at 80)("I don't know this.  So you're asking me if maybe other reasons? I don't know.")

In contrast, Plaintiff's new affidavit now affirmatively states, "the complaint was made based upon my gender, male, and because Dr. Stewart is a strong feminist." (Opp. Ex. 4 ¶15.)

It is well-established that an affidavit which contradicts deposition testimony cannot be used as a basis for denying summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F. 2d 970, 975 (4th Cir. 1990) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (internal quotation marks omitted); *see also City of Joseph v. Southwestern Bell Telephone*, 439 F. 3d 468, 475 (8th Cir. 2006) ("an affidavit filed by the plaintiff in opposition to a motion for summary judgment that directly contradict[s] the plaintiff's previous deposition testimony [is] insufficient to create a genuine issue of material fact under Rule 56.")(citations omitted.) "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *City of Joseph* at 476 (citations omitted).

Plaintiff cannot be permitted to alter his testimony to declare that McDaniel pursued a complaint against him because of his gender, with what can best be described as a "sham affidavit," contradicting his own testimony and critical admissions. *Jackson v. Consolidation Coal Co.*, 1994 WL 89801, *2 (4th Cir. Mar. 22, 1994) (Court affirmed employer's motion for summary judgment

and held that "district court correctly disregarded [employee's] affidavit as a sham even though he had not been expressly questioned about [employer's] alleged threats" since employee had been repeatedly questioned about the basis for his discharge claim and employee never mentioned the threats in his deposition despite having access to the relevant information.)

### D.   Plaintiff's New Claim that McDaniel is Biased Against Male Faculty Members is Also Contradicted by his Own Deposition Testimony

Similarly, Plaintiff now claims for the first time that the "College has created an environment in, and procedure by, which male faculty accused of sexual harassment are virtually assured of a finding of guilt/responsibility and/or the College is deliberately indifferent to such a culture on its campus. (Opp. at 24.) Nor surprisingly, Plaintiff cites to no support from the record for this outlandish allegation. *Id.*[2]

Apparently in an attempt to bolster his new claim that McDaniel is hostile to male faculty, Plaintiff also asserts in his affidavit that, "Dr. Stewart had indicated she is a feminist by, among others, abruptly removing beloved male dean of graduate studies in spite of faculty opposition." (Opp. Ex. 4, ¶80.) However, at deposition, Plaintiff identified two McDaniel administrators, one female, one male, who he believes were treated unfairly and received disproportionate punishment from McDaniel.  (Pl. Dep. 358-361.)   Plaintiff did not suggest that these administrators were singled out on account of their gender (as he does now for the dean of graduate studies), nor could he, since both a female and male were disciplined.  *Id.*

### E.   Plaintiff Cannot Avoid Summary Judgment by his Mere Speculation that He Was Subjected to Gender Discrimination

---

[2] Instead, Plaintiff refers the Court to *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015), which has no relevance to the case at bar. In *Doe*, Judge Bredar from this Court was considering a motion to dismiss and found that Plaintiff had made sufficient specific factual allegations of possible gender bias to avoid dismissal. The Court stated that "Plaintiffs may have a viable case if they are able to uncover discoverable and admissible evidence that Plaintiffs' gender was a motivating factor behind [Salisbury University's] allegedly flawed disciplinary procedures and wrongful conclusions. *Id.* at 769. In contrast, Naumov's Amended Complaint contained no allegations that gender bias was a motivating factor behind McDaniel's findings, and he has failed to uncover any evidence that his gender was a motivating factor behind his disciplinary proceedings.

Even assuming Plaintiff is allowed to contradict his prior deposition testimony and assert that his discipline and termination were the result of gender bias, these allegations are nothing but speculation by Plaintiff, totally unsupported by fact.   In order to accept Plaintiff's new-found theory, the Court would need to disregard that several individuals who considered the charges against Plaintiff were also male, including three members of the 5-person Grievance Committee, one member of the 2-person Appeal Committee, Dr. Roger Casey, and thirteen members of the 15-person Board of Trustees Executive Committee who voted to uphold Plaintiff's termination. (Ex. 35 at ¶6.)  Plaintiff's new speculation that McDaniel was motivated to pursue charges against him out of gender bias does not constitute evidence sufficient to defeat summary judgment.

As this Court and the Fourth Circuit have reminded us, Plaintiff cannot avoid summary judgment on his mere speculation or unsupported allegations. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281, n. 1 (4th Cir. 2000);  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985); *Robinson v. Baltimore City Police Dept.*, 181 F. Supp. 2d 470, 474 (D. Md. 2002); *Ward v. Johns Hopkins University,* 861 F. Supp. 367, 372 (D. Md. 1994).  Since Plaintiff has not produced any evidence that gender bias was a motivating factor behind McDaniel's processing of the grievance, Plaintiff's Title IX claim (Count I) fails as a matter of law.

### III.   Plaintiff Does Not Oppose Defendants' Argument that it is Entitled to Summary Judgment on Count II (Intentional Infliction of Emotional Distress and Count III (Violation of Due Process)

Defendants argued in their Opening Brief that Plaintiff could not prove any of the elements of Intentional Infliction of Emotional Distress (Count II), and could not satisfy any of the possible tests to establish that McDaniel is a state actor, as required for Plaintiff's violation of due process claim (Count IV.)  Plaintiff's Opposition is totally silent on both issues and the court should treat that silence as a concession by Plaintiff as to the validity of Defendants' arguments. *See McKeel*

*v. United States*, 178 F. Supp. 2d 493, 504 (D. Md. 2001) ("Plaintiff appears to concede this point, as he has failed to respond to the government's argument on this point."); *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440 (D. Md. 2001) ("Plaintiffs appear to concede this point, as they have failed respond to this argument."); *cf. Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (non-moving party's failure to address in opposition brief an argument raised in opening brief constitutes abandonment of claim.)  Accordingly, Defendants are entitled to summary judgment on Counts II and III.

Additionally, since the *only allegation* Plaintiff made against the three Individual Defendants was his claim for Intentional Infliction of Emotional Distress (Count II), the Individual Defendants should be dismissed from the case, regardless of the Court's ruling on the remaining counts.

## IV.  McDaniel is entitled to Summary Judgment on Plaintiff's Breach of Contract Claim, Count IV (Violation of Faculty Handbook), Because McDaniel Complied with its Own Title IX Policy

Plaintiff attempts to avoid summary judgment on Count IV (Violation of Faculty Handbook) by erroneously arguing that McDaniel failed to comply with several provisions of its Title IX policy. (Opp. at 26.)  Plaintiff seeks to bolster his argument with unsupported allegations,[3] allegations contrary to sworn testimony, and with misleading citations of the record.  As explained

---

[3]Plaintiff seeks to bolster his case with several allegations, with no record support whatsoever, which the Court should disregard, including the following:
- Johns Hopkins is a more prestigious institution where Dr. More was simply attempting to obtain a faculty position. (Opp. at 5.)
- [Dr. More] would receive more pay and a smaller teaching load [at JHU] and would work with brighter students. *Id.*
- [Plaintiff] does not recall anything about [Dr. More's] sweater or making comments on her sweater.  [Plaintiff] denied that he walked [Dr. More] to her car.  (Opp. at 6.)
- [Plaintiff's] letter to [Dr. More] was only an appeal to a colleague to continue their collaborative research.  (Opp. at 7.)
- The Department Members declined to go to lunch with [Dr. More] and [Plaintiff] invited her alone. (Opp at 8.)
- Glennon told [Plaintiff] she would not help him in obtaining any witnesses, as this was "his job." (Opp. at 10.)
- [Plaintiff] requested counsel for his hearing before the Grievance Committee.  (Opp. at 12.)

below, McDaniel complied with all provisions of its Title IX policy, and Plaintiff offers no evidence to the contrary.

A.    **Plaintiff Concedes that McDaniel's Faculty Handbook Incorporates its Title IX Policy, and that the Title IX Policy Governs Allegations of Sex-based Discrimination or Harassment.**

In its Opening Brief, Defendants explained why the particularized procedures of McDaniel's Title IX policy were the procedures which were contractually guaranteed to Plaintiff in this case, and not the general dismissal procedures contained in the Faculty Handbook or AAUP guidelines:

> Plaintiff cannot deny that the McDaniel Title IX policy was distributed to all faculty and that all faculty were required to complete training on the policy. (Glennon Aff. at ¶9.) Nor can he dispute that the Provost (Dr. Stewart) and the College Title IX Coordinator (Glennon) advised him that the Title IX complaint against him would be governed by the McDaniel Title IX policy. (Stewart Dep. at 32; Ex. 34, Jennifer Glennon email to Plaintiff dated Sept.13, 2014.) Furthermore, it is beyond dispute that the McDaniel June 2014 Title IX policy provided procedures for the sanctioning of offending employees, up to and including dismissal, following a finding of a Title IX violation. (Ex. 12 at p. 13.) Since the Faculty Handbook expressly refers faculty to the separate policy for the adjudication of discrimination and harassment complaints, and since that policy includes the College's specific "Title IX Policy" for the adjudication of harassment grievances (including the sanction of dismissal,) it is evident that the procedure which was contractually guaranteed to Plaintiff in this case was the McDaniel Title IX policy – and not the general dismissal policy found in the Faculty Handbook.
>
> Accordingly, McDaniel did not owe Plaintiff a duty to follow the general dismissal procedures contained in the Faculty Handbook (or in the referenced AAUP guidelines), but rather owed him a duty to follow the more particularized procedures, including dismissal procedures, contained in the Title IX policy for consideration of harassment grievances.

(Defendants' Opening Brief at 33.)

Plaintiff states in his Opposition, "Moreover, it is agreed that the McDaniel Faculty Handbook in relevant part incorporates the McDaniel Title IX Policy for purposes of alleged sex-based discrimination or harassment." (Opp. at 26.) Plaintiff even references "Defs.' Mem. 33" in support of his agreement that the McDaniel College Title IX policy governs. *Id.*

B.    **Plaintiff Has Failed to Identify Any Violations by McDaniel of its Title IX Policy.**

In his Opposition, Plaintiff summarily states that the "College failed to abide by several

provisions of its Title IX Policy with respect to the allegations, investigations, and process with regard to Dr. Naumov." (Opp. at 26.)  Plaintiff does not set forth the alleged violations in his argument, but instead references his Statement of Facts. *Id.*  Therefore, Defendants will explain why none of the alleged violations of policy which are embedded in Plaintiff's Statement of Facts constitute a violation of McDaniel's Title IX policy:

      **i.**      Plaintiff alleges several times within his Opposition that "Dr. More refused to be a complainant, and the matter should have been dropped because of her failure to come forward." (Opp. at 8); "according to the College's Title IX policy, the complainant must come forward or abandon his or her complaint" (Opp. at 1); "if the complainant does not come forward, the matter must be dropped" (Opp. at 9.)  The only reference which Plaintiff offers for this argument is the Title IX policy itself. (Def. Ex. 12.)

However, as already explained in Defendants' Opening Brief, the McDaniel Title IX policy does not contain the language or requirement which Plaintiff alleges.  The Title IX policy provides that,

> "If a formal hearing is instituted, the name of the complainant will be *disclosed* to the Grievance Committee; however, the formal hearing may be postponed until such time as the complainant is willing to be identified (e.g., until final grades are in or appointment renewals made), at the discretion of the chairperson of the Grievance Committee.  *In the event that the complainant is unwilling to be identified, the formal hearing will be dismissed, no action will be taken and no report of any action will be filed.*"  (Ex. 12 at p. 11.) (*emphasis added*)

As previously explained in Defendants' Opening brief, this is not a case in which the "complainant is unwilling to be identified".   (Ex. 12 at p. 11.)  Not only did Dr. More allow herself to be identified, but Plaintiff was informed during his August 2014 meeting with Dr. Stewart that Dr. More was the individual who had made harassment allegations against him, as testified to by Plaintiff's wife. (Safirova Dep. at 34.)  Thereafter, Plaintiff was told by Ms. Glennon that the Provost, Defendant Stewart, was serving as the Complainant. (Glennon Aff. at ¶25.)  Thus, McDaniel has not

violated its Title IX policy by moving forward with a hearing in which a complainant was unwilling to be identified.

ii.    Plaintiff erroneously claims that McDaniel violated its Title IX policy by allowing Defendant Stewart to serve as the Complainant.   (Opp. at 1)   In fact, the June 2014 Title IX policy which was in effect during Plaintiff's grievance process is silent about who may serve as the Complainant, and contains no definitions of the terms "Complainant" or "Responsible Party."   (Def. Ex. 12.)   Therefore, McDaniel did not violate its own policy by allowing Dr. Stewart to serve as the Complainant in the grievance against Plaintiff.

The  McDaniel  Human  Resource  Director  and  Title  IX  Coordinator,  Jennifer  Glennon, explained at her deposition that McDaniel subsequently revised its Title IX policy, after Plaintiff's grievance hearing, to define Complainant as "the person who allegedly experienced the violation." (Glennon Dep. at 7-11)  However, this definitional language does not exist in the June 2014 Title IX policy which governed Plaintiff's grievance hearing.  (Def. Ex. 12.)   At deposition, Glennon twice reminded Plaintiff's counsel that the Title IX policy that she was being asked to review and comment upon  [which  was  eventually  marked  as  Glennon 2],  and  which  contained  the  definition  of "Complainant", was *not* the policy which applied to Plaintiff's proceedings, but was a later revision: "This is a revision after Dr. Naumov's grievance was filed" (Glennon Dep. at 10); "But again, this policy was revised after Dr. Naumov's grievance was filed." (*Id.* at 11.)[4]

Plaintiff misleads the Court when he states, variously that, "there is no proper complainant since, *according to Title IX policy*, the complainant is the individual to whom the bad behavior is

---

[4] Even if the December 2014 Title IX *had* been the policy in effect during Plaintiff's grievance – which it was not – Dr. Stewart could still have pursued a grievance against Plaintiff.  However, because of the new definitions introduced by the December 2014 version of the policy, she would not have been referred to as the "Complainant," but would have been referred to as a "Responsible Person" under the new definitions introduced in December 2014.  (*See* Second Affidavit of Jennifer Glennon, Ex. 35, ¶ 4.)  It was not McDaniel's intent to eliminate the opportunity for a person other than the victim to pursue a grievance against a Respondent in its December 2014 policy, nor does it believe it did so.  (*Id.* at ¶5.)

directed" (Opp. at 5); "the complainant must be the one who experiences the behavior" (Opp. at 9); and "[a]s acknowledged by Jennifer Glennon … McDaniel's Title IX handbook provides that only the person subjected to the alleged behavior can make a formal complaint." (Opp. at 1.)

As Plaintiff is fully aware, only a later Title IX policy dated December 2014 (attached as Ex. 36) defined the complainant as the person who allegedly experienced the violation. (Glennon Dep. at 11.)   However, Glennon did not state nor suggest that the June 2014 Title IX policy defined the complainant as the person who allegedly experienced the violation, and Plaintiff's insinuation that she made such a statement is false. (Glennon Dep. at 7-11.)   The fact that McDaniel later revised its Title IX policy, *after Plaintiff's grievance was filed,* to define the roles of Complainant and Responsible Person for the first time, and enhance its other definitions, has no bearing whatsoever on the Title IX procedure which was in place during Plaintiff's grievance procedures.

     **iii.**     Plaintiff erroneously claims no less than five times in his Opposition that the charges which were brought against him by McDaniel were untimely since – he contends - none of the violations were reported within 90 days of their occurrence.  (Opp. at 2, 5, 9, 10, 11)  The undisputed facts show otherwise.

Plaintiff does not dispute that on April 28, 2014, Dr. Sara More informed Defendant Stewart that she planned to resign her tenured position at McDaniel and accept a non-tenure-track position elsewhere, and that she would probably not have considered leaving McDaniel's employment if not for Plaintiff. (Def. Ex. 3, Ans. No. 1.)  In subsequent meetings with Defendant Stewart in May 2014, Dr. More described the recurring conduct and unwanted attention from Plaintiff that brought her to her resignation decision. (*Id.*; Def. Ex. 4 at D0001-D0003.)

It is also undisputed that on May 28, 2014, Dr. More further complained to Defendant Stewart that she had recently received unwelcome communications from Plaintiff who was asking Dr. More to join him for lunch prior to leaving McDaniel.  (Def. Ex. 4 at D0004.)  Dr. More explained to Dr.

Stewart that this request troubled her because it was not a suggestion to meet for a meal with the entire department (which she would find appropriate) but a request for her to meet with him alone. *Id.*

It is also undisputed that within 90 days of Dr. More announcing her resignation, and the reasons for her decision to Defendant Stewart, and Dr. More complaining about Plaintiff's repeated lunch invitations, Defendant Stewart reported the resignation and unwelcomed communications to a McDaniel Title IX Advisor. (Stewart Dep. at 20.) Thus, while it is true that *some* of the occurrences for which Plaintiff was charged "happened months and even years before the actual complaint was made" (Opp. at 2), it is also undeniable that Dr. More's resignation and Plaintiff's repeated lunch invitations to Dr. More (which she reported as finding offensive) were both reported within 90 days of occurrence. (Def. Ex. 3, Ans. No. 1; Def. Ex. 4 at D0001-D0003; Stewart Dep. at 20.)

Since one of the complaints made by McDaniel against Plaintiff was a "hostile environment" claim, and because at least one act contributing to the claim occurred during the 90-day complaint-filing period, it was appropriate for McDaniel to consider the entire period of the hostile environment, under the continuing violation doctrine applied by the Supreme Court to Title VII[5] cases in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002.) As the *Morgan* Court explained, a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *Id.* If a plaintiff can establish that at least one act contributing to the claim occurred during the charge-filing period, then the entire time period of the hostile environment may be considered by the court for determining liability. *See, Turner v. The Saloon, Ltd.*, 595 F. 3d

---

[5] Courts have generally analyzed Title IX discrimination claims under the same legal standards as Title VII claims. *See, e.g. Gossett v. Oklahoma ex rel. Bd. of Regens for Langston Univ.*, 245 F. 3d 1172, 1176 (10th Cir. 2001) (Title VII is most appropriate analogue when defining Title IX's substantive standards); *Murray v. New York Univ. Coll. of Dentistry*, 57 F. 3d 243, 248 (2nd Cir. 1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have general adopted the same legal standards that are applied to such claims under Title VII"); *Lipsett v. University of P.R.*, 864 F. 2d 881, 896 (1st Cir. 1988) (court "can draw upon the substantial body of case law developed under Title VII to assess the plaintiff's claims under....Title IX".)

679, 683-685 (7th Cir. 2010) (district court erred in finding that all alleged incidents of sexual harassment were time-barred when one of the alleged incidents was within limitations period and was claimed to be part of continuing violation); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 817-18 (6th Cir. 2013) (not abuse of discretion to conclude that hostility and isolation experienced by plaintiff were sufficient to constitute one incident of discrimination occurring within limitations period that allowed plaintiff to claim hostile environment based also upon acts occurring outside of limitations period.)

Following *Morgan*, several courts have applied the continuing violation doctrine even when only a small portion of the unlawful harassment occurred during the limitations period or when the events that occurred during the filing period were seemingly innocuous. *See, Marrero v. Goya of P.R.*, 304 F. 3d 7 (1st Cir. 2002) (single timely incident in which supervisor gave penetrating look with lust toward employee and made comments employee interpreted as sexually suggestive was sufficient to trigger continuing violations doctrine); *Jensen v. Henderson*, 315 F.3d 854, 859 (8th Cir. 2002) ("[o]nly the smallest portion of that "practice" needs to occur within the limitations period for the claim to be timely"); *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (put simply, if the smallest portion of that 'practice' occurred within the limitations time period, then the court should consider it as a whole); *McFarland v. Henderson,* 307 F. 3d 402 (6th Cir. 2002) (sexual harassment claims allowed to proceed under a continuing violation doctrine where the conduct that occurred during the charge-filing period included allegedly permitting a magazine to fall on the plaintiff's hand, refusing the plaintiff the option of working through lunch, and speaking to the plaintiff in a manner likely to case her to lose esteem in the eyes of co-workers.)

Thus, McDaniel did not violate its own policy by considering *all* of the allegations of hostile environment made against Plaintiff, including the allegations of harassment lying outside of the 90-day filing period.

15

**iv.**    Plaintiff erroneously claims that there was "no right of the College to stand in place of the complainant in Title IX policy of 06/01/14, when [Plaintiff's] case arose" (Opp. at 4.)  In fact, the applicable June 2014 Title IX policy is completely silent about the ability of the College to stand in the place of another and pursue a Title IX complaint.

However, there is language in both the Department of Education's Dear Colleague letter of April 4, 2011 (DCL) and its April 29, 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Q & A") which strongly suggest that McDaniel has a duty to pursue charges against a respondent even in cases where the complainant may not desire to do so, and that a third party can file a Title IX complaint.  (*See* Def. Ex. 33; Def. Ex. 3.)  For example, the DCL[6] provides:

> If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects...Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.

(Def. Ex. 33 at 4.)

> As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects.

(Def. Ex. 33 at 15.)

The 2014 Q &A [7] provide further guidance on a school's duty to act:

> OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence.

(Def. Ex. 37 at 2.)

---

[6] The DCL provides that "Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination." (Def. Ex. 33, fn. 21.)

[7] The Department of Education states that although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment. (Ex. 37, fn. 5.)

> When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E.) If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

(Ex. 37 at 2-3.)

> Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known.

(Ex. 37 at 14.)

> As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint.

(Ex. 37 at 15-16.)

Based upon this guidance, Defendants Casey and Stewart believed it was McDaniel's duty to pursue Title IX charges against Plaintiff after Dr. More voiced her complaint, and even though Dr. More did not wish to be the one pursuing the complaint. (Casey Dep. at 18, 20; Stewart Dep. at 23,57-59.) Since the DCL and 2014 Q & A refer to "third party complaints" and the obligation for a school to eliminate hostile environment and remedy its effects, regardless of whether others file a complaint, Plaintiff cannot plausibly argue that there is no support in the DCL for McDaniel's action in pursuing the Title IX charge even after Dr. More's resignation (as Plaintiff argues in his Opposition at p. 8.)

     **v.**     While the Opposition is unclear, to the extent Plaintiff is alleging that he was denied the ability to contact witnesses in preparing for his grievance hearing (Opp. at 10), such a claim is

contradicted by Plaintiff's own testimony:  At deposition, Plaintiff testified at length about contacting his witnesses by text and email, and meeting with them to prepare for his grievance hearing.  (Pl. Dep. at 196-202.)  It is evident that Plaintiff was not denied the opportunity to send or receive email, since Plaintiff admits to regularly using ten email addresses, only one of which is a McDaniel.edu account. (*See* Ex. 32, Plaintiff Ans. To Interr. 4.)  Additionally, it is undisputed that Plaintiff could still access his *existing* campus email since he admits that he copied all relevant documents (including email) from his McDaniel college computer to Dropbox before he returned his computer to the College (Pl. Dep. at 100-103.)  Moreover, Plaintiff provided many pages of his email to the Grievance Committee for their consideration, and produced thousands of pages from his McDaniel email during discovery. (Glennon Aff. at ¶22.)  Plaintiff's allegation that Ms. Glennon told him she should not help in obtaining witnesses (Opp. at 10) should be disregarded since it is not supported by any of Plaintiff's references, not even by his own affidavit.

 **vi.** Plaintiff claims, without basis, that having the Provost serve as the complainant "severely biased the process since most of the faculty reported to the Provost and she was second in command at McDaniel".  (Opp. at 11.)  However, Plaintiff has not presented any evidence, beyond his mere speculation, that any of the bodies which considered the charges against him were biased in favor of Dr. Stewart.

 **vii.** Plaintiff claims that "according to the Faculty Handbook" he "should have had his lawyer with him and should have had the opportunity to testify before all panels considering the evidence" (Opp. at 12.)  However, the procedures which applied to Plaintiff's grievance were the procedures afforded by the McDaniel Title IX policy, and not the general, and sometimes conflicting, procedures provided by the Faculty Handbook or by the AAUP (American Association of University Professors.)  (*See* Reply below at 21.)

 The McDaniel Title IX policy does not contain a right for either party to be accompanied by

an attorney. This policy is not in violation of Title IX, since the Department of Education expressly states in the DCL that the "OCR (Office of Civil Rights) does not require schools to permit parties to have lawyers at any stage of the proceedings." (Def. Ex. 33 at 12.) Moreover, it remains undisputed that Plaintiff never requested counsel nor to be accompanied by an advisor of his own choosing other than the ombudsman. (Glennon Aff. at ¶10.) Plaintiff cannot now challenge this statement nor create any dispute of fact by his entirely unsupported new claim that he "did request counsel for this hearing before the Grievance Committee."[8] (Opp. at 12.)

Nor does the McDaniel Title IX policy guarantee Plaintiff the right to testify before all panels considering the evidence. (Def. Ex. 12.) In fact, in addition to testifying before and presenting witnesses and documents to the Grievance Committee, Plaintiff presented extensive written submissions to the Appeals Panel, Faculty Affairs Committee and Board of Trustees which each considered the charges against him. (Ex. 9, ¶¶ 15,23; Glennon Dep. at 47-48; Ex. 26; Pl. Dep 76-78; Pl. Dep. Ex. 2; Ex. 30.) Plaintiff cannot point to any requirement that these bodies must afford him an in-person hearing as part of their proceedings.

    **viii.** Plaintiff incorrectly claims, again without any citation to the record, that "all members of the Grievance Committee reported to Provost Stewart. This meeting [sic] made the Committee biased in favor of Dr. Stewart's charges." (Opp. at 12.) To the contrary, McDaniel Vice President of Enrollment Florence Hines testified that she was the Chair of the Grievance Committee and does not report to Dr. Stewart. (Def. Ex. 17, Hines Dep. at 5, 44, 48.) Hines further testified that Grievance Committee member Chris Collins also did not report to Dr. Stewart. (Hines Dep. at 49.) When asked about bias within the Committee, Hines denied that the Committee was "supposed to find" against Plaintiff, and denied that anyone told her "you need to decide against [Plaintiff]." *Id.*

---

[8] Plaintiff's claim about having requested counsel is not contained in the referenced documents nor in Plaintiff's affidavit, and was never before mentioned during discovery. There is simply no support for this new claim.

ix.    Plaintiff claims he did not receive a decisional document that contained the Grievance Committee signatures and that this was a violation of Title IX policy. (Opp. at 13.)   At deposition, Plaintiff elaborated on this complaint, stating that the letter he admittedly received with the Grievance Committee findings did not have the signatures of the members, and lacked the word "Decision." (Pl. Dep. at 208-212.)  However, the Title IX policy requires only "written notification of the decision," with no requirement that the notification include member signatures, or be titled "Decision". (Ex. 12.) Significantly, Plaintiff does not dispute receiving a letter with the Grievance Committee findings. *Id.* Plaintiff's further complaint that the Grievance Committee decision was not delivered to him in person was previously addressed by Defendants in the Opening Brief at p. 42.

x.    Plaintiff claims he was not allowed to address the Appeals Panel.  (Opp. at 14.) However, the McDaniel Title IX policy does not provide parties with a right to "address the Appeal Panel". (Def. Ex. 12.) Rather, the policy provides that "[a]ppeals will be based upon the record of the hearings created by the Grievance Committee...At the discretion of the appeal panel, additional proceedings may be held, the form and nature of which is in the discretion of the appeal panel." (Def. Ex. 12 at 14.) Plaintiff also does not dispute that he submitted written documents for consideration by the Appeal Panel. (Glennon Dep. at 47-48.)

xi.    Plaintiff claims that the decision to terminate his employment should be disallowed because Defendant President Casey, in the Sanction Assignment, recommended that Plaintiff be dismissed "for reasons of serious professional misconduct consistent with moral turpitude" and "for deliberate violation of the rights and freedoms of fellow faculty members." (Opp. at 15.) Apparently Plaintiff believes that the Title IX charge against him was required to include the language "moral turpitude" and "violation of the rights and freedoms of fellow faculty members" before Dr. Casey was allowed to use such summary language to describe the decision of the Appeal Panel.  However, Plaintiff cites to no authority for this restrictive view.   It is clear from the Sanction Assignment that

Dr. Casey is merely characterizing his view of the charges which have already been substantiated by the Grievance Committee and Appeal Panel, and that Dr. Casey is not recommending a sanction for new or different charges which have not been investigated. (Def. Ex. 25.)

**xii.**    Plaintiff complains, again without authority, that the fact that "Dr. Casey gave a PowerPoint presentation to the FAC [Faculty Affairs Committee] about the [Title IX] process, after which he left the meeting" "was a violation of the Title IX policy and could easily have biased the FAC. (Opp. at 17.) Plaintiff provides no citation to the record since none exists. The Title IX policy contains no language to suggest that Dr. Casey acted improperly in presenting a PowerPoint presentation. (Def. Ex. 12.) Plaintiff does not even suggest what, if any, portion of the presentation he found offensive or likely to result in bias. Indeed, this is the first time Plaintiff has raised this issue. Plaintiff does not even state that Dr. Casey's PowerPoint presentation biased the FAC, only that it "could easily" have done so. (Opp. at 17.) Plaintiff's sheer speculation about possible bias does not amount to a breach of contract on the part of McDaniel.

Since Plaintiff has not demonstrated that McDaniel violated *any of the provisions of its Title IX policy*, nor raised any dispute of material fact, McDaniel is entitled to judgment on Count IV.

**C.    Plaintiff is Not Entitled to the General Dismissal Procedures Contained in the Faculty Handbook, Which are Inconsistent with the More Particularized Procedures Contained in the Title IX Policy for Consideration of Harassment Grievances.**

In his Opposition, Plaintiff concedes that the Faculty Handbook incorporated McDaniel's Title IX policy for purposes of resolving sexual discrimination and harassment complaints, the very complaints asserted against Plaintiff by Dr. More. (Opp. at 26.) In addition to Plaintiff's admission, the unambiguous language of McDaniel's policies support the undisputed fact that the Title IX policy controls all claims relating to sexual harassment. First, the clear language of the Faculty Handbook provides that "[w]hen a grievance is alleged to be discrimination or harassment, procedures outlined

in the Affirmative Action Manual [which included the subject 2014 Title IX policy] will be followed." (*See* Glennon Aff. at ¶ 6.) In addition, the Faculty Handbook expressly states that "when prejudice or discrimination in the decision-making process [related to the appeal of Renewal, Tenure or Promotion decisions] is alleged, individuals should refer to the College's Title IX policy." *Id.* Thus, it is undisputed that McDaniel properly chose those procedures detailed in the Title IX policy to resolve the complaints against Plaintiff.[9]

Within those procedures, McDaniel expressly states that "[a faculty member's] tenure status is not a protection, since discrimination, harassment and sexual assault violate basic human rights guaranteed by law, and tenure is not a guarantee against sanction due to either established academic principles or civil or criminal laws." (Def. Ex. 12 at 13.) Therefore, there is no doubt that Plaintiff knew he would not be protected by his tenure status if he violated the Title IX policy, based on the unambiguous provisions of the Parties' agreement.

Despite Plaintiff's admission, and the fact that McDaniel's Faculty Handbook unambiguously provides that the Title IX policy governs discrimination or harassment complaints against tenured faculty, Plaintiff curiously asserts that he was also entitled to "separate procedures" and "additional hearings" found in the Faculty Handbook. (Opp. at 26-27.) First, this reading is contrary to the clear language of the Faculty Handbook which provides that the Title IX policy will be followed "when a grievance is alleged to be discrimination or harassment". (*See* Glennon Aff. at ¶ 6.) Notably, the Faculty Handbook does not state that the Title IX procedures will be followed *in addition to other Faculty handbook procedures.* Moreover, a closer look at those unrelated handbook procedures demonstrates that they conflict with the Title IX policy in important respects, and could not possibly

---

[9] While Plaintiff claims McDaniel did not follow its Title IX policy, Plaintiff has failed to allege any material fact demonstrating support of this baseless allegation, as McDaniel has already addressed in its Memorandum in Support of its Motion for Summary Judgment (at pp. 34-43), and its Reply (at pp. 10-21.)

be available to Plaintiff as additional procedures, without directly undermining the Title IX policy.

For instance, Plaintiff alleges that he should have been afforded the right to cross-examine all witnesses who testify at the hearing, a right provided by the dismissal procedures in the Faculty Handbook. (*See* Am. Cp. ¶¶ 40, 41, 87, 112.)  The Title IX policy does not provide such a right, and the parties do not have an opportunity to cross-examine or confront witnesses; instead, the Grievance Committee pursues its investigation in "separate hearings."[10]  (Def. Ex. 12, at p. 11.)  Similarly, consistent with the Dear Colleague Letter, the McDaniel Title IX policy requires use of the preponderance of evidence standard, whereas the Faculty Handbook contains no prescribed evidence standard. (Def. Ex. 12; Pl. Ex. 2.)

Plaintiff further complains that under the terms of the Faculty Handbook, the FAC should have been consulted before he was asked to "resign or be terminated."[11] (*See* Opp. at 10-11, *see also* Pl. Ex. 4 at ¶ 12.)   In fact, there is no conflict between the procedure which McDaniel followed and the Faculty Handbook since there is nothing in the Faculty Handbook that restricts McDaniel's attempt to informally resolve a conflict with a faculty member. (Pl. Ex. 2.) Even if such a conflict did exist (as is the case with the inability to cross-examine witnesses) the Title IX policy controls.[12]

Under Maryland law, "[w]here two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take

---

[10] McDaniel's procedure with respect to sexual harassment complaints is consistent with the guidance found in the Dear Colleague Letter that strongly discouraged schools from allowing parties personally to question or cross examine each other during the hearing.  (Def. Ex. 33, at p. 12.)

[11] The undisputed facts establish that Dr. Stewart met with Plaintiff to explain the charges against him, informed him of the Title IX policy, offered him a severance agreement for his consideration, give him the option to resign from the College before any formal hearing went forward, gave him access to the Human Resources Department, and encouraged him to speak with his own counsel. (Glennon Dep. at 18, 97; Stewart Dep. at 32-33.)

[12] In his Opposition, despite not providing any evidence or fact to support such a claim, Plaintiff, for the first time, alleges that he was denied the opportunity to have counsel at the Hearing. (*See* Opp. at 12.)  It remains undisputed that Plaintiff never requested counsel nor to be accompanied by an advisor of his own choosing other than the ombudsman. (Glennon Aff. at ¶10.)

precedence over the general, and control it." *Heist v. E. Sav. Bank, FSB*, 165 Md. App. 144, 151-152 (2005) (*citing Fed. Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 472 (1975.)  In this case, McDaniel's Title IX policy provides the specific grievance procedures for adjudicating allegations of discrimination, harassment or sexual assault, and thus is the policy which should be applied.

Instead of attempting to refute McDaniel's argument with actual facts or with Maryland law, in his Opposition Plaintiff relies on a single Ohio state court decision, *Chan v. Miami Univ.*, 73 Ohio St. 3d 52 (1995), a case which interprets a public university's policies and procedures under Ohio contract law, and which has never been cited by any Court outside of Ohio.  In *Chan*, the tenured faculty member claimed that he should have been afforded an additional hearing (beyond the sexual harassment hearing procedures) because his tenure was at issue.  73 Ohio St. 3d at 57-58.  The court in *Chan* agreed that faculty member should have been afforded an additional hearing to adjudicate his tenure status, since the sexual harassment policy which was used was silent on the procedures to be used when the conduct subjected a tenured faculty to dismissal.  *See Chan*, 73 Ohio St. 3d at 58-60.

However, in the case at bar, unlike in *Chan*, McDaniel's Title IX policy expressly provides for the discipline of tenured faculty.  As mentioned above, the Title IX policy states that "if the respondent is a faculty member, his/her tenure status is not a protection, since discrimination, harassment and sexual assault violate basic human rights guaranteed by law, and tenure is not a guarantee against sanction due to either established academic principles or civil or criminal laws." (Def. Ex. 12 at 13.)  More importantly, McDaniel's Title IX policy then provides the procedure that McDaniel will need to follow if it involves such an employee – the President will seek the additional recommendation of the Faculty Affairs Committee (which will receive a copy of the record for its determination) – the exact procedure McDaniel applied with respect to Plaintiff. *Id.*[13]  Therefore, even

---

[13] *Chan* is further distinguishable in that it relies upon Ohio contract law and involves the due process rights of a state employee.

24

if this Honorable Court deems the *Chan* decision to be persuasive, which it is not, McDaniel's Title IX policy provided for the remedy and discipline of tenured faculty, while the sexual harassment policy in *Chan* did not. Quite simply, McDaniel did not breach the Faculty Handbook in its investigation and dismissal of Plaintiff, since McDaniel properly followed the specific procedures called for in the Faculty Handbook for dealing with complaints of harassment against faculty members, *i.e.* the McDaniel Title IX policy.

### V.     Conclusion

As this Court and the Fourth Circuit have reminded us, Plaintiff cannot avoid summary judgment on his mere speculation or unsupported allegations. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281, n. 1 (4th Cir. 2000);  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985); *Robinson v. Baltimore City Police Dept.*, 181 F. Supp. 2d 470, 474 (D. Md. 2002); *Ward v. Johns Hopkins University,* 861 F. Supp. 367, 372 (D. Md. 1994).  Since Plaintiff cannot demonstrate that McDaniel discriminated against him based upon his gender, or that McDaniel violated its own Title IX policy in any way, Plaintiff's remaining claims fail as a matter of law.

WHEREFORE, for the foregoing reasons and for the reasons set forth in Defendants' Memorandum in Support of Motion for Summary Judgment, the Court should enter summary judgment in Defendants' favor on all claims asserted by Plaintiff Pavel Naumov, and award Defendants their costs and attorneys' fees incurred in defending this action.

Dated:  May 12, 2016

Respectfully submitted,

_____/s/_____

Gil A. Abramson (01240)
Eileen Carr Riley (23758)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, MD  21209
Phone:  (410) 415-2000
Gil.Abramson@jacksonlewis.com
Eileen.Riley@jacksonlewis.com
*Counsel for Defendants*

25