# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3

 4
                                      )
 5   PAVEL NAUMOV,                    )
                                      )
 6              Plaintiff,            )
                                      )
 7       -vs-                         ) No. 8:15-cv-00482-GJH
                                      )
 8   MCDANIEL COLLEGE, INC., et al.,  )
                                      )
 9              Defendants.           )
                                      )
10

11

12

13

14           DEPOSITION OF PAVEL NAUMOV

15                 DECEMBER 4, 2015

16                BALTIMORE, MARYLAND

17      REPORTED BY:  LAURA MAES, CSR NO. 9836

18

19

20

21   JOB NO. WDC-066265

22   PAGES: 1 - 379
```

1                Did you think if -- you, yourself,

2    that you were being viewed as a terrorist and

3    being deprived of rights because people

4    thought you were a terrorist?

5         A.    No, this is -- I don't think that the

6    word "terrorist" is appropriate in this

7    setting with respect to me, but this picture

8    is the best one that I found when I Googled

9    "due process" on the Google Images.

10        Q.    All right.

11        A.    I believe "terrorist" -- original

12   meaning of "terrorist" --

13              MR. STROUSE:  There's no question.

14   BY MR. ABRAMSON:

15        Q.    Go ahead.  You can continue.

16        A.    -- is intimidation.  It comes from, I

17   think, French and Latin root that means

18   intimidation.  I don't think I intimidated

19   anyone.

20        Q.    So from the time -- you say that the

21   president and the provost retaliated against

22   you to "force me to leave" based on a pretext

1       THE REPORTER:  I didn't -- say it

2   again.

3   BY MR. ABRAMSON:

4       Q.   You've got to slow down.

5       A.   My complaint is about not following

6   the procedures.  My complaint is not about

7   retaliating.

8       Q.   The retal- -- the form of the

9   retaliation was that they didn't follow the

10  procedures to lead to the termination of your

11  employment.

12      A.   I'm making no -- no claims about the

13  retaliation part of -- of this sentence.  I'm

14  only saying that my claim is about not

15  following procedure.  The motives behind that

16  is beyond my...

17      Q.   Right.  The -- the motives were

18  stated -- your thought of the motives were

19  stated in Exhibit 2 in the very first

20  paragraph.

21      A.   That's one possible explanation, but

22  it might be different as well.

1  you know, starter questions.

2  Q.  Got it.

3      Okay.  So did you have any discussion

4  with any of these five individuals about what

5  you meant by them being asked what the style

6  of the interactions were?

7  A.  No.

8  Q.  Did you have any discussions with

9  them at all about naming them as potential

10 witnesses?

11 A.  No.  With stud- -- with students, no,

12 I have not because it was said -- I was told

13 that the list of witnesses should be cleared

14 by college before I can contact them.

15     So I first named them --

16 Q.  Yes.

17 A.  -- and after this, I contacted them.

18 Q.  All right.  So tell me about what

19 happened when you contacted Ms. Nicholls.

20 A.  She said she'll be happy --

21 Q.  Start with what you say.

22 A.  Hmm?

1    Q.  Start with what you said.  Because
2  she wouldn't have said anything until you said
3  something.
4    A.  I think I -- I either sent her e-mail
5  or texted her -- I don't remember now.  And I
6  described her briefly situation and asked if
7  she would be willing to come, and she replied,
8  within several hours, saying she would be
9  happy to.
10   Q.  Okay.  Did you produce any of those
11 e-mails with -- to her?
12   A.  No.
13   Q.  Why not?
14   A.  Because I did not feel like you asked
15 for them, but if you ask now, we'll produce.
16   Q.  I mean, they certainly --
17   A.  Texts --
18   Q.  They certainly relate to your claim;
19 right?
20   A.  But texts might -- might be a
21 different issue.  I don't -- I'm not sure if
22 text -- text messages still survived.  I will

1   look for them and I will try to find them.

2        Q.   Well, if anybody can find them, you

3   can; right?  You know computers.

4        A.   No, no, no, no, NSA can, National

5   Security Agency can.  I --

6        Q.   Okay.  So we're going to want those

7   e-mails, and we're going to reserve on them.

8             Same question for Andrew Yang; what

9   happened when you contacted him?

10            Well, did you?

11       A.   I think that I -- so I sent e-mails

12  to some of them -- to all of them, but not

13  everyone replied fast enough.  So I asked

14  which was e-mail to the McDaniel accounts.  It

15  was not --

16            THE REPORTER:  Say it again.  I'm

17  sorry.

18  BY MR. ABRAMSON:

19       Q.   Yeah, start again.

20       A.   I sent e-mails to the McDaniel

21  accounts -- McDaniel is the name of the

22  college.  So Brittany replied; I think some of

1   them didn't reply.  And I asked another
2   student, Sarah Holbrook -- not to be confused
3   with Dr. Sara Miner More -- and Sarah
4   Holbrook, I explained to her what the
5   situation was, and she reached to those
6   students through -- and I think she friends
7   with them on -- on -- on Facebook and through
8   other means.  And so she -- she was in charge
9   of organizing my defense.
10       Q.   All right.  So let me just get it
11  straight.  Sarah Holbrook is a former student?
12       A.   Sarah Holbrook is a former student of
13  mine, yes.
14       Q.   All right.  At the time you contacted
15  her?
16       A.   At the time I contacted her, she was
17  alumni working for a defense contractor.
18       Q.   Okay.  So you asked her to contact
19  all five of these people or just the ones who
20  didn't respond to you?
21       A.   Those who did not respond fast
22  enough.

1      Q.    Okay.  Would that be Yang, McCaslin,
2    Putnam, and Sapp?
3      A.    I don't remember -- I don't remember
4    right now whom she contacted.
5            So it was -- it was all very fast
6    because I have very few -- few days to -- to
7    get in touch with them.  I don't remember who
8    contacted me directly.  Brittany for sure
9    contacted me immediately.  The others, I don't
10   remember who of them contacted immediately and
11   who was pinged first by Sarah -- Sarah
12   Holbrook.
13     Q.    You could -- well, how did Sarah
14   Holbrook tell you that she had contacted the
15   people and, you know, what they had said when
16   she contacted them?
17           How did she let you know that?
18     A.    Well, we were text -- texting to each
19   other.
20     Q.    You were e-mailing?
21     A.    Texting.
22     Q.    Texting, okay.

PAVEL NAUMOV - 12/04/2015                              Page 201

```
 1           But initially you e-mailed Yang and
 2   McCaslin and Putnam and Sapp; correct?
 3      A.   Mm-hmm.
 4      Q.   So you would have copies of those
 5   e-mails; correct?
 6      A.   Yes.
 7      Q.   Okay.  And you're going to produce
 8   those; right?
 9      A.   Yes.  We're keeping track of...
10      Q.   Okay.  So am I.
11           Did you ever speak with any of these
12   five individuals prior to their giving any
13   kind of testimony?
14      A.   I only had e-mail exchange.
15      Q.   Well, so did you -- so I'll change my
16   question.
17           Did you correspond with any of
18   them --
19      A.   Yes.
20      Q.   -- prior to them giving their
21   testimony?
22      A.   Yes, because I -- I asked for them to
```

1   come, and I got reply from them.  I

2   offered them to -- that I will -- well,

3   originally, I wanted to just send the

4   allegations against me as attachment to an

5   e-mail, and -- and -- and Sarah Holbrook told

6   me that this is not a wise thing to do because

7   students who -- whom you haven't seen for

8   several years and -- and -- and so I was

9   listening to her advice.

10           And -- and I offered -- I just

11  offered in the e-mail that I can share

12  allegations against me if -- if that will make

13  them more comfortable to testify.

14           Only one person took me on this.  Ben

15  Sapp said that he, indeed, would be more

16  willing to testify if he sees what I'm accused

17  of.  I sent him a copy of allegations against

18  me.

19      Q.   What particular copy -- what document

20  did you send them, if you can recall?

21      A.   You are asking whether it was with

22  name of Defendant Stewart on it or without?

```
 1   BY MR. ABRAMSON:
 2        Q.   Okay.  Back on the record.
 3        A.   I would like to add a
 4   correction/addition to --
 5        Q.   Go ahead.
 6        A.   Huh?
 7        Q.   Go ahead.
 8        A.   -- about material facts known to
 9   Defendant Stewart.
10        Q.   Okay.
11        A.   I would like to mention that we had
12   two conflicts with her.  One is that she --
13   she was very slow in answering my e-mails
14   during her year -- first year at McDaniel.
15   And I -- at some point, I even sent e-mail to
16   her secretary saying, "Hey, can I make Affairs
17   Office confirm that you have received my
18   e-mail?"  Because there would be deadlines,
19   and you submit something to her, she doesn't
20   reply.
21             The other thing that I would like to
22   add about her is that we also had a conflict
```

```
 1            also mistreated by the current
 2            college administration."
 3        Who are these people?
 4   A.   Former staff members at McDaniel
 5   College.
 6   Q.   Where did P. Morley work?
 7   A.   In IT Department.
 8   Q.   And D. Folendorf?
 9   A.   In IT Department.
10   Q.   All right.  And when did they contact
11   you to say they were mistreated?
12   A.   After the newspaper article appeared.
13   Q.   What did they say about how they were
14   mistreated?
15   A.   Donni Folendorf said that she was
16   fired after she made a non-authorized purchase
17   -- well, purchase that was not properly signed
18   for in the rush for -- in preparation for new
19   year, I believe -- new academic year.
20        She was trying to buy some equipment
21   and she didn't get all the signatures right,
22   and she felt that, although it's a violation
```

1   of this, but she felt that after 15 years
2   working for the college, maybe a different --
3   different way to address this violation would
4   be more appropriate.
5       Q.   Okay. And what about Morley?
6            What's Morley's first name?
7       A.   Phillip.
8       Q.   Phillip, okay.
9            What did he say?
10      A.   He said that he has lots of -- lots
11  of problems with the college and with --
12      Q.   Okay.
13      A.   -- and how, you know, things are in
14  college, and he's talking to lawyers about
15  this.
16      Q.   And who -- when you say "current
17  college administration," who -- whom were they
18  talking about?
19      A.   When I --
20      Q.   All the way up to the president and
21  the provost?
22      A.   When I talk about current -- oh,

1  administration?

2      Q.   Yeah, because it says, "They were
3  mistreated by the current college
4  administration."

5      A.   Yeah, I believe Donni was fired by
6  whoever the new person in charge of IT is.  I
7  don't know -- Esther used to be there for
8  many, many years.  I don't remember who is
9  right now, Greg -- Greg something.

10     Q.   What does -- what does this have to
11 do with how -- how Morley and Folendorf were
12 treated, how -- what does that have do with
13 the claims you're making?

14     A.   You asked me whom I contacted.  I --

15     Q.   Yeah, okay.  Does it have -- so I
16 just want to confirm that -- would it -- would
17 it be true that that doesn't have anything to
18 do with the claims you're making relating to
19 them?

20     A.   There seems to be, you know,
21 disproportion -- you know, disproportional
22 punishment for Donni.  I don't know details of

```
 1   her case.
 2            Phillip says that he was -- he went
 3   for something very similar to my story.  He
 4   did not share details of his story with me,
 5   but he even --
 6       Q.   All right.  And -- and Donni, how do
 7   you spell that?
 8       A.   Donni.
 9       Q.   Like Donn, D-o-n-n?
10            MR. STROUSE:  Donni?
11            THE WITNESS:  D-o-n-n-i, I think.
12   Right?
13   BY MR. ABRAMSON:
14       Q.   Male or female?
15       A.   Female.
16       Q.   Okay. All right.  Now look at 16,
17   and in addition to what you testified to today
18   and what is written here, have you -- is this
19   a full and complete response to this
20   Interrogatory No. 16?
21       A.   I mentioned today, but I -- I had
22   brief updates on -- on lawsuits e-mailed to
```