**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

PAVEL NAUMOV,

    Plaintiff,

v.

MCDANIEL COLLEGE, INC., *et al.*,

    Defendants.

Case No.: GJH-15-482

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

It is possible for an institution or individual to seek to do the right thing, motivated by proper motives and, yet, do so in the wrong way. This may be such a case. Defendant McDaniel College, Inc. ("McDaniel"), its President, Defendant Dr. Roger Casey, and its Provost, Defendant Dr. Jeanine Stewart (collectively, along with Chairman of the Board of Trustees Defendant Martin Hill, "Defendants"), became aware of a potential claim of harassment, hostile work environment and stalking from a departing professor and immediately initiated an investigation. But the target of that investigation, Plaintiff Dr. Pavel Naumov, has adduced sufficient evidence to create a genuine dispute of material fact as to whether the manner in which Defendants pursued the investigation, which led to his termination, violated their own Title IX Policy and, thus, breached an agreement between the parties. As a result, having held a hearing on this matter on February 13, 2017, *see* Loc. R. 105.6 (D. Md. 2016), the Court grants, in part, and denies, in part, Defendant's Motion for Summary Judgment. Specifically, Plaintiff's claims for Violation of the Title IX Policy (Count I) and Violation of Faculty Handbook (Count IV) will

1

be merged and will survive as one count, while claims for Intentional Infliction of Emotional Distress (Count II) and Violation of Due Process (Count III) are dismissed.

## I.      BACKGROUND[1]

McDaniel is a liberal arts college located in Westminster, Maryland. ECF No. 53-11 ¶ 3. Plaintiff joined the faculty at McDaniel in 2005 as an Assistant Professor of Computer Science. *Id.* ¶ 4. In 2011, Plaintiff was awarded tenure and promoted to Associate Professor of Computer Science. ECF No. 53-12 at 2.[2] Dr. Stewart served as Provost and Dean of Faculty for McDaniel College for two years, until the end of the 2014-2015 academic year. ECF No. 53-8 at 3-4.

On April 28, 2014, Dr. Sara More, an Associate Professor of Computer Science at McDaniel, who had worked with Plaintiff, informed Dr. Stewart that she planned to resign her tenured position at McDaniel and accept a non-tenure-track position at Johns Hopkins University. ECF 53-5 at 8. Dr. More stated that she would probably not have considered leaving McDaniel if not for the presence of Plaintiff. *Id.* Dr. Stewart arranged for follow-up meetings with Dr. More and Dr. More shared her concerns regarding Plaintiff in more detail. Specifically, Dr. More relayed that, despite repeated requests that he stop, Plaintiff made frequent comments about her appearance. ECF 53-6 at 2. On one occasion, when she was wearing a sweater with circles, Plaintiff stared at her chest and said "I'll be thinking of circles all day." *Id.* Additionally, Plaintiff would walk Dr. More to her car at the end of every day, even after having been asked not to do so. *Id.* Dr. More did not allege any inappropriate touching by Plaintiff, but felt that their interactions defied appropriate social boundaries and had been uncomfortably intense, with Plaintiff once telling her "if I weren't married I would marry you." *Id.* at 3. Dr. More also

---

[1] The following facts are undisputed or viewed in the light most favorable to Plaintiff. *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) (describing procedure for summary judgment).

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

complained that, as her date of departure approached, Plaintiff asked if the two of them could have lunch together, which bothered her because she thought it was inappropriate for just the two of them to have lunch and not the entire department. *Id.* at 5.

Additionally, Dr. More shared with Dr. Stewart a lengthy letter, emails and cards she had received from Plaintiff. ECF No. 53-6 at 6. Dr. Stewart's impression of the communications was that they were "overly personal and presumptuous" and "smacked of adolescent intensity." *Id.* at 7. In an email discussing the documents Dr. More permitted her to read, Dr. Stewart wrote: "[Dr. More] brought with her four documents that she allowed me to read, but did not want to photocopy or leave in my possession. This is consistent with her ongoing request to be treated as an anonymous witness rather than a complainant." *Id.* at 6.

As a result of the information provided by Dr. More, Dr. Stewart told Dr. More that she felt obligated to file a Title IX claim on behalf of McDaniel and that an investigation would follow. ECF No. 53-6 at 2-3. Dr. Stewart recorded in her notes that Dr. More was "comfortable w[ith] this (assuming confidentiality and hoping to be gone before conclusion)." *Id.* at 4. Additionally, Dr. More agreed that she would share documentation from her file with investigators. *Id.*

Prior to discussing the investigation, it is useful to understand the policies that were intended to guide the investigation and results. There were three editions of the McDaniel Faculty Handbook in place during the relevant time period in this case: a February 2014 edition, an August 2014 edition and a December 2014 edition. ECF No. 53-11 ¶ 6. All three editions reference McDaniel's "Affirmative Action / Equal Opportunity Manual," and provide that "when a grievance is alleged to be discrimination or harassment, procedures outlined in the Affirmative

Action Manual will be followed." *Id.* ¶¶ 6-7. The Affirmative Action Manual includes the McDaniel Title IX Policy as an appendix. *Id.* ¶ 7.

McDaniel's Title IX Policy was first enacted in approximately 2012 and was updated several times. ECF No. 53-11 ¶ 8. A Title IX workshop for faculty was scheduled in November 2012, changes to the policy were disseminated by email to the faculty on April 1, 2013, and faculty and staff were required to participate in annual Title IX training beginning on June 5, 2014. *Id.* The June 2014 Title IX Policy was the version in effect at the time a Title IX complaint was filed against Plaintiff in September 2014. ECF No. 53-14. It provides that "if the respondent is a faculty member, his/her tenure status is not a protection, since discrimination, harassment and sexual assault violate basic human rights guaranteed by law, and tenure is not a guarantee against sanction due to either established academic principles or civil or criminal laws." *Id.* at 14.

Dr. Stewart reported Dr. More's complaints to McDaniel's Title IX advisor, Dr. Julia Jasken, who ordered an investigation. ECF No. 53-8 at 5-6. The investigation was conducted by Campus Safety Detective Eric Immler. *Id.* at 29. After an investigation was completed, Dr. Casey, McDaniel's President, and Dr. Stewart discussed the results and believed that they had an obligation imposed by the Department of Education's Office of Civil Rights' Dear Colleague Letter, dated April 4, 2011 ("Dear Colleague Letter"), to pursue a complaint on behalf of Dr. More and the college even if Dr. More "wished to remain as anonymous as possible." ECF 53-15 at 8-9.

Dr. Stewart met with Plaintiff on August 25, 2014, at which time she explained the charges against him, informed him of the Title IX Policy, gave him the option to resign before any formal hearing began, gave him access to the Human Resources Department and encouraged him to speak with his own counsel. ECF No. 53-8 at 32-33; ECF No. 53-13 at 7. Plaintiff was

also informed during the meeting that he was being suspended with full pay and was to remain

away from campus until further notice. ECF No. 53-8 at 16. He was, however, invited to contact

Title IX Coordinator Jennifer Glennon, if needed, and, even though he had no access to send

campus email, he was given permission to speak to witnesses. *Id.* at 16-17.

On August 29, 2014, Plaintiff declined the opportunity to resign and requested that the

formal grievance procedures specified in the policy begin. ECF No. 53-3 at 57. Dr. Casey

discussed with Dr. Stewart the need for her to remove herself from the role the Provost would

typically serve so that she could be designated as the complainant in a Title IX proceeding

against Plaintiff. ECF No. 53-15 at 8-9.

On September 8, 2014, Dr. Stewart, as the complainant, filed a formal Title IX grievance

against Plaintiff. ECF No. 53-10 at 2. In accordance with McDaniel's Title IX Policy, on

September 12, 2014, Plaintiff was notified that a preliminary hearing would take place during the

week of October 6, 2014 to decide whether to schedule a formal hearing. ECF No. 53-16 at 2.

The Title IX Coordinator appointed five faculty or staff members to sit as the Grievance

Committee to consider the charges against Plaintiff. ECF No. 53-13 at 8. Plaintiff did not object

to the composition of the committee and wrote in his journal: "I doubt I could have found better

candidates myself." ECF No. 53-18 at 2-3. The Grievance Committee held a preliminary

hearing, and in accordance with the Title IX Policy, they reviewed the complaint without

knowing the identities of the complainant or respondent. ECF No. 53-19 at 3-4. The Grievance

Committee decided to institute a formal hearing and the parties were notified by email. ECF No.

20.

The Grievance Committee held several meetings, including hearings on October 11 and

15, 2014. ECF No. 53-11 ¶ 13. Both Plaintiff and Dr. Stewart presented lists of witnesses and

Plaintiff provided a list of suggested questions. ECF No. 21. After hearing testimony, the Grievance Committee decided that Plaintiff was responsible for harassment, hostile environment and retaliation in violation of McDaniel's Title IX Policy, but was not responsible for stalking. ECF No. 22. The decision was communicated to the parties by letters emailed to both. ECF Nos. 23 & 24. Plaintiff acknowledged receiving the results but complained that they were delivered by email and not in person. ECF No. 53-11 ¶ 14.

On October 31, 2014, Plaintiff filed an appeal of the Grievance Committee decision. ECF No. 53-11 ¶ 14. According to the Title IX Policy, the Appeal Panel is to consist of the Provost, Vice President for Finance and the Vice President / Dean of Student Affairs. ECF No. 53-14 at 15. Since the Provost, Dr. Stewart, was the complainant, she recused herself and no one was appointed in her place. ECF No. 53-13 at 12. The Appeal Panel met several times and they were provided with written appeal documents from Plaintiff and all documents and transcripts from the Grievance Committee hearings. ECF No. 53-13 at 13-14, 99. On November 21, 2014, the Appeal Panel issued its decision, affirming the Grievance Committee's decision that Plaintiff was responsible for harassment and hostile environment but overturned the decision that Plaintiff was responsible for retaliation. ECF No. 53-26.

After reviewing the case, Dr. Casey, as President, recommended that Plaintiff be dismissed from the College for reasons of serious professional misconduct consistent with moral turpitude and for deliberate violation of the rights and freedoms of faculty members. ECF No. 53-9 at 14-15. On December 3, 2014, the Appeal Panel upheld the recommended sanction of dismissal. ECF No. 53-29. In accordance with the Title IX Policy, Dr. Casey informed Plaintiff that he would seek the additional recommendation of the Faculty Affairs Committee ("FAC"), which was required because Plaintiff was a tenured faculty member. ECF No. 53-30 at 2.

Plaintiff submitted a letter with exhibits to the FAC, which included the assertion that Dr. Casey was dissatisfied with Plaintiff in Spring 2013 when Plaintiff requested secret paper ballots to vote on the appointment of Dr. Stewart as Provost. ECF No. 53-3 at 7-9, 47-54. He claimed that the investigation was a pretext for their desire to dismiss him. ECF No. 53-3 at 47-48. During his deposition in this case, Plaintiff speculated that Dr. Stewart may have been motivated by her feminist beliefs but then acknowledged he had no evidence to support that speculation. *Id.* at 11. He also opined that Dr. Stewart might have retaliated against him because of his work on the Faculty Development Committee and his discussions about travel budgets and funding. *Id.* at 10.

Dr. Casey gave a PowerPoint presentation about the process to the FAC and then left the meeting. ECF No. 53-9 at 12. Dr. Stewart, who is normally a member of the FAC, recused herself from their work on the case. ECF No. 53-8 at 10. The FAC voted by majority vote that the recommended sanction of dismissal was appropriate. ECF No. 53-31. On January 14, 2015, the Board upheld the sanction of dismissal and Plaintiff's employment was terminated effective January 20, 2015. ECF No. 53-33 at 3.

Plaintiff admits that he neither sought nor received treatment for any kind of emotional distress arising out of his employment at McDaniel. ECF No. 53-34 at 5-6.

## II.   STANDARD OF REVIEW

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In undertaking this inquiry, the Court must consider the facts and all

7

reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007). But this Court must also abide by its affirmative obligation to prevent

factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774,

778-79 (4th Cir. 1993).

> The burden is on the moving party to show:

> that there is no genuine issue as to any material fact. However, no genuine issue
> of material fact exists if the nonmoving party fails to make a sufficient showing
> on an essential element of his or her case as to which he or she would have the
> burden of proof.

*Benton v. Prince George's Cmty. Coll.*, No. CIV.A. DKC 12-1577, 2013 WL 4501324, at *3 (D.

Md. Aug. 21, 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Thus, upon a

motion for summary judgment, the opposing party "may not rest upon . . . mere allegations or

denials," but rather, "must set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. Violation of Title IX Policy (Count I)

There are potentially two related, but distinct, claims to be considered in Count I.[3]

Although not clearly articulated in the Amended Complaint, Plaintiff now contends that he was

fired because of his gender in violation of Title IX and, more specifically, that his termination

was an "erroneous outcome that was motivated by gender bias." ECF No. 58 at 28. Additionally,

Plaintiff asserts that the process by which he was investigated and terminated violated a

---

[3] The Amended Complaint clearly articulates a violation of the Title IX Policy. ECF No. 24 ¶¶ 80-90. However, Defendants, in their Summary Judgment Motion, appear to read into the Amended Complaint a violation of Title IX itself and address such a claim in their briefing. ECF No. 53-1 at 25. Plaintiff responded to those arguments in its opposition. ECF No. 58 at 26. Although the Court could reject the claim solely on the basis that it is not properly pled in the Amended Complaint, *see Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D.Md.1997) (plaintiffs "cannot, through the use of motion briefs, amend the complaint"), since both sides have been fully heard on the issue, the Court will analyze the claim.

contractual obligation owed to him through McDaniel's Title IX Policy. Both claims will be addressed in turn.

### 1. Title IX: Erroneous Outcome Claim

Plaintiff claims that Defendant's decision to pursue charges and terminate him violated his rights under Title IX. Title IX of the Education Amendments of 1972 provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a). An implied right of action exists for enforcement of Title IX. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). Such a right exists where the Plaintiff has been (1) discriminated against on the basis of gender, (2) by an educational institution receiving federal funds. *Preston v. Comm. Of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994). McDaniel has not disputed that it is an educational institution receiving federal funds, thus, the only issue for analysis is whether Plaintiff was discriminated against on the basis of gender.

"'Title IX claims against universities arising from disciplinary hearings' are analyzed under the 'erroneous outcome' standard, 'selective enforcement' standard, 'deliberate indifference' standard, and 'archaic assumptions' standard." *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (quoting *Mallory v. Ohio Univ.*, 76 F App'x 634, 638 (6th Cir. 2003)). Plaintiff proceeds under the "erroneous outcome" standard. ECF No. 58 at 28 ("Dr. Naumov contends that McDaniel's decision to pursue the charge against him, and ultimately terminating him, was an erroneous outcome that was motivated by gender bias.").

In an erroneous outcome case, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense" on the basis of gender bias. *Doe*, 123 F. Supp. 3d at 765 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). To establish a claim, Plaintiff must demonstrate (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. Conclusory statements unsupported by evidence will not suffice to establish the third element. Sufficient evidence may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Plaintiff argues that "the College has created an environment in, and procedure by, which male faculty accused of sexual harassment are virtually assured of a finding of guilty/responsibility and/or the College is deliberately indifferent to such a culture on campus." ECF No. 58 at 30. But while the language used in Plaintiff's arguments align with the requirements articulated by courts in erroneous outcome cases, *see, e.g., Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015), Plaintiff fails to point to any evidence in the record to support the argument. Indeed, *Salisbury* makes the point. *Id.* There, in analyzing a case at the motion to dismiss stage, plaintiffs alleged that the school "possessed communications evidencing Defendants' deliberate indifference in imposing wrong discipline on Plaintiffs on the basis of their gender ... [and] evidencing SU's intent to favor female students alleging sexual assault over male students like Plaintiffs who are accused of sexual assault." *Id.* at 768. Plaintiffs have made no such allegations of internal communications or of the existence of any other evidence related

to gender bias and, more importantly, as this case is at the summary judgment stage, points to no evidence in the record to support such a claim.

Plaintiff additionally "strongly asserts that Dr. Stewart charged him because of her strong feminist views and her bias against male faculty members." ECF No. 58 at 30. Again, Plaintiff's articulation of the claim finds support in case law, *see, e.g., Doe v. Washington & Lee Univ.*, 6:14-CV-00052 2015 WL 4647596, at *10 (W.D. Va. Aug. 5, 2015) (finding plausible link between plaintiff's expulsion and gender bias based on nature of article written by Title IX Officer for "female-focused website"), but fails to cite to any evidence in the record to create a genuine dispute of fact regarding the issue. Indeed, Plaintiff's only citation in support of this proposition is to his own self-serving affidavit in which he simply states that Dr. Stewart holds "strong feminist views" and filed the complaint against him as a result. ECF No. 58-5 ¶¶ 10, 15, 80.

And even if such unsupported statements were sufficient to establish that he was fired due to Dr. Stewart's "feminist views," those statements are contradicted by his own prior statements to the contrary, in which he expressed unrelated reasons for which Dr. Stewart may have wished to retaliate against him. Specifically, in his deposition, Plaintiff recounted that there was a time where he was on the Faculty Development Committee and expressed his displeasure with changes suggested by Dr. Stewart. ECF No. 53-3 at 43. Referring to that dispute, he stated "that's another reason [why she] potentially might be retaliating against me." *Id.* Additionally, when asked for further explanation of his statement that Dr. Casey's dismissal recommendation was "unjustified and vindictive," he stated that it was "hard for me to speculate about people's motives" and agreed that he did not know the reason for the termination. ECF No. 53-3 at 13-14.

In sum, while Plaintiff may earnestly believe he has been the victim of gender bias, he has not pointed to any evidence that he has been the victim of gender bias. Because Plaintiff provides no evidentiary support for the proposition that gender bias was a motivating factor behind the alleged erroneous outcome of his termination, his Title IX erroneous outcome claim fails.

### 2. Violation of the Title IX Policy

Plaintiff also asserts that McDaniel violated their Title IX Policy (Count I) and the Employee Handbook (Count IV). Defendants concede that the Title IX Policy and Employee Handbook are binding contracts between McDaniel and its employees, including Plaintiff. ECF No. 61 at 12 ("In its Opening Brief Defendants explained why the particularized procedures of McDaniel's Title IX policy were the procedures which were contractually guaranteed to Plaintiff in this case. . ."); *see also Staggs v. Blue Cross of Md.,* 61 Md. App. 381, 392 (Md. Ct. Spec. App. 1985) ("policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee."); *but see Doe v. Washington and Lee Univ.,* Case No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426, at *30 (W.D. Va. Aug. 5, 2015) (holding that under Virginia law, Student Handbook and the Interim Sexual Harassment and Misconduct Policy were not binding contracts). Thus, these claims are best analyzed as breach of contract claims.

A brief of contract claim under Maryland law requires (1) a contractual obligation and (2) a material breach of that obligation. *Reed v. Bank of Am. Home Loans,* Civil No. PJM 13-3265,

2016 U.S. Dist. LEXIS 75670, at *28 (D. Md. Jun. 10, 2016). Plaintiff asserts a number of potential breaches of the Title IX Policy but only two merit serious consideration: that Defendants improperly identified Dr. Stewart as the complainant instead of Dr. More, who was the person Plaintiff allegedly harassed, and that the complaint was not reported within 90 days of the occurrence, as required by the Title IX Policy. In addition to denying any breach, Defendant alternatively argues that, if they did breach, it was only because public policy required the action they undertook. The Court will address the allegations of breach and then turn to the public policy issues raised by Defendant.

### a.   Dr. Stewart as Named Complainant

Although it was Dr. More who was allegedly harassed by Plaintiff, Dr. Stewart, the School Provost, filed the claim as the complainant. The significance of such an approach is that the Title IX Policy requires a complainant who is willing to be identified in order for the claim to proceed, ECF No. 53-14 at 12, and Dr. More had indicated that her family and friends had been discouraging her from participating in a claim and that she wished to remain an "anonymous witness rather than a complainant." ECF No. 53-6 at 5-6. Thus, without substituting Dr. Stewart as the complainant, Defendants would not have been able to pursue the claim against Plaintiff. Plaintiff contends that this was a breach of the Title IX Policy, which, according to Plaintiff, required that the person who was the alleged victim of the harassment serve as the complainant. Defendant contends that the policy permitted their approach. As indicated above, Defendants concede that the Title IX Policy is a contractual agreement, thus principles of contract interpretation apply to the Title IX Policy.

For the purpose of interpreting contacts, Maryland applies the objective theory, which states that:

a court is to determine from the language of the agreement, what a reasonable person in the position of the parties would have understood the contract to mean at the time the contract was entered into; when the language of the contract is plain and unambiguous, there is no room for construction as the court will presume that the parties meant what they expressed.

*Wooldridge, v. World Championship Sports Network, Inc.,* Civil Action No. DKC 2007-3482, 2009 U.S. Dist. LEXIS 85057, at *14-15 (D. Md. Sept. 17, 2009) (quoting *Mathis v. Hargrove*, 166 Md. App. 286, 318-19 (Md. Ct. Spec. App. 2005)). When the contract's meaning is unambiguous, interpretation of the contract is a matter of law to be resolved by the trial judge. *Trouard v. Dickey's Barbecue Rests., Inc.*, Case No. PWG-14-1703, 2014 U.S. Dist. LEXIS 106218, at *23 (D. Md. Aug. 1, 2014). But when "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract is submitted to the trier of the fact for interpretation." *Bd. of Ed. of Charles Cty v. Plymouth Rubber Co.,* 82 Md. App. 9, 23 (Md. Ct. Spec. App. 1990). A review of the Title IX Policy leaves the Court unable to find that it unambiguously supports Defendant's interpretation that a sexual harassment claim, such as the one brought against Plaintiff, could be pursued by McDaniel with someone other than Dr. More serving as the complainant.

To interpret the policy, it is helpful to first understand the distinctions it draws between various forms of misconduct. Specifically, there are distinctions between the policies created for addressing claims of discrimination and harassment, on the one hand, and policies related to sexual assault and violence, on the other. *See, e.g.*, ECF No. 53-14 at 3-5 (discussing "Policy Against Discrimination and Harassment," "Policy Against Stalking and Relationship Violence," and "Policy Against Sexual Assault and Sexual Violence"). Notwithstanding the different subject headings, the Title IX Policy, at times, discusses these issues jointly but, at times, appears to

make distinctions between the procedures McDaniel will use for each. Significantly, under the

heading for Sexual Assault and Violence, the Policy reads:

> If the College becomes aware of incidents of sexual harassment, sexual violence or
> sexual assault, the College will take immediate action to eliminate the sexual harassment,
> sexual violence or sexual assault, prevent its recurrence, and address its effects.

*Id.* at 5. At first blush, this provision would seem to give comfort to Defendants' argument that

they were empowered, if not obligated, to take all necessary steps to immediately address an

allegation of sexual harassment, with or without the active involvement of the alleged victim of

the harassment. But later in the same section, under the sub-heading "Procedures," the policy

also reads:

> Due to the extremely private nature of sexual assault and/or sexual violence incidents, the
> College will not normally pursue charges of sexual assault and/or sexual violence
> incidents, unless the person who believes that he/she has been sexually assaulted/violated
> is involved in the process. . . . However, the College reserves the right, at its sole
> discretion, to pursue an incident of sexual assault to its conclusion in cases where not
> pursuing the incident would constitute a danger to the College.

*Id.* at 9. This provision does not mention sexual harassment and there is no similar language

addressing the issue of an uninvolved victim in the context of sexual harassment. Thus, in

drafting this policy, it appears that McDaniel specifically considered the idea that it may, in

certain situations, need to pursue an event to its conclusion even where it did not have the

involvement of the victim and specifically identified only cases involving sexual assault as

warranting that approach; and then even further limited that category to situations where not

pursuing the incident would constitute a danger to the College community. Plaintiff's case did

not involve sexual assault and there has been no argument that Plaintiff represented a danger to

the College community.[4]

---

[4] The Court notes that this language could also be read to mean that because Sexual Harassment is not considered to
be "extremely private" in nature like Sexual Assault and Sexual Violence, that Sexual Harassment claims *could* be

Additionally, to the extent the word "complainant" is used in the Title IX Policy, there is nowhere to be found an indication that the complainant can be any person other than the person allegedly harassed and, to the contrary, there are places that affirmatively suggest that the complainant *is* the person harassed and not another individual acting in his or her stead as Dr. Stewart did here. For example, in describing the grievance procedure, the policy reads:

> Anyone in the College community who is approached by someone claiming to have been discriminated against or harassed is encouraged to direct or accompany the complainant to meet with one of the designated advisors.

*Id.* at 9. It would be difficult to read this provision to mean anything other than that the complainant and the person harassed are one and the same. Further, regarding the formal hearing, the Policy states:

> in the event that the complainant is unwilling to be identified, the formal hearing will be dismissed, no action will be taken and no report of any action will be filed.

*Id.* at 11. Defendants argue that they complied with this provision because Dr. More was identified as part of the grievance procedure, ECF No. 53-1 at 44, apparently notwithstanding her desire to be "an anonymous witness." But to make that point is to acknowledge that Dr. More *is* the proper complainant and not Dr. Stewart.[5] Thus, in every other step in the process where they allowed Dr. Stewart to serve the role of complainant, they potentially violated their own policy.

As it relates to Defendant's position that their Title IX Policy permitted them to substitute Dr. Stewart as the complainant for Dr. More, "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances," *Bd. of Ed. of Charles*

---

pursued without the involvement of the victim. But that interpretation only highlights the ambiguity of the provision as it relates to Sexual Harassment cases.

[5] In the context of this provision, if Dr. Stewart, or any person other than the person harassed, is allowed to be the complainant, the purpose of this provision could be entirely frustrated as the school could "identify" the complainant and satisfy the letter of the provision without giving the respondent any idea of who his actual accuser is. The fact that Dr. More was identified in this instance does not change the fact that Defendant's interpretation would, as a general matter, render this provision a nullity.

*Cty,* 82 Md. App. at 23, thus, the Court will deny Defendant's Motion for Summary Judgment as to Counts I and IV.[6]

### b. Timing of Complaint

Plaintiff alleges that the charges filed against McDaniel were untimely because – he alleges – none of the violations were reported within 90 days of their occurrence. As an initial matter, the Title IX Policy states that "[a]ny complaint must be reported to an advisor within 90 days of the occurrence." ECF No. 53-14 at 11. Dr. More first complained to Dr. Stewart about Plaintiff on April 28, 2014, when she stated she planned to resign and would not be doing so but for Plaintiff. ECF No. 53-5 at 3. On May 28, 2014, she had a second meeting where she further complained about unwelcome communication, including an invitation from Plaintiff to have lunch prior to leaving McDaniel. ECF No. 53-6 at 5. Dr. More believed the invitation to be inappropriate because it did not involve other members of the team and was thus troubled by it. The lunch invitation to Dr. More from Plaintiff was sent in an email dated May 12, 2014. ECF No. 69-2. According to the testimony of Title IX coordinator Jennifer Glennon, a report was made to the advisor "in the spring," which, by necessity of the calendar and typical changing of the seasons, would mean the report was made within 90 days of the alleged harassing act of the lunch invitation. If an act contributing to a hostile work environment claim, which was one of the claims brought against Plaintiff, occurs within the limitation period, "the entire time period of the

---

[6] To the extent that Count IV alleges Breach of the Faculty Handbook, the claim is duplicative of Count I. The Faculty Handbook states that when "a grievance is alleged to be discrimination or harassment, procedures outlined in the Affirmative Action Manual will be followed." ECF No. 53-11 at 3. The Affirmative Action Manual attaches the Title IX Policy. *Id.* Thus, any breach of the Title IX Policy would be a breach of the Faculty Handbook. Count I and Count IV will therefore be merged into one count. For the same reason, alleged breaches of the Faculty Handbook based on language in the Faculty Handbook that does not appear in the Title IX Policy are dismissed, as they relate to circumstances not related to harassment claims covered by the Title IX Policy. This would include allegations that the Faculty Handbook allowed for testimony by Plaintiff before the Appeal Panel and for representation by counsel.

hostile environment may be considered by a court for the purposes of determining liability."

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Thus, applying what is known

as the continuing violation doctrine to this circumstance, Defendants did not breach their policy

by investigating those portions of the claim occurring more than 90 days before the report to the

advisor because at least one act related to the continuing hostile work environment claim was

timely reported.[7]

### c.  Public Policy

Defendant claims that if they did breach the Title IX Policy, they did so because they

were required to by the Dear Colleague Letter. "A contractual provision that violates public

policy is invalid, but only to the extent of the conflict between the stated public policy and the

contractual provision." *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631,

643 (Md. 1986).

The Dear Colleague Letter was issued by the United States Department of Education's

Office of Civil Rights ("OCR") and is considered a "significant guidance document" issued to

"provide recipients with information to assist them in meeting their obligations, and to provide

members of the public with information about their rights, under the civil rights laws and

implementing regulations that we enforce." ECF No. 53-35 at 2 n.1. While not adding

requirements to the law, it "provides information and examples to inform recipients about how

OCR evaluates whether covered entities are complying with their legal obligations." *Id.* A

number of provisions of the letter are relevant to this case. First, the letter states that:

---

[7] The remaining alleged breaches of the policy were not discussed in detail in Plaintiff's briefing and will, therefore, not be discussed in detail herein. In short, Plaintiff's allegation that he was denied access to witnesses is contradicted by his deposition testimony. ECF No. 61-1 at 5-11 (discussing contacts Plaintiff made with witnesses). Plaintiff alleges that the Defendants' delivery of the results of the Grievance Committee proceeding by email and not in person violated the Title IX Policy, but points to no provision of the Title IX Policy requiring in-person delivery. Similarly, there is no citation to the Title IX Policy to support the allegation that Dr. Casey's presentation to the Faculty Affairs Committee was a breach of the Title IX Policy. Thus, the alleged breach related to Dr. Stewart serving as the named complainant is the only breach of the Title IX Policy that survives Summary Judgment.

> If a school knows or reasonably should know about student-on-student[8] harassment that
> creates a hostile environment, Title IX requires the school to take immediate action to
> eliminate the harassment, prevent its recurrence and address its effects.

ECF No. 53-35 at 5.

The Dear Colleague Letter also addresses a complainant's preference for confidentiality:

> If the complainant requests confidentiality or asks that the complaint not be
> pursued, the school should take all reasonable steps to investigate and respond to
> the complaint consistent with the request for confidentiality or request not to
> pursue an investigation . . . [T]he school may weigh the request for confidentiality
> against the following factors: the seriousness of the alleged harassment; the
> complainant's age; [and] whether there have been other harassment complaints
> about the same individual. . .

*Id.* In the section labeled "Remedies and Enforcement" the Dear Colleague Letter reads, in

relevant part:

> If a school determines that sexual harassment that creates a hostile environment
> has occurred, it must take immediate action to eliminate the hostile environment,
> prevent its recurrence, and address its effects. In addition to counseling or taking
> disciplinary action against the harasser, effective corrective action may require
> remedies for the complainant, as well as changes to the school's overall services
> or polices.

*Id.* at 16.

From these provisions, Defendants contend that when they became aware of Dr. More's

concerns, they had a clear obligation to pursue the matter as they did despite the fact that Dr.

More was only "comfortable with this (assuming confidentiality and hoping to be gone before

conclusion)." ECF No. 53-6 at 4.

There are certainly clear statements of policy in the Dear Colleague Letter. It is certainly

clear that schools are encouraged to actively investigate and pursue claims of sexual harassment

(among other forms of sexual misconduct). But the Court sees nothing in these provisions that

requires the actions taken by McDaniel here. Like the Title IX Policy in place at McDaniel at the

---

[8] Defendants state, and the Plaintiffs have not disputed that, despite its language, the instructions provided by the
Dear Colleague letter apply to school employees as well as students.

time, there is no provision indicating that another individual could be substituted as the complainant in a circumstance, like here, where the actual complainant expresses the desire to remain anonymous in a harassment case, and nothing to indicate that the complainant could be considered anyone other than the person to whom the alleged harassing conduct was directed. Rather, there is just the general admonition that the school "should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality." Whether "reasonable steps" merely requires some investigation, an informal process or a formal process, such as here, wherein the Provost files a complaint in her own name, rather than the alleged victim who expresses reticence, ultimately leading to the termination of the accused, is far from clear.

More to the point, however, to the extent the Dear Colleague Letter, dated April 4, 2011, was potentially inconsistent with its policy, the response by McDaniel upon receipt of the Dear Colleague Letter should have been to change their policy not to breach it when necessary. Considering that the reports from Dr. More to Dr. Stewart took place a full three years after the date of the Dear Colleague Letter, they clearly had ample opportunity to make the adjustment. It is not for the Court to invalidate a contract between the parties based on its sense of public policy, where, as here, the correct application of that public policy to the particular circumstances of the case is not clear. *See Severn Peanut Co. v. Indus. Fumigrant Co.,* 807 F.3d 88, 93 (4th Cir. 2015) (advising that courts exercise caution in invalidating contracts on public policy concerns unless definitively defined).

In a further attempt to find a clear statement of public policy, Defendants additionally point to "Questions and Answers on Title IX and Sexual Violence" published by OCR in 2014. Specifically Defendants point to a provision which states that:

> [W]hen a responsible employee knows or reasonably should know of possible *sexual violence*, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. *The school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint*

ECF No. 59-7 at 23-34 (emphasis added). To understand the requirement of this provision, however, one must first understand what is meant by "sexual violence." And that answer is also provided in the same document under the question "What is sexual violence?" The answer provided is as follows:

> Answer: Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent . . . A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion.

ECF No. 59-7 at 9. Importantly, while the Dear Colleague Letter states that sexual harassment includes sexual violence, ECF No. 53-35 at 4 ("Sexual violence is a form of sexual harassment prohibited by Title IX"), the reverse is not true. That is to say that sexual violence appears to be considered a subset of sexual harassment and, thus, not all sexual harassment is sexual violence. Even a cursory understanding of the allegations raised against Plaintiff indicates that what he was accused of would not meet the definition of sexual violence above. Thus, this provision, which clearly focuses on sexual violence, is of no relevance to this case.[9]

Finally, at the Motions Hearing, Defendants cautioned the Court that a ruling denying summary judgment in its favor could have a chilling effect on a school's ability to remedy a claim of sexual harassment where the alleged victim does not wish to participate in the process.

---

[9] If anything, this is consistent with the Title IX Policy which, as the Court explained earlier, appears to explicitly encourage the school to proceed in matters of sexual assault, even with an uncooperative victim, while containing no similar encouragement for sexual harassment cases.

That argument misapprehends both the substance and limitation of the Court's ruling. The Court has no opinion, and has no reason to provide an opinion, as to the general appropriateness of the investigation conducted by McDaniel or its outcome. Nor is the Court opining as to a potential constitutional infirmity with the approach taken by McDaniel. The Court is simply finding that it is unclear whether the approach taken by McDaniel was consistent with its own Title IX Policy in existence at the time and that the issue merits resolution by a jury.

**B.      Intentional Infliction of Emotional Distress (Count II)**

Plaintiff also asserts a claim for Intentional Infliction of Emotional Distress ("IIED"), alleging in Count II that "the deliberate and outrageous actions by Provost Stewart and President Casey in proceeding with a false charge, out of date and without a legitimate complainant, was extreme and outrageous and caused Dr. Naumcv extreme emotional distress." ECF No. 21-1 ¶ 105. To prevail on an IIED claim, Plaintiff must demonstrate: "(1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) casually connected to the emotional distress, which is (4) severe." *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 759 (D. Md. 2015) (citing *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 367 (Md. 2000). A claim for IIED "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct . . . 'of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" *Kentucky Fried Chicken Nat. Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (Md. 1992) (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 12, at 60-61 (5th ed. 1984)). "Liability for the tort of [IIED] should be . . . 'reserved for those wounds that are truly severe and incapable of healing themselves.'" *Caldor, Inc. v. Bowden*, 330 Md. 632, 642 (Md. 1993) (quoting *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653 (Md. 1991)).

"The Fourth element of [IIED] requires the plaintiff to show that he suffered a severely disabling emotional response to the defendant's conduct.'" *Caldor*, 625 A.2d at 964 (quoting *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 616 (Md. 1977)). The "distress [must be] so severe that 'no reasonable man could be expected to endure it.'" *Thacker v. City of Hyattsville*, 135 Md. App. 268, 315 (Md. Ct. Spec. App. 2000) (quoting *Harris*, 281 Md. at 570-71).

Here, Plaintiff has failed to demonstrate severe emotional distress necessary to prevail on a claim for IIED. To the contrary, Plaintiff acknowledges in his deposition that he received no treatment for any emotional distress, could not identify any resulting medical condition and could only state that he was "very upset." ECF No. 53-3 at 3. This falls well short of the distress required by Maryland courts, which has referred to conduct that strikes "to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59-60, *cert. denied*, 306 Md. 118 (Md. Ct. Spec. App. 1986).

Because any emotional distress suffered by Plaintiff was lacking in severity, summary judgment is granted in favor of Defendants as to Count II. See *Robinson v. Cutchin*, 140 F. Supp. 2d 488, 494 (D. Md. 2001) (granting motion for summary judgment on claim of IIED where there was no indication plaintiff was treated or hospitalized for mental anguish or allegedly severely disabling emotional condition.).[10]

### C. Violation of Due Process (Count III)

In Count III, Plaintiff alleges that Defendant violated his Fifth Amendment right to Due Process. However, as a general matter, a private institution, such as McDaniel, is not subject to the constitutional requirements of the Fifth Amendment. *Doe v. Washington and Lee Univ.*, Case

---

[10] Because Count II is the only count naming Mr. Hill, Dr. Casey and Dr. Stewart as defendants, they are dismissed from the case.

No. 6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426, at *22 (W.D. Va. Aug. 5, 2015). "There are, however, limited circumstances, wherein the Fifth Amendment applies to a private university, namely, when the conduct at issue is '[governmental] action,' that is where it 'can fairly be attributed to the [federal government].'" *Id.* (citations omitted) (alterations in original). There are three situations where a private party's conduct can be considered governmental action: "(1) when there is either a sufficiently close nexus, or joint action between the [government] and the private party; (2) when the [government] has, through extensive regulation, exercised coercive power over, or provided significant encouragement to, the private actor; or (3) when the function performed by the private party has traditionally been an exclusive public function." *S.P. v. City of Takoma Park, Md.,* 134 F.3d 260, 269 (4th Cir. 1998).

The Court in *Washington and Lee* addressed the identical issue currently before this Court. There, plaintiff argued that the school's disciplinary proceedings were attributable to the government because they were motivated by the Dear Colleague Letter. *Washington and Lee Univ.,* 2015 U.S. Dist. LEXIS 102426, at *23. The court rejected the argument noting that while it was plausible the school was under pressure to convict students accused of sexual assault, for Fifth Amendment protections to apply, "the government must have compelled the act of which [Plaintiff] complains." *Id.* (quoting *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 218 (4th Cir. 1993).Thus, because there was no allegation that the school was deprived of its autonomy or that the government participated in the decision-making process, the school could not be considered a governmental actor subject to due process requirements. *Id.*

Likewise, here, Plaintiffs have not made any showing that Defendants' actions represented joint conduct between McDaniel and the government. While the Defendant may have been attempting to comply with what it perceived to be the expectations of the Dear

Colleague Letter, the actions complained of were not dictated by the Government. Thus, as a private entity, the Due Process claims against the Defendants fail and summary judgment is entered on their behalf as to Count III alleging Due Process violations.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. A separate Order shall issue.

Dated:  March 31 , 2017

GEORGE J. HAZEL
United States District Judge