1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF MARYLAND

3
PAVEL NAUMOV,                )
4                            )
          Plaintiff,         )
5                            )
     vs.                     )     CASE NUMBER 8:15-cv-00482-GJH
6                            )
MCDANIEL COLLEGE, INC.       )
7                            )
          Defendant.         )
8    _____ )

9
        TRANSCRIPT OF PROCEEDINGS - WITNESS TESTIMONY ONLY
10          BEFORE THE HONORABLE GEORGE J. HAZEL
            TUESDAY, JANUARY 23, 2018; 9:30 A.M.
11                 GREENBELT, MARYLAND

12
FOR THE PLAINTIFF:
13
        James C. Strouse, Esquire
14      STROUSE LEGAL SERVICES
        5401 Twin Knolls Road, Suite 7
15      Columbia, MD  21045

16   FOR THE DEFENDANT:

17      Donald E. English, Jr., Esquire
        Eileen Carr Riley, Esquire
18      JACKSON LEWIS, P.C.
        2800 Quarry Lake Drive, Suite 200
19      Baltimore, MD  21209

20
        Proceedings recorded by mechanical stenography, transcript
21   produced by computer.

22
     _____
23

24              CINDY S. DAVIS, RPR
            FEDERAL OFFICIAL COURT REPORTER
25          6500 CHERRYWOOD LANE, SUITE 200
                GREENBELT, MD  20770

1        I N D E X   O F   W I T N E S S   T E S T I M O N Y

2                JANUARY 23, 2018, Volume 1

3

4    PLAINTIFF'S

5    WITNESSES:_____   DIRECT   CROSS   REDIRECT   RECROSS

6    Jeffrey Marx                    3      14        16        --

7    Thomas Zirpoli                 18      25        30        --

8    Robert Boner                   31      --        --        --

9    Benjamin Sapp                  36      39        --        --

10   Margaret Protzman              42      46        --        --

11   Sarah Holbrook                 48      --        --        --

12   Elena Safirova                 53      60        66        --

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2        (Plaintiff's Witness **JEFFREY MARX** sworn.)

3           THE COURTROOM DEPUTY:  You may be seated right here

4    in the witness box.  Please remember to speak loudly and

5    clearly into the microphone.  State your full name for the

6    record and spell your last name.

7           THE WITNESS:  Okay.  Jeffrey David Marx, last name is

8    M-a-r-x.

9           THE COURT:  If you could pull the microphone down

10   toward you and make sure you speak into the microphone.

11          THE WITNESS:  Sorry.

12          THE COURT:  That's okay.

13        **DIRECT EXAMINATION BY PLAINTIFF'S COUNSEL**

14   BY MR. STROUSE:

15   Q.    Dr. Marx, what do you do at McDaniel College?

16          THE COURT:  Counsel, if you need to remain seated,

17   you can.  You should either stand there or speak into the mike

18   at least.

19          MR. STROUSE:  Oh, okay.  I'm sorry.  Is this better,

20   Your Honor?

21          THE COURT:  That's better.  Thank you.

22   BY MR. STROUSE:

23   Q.    What do you do at McDaniel College?

24   A.    **I'm a professor of physics and chairman of the physics**

25   **department**.

1    Q.    And do you have tenure at McDaniel?

2    **A.    I do, yes.**

3    Q.    And briefly, what does tenure mean to you?

4    **A.    So tenure is a process of review that faculty at many**

5    **colleges and universities go through, McDaniel being one of**

6    **them.  Basically, it's a review process that happens typically**

7    **in about your seventh year, and you're evaluated by your peers**

8    **for your teaching, your scholarship, and your service to the**

9    **college.  That review by your peers then goes as a**

10   **recommendation to -- ultimately, to the board of trustees, who**

11   **then approve your tenure at the institution.**

12             THE COURT:  Sorry.  Is the jury able to hear the

13   witness well?  I just wanted to make sure.  Very well.

14   BY MR. STROUSE:

15   Q.    In order to be a full professor, must you be a tenured

16   associate professor first?

17   **A.    By and large, that's how it works.  Under sort of very**

18   **unusual circumstances, someone might be hired at an institution**

19   **as a full professor who had a distinguished record somewhere**

20   **else, but might not have tenure their first or second year**

21   **there.  But at a school like McDaniel, it's pretty common or**

22   **it's essentially the norm for full professors to have tenure.**

23   Q.    Do full professors make more than associate professors?

24   **A.    Typically, yes.  There is an increase in salary that**

25   **comes with being promoted to full -- and again, typically, full**

1    **professors have been there longer, so would enjoy -- you know,**

2    **have more raises, etc.**

3    Q.    And do you know how much that is?

4    **A.    Yeah, actually -- so what specifically?**

5          MR. ENGLISH:  Your Honor, I have objection that he's

6    clearly being offered to --

7          THE COURT:  Approach.  Approach.

8          (Bench conference on the record.)

9          THE COURT:  If it's more than a word or two,

10   relevance, hearsay, then we just do it at the bench so the jury

11   doesn't hear.

12         MR. ENGLISH:  So here, it's clear that he's being

13   offered to testify as an expert as to the value of being a full

14   professor and/or tenure, and before we go too far along that

15   line, I wanted to make sure I make an objection.  I know he has

16   some personal knowledge about what tenure means, what full

17   professor means, but we're starting to talk about the amount of

18   money that corresponds to those titles, which there has been no

19   designation as such, and you've ruled on that issue already.

20         THE COURT:  So if he's able to --

21         MR. ENGLISH:  He's a fact witness.

22         THE COURT:  If he's able to lay a foundation that

23   this individual would have knowledge of the salaries of

24   different positions at the school, then he can testify as to

25   facts regarding what a full professor makes or what an

1   attending professor makes.  If it moves into opinion, I'll

2   strike that because he's not an expert witness.  But as long as

3   he's testifying about facts within his knowledge, I'm going to

4   allow it.

5           MS. RILEY:  Your Honor, it also differs by

6   discipline.  So what a professor makes in the physics

7   department is not what a professor makes in the computer

8   science department.

9           THE COURT:  Sounds like something you can point out

10  in cross.

11          MS. RILEY:  Thank you.

12      (End of bench conference.)

13  BY MR. STROUSE:

14  Q.    What is the difference between salaries, if you know?

15  **A.    Associated with a promotion, I believe it's a $3,000**

16  **increase in salary that comes with the promotion to full.**

17  Q.    And at McDaniel, what is the disparity between the

18  average salary of a full professor and the average salary of an

19  associate professor?

20  **A.    Yeah, so those numbers are published or readily**

21  **available.  The average -- and that's all I have.  The average**

22  **salary at McDaniel for a full professor is about 84, 85,000,**

23  **and for an associate professor, it's about 67,000, if I**

24  **remember correctly.  So about $18,000 difference.**

25  Q.    Okay.  Thank you.  What about sabbaticals?  What are

1   they?

2   A.      So a sabbatical, again, is something that faculty are

3   awarded after a certain amount of time at an institution.  It's

4   after a review.  Faculty have to submit a proposal, usually to

5   what's known as the faculty affairs committee.  That proposal

6   is reviewed, and if it's approved, then a faculty member,

7   typically after their seventh year, which is what is true at

8   McDaniel, would be granted a sabbatical, the purpose of which

9   would be to improve your teaching and/or your scholarship,

10  things that are valuable to the institution.

11          So essentially, it's -- I wouldn't use the phrase "paid

12  leave," but you certainly are compensated for the semester that

13  you aren't there, but you're expected to advance your

14  scholarship and your teaching.

15  Q.      And how often are you awarded sabbaticals?

16  A.      You're eligible every seven years at McDaniel College.

17  Again, that's pretty typical for most institutions like

18  McDaniel.  Again, you're not necessarily going to be granted a

19  sabbatical.  You have to make the case for it.

20  Q.      Okay.  Now, how do you know Dr. Naumov, if you do?

21  A.      Yeah.  So I do.  It's a small college.  We have about --

22  let's just say roughly 100 full-time faculty.  And certainly,

23  being in the physics department and he was in the computer

24  science department, we shared a lot of common interest, a lot

25  of common students.  We had the same office suite where our

1  administrative assistant worked and our mailboxes were housed.

2  So there was certainly plenty of opportunity for me to interact

3  with Dr. Naumov on almost a daily basis while he was at

4  McDaniel.

5  Q.    And what about Dr. More?  How did you know her?

6  A.    Same set of circumstances.  She was a professor in the

7  computer science department and, like I said, we shared a lot

8  of students, a lot after common interests, some shared spaces.

9  So again, I had the opportunity to interact with her on almost

10  a daily basis.

11  Q.    Did you know they worked together on research projects?

12  A.    Yeah.  Actually, I did see them together working on

13  various projects.  I couldn't have identified one in particular

14  as being either curricular or research, but I do know they

15  worked on research together.

16  Q.    Do you know how many research projects they got

17  published?

18  A.    Actually, I didn't know until sort of talking with the

19  various lawyers.  So I now know that that number is up to, I

20  think, about 12.

21        But I do recall that they were both awarded -- what's the

22  phrase -- scholarly research award, which means you had to

23  publish five papers in three years.  So I do remember that.  So

24  I knew it was at least five but, apparently, it's a dozen.  So

25  it's a pretty significant output for faculty at McDaniel.

1  Q.    And did you ever know about the relationship between

2  Dr. More and Dr. Naumov?

3  **A.    Again, I know that they worked together.  I saw them**

4  **working together frequently.  They were members of the same**

5  **department, so I'm sure they exchanged a lot of -- or spent a**

6  **lot of time together, you know, developing that department,**

7  **talking about their majors, working on research.  So that would**

8  **be normal.**

9  Q.    One of the complaints that Dr. More made was that he,

10  Dr. Naumov, offered to take her for lunch as he was leaving.

11  Is that inappropriate?

12  **A.    As he was leaving or as she was leaving?**

13  Q.    As she was leaving.  I'm sorry.

14  **A.    It would certainly be considered normal behavior, you**

15  **know, if -- it wouldn't be outside the realm of what you might**

16  **expect between two colleagues in the same department.**

17  **Certainly, I've had other colleagues leave, and I've taken them**

18  **out to lunch or had little social gatherings for them.  So for**

19  **a small school like McDaniel, that's not at all outside the**

20  **realm of how we interact with our colleagues.**

21  Q.    How about weekend e-mails?  Is that often done?

22       MR. ENGLISH:  Your Honor, I'm going to object to in

23  terms of he doesn't have --

24       THE COURT:  Approach.  Approach for a second.

25       (Bench conference on the record.)

1          THE COURT:  So this question I find less

2    objectionable.  I would have sustained the objection to the

3    previous question as to what is or is not inappropriate,

4    because that sounds like an opinion, but I didn't hear an

5    objection there.

6          MR. ENGLISH:  I didn't make one on purpose for that

7    question, but as he started getting more into just, in general,

8    what's appropriate, what's not appropriate, like weekend

9    e-mails --

10         THE COURT:  As he phrased this particular question,

11   it was different than that.  So if you were to ask him if

12   colleagues at the school typically exchange e-mails over the

13   weekend, I overrule that objection.

14         MR. ENGLISH:  As it relates to -- just to get the

15   objection on the record.  As the questions continue to relate

16   to his understanding of any specific conduct between Dr. Naumov

17   and Dr. More, I'm going to have an objection.

18         THE COURT:  Sure.  Unless he has a basis of

19   knowledge.

20      Let me also say, while I have you up here, so we limit

21   the amount of times we have to do this, look, counsel for

22   defense opened on years of inappropriate and unwelcome conduct.

23         MR. ENGLISH:  Yes.

24         THE COURT:  I heard that phrase come out multiple

25   times during defense closing -- opening, which, frankly, gives

1   them, in my view -- or gives plaintiff, perhaps I should say, a

2   little more latitude to rebut that statement that there was

3   years of unwelcome and inappropriate conduct that they were

4   responding to.  I still don't know that we need six witnesses

5   to discuss that but --

6              MR. ENGLISH:  Just to briefly address that.  The

7   reference is to the actual conduct that was before the college

8   in making its decision and investigating before with the

9   grievance.  I think that is fair game --

10             THE COURT:  I'm not saying there was anything

11  inappropriate with the comment, but it might adjust my

12  willingness to allow some testimony as to other's observations

13  of the interactions.

14             MR. ENGLISH:  I understand.  Thank you, Your Honor.

15             THE DEFENSE:  Thank you, Your Honor.

16          (End of bench conference.)

17  BY MR. STROUSE:

18  Q.    What, if anything, did you observe about Dr. Naumov's

19  stalking Dr. More?

20  **A.    I never observed any behavior that I would come close to**

21  **classifying as stalking.**

22  Q.    And what about the weekend e-mails?  Is that unusual at

23  McDaniel?

24  **A.    No.  Certainly, all my colleagues e-mail each other**

25  **frequently, weekends, evenings, for anything related to work.**

1   **That's perfectly normal.**

2   Q.    And if you know, to what extent were students involved in

3   Dr. Naumov's research?

4   **A.    His students were pretty extensively involved in his**

5   **research.   Again, like many members of faculty, Dr. Naumov and**

6   **Dr. More had students involved in research.   It's not only**

7   **common, it's encouraged.**

8   Q.    With regard to excessive conversations, what, if

9   anything, did you observe between Naumov and Dr. More?

10  **A.    I certainly never saw them involved in anything that I**

11  **would consider to be excessive conversations.   We're academics;**

12  **we talk a long time.**

13  Q.    Were you ever aware of any comments he made on her

14  sweater?

15  **A.    No.**

16  Q.    Were you ever aware of a comment that he made about,

17  "Gee, things are going Well; if I weren't married, I would

18  marry you"?

19  **A.    No.**

20  Q.    To what extent were you involved in the grievance

21  process?

22  **A.    I was present -- since I'm one of the ombuds of the**

23  **institution --**

24  Q.    What is that?

25  **A.    So an ombuds is a person that is elected by the faculty**

1    to help when their employees at the institution, whether

2    faculty staff or administrators, negotiate policy or conflicts

3    between two people.  So more often than not, if someone feels

4    that there has been a policy that's either been overlooked or

5    misapplied, they'll contact one of the ombuds, and we'll step

6    in to try to help interpret the policy and guide people through

7    the process and navigate any rough spots.

8         So Dr. Naumov approached me as ombuds and asked me to

9    help him out.  So I was present only at the grievance hearing,

10   only for the time that Dr. Naumov was present.  So that's what

11   I know of that process.

12   Q.   Do you know about the Title IX policy that McDaniel has?

13   A.   Yes.

14   Q.   And what, in anything, do you know about a person

15   stepping in for another person who is not a complainant?

16   A.   So that's an interesting question.  I know, nationally,

17   there's a debate about whether or not that is a reasonable

18   interpretation of Title IX as passed by Congress, and I

19   certainly don't want to weigh in on that part of the

20   discussion.

21        I will say that at the time of Dr. Naumov's grievance

22   hearing, the McDaniel policy said that the provost -- among

23   other people, faculty included, the provost was considered a

24   responsible party.  So if a responsible party had any

25   information that was related to a possible Title IX violation,

1  that person was to come forward.

2  Q.    And Dr. Stewart did come forward and stepped in the place

3  of Dr. More?

4  **A.    Actually, at the time I didn't know who, you know, the**

5  **complaints were really related to.  That came out after.  I**

6  **only knew that Dr. Stewart had filed the complaint.**

7  Q.    And did you have any concern about that, Dr. Stewart

8  filing?

9  **A.    Did I have concern about that at the time?  I would say**

10  **probably the answer to that is no because, again, not being**

11  **expert on Title IX, just having reviewed McDaniel's policy,**

12  **that did not bother me.  I was concerned that the complainant**

13  **was involved with the grievance process afterwards, and that's**

14  **where I sort of stepped in and raised some concerns with the**

15  **institution.**

16  Q.    Okay.  That's all I have.  Thank you.

17         THE COURT:  Cross, Mr. English.

18            **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

19  BY MR. ENGLISH:

20  Q.    Good afternoon, Dr. Marx.

21  **A.    Good afternoon.**

22  Q.    Just a couple questions for you.  First, on tenure, is it

23  true that a professor usually only gets one chance at making

24  tenure?  Is that what is typical?

25  **A.    I would say it's typical, but there are certainly cases**

1    **where, for various reasons, people have sort of gotten a second**

2    **shot at it, yes.**

3    Q.      Sure.  And then you talked about sabbaticals.  Isn't it

4    true that a sabbatical is a privilege, not a right?

5    **A.      Yeah, you have to apply and be approved for sabbatical.**

6    **It's not something that is just automatic; that's correct.**

7    Q.      It's not just time off, right?

8    **A.      Absolutely not, yes.**

9    Q.      You have to present a plan and what you're going to

10   actually do.  You can't be remodeling your kitchen --

11   **A.      That's correct.  And once you're done, you have to submit**

12   **a report with evidence that you carried out what you explained**

13   **you would.**

14   Q.      You get paid for your sabbatical just as you would if you

15   were teaching; it's just you're going something else other than

16   teaching.

17   **A.      That is correct, yeah.**

18   Q.      And then I just want to be clear.  You do not get

19   involved in this matter until after the grievance went forward;

20   is that correct?  So after the decision to bring the grievance

21   was made.

22   **A.      Honestly, it's a little hard for me to say the exact**

23   **date.  It certainly was close to the beginning of that, but I'm**

24   **a little hard pressed to say yes or no in terms of when things**

25   **actually started and when I was first involved.  I apologize**

1 **for not knowing that day.**

2 Q.     And you were not aware of all of the information that the

3 college had before it when it made its decision to investigate

4 and to go forward with the grievance.

5 **A.     That is absolutely true; I did not.**

6 Q.     And just to make sure we clarify your testimony.  It's my

7 understanding that your understanding of the policy is that the

8 victim is not required to be the complainant in order for the

9 college to pursue a grievance; is that correct?

10 **A.     Again, as long as the policy is in line with Title IX as**

11 **passed by Congress, that seems reasonable.  As was written,**

12 **that is how McDaniel interpreted Title IX at the time, was that**

13 **the provost was a legitimate person -- responsible party.**

14 Q.     So you would agree that at the time Dr. Stewart was the

15 provost.

16 **A.     Yeah.**

17 Q.     And at that time she was a responsible party.

18 **A.     As outlined by McDaniel policy, yes.**

19        MR. ENGLISH:  That's all I have.

20        THE COURT:  Redirect, Mr. Strouse?

21              **REDIRECT EXAMINATION BY PLAINTIFF**

22 BY MR. STROUSE:

23 Q.     You are not an expert on Title IX?

24 **A.     No, I am absolutely not.**

25 Q.     And Title IX policy, you've read that, I suspect.

1    **A.      Yes.   Oh, absolutely, yeah, but I would not consider**

2    **myself an expert.**

3    Q.      And where -- if you know, doesn't it state in Title IX

4    that if the complainant doesn't come forward, the matter must

5    be dismissed?

6    **A.      I was not aware of that.   But again, I feel a little bit**

7    **out of my league knowing when things should be dismissed and**

8    **not.**

9                THE DEFENSE:   No further questions, Your Honor.

10               THE COURT:   Sir, thank you so much for your

11   testimony.   You're excused at this time.   Please do not discuss

12   your testimony with anyone else until the trial has been

13   completed, and enjoy the rest of your day.

14               THE WITNESS:   Thank you very much.

15            (End of testimony of Jeffrey Marx.)

16

17

18

19

20

21

22

23

24

25

1          (Plaintiff's Witness **THOMAS ZIRPOLI** sworn.)

2          THE COURTROOM DEPUTY:  Please step into the witness

3   box.  Remember to speak loudly and clearly into the microphone.

4   State your full name for the record and spell your name,

5   please.

6          THE WITNESS:  My full name is Thomas James Zirpoli,

7   Z-i-r-p-o-l-i.

8          **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

9   BY MR. STROUSE:

10  Q.    Dr. Zirpoli, what do you do at McDaniel?

11  **A.    I hold the Laurence J. Adams endowed chair in special**

12  **education, I coordinate the graduate program in human services**

13  **management, and I'm the president of Target Community and**

14  **Educational Services, an intern site for McDaniel College.**

15  Q.    Do you have tenure at McDaniel?

16  **A.    No.**

17  Q.    Are you a full professor?

18  **A.    Yes.**

19  Q.    And so you already mentioned your area of specialization.

20  What is your area of specialization?

21  **A.    I'm coordinator of the graduate program in Human Services**

22  **Management.**

23  Q.    Okay.  Now, how do you know Dr. Naumov, if you do?

24  **A.    I just know him as a fellow faculty member at McDaniel**

25  **College.**

1    Q.    And at one point you were interim provost, were you not?

2    **A.    Yes, I was, from January 1, 2013, through June 30, 2013.**

3    **For six months I was interim provost, yes.**

4    Q.    And did there come a time when you heard that Dr. Naumov

5    was leaving the college?  I mean Dr. More.

6    **A.    No.  I had a conversation, while I was provost, with**

7    **Dr. More regarding a different topic, in which she said she was**

8    **looking for another job because her family lived in Baltimore,**

9    **her children were in Baltimore, her husband worked in**

10   **Baltimore, and she wanted to be in Baltimore.**

11   Q.    Okay.  Now, with regard to interactions between

12   Dr. Naumov and Dr. More, were you aware that they, for example,

13   worked on research papers, if you were?

14   **A.    I did.  When we were looking for -- trying to decide on a**

15   **new department chair for that department, I did review the**

16   **resumes and noted that they both did a lot of research**

17   **together.  I had already known that, but I didn't know exactly**

18   **how many things they had published together.  That's when it**

19   **came to my attention, the extent to which they did.**

20   Q.    Did you know anything about their family relation?

21   **A.    No, I don't know anything about any --**

22   Q.    Did you ever observe Dr. Naumov stalking Dr. More?

23   **A.    No.  I've never seen them together except at faculty**

24   **meetings.**

25   Q.    I see.  Now, with regard to the complainant, she didn't

1    make a complaint about Dr. Naumov, did she?

2    **A.      Not to me while I was provost, no.**

3    Q.      Okay.  And when were you provost?

4    **A.      From January 1, 2013, through June 30, 2013.**

5    Q.      So you never did an investigation of their relationship?

6    **A.      No.  I mean the topic did come up regarding the search**

7    **for a new chair of the department.  Dr. Pavel was the chair of**

8    **the department -- do you want me to explain all this?**

9    Q.      Sure.

10   **A.      Okay.  Some of the departments at McDaniel have a**

11   **five-year rotation for chairs, and it was his turn to serve as**

12   **chair.  This was in May, and he had been chair since August or**

13   **September.  And I had a request from someone in his department**

14   **to meet with me, and that was Dr. Spencer Hamblen, and he**

15   **didn't think that -- he and Dr. Pavel didn't get along very**

16   **well, and he was asking me, basically, if I could ask him to**

17   **step aside as chair and appoint someone else.**

18   Q.      Did that, in fact, happen?

19   **A.      Well, I kind of investigated with him, with Dr. Hamblen**

20   **what the problem was, and he said that he didn't seem**

21   **interested in being chair.  He wanted to teach and do research,**

22   **and the administrative stuff, he felt like it was just an**

23   **obligation because it was his turn to do it.  So I told him I**

24   **would talk to Dr. Pavel, and I would talk to other members of**

25   **the faculty in that department and see if we wanted to make a**

1  change.

2       So I did call Dr. Pavel into my office, and he expressed

3  to me that he really wasn't interested in being department

4  chair.  He felt obligated to do it because it was his turn,

5  that he'd rather focus his attention on teaching and research.

6  He admitted that, you know, it's not something I'm particularly

7  interested in or good at.  I said, well, if I found someone

8  else in the department who would be willing to do it, would you

9  step aside, would you -- he said absolutely.

10      So I then interviewed the other people in the department,

11 kind of got a consensus of who they thought might be interested

12 and who they agreed for me to ask, and the consensus was that I

13 would ask Dr. Sara More.

14      So I called her in and asked her if she would be

15 interested in doing it, and that's when she mentioned to me

16 that she really didn't want to do it, at least not long term,

17 not for five years, because she lived in Baltimore, and she had

18 young children, and her husband worked there, and she was

19 looking for another job, so she didn't know how much longer

20 she'd be there anyways.  I said, well, would you be willing to

21 do it for a year, until the new provost came and found someone

22 else, and she said she would do it for a year.

23      I then asked her --

24           THE COURT:  I'm sorry, next question.

25 BY MR. STROUSE:

1   Q.    Did you have any special knowledge of Title IX at that

2   time?

3   **A.    Well, I was aware of Title IX.  I was the interim**

4   **provost, so it was something that was important and something**

5   **that I received some training on.**

6   Q.    And were you aware that if the complainant doesn't come

7   forward, that the matter must be dismissed?

8   **A.    Honestly, I did not at that time pay attention to that**

9   **part of Title IX.**

10  Q.    When did you hear, if you did, that Dr. Stewart was

11  standing in for Dr. More in this matter?

12  **A.    I was never --**

13          MR. ENGLISH:  Objection.  He's leading him.

14          THE COURT:  Sustained as to form.  You can rephrase

15  the question.

16  BY MR. STROUSE:

17  Q.    What did you hear about Dr. Stewart in this matter?

18  **A.    I did not talk to Dr. Stewart about this.  I just know**

19  **after it happened, just through the rumor mill that it**

20  **happened.  I don't have any other special information about it.**

21  Q.    And did you consider that her standing in was

22  inappropriate?

23          MR. ENGLISH:  Same objection.

24          THE COURT:  Sustained.

25  BY MR. STROUSE:

1  Q.    What, if anything, did you consider about her standing in

2  for Dr. More in this matter?

3            MR. ENGLISH:  Same objection.

4            THE COURT:  Sustained as to foundation.

5  BY MR. STROUSE:

6  Q.    Did you know that -- what did you know about Dr. Stewart

7  and this matter?

8  **A.    I didn't.  When I -- when the provost took my place, I**

9  **offered to sit down with her and brief her and give her an**

10 **up-to-date on different faculty issues that we were dealing**

11 **with at that time, and she did not want to have that**

12 **opportunity.  So she asked -- I went on to become interim dean**

13 **of the graduate program, and we never discussed that, that**

14 **whole issue.**

15 Q.    I see.  Did you, as interim provost, did you have any

16 Title IX charges being made against other people?

17 **A.    When I met with Dr. Hamblen, he mentioned to me that he**

18 **thought there were some issues between Dr. Pavel and Sara, when**

19 **he was talking to me about that he thought we should have a new**

20 **chair in that department.  I asked him for examples of any**

21 **problems or issues.  He said he didn't -- he didn't give me**

22 **any.  He just said he thought there were some issues between**

23 **them.  I said okay.**

24 **        So when I did meet with Dr. Sara More, I felt obligated**

25 **to follow up on that, and I also felt obligated, when I talked**

1   to other members of that faculty, to follow up on it.

2   Q.    And what happened then?

3   A.    None of the other faculty had anything to say about that.

4   They said they didn't see any problems.  They did note that

5   Dr. Hamblen and Dr. Pavel didn't get along very well.

6         When I met with Dr. Sara More, I asked her, I said I'm

7   hearing from one of your colleagues that there's a problem

8   between you and Dr. Pavel; is there anything you want to talk

9   to me about.  She said no.  Then she said I think because of

10  cultural influences -- or cultural differences was her exact

11  words, I think a lot of his behavior is misinterpreted.  I

12  said, well, I'm the provost; if you have something that you

13  want to talk to me about now or in the future, please come to

14  me because I want to deal with it; if there's a problem, I want

15  to know about it.  And she kind of chuckled at me and said --

16  she was the only female in the department, and she said I can

17  handle the gentlemen in my department well; thank you very

18  much.  And she said she had nothing else to share about that.

19  So I didn't feel like there was anything else I could do.

20        I had asked everyone else in the department, and no one

21  else had anything to tell me either.

22  Q.    Okay.  And you didn't know about anything else, about any

23  complaints or any of that to your knowledge?

24  A.    No.  Those were the only times I've even talked to those

25  people in that department really.  As provost anyways.

1   Q.    And you never had a Title IX problem when you were

2   provost, to your knowledge?

3   **A.    The only thing I had in that area was with an adjunct**

4   **faculty member who I discovered was dating an undergraduate**

5   **student, and I did some investigation into that, found out it**

6   **was true, found out that the previous provost had warned him**

7   **about that.  There had been another incident.  He was not a**

8   **tenured faculty member.  He wasn't tenured track.  He was an**

9   **adjunct.  In other words, he was a semester-by-semester**

10  **contract.  So I made the decision not to renew his contract for**

11  **the following semester.  That's the closest I've ever had in**

12  **that.**

13              MR. STROUSE:  I have no further questions, Your

14  Honor.

15              THE COURT:  Cross.

16              **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

17  BY MR. ENGLISH:

18  Q.    Good afternoon, Dr. Zirpoli.  Just a few questions for

19  you.

20        Is it your understanding that the Title IX policy at

21  McDaniel does not require the victim to be the complainant in

22  order for the college to move forward with the grievance

23  process?

24  **A.    I don't know.**

25  Q.    Let me ask you this.  So we go back to 2013.  This was

1  around May of 2013.  You talked about your conversation with

2  Dr. Stewart -- I mean Dr. More.

3  **A.    Dr. More, right.**

4  Q.    If Dr. More had presented specific instances of issues of

5  unwelcome behavior that Dr. Naumov made towards her, or e-mails

6  or other things, but she wasn't willing to go forward, would

7  you, as the provost, have been required to initiate an

8  investigation?

9  **A.    Absolutely.**

10  Q.    And if the result of that investigation corroborated the

11  allegations, would the college have been required to move

12  forward under its Title IX policy?

13  **A.    The way I understand Title IX, it depends.  I've read**

14  **that thing a million times.  If someone was at risk for sexual**

15  **violence, for example, then, yes, I think terminating that**

16  **person would have been appropriate.  If I had done an**

17  **investigation, followed all the procedures and found, in my**

18  **mind, without a shadow of a doubt, that that person was guilty**

19  **of that and someone else was at risk, I would terminate that**

20  **personal whether or not the victim would come forward.  If it**

21  **was actual violence.  If it was violence of any type.  If**

22  **someone was truly in danger.**

23  **That's the way I've kind of concluded in reading that**

24  **policy, and I've talked to many people about it and tried to**

25  **get my hands around it.  That's the way I understand it.**

1  Q.    Would you agree that in cases of sexual harassment, that

2  if you were to confirm that there was an issue of sexual

3  harassment, we've got a Professor Harvey Weinstein, and there

4  are multiple victims, and you have evidence corroborating it,

5  would you agree that the college would be required to act?

6            MR. STROUSE:  Objection.

7            THE COURT:  Sustained.

8  BY MR. ENGLISH:

9  Q.    Let me ask it more generally.  If you knew about sexual

10 harassment.  You mentioned sexual violence, but if it was just

11 sexual harassment, and you corroborated it in your

12 investigation, would the college be required to move forward

13 under the Title IX policy?

14           MR. STROUSE:  Asked and answered, Your Honor.

15           THE COURT:  Overruled.

16 BY MR. ENGLISH:

17 Q.    You may answer.

18 **A.    I believe I would, yes.**

19 Q.    Is your understanding that the provost -- who is also the

20 dean of faculty, correct?  Is that your position?

21 **A.    I'm sorry, just note of clarification.  When I was**

22 **interim provost, the president also named a dean of the**

23 **faculty.**

24 Q.    There was a separate one at the time when you were

25 provost?

1    **A.      For six months.  When Dr. Stewart took over, she had both**

2    **roles.**

3    Q.      You would agree, though, the provost is a responsible

4    party who is required to act upon knowledge of sexual

5    harassment.

6    **A.      Yes.**

7    Q.      You mentioned that Spencer Hamblen came to you about his

8    concerns about Dr. Naumov's behavior toward Dr. More; is that

9    correct?

10   **A.      He came to me because he was concerned about the**

11   **department and the role of the chair of the department and the**

12   **job that Dr. Pavel was doing as chair of the department.  He**

13   **did not come to me because of that.**

14   Q.      I understand.

15   **A.      It came up in our conversation, in our meeting.**

16   Q.      Understood.  But at some point during the meeting, he

17   volunteered to you that there was some problems between

18   Dr. Naumov and Dr. More; is that correct?

19   **A.      We were going through possible replacements --**

20            MR. STROUSE:  That's hearsay, Your Honor.

21            THE COURT:  Sustained.

22   BY MR. ENGLISH,

23   Q.      At some point during this conversation, what was your

24   understanding of the issue between Dr. Naumov and Dr. More?

25   **A.      Again, Dr. Hamblen would not give me any specifics, would**

1  not elaborate.  I certainly pushed the question because this

2  was the first time I've heard of an issue of that type between

3  the two faculty members.  So he just said that -- we were

4  discussing who would possibly take over, and when I

5  mentioned -- I went through all the people, tenured people in

6  the department, and when I mentioned Sara More, he said, well,

7  there might be some issues there with Dr. Pavel and Dr. More.

8  And I said, well, what do you mean by that.  And he says, well,

9  I think there's some issues there.  And I said can you be

10 specific, can you elaborate, can you -- you know.  I got

11 nothing out of him.  It was pretty frustrating.

12 Q.    Isn't it true that you were under the understanding that

13 Dr. Naumov had an interest in Dr. More that went beyond

14 academics?

15 A.    That is what Dr. Hamblen led me to believe, yes.  And

16 when I wrote my notes afterwards, that's what I wrote.

17 Q.    And you mentioned that Dr. More had no interest in

18 pursuing a grievance when you spoke to her about this, right?

19 A.    Yes, but we weren't even talking about a specific

20 grievance.  We were just talking about do you have a complaint,

21 can you tell me about this, and she said there's nothing to

22 talk about.

23 Q.    You don't know what was going on in her mind or why she

24 didn't tell you.

25 A.    I have no idea.

1          MR. ENGLISH:  That's all.

2          THE COURT:  Redirect.

3      **REDIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

4  BY MR. STROUSE:

5  Q.    There was never any charge of sexual harassment, was

6  there?

7          MR. ENGLISH:  Objection.  He already said he didn't

8  know.

9          THE COURT:  Overruled.  He can answer the question.

10         THE WITNESS:  I have no idea.  Not during my tenure

11  as provost, no.

12         MR. STROUSE:  No further questions, Your Honor.

13         THE COURT:  Sir, thank you so much for your

14  testimony.  You may be excused.  Please don't discuss your

15  testimony with anyone until the trial has been completed, and

16  enjoy the rest of your day.

17         THE WITNESS:  Thank you.

18      (End of testimony of Thomas Zirpoli.)

19

20

21

22

23

24

25

1          (Plaintiff's Witness **ROBERT BONER** sworn.)

2          THE COURTROOM DEPUTY:  You may be sated.  If you

3  could please speak clearly and loudly into the microphone,

4  state your name for the record and spell your name.

5          THE WITNESS:  Robert Boner, R-o-b-e-r-t, B-o-n-e-r.

6          **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

7  BY MR. STROUSE:

8  Q.    Dr. Boner, what did you do at McDaniel College?

9  **A.    I taught there for 37 years.**

10  Q.    And what did you teach?

11  **A.    Mathematics and photography.**

12  Q.    And when did you retire?

13  **A.    In 2007.**

14  Q.    Okay.  And what, if anything, have you done with the

15  department since 2007?

16  **A.    I'm there frequently because I go over for various talks**

17  **or I go over to -- I walk up and down the steps over there for**

18  **exercise.  I do that two or three times a week.**

19  Q.    Are you over there quite a bit with regard to the

20  computer and science and mathematics department?

21  **A.    I'm in the department, but I'm not there because of that.**

22  Q.    Did you know Dr. Naumov?

23  **A.    Yes.**

24  Q.    How did you know him?

25  **A.    Well, I was chair of the department when we hired him, so**

1  I led the search and presented his name for hiring.

2  Q.    And how about Dr. More?

3  A.    Same thing.  She was a year later.  Actually, we had

4  tried to hire her the year before that, and we missed her by

5  one day.  So she was taken by somebody else, so we hired her

6  the next year.

7  Q.    If you know, did you know that they did research

8  together?

9  A.    Yes.

10 Q.    And if you did, did you know that they had 12 papers

11 published together?

12 A.    I did.

13 Q.    And if you did, did you know that they were friendly in

14 terms of their families and the like?

15 A.    Yes.

16 Q.    Okay.  And did you ever observe Dr. More stalking -- I

17 mean Dr. Naumov stalking Dr. More?

18 A.    No.

19 Q.    Did you ever observe them in conversation?

20 A.    Yes, frequently.

21 Q.    Did you ever get the idea that the conversations were

22 excessive?

23 A.    No.  I mean, they were the two computer scientists we

24 had, so they were in charge of what courses we were going to be

25 giving and would discuss things about students and the computer

1    **science classes.  So, no, I didn't think it was excessive.**

2    Q.     What about e-mails on the weekends?  Did you ever do that

3    yourself?

4    **A.     I don't think so, no.**

5    Q.     What would you consider about Dr. Naumov sending Dr. More

6    e-mails?

7              MR. ENGLISH:  Objection.

8              THE COURT:  Sustained.  Calls for opinion.

9    BY MR. STROUSE:

10   Q.     Did you know that Dr. Naumov often sent e-mails on the

11   weekend to Dr. More?

12   **A.     No.**

13   Q.     And were you ever involved in a Title IX problem?

14   **A.     Can you explain what that means?**

15   Q.     With regard to Title IX, were there any occasions when

16   you were chair that someone got charged with a Title IX

17   violation?

18   **A.     No.**

19   Q.     Were you aware of the policy of Title IX?

20   **A.     Yes.**

21   Q.     And did you know or were you aware that Dr. Stewart

22   stepped in for Dr. More in the Title IX?

23   **A.     Yes.**

24             MR. ENGLISH:  Objection.  Leading.

25             THE COURT:  I'll overrule it.

1    BY MR. STROUSE:

2    Q.    And what, if anything, did you think about that?

3              MR. ENGLISH:  Objection.

4              THE COURT:  Sustained.

5    BY MR. STROUSE:

6    Q.    Did you think that was appropriate or not?

7              MR. ENGLISH:  Same objection.

8              THE COURT:  Sustained.  He's not an expert.

9    BY MR. STROUSE:

10   Q.    Did you yourself review the Title IX booklet?

11   **A.    No.**

12   Q.    How long were you chair of the Department of Mathematics

13   and Computer Science?

14   **A.    Probably 10 or 12 years, my last stage of it.  I'd been**

15   **chair earlier in my career there.**

16   Q.    And with regard to Dr. Naumov and Dr. More, did you

17   yourself observe any negative behavior or what you would

18   consider negative behavior --

19   **A.    No.**

20   Q.    No.

21             MR. STROUSE:  I have no further questions, Your

22   Honor.

23             THE COURT:  Cross.

24             MR. ENGLISH:  I don't have any questions, Your Honor.

25             THE COURT:  Sir, thank you so much for your

1    testimony.  You are excused.  Please don't discuss your

2    testimony with anyone else until the trial has been completed,

3    and enjoy the rest of your day.

4          (End of testimony of Robert Boner.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Plaintiff's Witness **BENJAMIN SAPP** sworn.)

2          THE COURTROOM DEPUTY:  You may be seated.  If you

3     could please speak clearly and loudly into the microphone,

4     state your name for the record and spell your name.

5          THE WITNESS:  My name is Benjamin Sapp,

6     B-e-n-j-a-m-i-n, last name S-a-p-p.

7          **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

8     BY MR. STROUSE:

9     Q.    Ben, what do you do since you left McDaniel?

10    **A.    I spent two years in graduate school.  I have a masters**

11    **degree in applied physics, and I've been working for the last**

12    **four years.**

13    Q.    And who do you work for?

14    **A.    I currently work for Orbit Logic, Incorporated.**

15    Q.    Now, how do you know Dr. Naumov, if you do?

16    **A.    I knew him when I was at McDaniel College.  He was my**

17    **professor for several computer science classes.**

18    Q.    And what about Dr. More?  How do you know her, if you do?

19    **A.    She was also one of my professors.  Additionally, I did**

20    **research with both of them.**

21    Q.    And was this research successful in producing papers?

22    **A.    Yes.  I believe we published two papers together.**

23    Q.    And they were published in journals?

24    **A.    Yes, in two different journals, the proceedings of**

25    **conferences.**

1   Q.      And who gave the presentation, if you remember?

2   **A.      I believe Dr. Naumov presented both of those papers.**

3   Q.      Did you observe the interaction between Dr. Naumov and

4   Dr. More?

5   **A.      Yeah.  While we were doing research, yes.**

6   Q.      And what, if anything, did you know whether Dr. More had

7   any complaints about Dr. Naumov?

8   **A.      I don't know of any particular complaints.**

9   Q.      Were you aware, if you were, that Dr. Naumov often sent

10  e-mails on the weekends?

11  **A.      I don't know for certain.  I certainly have received**

12  **e-mails from Dr. Naumov on the weekend before.  So it's**

13  **believable.**

14  Q.      Did you think that was inappropriate?

15          MS. RILEY:  Objection, Your Honor.  It calls for

16  opinion on the part of this student witness.

17          THE COURT:  I'm going to overrule as to this specific

18  instance, as to whether the e-mails to him, he considered them

19  to be inappropriate.  You can answer that question.

20          THE WITNESS:  Could you repeat that?

21  BY MR. STROUSE:

22  Q.      Yeah.  Did you think that they were inappropriate to

23  receive?

24  **A.      No.  They were usually regarding class work or research.**

25  Q.      Okay.  Did you ever observe Dr. Naumov harassing Dr. More

1   in any way?

2   **A.      No.**

3   Q.      Did you ever observe longer than needed conversations

4   with Dr. More and Dr. Naumov?

5   **A.      I wouldn't say exorbitantly longer than needed.  Longer**

6   **than needed is a relative term.**

7   Q.      Okay.  And what about Dr. Naumov creating a hostile work

8   environment?  Did you feel he did that?

9   **A.      I would not say so.**

10  Q.      Were you aware at any time that they said any nasty or

11  insulting words towards each other, if you were?

12  **A.      I was not aware of any nasty words.**

13  Q.      And overall, what was your relationship, working

14  relationship with Dr. Naumov?

15  **A.      I'd say it was good.  We did research for two summers and**

16  **we produced publications.  I wouldn't say I had any bad**

17  **dealings with him.**

18  Q.      Did you ever observe Dr. Naumov standing in the doorway

19  of Dr. More?

20  **A.      I would say I did.  That's generally the way Dr. Naumov**

21  **would stand sometimes.  I feel like he'll be leaning on a**

22  **doorway.  So I would say that I certainly did observe that.**

23  Q.      And generally, you worked with both Dr. More and

24  Dr. Naumov?

25  **A.      Yes.**

1    Q.    And did you ever observe any difficulties between them?

2    **A.    There's one anecdote where I can recall there were slight**

3    **difficulties, if I may?**

4    Q.    What was that?

5    **A.    Because I was in -- the one I remember, I was in**

6    **Dr. More's office, and I was discussing something else with**

7    **her, and Dr. Naumov came in and said, hey, I see you both, and**

8    **I had this idea, and I want to discuss it, and Dr. More and I**

9    **were discussing a separate subject, and Dr. Naumov really -- he**

10   **was excited about this, but Dr. More was trying to accomplish**

11   **something else.  I think we were between classes, and,**

12   **eventually, I think it came to the point where Dr. More said,**

13   **Pavel, enough, and he left, and we discussed it at another**

14   **time.  That's the one I can particularly recall.  So it's**

15   **possible frustration.**

16   Q.    Do you recall ever -- or were you ever involved in a

17   Title IX problem at McDaniel?

18   **A.    No, sir.**

19   Q.    Do you recall what the policy was?

20   **A.    No, sir.**

21             MR. STROUSE:  I have no further questions, Your

22   Honor.

23             THE COURT:  Cross.

24             **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

25   BY MS. RILEY:

1  Q.    Good afternoon, Mr. Sapp?

2  **A.    Good afternoon.**

3  Q.    Mr. Sapp, am I correct that you graduated from McDaniel

4  in 2011?

5  **A.    Yes.**

6  Q.    And that the two summers that you worked at the college

7  were 2009 and 2010?

8  **A.    Yes.**

9  Q.    And since graduating in 2011, you haven't been back there

10 working at the college, have you?

11 **A.    No.**

12 Q.    You told us today that you did not observe any harassing

13 conduct on the part of Dr. Naumov towards Dr. More.  Wouldn't

14 you agree, though, that you didn't have much opportunity to

15 observe Dr. Naumov's conduct toward Dr. More since the spring

16 of 2011?

17 **A.    Since the spring of 2011, yes, I would not say I had that**

18 **opportunity.**

19 Q.    And even during the time you worked together, Dr. Naumov

20 never shared with you the e-mails that he was sending to

21 Dr. More, did he?

22 **A.    No.**

23 Q.    Did you ever see the letter that he wrote to Dr. More?

24 **A.    I have not.**

25 Q.    Was Dr. Naumov a mentor for you?

1   **A.      Possibly.  It depends on how you define mentor.**

2   Q.      Did he write a reference for you?

3   **A.      Yes.**

4   Q.      Did Dr. More write a reference for you as well?

5   **A.      I can't recall.  She might have.**

6           MS. RILEY:  I have no further questions.  Thank you

7   so much.

8           THE COURT:  Redirect.

9           MR. STROUSE:  No, I have nothing further, Your Honor.

10          THE COURT:  Sir, thank you so much for your

11  testimony.  You are excused.  Please don't discuss your

12  testimony with anyone else until the trial is completed, and

13  enjoy the rest of your day.

14          THE WITNESS:  Thank you so much.

15          (End of testimony of Benjamin Sapp.)

16

17

18

19

20

21

22

23

24

25

1          (Plaintiff's Witness **MARGARET PROTZMAN** sworn.)

2          THE COURTROOM DEPUTY:  You may be seated.  If you

3    could please speak clearly and loudly into the microphone,

4    state your name for the record and spell your name.

5          THE WITNESS:  Margaret Protzman, M-a-r-g-a-r-e-t,

6    P-r-o-t-z-m-a-n.

7          **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

8    BY MR. STROUSE:

9    Q.    Okay, Ms. Protzman, what have you done since you left

10   McDaniel?

11   **A.    I've been working for the Department of Defense.**

12   Q.    Okay.  And how do you know Dr. Naumov, if you do?

13   **A.    He was my professor while I was at McDaniel.**

14   Q.    And what about Dr. More?  How do you know her, if you do?

15   **A.    She also was my professor while I was at McDaniel.**

16   Q.    And if you did, how did you become involved with research

17   projects with him?

18   **A.    At the end or middle of my sophomore year at McDaniel,**

19   **Dr. Naumov asked me if I wanted to do research with him that**

20   **summer, and I said yes.**

21   Q.    Do you remember tea time, if you do?

22   **A.    Yes.**

23   Q.    And what was that?

24   **A.    That was on -- I don't remember which day of the week.**

25   **One day of the week there would be tea time at, like, four**

1    o'clock, and it was just in the department office, and all of

2    the students were invited and faculty, anybody who wanted to

3    go, and we would just drink tea and eat cookies and talk about

4    math and computer science, and then usually there be a

5    talk following.

6    Q.    Do you remember what, if anything, Dr. Naumov had to do

7    with that?

8    A.    I remember him, like, telling us in class that tea time

9    was going to be happening that day and we could go.  I think he

10   would put the cookies out sometimes, if they needed to be put

11   out.

12   Q.    Now, did you produce research papers with Dr. Naumov?

13   A.    Yes.

14   Q.    And how many papers did you do?

15   A.    One.

16   Q.    And were you aware, if you were, about him producing

17   papers with Dr. More?

18   A.    Yes, I know that he did have papers with Dr. More.

19   Q.    Okay.  And where were your papers given, if they were?

20   A.    The paper that I wrote with Dr. Naumov?

21   Q.    Yes.

22   A.    Where did we -- like, what happened to it?  Where was it

23   published?

24   Q.    Yes.

25   A.    I can't remember exactly what journal it got published

1  in, but there was a journal that it was published in.  And also

2  on, I think a different topic, I gave a couple of talks about

3  the research that we did.

4  Q.    Did you present it anywhere?

5  A.    Yes.  I presented it at the Nebraska conference for

6  undergraduate women in mathematics, and I also presented it

7  at -- I think it was the MAA meeting, a math conference.

8  Q.    Now, with regard to Dr. More and Dr. Naumov, did you

9  observe them together when they were conversing about research

10  and other matters, if you did?

11  A.    I'm sure I saw them talking to each other.  I don't know

12  if they were talking about research specifically, but probably

13  curriculum, things like that.

14  Q.    What, if anything, did you observe?  Were these difficult

15  conversations or --

16  A.    I didn't notice anything that stood out to me in their

17  conversations.  I don't really remember.

18  Q.    Did you ever, if you did, observe Dr. Naumov stalking

19  Dr. More?

20  A.    No.  Not that I remember.

21  Q.    What about e-mails?  Did he ever send e-mails to you on

22  weekends?

23  A.    I don't specifically remember e-mails being sent on the

24  weekend.  I'm sure I got e-mails about homework assignments.

25  Or if I had a question about something, I could send him an

1    e-mail.  It's possible that he might have responded on the

2    weekends, but I don't remember specifics of when e-mail

3    responses were sent.

4    Q.    Did you ever observe anything with regard to longer than

5    needed conversations between Dr. Naumov and Dr. More?

6    A.    Not that I remember.

7    Q.    How was working with Dr. More for you?

8    A.    I got along well with Dr. More.  She -- I had her for a

9    professor for a few classes, and I also tutored for one or

10   two -- I can't remember.  One or two of her classes.

11   Q.    I see.  What does that mean?

12   A.    So for the intro-computer science class, I would go

13   whenever they had their lab once a week, and I would help

14   students with their lab assignments.  And then -- I must have

15   tutored for two classes, because for the other class I tutored

16   for, I had kind of, like, TA hours once a week, and they could

17   come to me with questions and I would help.

18   Q.    What, if anything, did you observe if Dr. Naumov sat

19   outside Dr. More's office in the sitting area?

20   A.    I don't remember anything about that.

21   Q.    And so you presented your papers in Nebraska for the one

22   paper that you did with him?

23   A.    Yes.

24   Q.    And did you notice anything between Dr. Naumov and

25   Dr. More that was difficult or not?  Difficult in that they had

1   bad words to say against each other?

2   **A.      Are you talking about the Nebraska?**

3   Q.      No.   About Dr. More and Dr. Naumov.

4   **A.      No, not that I remember.**

5              MR. STROUSE:   No further questions, Your Honor.

6              THE COURT:   Cross.

7          **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

8   BY MS. RILEY:

9   Q.      Good afternoon, Ms. Protzman.   Do I understand you

10  currently work as a government analyst with Department of

11  Defense?

12  **A.      I'm in a development program for mathematicians.**

13  Q.      With Department of Defense?

14  **A.      Yes.**

15  Q.      And have you obtained a masters or PhD, any post-graduate

16  work?

17  **A.      No.**

18  Q.      Did you have any difficulty in obtaining employment in

19  the Government since you don't hold an advanced degree?

20  **A.      I'm sorry, I couldn't hear you.**

21  Q.      Since you don't hold an advanced degree in computer

22  science, did you have difficulty obtaining employment?

23  **A.      No.**

24  Q.      In your experience, is there a demand in your community,

25  Department of Defense, for individuals with computer science

1  degrees?

2  **A.      I'm sorry, what --**

3  Q.      Is there a demand in your job, in your community, for

4  people with advanced degrees in computer science?

5  **A.      Yes.**

6  Q.      Are you considering going back to school to get an

7  advanced degree?

8  **A.      Yes.**

9  Q.      Would such a degree be valuable to you in your work?

10  **A.      Yes.**

11  Q.      And are there other people you work with at Department of

12  Defense who do have advanced degrees, like PhDs and masters in

13  computer science?

14  **A.      Yes.**

15           MS. RILEY:  I have no further questions.  Thank you

16  so much.

17           THE COURT:  Redirect.

18           MR. STROUSE:  None, Your Honor.

19           THE COURT:  Ma'am, thank you for your testimony.  You

20  are excused at this time.  Please don't discuss your testimony

21  with anyone until the trial has been completed, and please

22  enjoy the rest of your day.

23           THE WITNESS:  Thank you.

24       (End of testimony of Margaret Protzman.)

25

1          (Plaintiff's Witness **SARAH HOLBROOK** sworn.)

2          THE COURTROOM DEPUTY:  You may be seated.  If you

3    could please speak clearly and loudly into the microphone,

4    state your name for the record and spell your name.

5          THE WITNESS:  Sarah Holbrook, S-a-r-a-h,

6    H-o-l-b-r-o-o-k.

7          **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

8    BY MR. STROUSE:

9    Q.    What have you done since you left McDaniel, Ms. Holbrook?

10   **A.    I work for a contracting firm.**

11   Q.    Okay.  And if you do, how do you know Dr. Naumov?

12   **A.    He was one of my computer science professors at McDaniel.**

13   Q.    And if you do, how do you know Dr. More?

14   **A.    She was also one of my computer science professors at**

15   **McDaniel College.**

16   Q.    If you did, how did you become involved with research

17   projects with them?

18   **A.    I think -- well, I was never involved with research**

19   **projects with Dr. More; it was just Dr. Naumov, and I got**

20   **involved because my college roommate was already involved with**

21   **research with them.**

22   Q.    And did you produce a paper?

23   **A.    I did.**

24   Q.    And where did you present it, if you did?

25   **A.    Dr. Naumov presented it in Toulouse, France, and I**

1   **accompanied him.**

2   Q.    So you went to Toulouse, France, as well?

3   **A.    Yes, I did.**

4   Q.    What, if any, problems did you have with Dr. Naumov?

5   **A.    Can you define problem, please?**

6   Q.    Did you have any interactions you felt that were

7   difficult for you or --

8   **A.    Not particularly.  The only thing that I would say at all**

9   **qualified is that he has a tendency to subconsciously walk**

10  **toward you when he's speaking to you, and after I alerted him**

11  **to that, he was very conscious of that and respectfully would**

12  **move away if I said that he was moving toward me.**

13  Q.    Now, with regard to Dr. Naumov and Dr. More, what, if

14  anything, did you observe about them talking about research?

15  **A.    I can't say that I recall having seen them.  I didn't see**

16  **them together very often.**

17  Q.    Did you ever observe, for example, doctor --

18              THE COURT:  Sustained.

19  BY MR. STROUSE:

20  Q.    What, if anything, did you observe regarding Dr. Naumov

21  stalking Dr. More?

22              MS. RILEY:  Objection.

23              THE COURT:  Sustained.

24              THE WITNESS:  I can't say --

25              THE COURT:  Lack of foundation.  Sustained.

1        Just to be clear, if I sustain the objection, you should

2   disregard any answer that's given.

3   BY MR. STROUSE:

4   Q.    Did you ever involve or see Dr. Naumov doing anything to

5   Dr. More that you would consider a negative?

6   **A.    I'm not sure I understand what you're asking.**

7   Q.    With regard to behavior of Dr. More towards Dr. Naumov,

8   what did you observe on that?

9           MS. RILEY:  Objection.

10          THE COURT:  Sustained.  I believe she testified she

11  didn't see the.

12  BY MR. STROUSE:

13  Q.    With regard to weekend e-mails, did you ever get weekend

14  e-mails from Dr. Naumov?

15  **A.    I don't recall.**

16  Q.    You don't recall?  Okay.  And with regard to longer than

17  needed conversations, did you ever observe Dr. Naumov having

18  such conversation?

19  **A.    I didn't pay attention that closely.**

20  Q.    Okay.  Would you say that Dr. Naumov is -- what, if

21  anything, would you say about Dr. Naumov being a talkative

22  person?

23  **A.    That's definitely accurate.**

24  Q.    Do you think they were -- what, if anything, would you

25  say about cultural differences with Dr. Naumov?

1          MS. RILEY:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. STROUSE:

4    Q.    What, if anything -- are you aware that Dr. Naumov is

5    Russian?

6          MS. RILEY:  Objection, Your Honor.

7          THE COURT:  I'll allow her to answer that question.

8          THE WITNESS:  I am aware that Dr. Naumov is from

9    Russia.

10   BY MR. STROUSE:

11   Q.    Okay.  And did that give you any idea that there were --

12   what, if anything, did it give you with regard to cultural

13   differences?

14         MS. RILEY:  Objection, Your Honor.

15         THE COURT:  I am going to sustain that objection.

16   BY MR. STROUSE:

17   Q.    Did you ever observe Dr. More and Dr. Naumov having

18   conversations, if you did?

19         MS. RILEY:  Objection.

20         THE COURT:  Sustained as -- sustained.

21   BY MR. STROUSE:

22   Q.    Okay.  How did they work together, if you observed that?

23   **A.    Can you specify what you mean by work together?**

24   Q.    What kind of relationship was it?

25   **A.    I couldn't say anything about their relationship.**

1  Q.    Did you ever observe, if you did, Dr. Naumov working in

2  the common area in the sitting area?

3  **A.    Yes, that did occur.**

4  Q.    And what did you observe about that?

5  **A.    He would be sitting there as students would come in and**

6  **have questions for either him or other professors.  He would**

7  **make conversation with people.**

8          MR. STROUSE:  I have no further questions, Your

9  Honor.

10          THE COURT:  Cross.

11          MS. RILEY:  I have no cross, Your Honor.

12          THE COURT:  Ma'am, thank you for your testimony.  You

13  are excused.  Please don't discuss your testimony with anyone

14  until the trial has been completed, and enjoy the rest of your

15  day.

16          THE WITNESS:  Witness thank you.

17      (End of testimony of Sarah Holbrook.)

18

19

20

21

22

23

24

25

1          (Plaintiff's Witness **ELENA SAFIROVA** sworn.)

2          THE COURTROOM DEPUTY:  If you would please be seated.

3    Speak clearly and loudly into the microphone, state your name

4    for the record and spell your name.

5          THE WITNESS:  My name is Elena Safirova.  Last name

6    is Safirova, S-like Sam-L-like apple-F-like Frank-I-like

7    iron-R-like run-O-like oven-V-like Victor-A-like apple.  And

8    the first name is Elena, E-l-e-n-a.

9          THE COURT:  Ma'am, just make sure you're speaking

10   into the microphone.  Thank you.

11       **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

12   BY MR. STROUSE:

13   Q.    Dr. Safirova, what do you do?

14   **A.    I'm an economist with United States Geological Survey.**

15   Q.    And where did you earn your PhD, if you did?

16   **A.    It's in economics, and I did it in -- I received my PhD**

17   **in 1999 from State University of New York at Buffalo.**

18   Q.    To whom are you married?

19   **A.    I'm married to Pavel Naumov.**

20   Q.    And how many children do you have?

21   **A.    We have two children, two daughters, 17 and 13.**

22   Q.    Okay.  And how long have you been married?

23   **A.    We got married in June 1990.  That makes it 27 years.**

24   Q.    And if you do, how do you know Dr. More?

25   **A.    Dr. More came to McDaniel College as an assistant**

1   professor of computer science one year after Pavel, and this is

2   how I met her.  She was his colleague and, you know, when she

3   came, they were the only two professors of computer science at

4   the department, and we invited Dr. More and her husband JC

5   (phonetic) to our house.  I think it was either when she was

6   offered the job and accepted it or a little later.  Because,

7   before that, she was working at another local college which was

8   further out from the job of her husband's.

9   Q.    And was there ever a time when you exchanged gifts, if

10  you did?

11  A.    Yes.  We would come to their house, they would come to

12  our house, they would bring little something.  I think it was

13  pretty cordial.

14  Q.    Were you aware, if you were, that Dr. Naumov and Dr. More

15  worked on papers together?

16  A.    Yes.  Actually, one day, you know, it turned out they

17  were the only two computer science professors at the same

18  department, and, you know, they were assistant professors, and

19  they had to publish to start their careers as professors.  So

20  they came up with joint project, because Pavel's specialization

21  is mathematical logic and logic and computer science, and

22  Sara's specialization is in cryptography.  So they tried to

23  marry or to put together those two fields so they could be

24  applied and used in both.  This is how they started doing

25  research.

1   Q.    Did you know, did they produce papers together, if you

2   did?

3   A.    Yeah.  They started working on it when Sara physically

4   came to McDaniel, because this is when they had time to

5   actually work together.  And so it was in 2006.  I think the

6   first paper out of this collaboration actually was published in

7   2009, because it takes time to publish a new line of research.

8   Some people are not quite sure of what it is, and you get some

9   rejections.  But I think, overall, they published, I think by

10  different accounts, either 12 or 13 papers.  I think.  Pavel

11  counted 12.  I think Sara, on her website, at some point was

12  counting 13.  But I don't think it's material.  But yes, it's

13  that amount of work.

14  Q.    Did you ever observe any difficulties between them, if

15  you did?

16        MS. RILEY:  Objection, Your Honor.  Foundation.

17        THE COURT:  Overruled.

18        THE WITNESS:  Can I answer?

19  BY MR. STROUSE:

20  Q.    Yes.

21  A.    So in the beginning, I think all the relationship was

22  very cordial and later on -- you know, when we met them, we had

23  two kids, and they had no kids, but they expected to get some.

24  I think their first son was born in 2008, and after that they

25  had twins a couple of years later.  I think Sara was acquiring

1  this additional burden.  She was more -- once again, this is my

2  position.  She was more irritated --

3          MS. RILEY:  Objection.

4          THE COURT:  Sustained.  Sustained.

5  BY MR. STROUSE:

6  Q.    With regard to maintaining two households, has that been

7  a reality for you?

8  A.    Yes, it's been reality for me.  And actually, this

9  reality is much worse than just maintaining two households and

10 spending money on two households.  It's basically, this whole

11 case just throwing my life as a mother --

12         MS. RILEY:  Objection, Your Honor.

13         THE COURT:  Sustained.  The jury should disregard the

14 statement beginning "this whole case."

15 BY MR. STROUSE:

16 Q.    But generally, how difficult has this separation been for

17 you?

18 A.    It's been very difficult because we've been married for

19 so long, we are parts of each other's life.  Right now, my

20 husband is working in temporary position in another state,

21 which is six hours away.  We have two teenage daughters, which

22 need a father, and they don't get enough attention from the

23 father --

24         MS. RILEY:  Objection --

25         THE WITNESS:  What else can I do?  I am the mother of

1  those children.

2        THE COURT:  Approach.  Approach.  Ma'am, I apologize.

3  Approach.

4        (Bench conference on the record.)

5        THE COURT:  Is there a loss of consortium claim in

6  here somewhere?  I haven't seen one.

7        MR. STROUSE:  No, there's no consortium claim.

8        THE COURT:  So where are we going now?

9        MR. STROUSE:  We're going, maintaining two

10  households.

11        THE COURT:  Well, she's talking about the emotional

12  toll and the loss of her husband.

13        MS. RILEY:  And you'll recall, Your Honor, that was a

14  charge, intentional infliction of emotional distress, that was

15  dismissed.  They abandoned that claim.

16        THE COURT:  She can talk about sort of the money that

17  it's cost him, he's living somewhere else.  To the extent she

18  knows about the money it's costing him, that he's living

19  somewhere else.  But she's trying to take this in another

20  direction now.  I'm not saying I'm unsympathetic, but in terms

21  of what is admissible testimony.

22        MR. STROUSE:  Okay.

23        THE COURT:  Next question.

24  BY MR. STROUSE:

25  Q.   What expenses, if any, have you had with regard to

1   maintaining two households?

2   A.    Well, we have our house in Rockville, Maryland, which we

3   bought assuming that we both live in it and our children live

4   in it and go to school in Montgomery County.  And this is how

5   we structured our life, and he would continue that position in

6   college.

7         Now, in addition to that, he has to rent an apartment at

8   his current place of employment.  I mean, it's much worse

9   conditions for him, but we still pay those $700 or $750 for

10  that residence.

11        In addition, we visit him with girls, or he comes to us,

12  and it's, as I said, 360 miles between the two bases.  We try

13  to visit each other because we're still a family, but having

14  this family is very hard.

15        In addition to that, it's not really expenses, but this

16  is the nature of my life.  When we structured this --

17              MS. RILEY:  Objection, Your Honor.

18              THE COURT:  Hold on.  Next question.  Next question.

19  BY MR. STROUSE:

20  Q.    How often does Dr. Naumov visit from New York?

21  A.    Either he visits from New York, or we go to him about

22  every three or four weeks, because it takes enormous amount of

23  time, and in addition to that money, and it also takes time

24  away from kids school if we go to visit, but we try to spend

25  some time together because he is our dad, and the girls need

1  him.

2  Q.    Is there expenses involved in visiting to New York?

3  A.    Yes, expenses are involved because, as I said, it's 360

4  miles.  You can count it by whatever federal rate, whatever.

5  It's driving.  And also the value of time.  Because I'm an

6  economist, and everybody in this room should understand that

7  value of time is also money, regardless of what law can say or

8  not.  So, yes, there are expenses.

9        And also, this apartment that he is renting, it comes

10  unfurnished, as customary in the United States.  So he has to

11  furnish this apartment.  He has other expenses.  Right now he

12  has, basically, a bed in that apartment and a desk for him to

13  work and a table to eat.  So when girls and I visit, girls have

14  to sleep on the floor.  There is not enough lighting in this

15  apartment, and nobody is paying us to maintain the second

16  household because, you know, all this happened, basically, to

17  break our normal life.

18  Q.    Okay.  Are there any other expenses related to having two

19  households?

20  A.    Well, there are lots of expenses.  There are expenses,

21  like, we have to maintain computers for girls because, you

22  know, he is professor of math and computer science.  He helps

23  girls with technical subjects in school, and he does it by

24  Skype.  So the girls have to have computers and cords to use

25  Skype --

1        MS. RILEY:  Objection.

2        THE COURT:  Ma'am, hold on.  Next question.  Next

3   question.

4        MR. STROUSE:  That's all I have.

5        THE COURT:  Cross.

6        **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

7   BY MS. RILEY:

8   Q.    Good afternoon, Dr. Safirova.

9        Dr. Safirova, do I understand from your prior testimony,

10  deposition, that your husband is on the health benefits that

11  you obtain through the federal government, is that correct?

12  **A.    Yes, that's correct.**

13  Q.    And is that still the case?

14  **A.    Yes.**

15  Q.    Now, Dr. Safirova, it's true, is it not, that since

16  August of 2015, your husband has been continuously employed,

17  has he not?

18  **A.    Yes, but all those jobs were temporary jobs.  So we never**

19  **know -- when one comes to the end, we don't know if the next is**

20  **coming up because it's colleges.**

21  Q.    In fact, Dr. Safirova, your husband currently earns more

22  than he earned at McDaniel; does he not?

23  **A.    I understand yes.**

24  Q.    Do we understand correctly that your husband, if he

25  should prove that there was a breach of contract, is seeking to

1    have McDaniel pay for his rent for an apartment for the next 15

2    years?  Is that your understand?

3    **A.     Well, honestly, I think he should ask for more, because**

4    **at this point we have absolutely no belief that he would ever**

5    **find permanent position.  And even if he finds this permanent**

6    **position, it's highly unlikely to be in the same general area**

7    **where I would have permanent position.  So given that I am 47**

8    **right now, if he finds it, say, in 15 years, it's, you know --**

9    **I have no reason to believe he would because it's -- college**

10   **isn't -- if you look at information, how often colleges fire,**

11   **for no reason, senior professors, you will see that it**

12   **practically doesn't happen.  You know why?  Because everybody**

13   **understands the enormous burden on people who have those tenure**

14   **positions.  I can give you some more information about what**

15   **tenure is and how it works.  Yes, I believe that --**

16           THE COURT:  Doctor.  Doctor, you have to just answer

17   the question asked, and then wait for your next question.

18           THE WITNESS:  Well, I don't know what question I'm

19   answering right now.  Yes, I think it should be more than 15

20   years.  That's my position.

21   BY MS. RILEY:

22   Q.    So, Dr. Safirova, do I understand from your testimony

23   that you don't expect your husband to be able to find a job in

24   the D.C. or Maryland or northern Virginia area for the next 15

25   years, maybe forever more?

1  **A.      Yes.   That's based on three years of his trying, this is**

2  **my estimate, yes.**

3  Q.      Now, isn't it true, Dr. Safirova, that in the last year,

4  your husband has only sent two applications to schools in the

5  D.C. or Baltimore metropolitan areas?

6  **A.      My husband sent applications to all schools which**

7  **announced that they are looking for professors with his**

8  **qualifications.   In every way, including places, like,**

9  **Kazakhstan, Hong Kong, I think Sweden, Japan, and pretty much**

10 **everywhere.**

11 Q.      Are you aware though that your husband only sent two

12 applications in the D.C. or Baltimore metropolitan area?

13 **A.      Well, I am not monitoring what announcements of jobs are**

14 **made.   But he sent applications to each and every job he can**

15 **put his hands on which is relevant to his qualifications.**

16 **        If you are suggesting here that my husband should go,**

17 **with his qualifications, to work as a janitor, I can tell you**

18 **that he probably would not be hired as a janitor because he is**

19 **highly overqualified for this position.**

20 Q.      Would you agree, Dr. Safirova, that your husband could

21 have applied to schools even that hadn't yet posted an opening?

22 **A.      No.   This is called cold calls, and as a person who has a**

23 **PhD myself, and I've done a few job searches myself, I can tell**

24 **you that cold calls usually do not work.   Maybe in legal line**

25 **of work, this is how it works.   But in higher education, and**

1   you had some other evidence, this is not how it works.  If you

2   just start sending resumes to all places which call themselves

3   colleges or universities, usually you cannot get anywhere.

4   Q.    Dr. Safirova, you weren't here earlier, but one of the

5   young alumni testified, who works as a computer scientist with

6   the Department of Defense.  And yet I noticed that in your --

7   isn't it true that in the last year your husband sent no

8   applications to work in the federal government here in D.C.?

9   A.    I don't think it's true because I believe he sent

10  applications to some jobs in federal government which are

11  relevant to his qualifications.

12        I can tell you that when we were just fresh out of

13  graduate school, you can apply pretty much everywhere because

14  you have no resume which says what you are good at.  You have

15  PhD in particular field, and that's pretty much it.  They

16  believe they can meld you into something, whatever they need.

17        This is where McDaniel College took advantage of my

18  husband.  They hired him.  They actually awarded him tenure,

19  and after that they threw him out.  Because at this point I

20  don't know -- you better know what happened with Dr. Stewart

21  and so on.  But basically, they melded him in the person they

22  want, and mid-career, when he cannot change what he can or

23  cannot do, they threw him out.

24        In the academic market in the U.S. and, as a matter of

25  fact, all over the world, as you get older, you get more

1    **mature, and you have some history of work.  So at this point my**

2    **husband has this CV of 60 or whatever publications.  He also**

3    **has skills in logic and teaching more theoretical topics in**

4    **computer science, because McDaniel College wanted this**

5    **previously, and now this is who he is, and there is not so much**

6    **demand in the whole higher education all over the world for**

7    **him, to offer him a full-time position.  This is the nature of**

8    **the market.**

9    Q.    Dr. Safirova, isn't it true that your husband wants to

10   work at only the most elite schools?

11   **A.    No, this is not true.  He's been sending applications to**

12   **all kinds of schools.**

13   Q.    Dr. Safirova, are you aware that just in Maryland, that

14   your husband has -- and in D.C. -- that your husband never

15   applied to Catholic University, Howard University, Georgetown,

16   Bowie State, Frostburg State, Hood College, Loyola College,

17   St. John's, Mount St. Mary's, Naval Academy --

18           THE COURT:  Can you slow down a little bit.

19   Actually, I'm going to ask both questioner and answerer if you

20   could just slow down a little bit as you're speaking.

21           MS. RILEY:  I'll repeat the question.

22           THE WITNESS:  No, I would --

23   BY MS. RILEY:

24   Q.    I haven't finished my question.

25   **A.    Yes, I would --**

1          THE COURT:  Ma'am, she's going to ask you a question,

2    and then you'll answer.

3    **A.      And then you already stated one question.  Should I make**

4    **notes of your questions?**

5    Q.    No.  I hadn't finished answering.  Are you aware that in

6    the list that your husband provided to us in discovery, that he

7    has admitted that he has not applied to Catholic University,

8    Howard University, Georgetown University, Bowie State

9    University, Frostburg State College, Hood College, Loyola

10   University of Maryland, St. John's, Mount St. Mary's, the Naval

11   Academy, University of Baltimore, Washington College, Coppin

12   State College, are you aware that those are among the many

13   schools that he has never applied to?

14   **A.      I think I am aware of this because the way academic**

15   **market works -- and I understand you lawyers don't understand**

16   **this -- is there is an announcement by a school, and it's a**

17   **national search.  It means anybody in the U.S. and, very often,**

18   **in the world can apply for this job, and they would hire for**

19   **this particular job the best candidate from all over the world.**

20   **If you just start sending cold turkey resumes to all those**

21   **schools, they will ignore it.  And I know how it works, and**

22   **this is not the way to find a position, just to start sending**

23   **resumes to all schools.**

24        **And he has tried that too.  But honestly, as far as I**

25   **know, your list that you get is the list of schools to which he**

1    actually has written a cover letter.  So if he sent a resume to

2    some employer who does not require a cover letter, it's not on

3    your list.

4         So honestly, I cannot tell you for sure whether he

5    applied -- I remember at some point he actually discussed with

6    me some position at Howard University.  I don't remember when

7    and where it was.  But, you know, if it's a job which is very

8    different from your qualifications -- I mean, he can apply to

9    Howard University to professor of literature position every

10   year, and I know and you know what the answer is going to be.

11   Do you know?

12            MS. RILEY:  I have no further questions.

13            THE COURT:  Redirect.

14         REDIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF

15   BY MR. STROUSE:

16   Q.    Dr. Safirova, do you know how many applications

17   Dr. Naumov has sent out?

18   A.    I personally have not counted them.  He counted, and he

19   told me at some point that it was --

20            MS. RILEY:  Objection, Your Honor.

21            THE COURT:  Sustained.

22   BY MR. STROUSE:

23   Q.    Would you -- can you give approximate number, if you

24   know?

25   A.    280.

1                MS. RILEY:  Objection.

2                THE COURT:  Sustained.

3       BY MR. STROUSE:

4       Q.    And he sent out many, many applications, is that --

5       A.    **Yes, that's correct.**

6       Q.    And the list that Ms. Riley mentioned, were they colleges

7       that had openings in computer science, if you know?

8       A.    **I mean, colleges, local colleges that she mentioned, I**

9       **never knew that they had openings in computer science.  If**

10      **Ms. Riley would kindly show me that they had openings, that**

11      **would be great, and I would tell her why those openings were**

12      **not appropriate.**

13           **I don't remember anything about those specific schools,**

14      **but this is my understanding.  Each individual school,**

15      **especially the one which has relatively small program, would**

16      **advertise for a professor when they need a professor.  And that**

17      **might be every two years, every three years.**

18           **In addition to that, often they would want professor with**

19      **specific qualifications, like somebody who is a specialist in**

20      **hardware engineering, which my husband is not.  So even if they**

21      **advertise for a professor of hardware engineering, sorry.  I**

22      **mean, we know how it will end because they will advertise it**

23      **for the whole nation and for the whole world, and they will**

24      **hire the best specialist in hardware engineering, and this is**

25      **not my husband.**

1   Q.    Okay.  Thank you very much.

2         THE COURT:  Ma'am, thank you for your testimony.  You

3  are excused.  Please don't discuss your testimony with anyone

4  else until the trial has been completed, and do enjoy the rest

5  of your day.

6         (End of testimony of Elena Safirova.)

7         (End of testimony of all witnesses on 1/23/2018.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Cindy S. Davis, Federal Official Court Reporter in and

4  for the United States District Court for the Southern District

5  of Maryland, do hereby certify that I reported, by machine

6  shorthand in my official capacity, the proceedings had in the

7  case of Pavel Naumov versus McDaniel College, Inc., case number

8  GJH-15-00582, in said court on January 23, 2018.

9        I further certify that the foregoing 68 pages constitute

10  the official transcript of an excerpt of the proceedings

11  consisting of witness testimony, as taken from my machine

12  shorthand notes to the best of my ability.

13        In witness whereof, I have hereto subscribed my name this

14  23rd day of January, 2018.

15

16

17

18

19             *Cindy S. Davis*

20             _____
             **CINDY S. DAVIS, RPR**
21             **FEDERAL OFFICIAL COURT REPORTER**

22

23

24

25