1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF MARYLAND

3
  PAVEL NAUMOV,              )
4                            )
              Plaintiff,     )
5                            )
       vs.                   )      CASE NUMBER 8:15-cv-00482-GJH
6                            )
  MCDANIEL COLLEGE, INC.     )
7                            )
              Defendant.     )
8  _____  )

9
        TRANSCRIPT OF PROCEEDINGS - TESTIMONY OF PAVEL NAUMOV
10           BEFORE THE HONORABLE GEORGE J. HAZEL
           TUESDAY, JANUARY 23, 2018; 9:30 A.M.
11                  GREENBELT, MARYLAND

12
  FOR THE PLAINTIFF:
13
       James C. Strouse, Esquire
14     STROUSE LEGAL SERVICES
       5401 Twin Knolls Road, Suite 7
15     Columbia, MD  21045

16 FOR THE DEFENDANT:

17     Donald E. English, Jr., Esquire
       Eileen Carr Riley, Esquire
18     JACKSON LEWIS, P.C.
       2800 Quarry Lake Drive, Suite 200
19     Baltimore, MD  21209

20
       Proceedings recorded by mechanical stenography, transcript
21 produced by computer.

22
   _____
23

24              **CINDY S. DAVIS, RPR**
            FEDERAL OFFICIAL COURT REPORTER
25          6500 CHERRYWOOD LANE, SUITE 200
               GREENBELT, MD  20770

1          <u>I N D E X   O F   W I T N E S S   T E S T I M O N Y</u>

2                    JANUARY 24, 2018, Volume 2

3

4   PLAINTIFF'S

5   <u>WITNESSES:_____</u>   <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

6   Pavel Naumov                    3       58        --         --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            E X C E R P T   O F   P R O C E E D I N G S

2        (The Plaintiff **DR. PAVEL NAUROV** was sworn.)

3            THE COURTROOM DEPUTY:  You may be seated.  Please

4    remember to speak loudly and clearly into the microphone, state

5    your name for the record and spell your entire name, please.

6            THE PLAINTIFF:  My name is Pavel Naumov.  It's P-like

7    Peter-A-like apple-V-like Victor-E-like -L-like Linda.  And

8    last name Naumov, N-like Nancy-A-like apple-U-like

9    umbrella-M-like May-O-like olive-V-like Victor.

10           **DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

11   BY MR. STROUSE:

12   Q.    Yes, did you give your name and address in Maryland,

13   Dr. Naumov?

14   **A.    My name is Pavel Naumov.  My old address in Maryland is**

15   **5301 Musket Court, Rockville, Maryland 20853.**

16   Q.    And what is your address in New York?

17   **A.    I live on campus at 91 Raymond Avenue, apartment 22,**

18   **Poughkeepsie, New York 12603.**

19           THE COURT:  If you could just try to make sure you

20   speak slowly and into the microphone.

21   BY MR. STROUSE:

22   Q.    And where did you teach before taking your position at

23   McDaniel?  Where did you teach?

24   **A.    Before coming to McDaniel, I was teaching at Penn State**

25   **at Harrisburg.  It's one of the campuses of Penn State in**

1  **Pennsylvania.**

2  Q.     And when did you get that position at McDaniel?

3  **A.     I was offered assistant professor position at McDaniel by**

4  **Tom Falkner in March 2005.**

5  Q.     I've put this material on the board.  What is this --

6            THE COURT:  Sir, let me just ask.  As you go through

7  them, if you can identify them by exhibit number so we can keep

8  track.

9            MR. STROUSE:  Yes, this is Joint Exhibit Number 1,

10  Your Honor.

11            THE COURT:  Thank you.

12            THE PLAINTIFF:  So this is my appointment letter,

13  signed by then-provost at McDaniel, Thomas Falkner, who offers

14  me tenure-track position at McDaniel, but it means that I need

15  to work up to six years, and then, based on relation of my

16  teaching and scholar activities and service, I will be awarded

17  or not awarded tenure.

18  Q.     And were you, in fact, awarded tenure?

19  **A.     Yes.**

20  Q.     And what is this letter?

21  **A.     This is letter from the same provost, Thomas Falkner,**

22  **dated April 2011, and he informs me that the Board of Trustees**

23  **of McDaniel College awarded me tenure, which is a right to**

24  **lifetime employment.**

25            THE COURT:  Exhibit number?

1          MR. STROUSE:  Oh, Exhibit Number 1 is the original

2   contract, and my Plaintiff's Number 7 is the second one.

3          THE COURT:  We're looking at Plaintiff's 7 now?

4          MR. STROUSE:  Yes, 7.  I can change it as I go.

5          THE COURT:  I'm not worried about how you do it.

6   It's just whenever you put a new exhibit up, just make sure you

7   identify it by number so that we know.

8          MR. STROUSE:  I'd like to introduce as Exhibits 1 and

9   7 of Plaintiff.

10          THE COURT:  It's admitted.

11          MR. STROUSE:  Thank you.

12   BY MR. STROUSE:

13   Q.    Now I'm going to produce this last letter.  Could you

14   identify this, Dr. Naumov?

15   **A.    Yes.  This is an annual letter from McDaniel President**

16   **Roger Casey, where he informs me that already for several**

17   **years, there will be no faculty raises, and my salary will**

18   **remain at $77,450.  This is dated October of 2015.**

19   Q.    How much were you making at that time?

20   **A.    I believe this is my salary.**

21   Q.    Your salary was what?

22   **A.    I believe this states correctly my salary at McDaniel at**

23   **the time when letter was written and when I was teaching there,**

24   **$77,450.**

25          MR. STROUSE:  And I'd like this admitted as

1  Plaintiff's 8, Plaintiff's Number 8.

2  BY MR. STROUSE:

3  Q.    Now, Dr. Naumov, are you married?

4  **A.    Yes.  I met my wife in high school.  We went to magnet**

5  **program back in Russia, in Moscow.  We were 14 years when we**

6  **met.  We waited six years before getting married at 20, and**

7  **this year we'll celebrate our 28th anniversary.**

8  Q.    And what degrees does she have?

9  **A.    My wife, Elena, who testified yesterday, has PhD in**

10  **economics, and she also has undergraduate degree in economics**

11  **from SUNY-Buffalo and undergraduate degree in economics from**

12  **Moscow State University, which is leading university in Russia.**

13       THE COURT:  Sir, again, I need you to slow down.

14  Repeat that and then --

15       THE PLAINTIFF:  So my wife has undergraduate degree

16  from most respected university in Russia, Moscow State

17  University, and she also has PhD in economics from

18  SUNY-Buffalo.

19  BY MR. STROUSE:

20  Q.    And do you have any children?

21  **A.    Yes, we have two daughters.  One of them is present here**

22  **today and the other is at school.  Victoria, the older one, and**

23  **Veronica is younger one.**

24  Q.    And with regard to your job efforts, how many

25  applications, if you remember, did you make for attending or

1  trying to get a position in colleges and universities?

2  **A.    Yes.  Last time I counted, since our conversation with**

3  **Stewart, which I would argue was in violation of Title IX**

4  **policy, since that conversation when she suspended me, I**

5  **applied to the best of my -- the way I counted is 279 different**

6  **places.  This is probably a little bit less than actual number**

7  **because there were some places where my CV was filed without**

8  **actually writing cover letter.  This is number without letter.**

9  **I wrote so far, from August or September until today, 279.**

10  Q.    And is this the first page of the list of colleges and

11  universities that you applied to?

12  **A.    Yes.  I believe it was -- the whole list is for almost**

13  **three years, and this is list of first year when I started to**

14  **apply.**

15  Q.    How many colleges and universities did you apply to in

16  the general area, in the Rockville area where you live?

17  **A.    Well, I didn't apply to any universities in Rockville**

18  **because I am not aware of any of them.  The academic job market**

19  **is national, at best, or maybe international.**

20  **Again, as my wife said yesterday, positions are**

21  **advertised online everywhere, and they are seeking best**

22  **candidate who fits the job description.**

23  **I applied to -- when all this started, I applied -- well,**

24  **after Roger Casey unlawful -- terminated my tenure at McDaniel,**

25  **I was required to apply everywhere, until I got first offer.**

1  So from January until end of August, I was applying to any

2  position that remotely fits me.  I have undergraduate degree in

3  mathematics, so if it was a position in mathematics, I would

4  apply.  If it was a position in computer science, I would

5  apply.  I applied for positions in U.S.  I've applied for

6  positions farther away.

7       Now, after I got August 1st, this temporary position for

8  one year in New Jersey, of course, I became a little bit more

9  selective.  I didn't apply for similar positions because I

10  already had one, although temporary, but I still kept applying

11  to many different places, and I probably have at least those

12  applied.

13  Q.   What was your first position you got since McDaniel?

14  A.   So I applied, as I said, to absolutely as many places as

15  I can.  Usually, our conversation on the phone or on Skype

16  would start why are you leaving McDaniel.  What can I say?  I

17  told them about my situation and the litigation against me,

18  which I believe are not correct, and usually that's how the

19  conversation would end.

20       And I think what happened New Jersey, they just got

21  desperate.  They needed somebody to teach classes in William

22  Patterson University.  I never heard of William Patterson

23  University before.  Although I had heard of schools in New

24  Jersey before, but I had never heard of William Patterson.

25  They called me in August and said can you come next week.  I

1  said okay, and that's how I started.  And then I lived there

2  for three nights, staying in hotel in New Jersey, and would

3  drive back to Maryland on Thursday night, and returning back on

4  Monday morning to spend the weekends with my family.

5  Q.    What did you do after Patterson?

6  A.    After Patterson, I was lucky where a position was

7  advertised, a temporary position, which kind of fit into what

8  I'm doing and matched my interests and my publications.  It was

9  Wesleyan University, in Bloomington, Illinois.  I was offered

10  this temporary position again, and I packed my car and drove to

11  Illinois.  And from there I was not able to fly as often as

12  drive from New Jersey, but I would -- once in few weeks I would

13  drive up to Chicago for three hours, park my car, and take

14  Sprint Air from Chicago to Baltimore.  And cheapest flight was

15  at night, so my wife would meet me at airport at one in the

16  morning.  Usually it would be late.  Then I would fly back on

17  Sunday.

18              MR. STROUSE:  Could I have this introduced as

19  Plaintiff's Number 9, Your Honor?

20              THE COURT:  It's admitted.

21  BY MR. STROUSE:

22  Q.    Now, given that you're highly specialized in computer

23  science and mathematics, why did it take so long for you to get

24  a position?  How long did it take for you to get a position at

25  William Patterson?

1  A.     So for William Patterson, again, I applied for positions

2  somewhat selectively before termination and completely to

3  everything under the moon that remotely fits me, no matter what

4  rank or level, position it is.  I started to apply in January.

5  And so from January until August, what is it?  Is it seven

6  months?  I think seven months before I got this position at

7  William Patterson.

8  Q.     Okay.  And how long have you been at Vassar?

9  A.     I was lucky.  From William Patterson, I kept applying to

10  different schools.  It was just -- not William Patterson.  At

11  Illinois Wesleyan.  It was year-and-a-half appointment, so my

12  position would terminate year and a half after it started.

13         So I kept looking, and I was invited to have Skype

14  interview with Vassar, and that was in summer of 2016.  I

15  believe I actually had phone interview with department chair

16  driving from Illinois Wesleyan in Ohio.  I stopped for one

17  night to sleep in Ohio, and that's when department chair first

18  conducted interview.  I already came from Maryland and had

19  interview here in Maryland with whole department.

20  Q.     And how long have you been at Vassar?

21  A.     So I started teaching there in August 2017.  I think,

22  technically, my appointment started in July 2017, but I started

23  teaching at end of August, beginning of -- no, just end of

24  August.  Of course, at Vassar --

25  Q.     How many years have you been there?

1  A.    That means I have been there year and a half.  I came

2  there on a one-year appointment, and my appointment was renewed

3  for one more year appointment last May.

4  Q.    Okay.  And what kind of institution is Vassar?

5  A.    Vassar is a highly selective liberal arts college.  It's

6  probably best known for being first women's college in United

7  States.  It was founded during Civil War as the first college

8  institution to provide high education for women.  Vassar is a

9  founding member of Seven Sisters.  The coalition, in fact,

10  Seven Sisters were founded on Vassar campus.  Vassar decided to

11  become coeducational when it's sister -- or its brother Yale

12  became coeducational.  At the same time, Vassar became

13  coeducational as well, but it still thinks of itself as part of

14  the Seven Sisters.

15  Q.    Now, with regard to your curriculum vitae, how many

16  publications do you have now?

17  A.    You want me to identify this?  So this is first two pages

18  of my curriculum vitae.  I have been lucky with everything in

19  last decade, when I started to work with Sarah, and I continued

20  later on.  I published lots of papers.  We have now 60 journal

21  and peer-reviewed conference papers that are published in

22  different venues.  And I have 12 more papers here on this CV

23  listed as unreviewed.  So I have 12 more papers which I'm

24  expecting to hear back soon.

25  Q.    How is this considered, say, in a place like McDaniel?

1   A.      When I came to McDaniel, we all -- when people come to

2   McDaniel as a tenure-track faculty, they have meetings -- as

3   part of interview, they have meetings with Faculty Affairs

4   Committee, and Faculty Affairs Committee, at least the guy that

5   talked to me, said we don't necessarily have even expectation

6   that you will publish; it's good to publish for your tenure,

7   but we count our activities as well.  And I remember talking

8   about exactly the same speech from different member of the

9   Faculty Affairs Committee.

10         When I looked at my colleagues -- for example, this is

11  joint math and computer science department.  So if I look at

12  math side, Spencer Hamblen, who is now chair of the department,

13  I believe he published one paper when he was graduate student,

14  and he had a second one, but he was always talking about

15  writing, and I don't know if it was published or not because I

16  left.

17         I think what I remember, when we hired new chair, you saw

18  Bob Boner yesterday, and he was chair all the time, and he was

19  retiring, we were looking for a new senior person to become

20  chair of the department.  Italo Simonelli eventually was

21  chosen, and I remember Bob Boner riding around campus and

22  saying he has 10 publications, and we should hire him for

23  chair; he was very good researcher.

24         I think that full professors, maybe one or two who have

25  similar research record.

1  Q.    Let me ask you.  Of your publications, how many have been

2  with female authors?

3  A.    Yes, I had long history of working with female students

4  on research.  Sarah originally encouraged me, and we started to

5  do something jointly.  But when she got pregnant and I

6  continued by myself, I published papers with 13 undergraduate

7  students, seven of them are women.

8       In computer science, percentage of students who graduate

9  with undergraduate degree, women who graduate with

10 undergraduate degree in mathematics is around 11.  More than

11 half of my students with whom I worked were women.

12      Two of them came yesterday, Brittany and Meg.  There are

13 several more students.  One of them is in university.  We had

14 together paper we finished working over Skype, because I left

15 the university, but we finished over Skype, and it was accepted

16 to International Journal of Artificial Intelligence.

17      I had a student from Iran.  She took my -- I was teaching

18 in 2014, a summer class in Germany, and she took this case, was

19 interested in what I was talking about, and we started to work

20 over internet.  Eventually, I published two papers with her.

21      Funny -- well, mostly a funny thing, but while we were

22 working, at some point she was arrested for her head scarf

23 falling down from her head --

24 Q.    About how many papers did you publish?

25 A.    I published, altogether, 41 papers coauthored with women

1    **out of 60.**

2           MR. STROUSE:  Your Honor, I'd like to introduce his

3    CV as Plaintiff's Number 10.

4           THE COURT:  It's admitted.

5    BY MR. STROUSE:

6    Q.   Now, let me ask you a few questions about Sergeant

7    Immler, who we might hear from tomorrow.  What do you know

8    about Sergeant Immler, if you know?

9    **A.    Nothing.  I had been working at McDaniel for over 10**

10   **years.  I have never met Sergeant Immler.  I have no idea how**

11   **he looks like.  I never heard about his existence until all of**

12   **this started.**

13         **Now, defense will claim that he conducted**

14   **investigation --**

15         THE COURT:  Next question.  Next question.

16   BY MR. STROUSE:

17   Q.   Did Sergeant Immler interview you at all?

18   **A.    No.  He never interviewed me.  He had all opportunities**

19   **to interview.  He claims that he conducted investigation.  It**

20   **seems to me a fair thing to do is to talk to the person you**

21   **accuse and who you investigate.  How could it be a fair --**

22         THE COURT:  Next question.  Next question.  Hold on,

23   Mr. Strouse.

24         Sir, I just need you to answer the question that's posed

25   to you; that's all.

1          THE PLAINTIFF:  Okay.  I'm doing my best.

2          THE COURT:  I appreciate that.

3    BY MR. STROUSE:

4    Q.    If you would look at this document, could you identify

5    this document?

6    A.    Yeah.  This is a printout from I call Apple calendar,

7    where I kept track of all my schedules, appointments for many

8    years, since -- for last about 10 years probably, and at least

9    everything that I do, most of it.  And so this is printout of

10   my calendar for months of May and June of 2013.

11   Q.    Did you know when Sergeant Immler was doing his

12   investigation?

13   A.    As I now know after I file lawsuit, I learned about this,

14   and I understand that he did his investigation in May and June,

15   and the results of his investigation were discussed at, I

16   believe, July 3rd meeting of that year.

17   Q.    And in terms of his investigation, were you at all

18   involved, to your knowledge?

19   A.    I was not involved.  I have never seen him.  Nobody

20   talked to me during this investigation.  And again, I was

21   available on campus.  In May, I was still teaching classes.  At

22   end of May we had commencement; I was there.

23         In June, we had -- Sarah was leaving, so Jeanine Stewart

24   authorized search for a temporary person to replace her.  I was

25   very active part of the search.  I was there several days a

1  week.  I checked my e-mail all the time.  I would always be

2  available.  No, nobody contacted me in terms of conducting this

3  investigation.

4  Q.    And at all times during that time, you were on campus?

5  A.    I was either on campus or I would be happy to come to

6  campus.  In fact, on July 1st, I believe two days before that

7  meeting where this investigation was discussed, I met with

8  Jeanine Stewart.  We met on a different topic.  We talked about

9  my grant application, and we talked about who will be the next

10  chair.  She never brought up the issue of any investigation

11  that she authorized.  She clearly knew that I was there,

12  available to talk to anyone, including investigator.

13          MR. STROUSE:  I'd like to introduce this as

14  Plaintiff's Number 28, Your Honor.

15          THE COURT:  Is this the same document that was 10?

16  The document he has in front of him?

17          MR. STROUSE:  Yes, Your Honor.

18          THE COURT:  Very well.

19  BY MR. STROUSE:

20  Q.    Now I'd like to ask you a few questions about

21  Dr. Sarah More.  How was it that you met Dr. Sara More?

22  A.    In March of 2015, I accepted -- well, 2005, sorry.  I

23  accepted a tenure-track position at McDaniel College.  I

24  started to come to department to get to know faculty, and they

25  invited me for department picnic.  And actually, I believe my

1  wife and Victoria also came to the same picnic.  During those

2  events when I tried to interact with them, they said we have

3  second position that we have not been able to fill, and one of

4  the candidates whom we all liked was Sara More, and they asked

5  me whether I find that she would be a good fit.  We had some

6  concerns about her area of interest being very close to mine,

7  but I thought it's an interesting candidate.  So we invited --

8  in the fall we invited Sarah to come for second round of

9  interviews, but it was mostly meeting with me, and she got job

10  offer.

11  Q.    Now, how often have you seen her since your sabbatical

12  year in 2011?

13  A.    Sarah got pregnant with twins in spring of 2011, and she

14  told us about this.  I went on sabbatical in the fall.  We had

15  very little interaction there because I was not there all the

16  time; I was doing research.  I would come from time to time to

17  department.  But she went on bedrest.  As you know, twins

18  usually -- well, often lead to bedrest, and she went on bedrest

19  in middle of October.  So she was completely off campus from

20  that time on.

21        In the spring of 2012, she went on parental leave, and

22  she was not on campus at all.

23        In the fall of 2012, she had sabbatical.  She would come

24  occasionally on campus, but I would see her very, very rarely,

25  and there would be almost no interaction.

 1          So since last time we actively interacted in, I would say

 2    May 2011, all the way until she comes back in January 2013 or

 3    February 2013, there was almost two years we had no

 4    interaction.

 5          (Trial recessed for the Court to take address other court

 6    matter.)

 7          (Direct Examination resumed.)

 8    BY MR. STROUSE:

 9    Q.    Have you received any awards or grants for working with

10    female college students?

11    A.    Yeah, so first, when we worked with Sarah, she suggested

12    that we would involve female undergraduate students into our

13    research.  We had a very successful PhD program, and she

14    impassioned to bring female students.  So we applied for this

15    grant that would give students stipend to work on research and

16    not to seek on-campus jobs.  It didn't pay anything to us, but

17    it gave more money to students, and there were also some pile

18    of money for conference travel.

19          That project was not very successful.  We worked for a

20    year.  We didn't have any publications out, and Sarah got

21    pregnant with second -- well, with her second and third child.

22          At that time I alone reapplied for the same grant from --

23    this is from CRAW, Computer Research Association, Committee on

24    Women, and I applied it just to students Brittany Nicholls and

25    Sarah Holbrook.  Sarah came here yesterday.

1          After that, we worked, and we were much more productive.

2    We had several papers published.  Sarah used this pile of money

3    to go to a conference with me in Toulouse, France, and Brittany

4    went to different conference where she co-presented paper with

5    me.  And that was paid by our grant.  It's a special

6    scholarship from Association for Computing Machinery for women,

7    graduate and undergraduate students.  So all eligible to apply.

8    She was undergraduate; nevertheless, she won this award and she

9    went to New Orleans.

10          Right now at Vassar, a similar award was given to my

11    student at Vassar, Kiya Dorcha (phonetic).  She has very

12    interesting mix of German and American heritage, but she

13    will -- next week, she, I, and my coauthor Jia Tao will go to

14    New Orleans to present two papers at a major conference in

15    artificial intelligence.

16    Q.    Now, with regard to Sara More, what did you publish

17    together?

18    A.    We published 12 papers, working very closely together

19    over several years.

20    Q.    Were you required to work with Sara More?

21    A.    No.  There was no expectation to publish 12 papers, at

22    McDaniel, at least.  Maybe at more research-focussed schools

23    but not at McDaniel.  Certainly, there's no expectation for her

24    to work with me.

25          I can tell you right now I have several coauthors.  One

1    of them is my former department chair at McDaniel.  We're still

2    working online.  I'm not allowed on campus, so we work over

3    Skype.  We write paper.

4          But I also have female coauthor Jia Tao, whom we now

5    publish 17 papers.  She used to be at the visiting faculty at

6    Bryn Mar College.  Now she's at Lafayette College.  We worked

7    together mostly on line.  We started in preparation with

8    corporation with Zoya (phonetic) in Germany.  It's interesting

9    project.  I have one paper with her right now.

10         So what I'm trying to say, people work with all kinds of

11   different coauthors if we want or by ourselves.  There's no

12   expectation or obligation for anyone to work with your

13   colleague in your department.

14   Q.    Okay.  And you've worked with female students as well?

15   A.    Yes.  Out of 13 students with whom I published papers --

16   I worked with many more students, but these actually had

17   results and we published papers.  But published papers with 13

18   students, seven of them are women.

19              THE COURT:  Counsel, approach, please.  Counsel

20   approach, please.

21         (Bench conference not transcribed.)

22   BY MR. STROUSE:

23   Q.    With regard to Dr. More, how did you feel you worked with

24   her?

25   A.    I'm sorry?

1   Q.    With regard to Dr. More, how did you feel that you worked

2   with her?

3   A.    I think it was very productive relations.  We started

4   in -- once she came, I remember I was actually sitting in

5   basement in our house, next to my wife, and I asked her, look,

6   we have this new colleague and she seems to be interested in

7   similar areas, in cryptography and security; I have logic;

8   maybe I could work with her.  My wife encouraged me to work

9   with Sarah, and we started to look at places where her interest

10  intersect with mine by just Googling first, security and logic,

11  and I started to read some papers.

12         Then one day, I remember I was teaching class, and there

13  was this notion of dining philosophers.  I was passing her

14  office.  I poked my head in and said did you know I was

15  teaching dining philosophers.  She said yeah; in cryptography

16  we have dining cryptographers.  I said what is that, and she

17  explained to me what dining cryptographers are, and we started

18  to think about them, and somehow out of discussion about dining

19  cryptographers, we have 12 papers.  That was much more than I

20  produced when I was writing papers by myself.  I was publishing

21  one paper a year.  With Sara, we started to publish four papers

22  per year.

23         So that was a big boost, and I was very excited about

24  those years.  And I understand that after two pregnancies, she

25  was busy with family, and she lost interest in doing this, and

1    I respected this, and I never wanted more.

2    Q.    What difficulties if in I did you have with her?

3    A.    I personally had very little difficulties.  The only

4    problem I had is that she is very secretive, closed person, and

5    it's hard to understand what is happening with her.  When she

6    came back after this almost three years of us not interacting

7    with each other, she clearly was upset about something.  I

8    asked her many times what is it, and she said no, you should

9    guess it by yourself.  I cannot guess it.  I tried to guess.

10         I suggested to her to go to our peers department chair,

11   sit down and maybe he can try to mediate whatever conflict

12   there is, because I don't know what I'm accused of or why she's

13   not here.

14         I actually went to the department chair and said would

15   you do it.  He said, Pavel, I don't really like to do it, but

16   if you ask me kindly, I will.  I went back to her.  She said

17   maybe we should do it.  Wait for a while.  Then she said no,

18   let's not do it.

19         So that was my issue.  I had no other issues with her.

20   Q.    Okay.  Now I'm going to show you a couple e-mails.

21   They're marked to Sharon Morrell, but this is an incorrect

22   marking.  It's related to Sarah.  According to the defense,

23   this was some kind of computer glitch.  But do you recall this

24   e-mail?

25   A.    Yes.  This is one of my e-mails.  I think it's dated

1    **August 2010.  So one of -- we have been working -- so this one**

2    **is -- yeah, this is about revising some paper and also talking**

3    **about teaching and which classes, how we need to finish**

4    **teaching classes, and also mentions about research.**

5    Q.    Is this one of your weekend e-mails?

6    **A.    Yes.  I think according to the header, it was sent on**

7    **Saturday, August 7th.**

8              MR. STROUSE:  I'd like this entered as Plaintiff's

9    Number 11, Your Honor.

10             THE COURT:  It's admitted.

11   BY MR. STROUSE:

12   Q.    Now, if you look at the next e-mail, this again is on the

13   weekend, Saturday, November 21st.  What is this e-mail about,

14   if you remember?

15   **A.    That seems to be e-mail purely about research, when we**

16   **finish the paper, and we try to edit this paper, do revisions**

17   **to different pages, and this e-mail, indeed, was sent on**

18   **Saturday, November 21, 2009.**

19             MR. STROUSE:  I'd like this entered as Plaintiff's

20   Number 12, Your Honor.

21             THE COURT:  It's admitted.

22   BY MR. STROUSE:

23   Q.    Now, if you look at the next e-mail, what, if anything,

24   is this about?

25   **A.    When Sarah was leaving, it's customary in academia, at**

1   least, to take leaving person for lunch.  When I left Penn

2   State-Harrisburg, department took me to lunch.  And here,

3   before Sarah was leaving, I was faculty in mathematics and I

4   was chair, I took her out for lunch.  Expensive; I took her for

5   dinner.  So it was natural to invite leaving person to go for

6   lunch.

7           I tried to arrange department lunch.  She was chair.  It

8   would be strange for her to arrange lunch for herself.  So I

9   felt as long as I am campus faculty, I would step up and try to

10  arrange this lunch.  I went to my colleagues on math side of

11  department.  Each of them told me that we would rather not go.

12  If you really want us, we will go, but we don't want to.

13          I don't know what the issue there was, but I felt the

14  best I can do is to invite Sarah myself for a lunch.  Because

15  she lives in Baltimore, and I know it's very hard for her to

16  get away from kids.  She had twins and plus a year older,

17  Brandon.

18  Q.    Were you --

19  A.    So I --

20          THE COURT:  Let him ask his next question.

21  Q.    Did you ever have lunch?

22  A.    We had lunches prior, I think.

23  Q.    I meant this time.

24  A.    This time, no.  She said I will think about this.  She

25  thought for a week, approximately.  Then afterwards I asked

1  again, said do you want to do it or not.  I don't care.  She

2  said I would rather not, and that was the end of the

3  conversation.

4  Q.    What about social interactions with Sara More?  What, if

5  anything, were there?

6  A.    So we -- when we started to work, I think we both thought

7  about each other as close friends.  We would sit for long

8  hours, talk about work, talk about research, talk about our

9  family lives, way we live before, what medical-health issues

10  we've had, kids, everything under the moon.  She would come

11  to -- she would visit our house several times, interacted.  And

12  Jesse came as well, and last time she brought all her three

13  kids to my house.

14        We visited them as well.  We first visited an apartment.

15  After, they moved to their current house in Baltimore.  We had

16  been at both of them.  I think in Baltimore we went to -- after

17  Brandon was born, we brought some presents and went to see

18  Brandon.

19  Q.    Okay.  With regard -- were you ever charged with sexual

20  advances or sexual harassment towards Dr. More?

21  A.    I have never been charged in sexual harassment or sexual

22  advances against Dr. More or any other person.

23  Q.    How about gender discrimination?

24  A.    I have never been charged with gender discrimination

25  against Dr. More or anyone else.

1  Q.    Has anyone ever lodged complaints about you other than

2  Dr. More?

3  A.    I am not aware of Dr. More lodging complaints about me.

4  I am aware of Jeanine Stewart filing complaint.  But no, I'm

5  not aware of any other complaints about me nor by anyone else.

6  Q.    What did you do when Dr. More -- when you heard that

7  Dr. More was going to Johns Hopkins and stepping down as

8  chairperson?  What did you do to convince her to stay, if you

9  did?

10  A.    I didn't.  She was leaving before that to National

11  Security Agency and that I felt -- well, first, I felt that

12  National Security Agency is not a good place for her.  She's a

13  very strong, opinionated person who would not fit into this

14  half-military environment of NSA.  So I told her about this.

15       And Tom Falkner, who will testify, I believe, tomorrow,

16  mentioned to me that -- to say, Pavel, I wish one day we sit

17  down together and you will tell me whatever problems between

18  two of you.  So I thought maybe we had some problems, and I

19  went to talk to her, and I later sent her e-mail when I was in

20  Japan.  I sent e-mail to her and her husband at same time,

21  saying, look, if we have problems, let's try to fix them.

22       She stayed at McDaniel.  I think that also part of it is

23  because security clearance took too long, so this job was given

24  to somebody else.  She was offered another job, and that was of

25  less interest.  I don't know what details are, but she stayed

1  at McDaniel.

2      But when she started to leave again, and she left for

3  Johns Hopkins.  I personally applied for this position at Johns

4  Hopkins before coming to McDaniel, when I was looking for jobs.

5  We both later learned that we both applied for these positions

6  at Johns Hopkins.  They did interview me.  I don't remember if

7  they interviewed her.  Not interview.  They interviewed me by

8  phone.  And she might have even got on campus.  But eventually,

9  she accepted whatever she accepted.

10      MR. STROUSE:  Let me enter this "lunch" memo as

11  Exhibit 13, Your Honor.

12      MR. ENGLISH:  What memo?  I'm sorry, what document?

13      MR. STROUSE:  Document 13, about lunch.

14      MR. ENGLISH:  Got it.

15  BY MR. STROUSE:

16  Q.   Now, did there come a time when you wrote a three-page

17  letter to Dr. More?

18  A.   Yes.  So as I said, when she came back from her

19  sabbatical, she clearly wasn't happy.  She started to tell me

20  that I am too dictatorial as a department chair.  I ask her did

21  I do anything against your will.  She said no, not against mine

22  but other people.  Well, people have disagreements.

23      Nevertheless, I stepped down, and I sent e-mail to Tom

24  Falkner that I am stepping down, and I suggested to him to

25  appoint Sarah as chair; she seems to be capable.  I said we

1  **need to talk about problems.  If we have problems, we need to**

2  **talk about them; find what those problems are and try to**

3  **resolve them.  Sarah said no, I don't want to talk about**

4  **problems.**

5         MR. ENGLISH:  Objection as to hearsay.

6         THE COURT:  Sustained.  Unless he's really leading up

7  to it, I haven't heard an answer to your actual question.  So

8  I'm going to sustain as, at least thus far, to non-responsive,

9  but also, that specific thing he was saying was hearsay.  So

10 ask another question.

11 BY MR. STROUSE:

12 Q.    With regard to this letter, it talks about

13 communications, problems, and emotional connection.  Would you

14 explain that?

15 **A.    So I spent long time trying to understand what could be**

16 **the source of it, because she doesn't tell me why she is not**

17 **happy here, and I thought that writing something on paper,**

18 **rather than saying it to her face, would be more meaningful,**

19 **and if she wants to talk about this more, we can talk more**

20 **about this.  If she doesn't want to talk about this, then we**

21 **probably should just try to interact as less as possible so she**

22 **would not feel uncomfortable.  And that's what I did.**

23        **After I wrote this letter, I gave it to my wife.  She**

24 **edited it, and I gave it to Sarah, and it seems to be after**

25 **this letter she had no complaints.  I asked her several times**

1  if she had any complaints.  She had no complaints.  When she

2  was leaving, I asked the same question.  She said no.

3       I know that there is some document that defense found

4  somewhere that says -- one of the documents that they have

5  says -- Stewart claims that she had no -- Sarah had no

6  complaints with me during the last year.

7            MR. STROUSE:  Let me enter this as Plaintiff's Number

8  14, Your Honor.

9            THE COURT:  Very well.

10 BY MR. STROUSE:

11 Q.   Now, with regard to taking Dr. More to her car, how many

12 times did this happen, if it did?

13 A.   Yes, this is something that somehow came from I don't

14 know where.  So here's the story about me taking her to the

15 car.  We need to look at definition of what "take" means.

16 Strict "take" means, look, let me walk you to the car.  That

17 happened just once.

18       Namely, when Brandon was born, she was on parental leave,

19 and I was teaching some classes for her.  She came, she brought

20 Brandon, I said do you want me to help you with baby carrier

21 and stroller and diaper bag and everything else to the car.

22 She said thank you for your help.  I walked her to the car, we

23 loaded it with all those items, and she drove away with

24 Brandon.

25       There have been other cases when we would finish working

1    together, in the beginning.  I believe it was in January 2007,

2    we would finish working on together.  Campus would be empty

3    because most people don't work in January at McDaniel.  So we

4    would walk out together to parking lot and get into car.  We

5    kind of continued to do this in the beginning of semester that

6    followed, and Sarah approached me and said, Pavel, I don't mind

7    walking with you, but it doesn't look appropriate if we do it

8    too many times too often.  I said --

9    Q.    Did you stop doing it?

10   A.    Yes.  I said no problem.  I not only stopped walking with

11   her ever, I actually changed my schedule so I would have office

12   hours in the evening when she leaves.  So there would be no

13   other adventures or situations where we would walk together.

14   If she's not comfortable with this, I have no problem with

15   this.  So since then, I never walk with her.

16   Q.    With regard to comments on her sweater, when, if any

17   time, did you comment on her outfits?

18   A.    This is another evidence that shows how unfair all this

19   investigation was against me.  There is a document which is

20   complaint by provost, the second person in charge on campus,

21   against me, and this complaint lists what the provost is

22   accusing me of.  There's nothing about sweater.  This is

23   something which was sneaked in.  I have never seen it.

24   Apparently, it comes from --

25               MR. ENGLISH:  Objection.

1          THE COURT:  Sustained.  You can restate your

2    question, and you have to answer the question that he asks you.

3    BY MR. STROUSE:

4    Q.    With regard to the sweater incident, what do you

5    remember, if anything, about that?

6    **A.    I do not remember making any comments about her sweater**

7    **whatsoever.**

8    Q.    Okay.  How about other times about her outfits?

9    **A.    Only time when I remember talking about her outfit is**

10   **shortly before she left.  One day she came in in all red, red**

11   **dress, very formal looking one, and I asked Sarah do you have**

12   **anything coming up in the evening.  She said yes; I need to go**

13   **somewhere.  That was all comments that I remember in 10 years**

14   **making about her outfit.**

15       **She did make comments about my outfits.  She talked my**

16   **pants to students --**

17          MR. ENGLISH:  Objection.

18          THE COURT:  Overruled.  Not for the truth of the

19   matter.  Overruled.

20   BY MR. STROUSE:

21   Q.    With regard to this next e-mail, could you identify this?

22   **A.    Yes.  This is Sara's e-mail from May 28, 2013, and my**

23   **reply -- is it also the same date?  Yeah, I think the same date**

24   **of May 2013.**

25   Q.    Yes.  What, if anything, were you discussing on this?

1  A.     So because she refused to talk about what issues are, she

2  said -- and this is in her e-mail on bottom of this.  She says,

3  Pavel, let's start from beginning; let's forget what happened

4  before --

5          MR. ENGLISH:  Objection.  Hearsay.

6          THE COURT:  It's not for the truth of the matter.

7  Overruled.  You can continue.

8          THE PLAINTIFF:  Let's start again and let's each --

9  let's discuss issues not in the past but in the future, when

10 one would come up.  And something came up where she wasn't

11 happy, and I felt like we agreed to talk about issues as they

12 come up.  So I said I'm not happy about this and that because

13 you asked me to tell you about this from now on.

14 BY MR. STROUSE:

15 Q.     How about conversations longer than necessary?

16 A.     This is another lie perpetrated by Stewart.  I believe

17 this quote comes from Immler's report -- now I know it comes

18 from Immler's report when he talked to Sarah.  Sarah said that

19 we had longer than needed research conversations.  Stewart

20 removes the word research and makes it into something sounding

21 very suspicious, like I really come and talk to her nonstop.

22 But if you look at what Immler wrote, it was longer than needed

23 research conversations.

24         Now, look, if you want to publish the papers, you need to

25 have conversations, and if you want to be part of publishing

1    those papers, you need to have long conversations.  Nobody

2    forced her to do it.

3         It's very hard for me to judge who can decide what a

4    longer than needed, what is longer than needed conversation.

5         Yes, I like to work, and I enjoyed working with her, and

6    we published more than we have ever published before.  So that

7    was longer than used to be.  If we can publish more with

8    talking less, I'm all for it.

9         MR. STROUSE:  Now, let me introduce just two things

10   as Plaintiff's Number 15, Your Honor.

11   BY MR. STROUSE:

12   Q.   Regarding cards, did you ever send -- what, if anything,

13   did you send to her?

14   A.   I sent cards to many colleagues, starting from Tom

15   Falkner, our provost.  When he interviewed me right before

16   Christmas, I sent him and all department members a card.

17        I sent cards to, for example, to Bob Boner, who testified

18   yesterday.

19        And I sent cards to Sarah for different occasions.  She

20   sent -- she and Jesse, her husband, who is professor at Loyola,

21   sent cards to us.  So there were some other cards, like, when

22   she was leaving, I felt like after so many years of joint work,

23   it's natural to give something to her, and I gave her a card

24   for us working together.

25        I believe defense will produce this card where it says,

1   look, Sarah, don't leave; let's try to fix our relations.

2   Q.    There was one statement that purportedly you made, and

3   I'd like you to comment.  It's something like "if we weren't

4   married, I would marry you."

5   A.    So my recollection was that when we work so close, we

6   felt that we had very many things in similar.  We both came

7   from academic families.  My parents and grandparents were

8   scientists and teachers, and her dad is physics professor at

9   University of Dayton.  Our spouses have PhDs, and we had

10  similar interests.  So we felt like we're very, very similar.

11       At some point, I remember Sarah telling me it's more

12  important to find the right work colleague than to find the

13  right husband.

14       So at some point I think I commented that we're so

15  similar, that we could have been married.  That was never a

16  proposal or suggestion that we suddenly should divorce our

17  spouses.  As you know, I have been married to my wife for many,

18  many years.  And when I said so, I don't remember Sarah giving

19  any negative reaction.  I think it was just a comment in

20  passing on how similar we were.

21  Q.    What, if anything, did you do regarding sexual comments

22  to her?

23  A.    I did not make any sexual comments.

24  Q.    What, if anything, did you regard touching her in a

25  sexual manner?

1   A.    I never touched her in a sexual manner.

2   Q.    Were you ever accused of touching her in a sexual manner?

3   A.    No.  There is no document that accuses me of touching her

4   in a sexual manner.

5   Q.    What specifically were you charged in the Title IX

6   charge?

7   A.    So the complaint filed against me by provost, the second

8   person in command on campus, charged me in stalking,

9   harassment, and creating hostile environment.  Stalking charge

10   later was dismissed by grievance committee.  Instead, the

11   grievance committee accused me of retaliating against provost.

12   Q.    Retaliating?

13   A.    Retaliation charge, and this charge was removed by appeal

14   committee.  So I think if you look at all of this, the output

15   is I am charged with hostile environment and harassment,

16   nonsexual harassment.

17   Q.    Now, with regard to Dr. Stewart, if you know, who is she?

18   A.    Dr. Stewart is previously provost and dean of the faculty

19   at McDaniel.  She also worked at several other institutions.

20   Right now, I believe she's unemployed.  She is trying to start

21   her own consulting company on how to manage people.

22   Q.    How did you come to know her?

23   A.    I first knew about her when she was interviewed for

24   campus -- for her position of provost.  Spencer Hamblen, who

25   was my department colleague, was on the search committee.

1          I was very suspicious of this candidate, and I wrote --

2     faculty was given CV of the candidates, and we had a chance to

3     comment to the search committee members on our thoughts, and I

4     was negative about Jeanine Stewart because I felt like she's

5     doing something strange.

6          She started as a faculty at Washington Lee University,

7     which is a highly ranked national liberal arts college,

8     somewhere in the top 15, depending on which year you look at.

9     And then there, she tries to be the provost, or some kind of

10    provost-like position, temporarily.  She stays for two years.

11    She doesn't get to be appointed to be permanent provost.

12         She was apparently so attached to the idea of being

13    administrator, that she goes to much, much higher rank -- much,

14    much lower ranked institution, Hollins University in Virginia,

15    and she becomes provost there.  Okay.  She works there five

16    years.

17         She comes now and applies to McDaniel.  McDaniel is

18    ranked about the same way as Hollins.  It's not clear to me why

19    she is interested in coming to Hollins.  Is she trying to

20    escape some scandal there --

21              MR. ENGLISH:  Objection.

22              THE COURT:  Next question.

23              THE PLAINTIFF:  I went --

24              THE COURT:  Sir.  Sir, stop.

25    BY MR. STROUSE:

1  Q.    Did you oppose her in any way?

2  **A.    Yes.**

3          THE COURT:  Sorry, was there --

4          MR. ENGLISH:  There's an objection to the answer.

5  She was speculating as to why she left one place and went to

6  another --

7          THE COURT:  So I'm going to strike the last comment

8  about scandal, because that's when the objection took place.

9  So I'm going to strike that portion.

10         Next question.

11 BY MR. STROUSE:

12 Q.    Did you ever oppose her in anything?

13 **A.    Yeah.  So I raised this concern with Spencer Hamblen when**

14 **we discussed her application.  And then --**

15         MR. ENGLISH:  Objection, Your Honor.

16         THE COURT:  I'll sustain this as to relevance.  I'll

17 sustain this as to relevance.

18 BY MR. STROUSE:

19 Q.    What did you do, if anything, to oppose her in anything

20 else?

21         MR. ENGLISH:  Same objection, Your Honor.

22         THE COURT:  Approach.  Counsel, approach.

23     (Bench conference not transcribed.)

24 BY MR. STROUSE:

25 Q.    Let me move on a little bit.  With regard to Dr. Stewart,

1  she stood in for Dr. More; is that correct?

2  **A.     Yes, that's correct.**

3  Q.     Okay.  On what basis did she stand in, to your knowledge?

4          MR. ENGLISH:  Objection, Your Honor, because it's

5  mischaracterizing that she stood in for Dr. More.

6          THE COURT:  I'm not going sustain it on that ground,

7  but I will as to speculation, to the extent it's asking this

8  witness why someone else did something.  I'll sustain based on

9  speculation.

10  BY MR. STROUSE:

11  Q.     Did you come to find out what was the basis for her

12  standing in for --

13          MR. ENGLISH:  Same objection, Your Honor.

14          THE COURT:  I'll overrule that as phrased.  I'll

15  overrule that.

16          THE PLAINTIFF:  With time, I learned that she's --

17  defense is using a letter from U.S. Department of Education

18  from April 2011 to find kind of a slippery justification for

19  what she has done.  However, at the time when all this was

20  conducted, I would be getting e-mails from human resources, and

21  each e-mail would have a copy of Title IX policy of McDaniel

22  College attached to it.  They were never ever mentioning any

23  letters from Department of Education, and nobody told me that

24  they exist, such letter.  I'm not aware of college ever

25  adopting this letter as any guidance or including it into

1  faculty documents or Title IX policy.

2  BY MR. STROUSE:

3  Q.    Did you have an opportunity to read this letter?

4  **A.    Yes, I looked at this letter, and I read it.**

5  Q.    And on the screen is a statement, "regardless of whether

6  a harassed student or his parent or a third party files the

7  complaint."

8  **A.    Yes.**

9  Q.    What does that third party mean, if you know?

10         MR. ENGLISH:  Objection, Your Honor.  He's not an

11  expert.

12         THE COURT:  Approach.  Approach.

13      (Bench conference not transcribed.)

14  BY MR. STROUSE:

15  Q.    I believe this is from page 5 of 20 of the document.

16  What does it say?

17         THE COURT:  Just so the record is clear, which

18  document are you referring to?

19         MR. STROUSE:  The document from the Department of

20  Education, April 2011.

21         THE COURT:  Thank you.

22  BY MR. STROUSE:

23  Q.    What does it say there, if you could read that --

24         THE COURT:  Please read slowly.  People tend to read

25  fast, so just read slowly.

1          THE PLAINTIFF:  Well, it says, "School's obligations

2    to respondent to sexual harassment and sexual violence."

3    BY MR. STROUSE:

4    Q.    Were you ever charged with that?

5    **A.    No, I was not charged, and nobody ever complained of me**

6    **being sexually violent or sexually harassing anyone.**

7    Q.    And then what does it say in that paragraph?

8    **A.    I believe this is a paragraph from the next page of this**

9    **section.  It talks about third party filing complaints, and if**

10   **the school needs to investigate this complaint, which I don't**

11   **see how it applies to my situation.**

12   Q.    And on the next page, page 5 --

13   **A.    Yes, on the next page it says that --**

14   Q.    First of all, what does it say at the top?  Dear

15   Colleague letter.

16   **A.    "Dear Colleague Letter:  Sexual violence."**

17   Q.    And then what does it say further down?

18   **A.    It says "if the complainant insists that his or her name**

19   **or other identifiable information not be disclosed to the**

20   **alleged perpetrator, the school should inform the complainant**

21   **that its ability to respond may be limited."**

22   Q.    Is this applicable in any way to the charges made about

23   you?

24   **A.    No, it's not applicable to me at all --**

25           MR. ENGLISH:  Objection, Your Honor.

1          THE COURT:  Sustained.  Again, he can read the

2   document.  He can't interpret it.

3   BY MR. STROUSE:

4   Q.    Were you ever charged with any kind of sexual violence?

5   **A.    There were not any charge that has anything sexual in it.**

6   Q.    To your knowledge, was this mentioned, this Department of

7   Education letter mentioned in Title IX booklet?

8   **A.    No.  To the best of my knowledge, Title IX policy of**

9   **McDaniel College does not refer to this letter and does not**

10  **incorporate it in any way, and this is just advisory letter,**

11  **recommendation from Department of Education.**

12          MR. STROUSE:  Your Honor, I'd like to enter this as

13  Plaintiff's Number 25.

14          THE COURT:  Very well.

15  BY MR. STROUSE:

16  Q.    Now, with regard to Title IX, where does it say in here,

17  if you can find it, that somebody else might step in for

18  another party?

19          THE COURT:  When you say "where does it say," are you

20  still referring to the Dear Colleague letter?

21          MR. STROUSE:  I'm sorry, Your Honor?

22          THE COURT:  Are you still referring to the Dear

23  Colleague letter?

24          MR. STROUSE:  No, we're referring to Title IX.

25  BY MR. STROUSE:

1   Q.    So Title IX, have you read Title IX?

2   **A.    Yes, I have read Title IX --**

3           MR. ENGLISH:  Objection.

4           THE COURT:  Sir, hold on one second.  When someone

5   objects, we need to address the objection.

6           MR. ENGLISH:  My objection is I don't know what we're

7   referring to, what he's being asked to look through.

8           THE COURT:  Yes, if you could just clarify for the

9   record and for us what you're referring him to at this point.

10          MR. STROUSE:  Yes.  I'm referring to, essentially,

11  page 10 and 11.

12          MR. ENGLISH:  Of what?

13          THE COURT:  Of which exhibit?

14          MR. STROUSE:  Title IX.

15          THE COURT:  Which exhibit number?

16          MR. STROUSE:  Which exhibit number is Exhibit Number

17  27, joint exhibit.

18          THE COURT:  Approach if we need to discuss further.

19       (Bench conference not transcribed.)

20  BY MR. STROUSE:

21  Q.    What you have before you is the school's, McDaniel

22  school's Title IX policy of June 2014.  Are you familiar with

23  this document?

24  **A.    Yes, I'm familiar with this document.  I received**

25  **multiple copies of it by e-mail.  I read it each time when I**

1    receive it, so I am very familiar with it.  And, indeed, this
2    is policy of McDaniel College, and this is part of contractual
3    obligations between college and me.

4    Q.    On page 9, if you would read what that line center says.

5    A.    It says that -- so title is "Informal Resolution," and in
6    the center it says "the advisor will discuss with the
7    complainant the appropriate response to discrimination and
8    harassment, the feelings of the complainant about the problem,
9    and whether the respondent is aware of his or her actions are
10   perceived as discrimination or harassment.  The seriousness and
11   possible consequences of formal charges must be recognized.
12   The advisor will suggest options for informally resolving the
13   complaint.  To the extent" --

14   Q.    That's all.  Did this happen to you?

15   A.    No.  The advisor in this case is somebody who is picked
16   by complainant, in this case Dr. Stewart, and the faculty
17   handbook -- may I have a copy of it?  It lists six different
18   members of faculty who could act as those advisors.   Jeanine
19   Stewart has chosen to pick one of them --

20            MR. ENGLISH:  Objection, Your Honor.

21            THE COURT:  Sustained.  Sir, when someone else
22   speaks, you have to stop.

23        So that exhibit is not in evidence.  So he shouldn't be
24   showing it to the jury.

25            MR. STROUSE:  I'm sorry.  I'd like that entered as

1  joint number -- what does that say on there?

2          THE PLAINTIFF:  Twenty-seven.

3          MR. STROUSE:  Twenty-seven.  I'd like that entered

4  Your Honor.

5          THE COURT:  Very well.  There's no objection to that?

6          MR. ENGLISH:  No objection.

7  BY MR. STROUSE:

8  Q.    Now, with regard to the next page, page 11, what does it

9  say in that formal hearing box?  If you could read at least the

10  last sentence.

11  **A.    So the formal hearing, which did not happen, contains the**

12  **statement that "in event that complainant is unwilling to be**

13  **identified, the formal hearing will be dismissed; no action**

14  **will be taken, and no report of any action will be filed."**

15  Q.    Is there any mention in here of the Department of

16  Education letter of April 2011 that we just looked at?

17  **A.    No.  No.  This is the document which was presented to me**

18  **as McDaniel College policy.**

19  Q.    And how was it then that Dr. Stewart became the

20  complainant?

21  **A.    It's extremely biased case.  When second-in-power person**

22  **decides to do something, she can do practically anything.**

23          MR. ENGLISH:  Objection, Your Honor.

24          THE COURT:  I'm going to sustain the objection and

25  strike your answer.  You can restate your question, and, sir,

1  you have to answer the question he asks you.

2  BY MR. STROUSE:

3  Q.    How was it unfair, under these sentences, for Dr. Stewart

4  to stand in for Dr. More, if it was?

5            MR. ENGLISH:  Objection.

6            THE COURT:  I'm going to sustain that.  That wasn't

7  the question you had asked previously, but I'm going to sustain

8  the objection to that question

9  BY MR. STROUSE:

10  Q.    How was it that Dr. Stewart stepped in under these

11  conditions for Dr. More?

12  **A.    I think she had no right to do it.**

13  Q.    Okay.  If you know, did Dr. Stewart ever observe herself

14  about the interactions between you?

15  **A.    No.**

16            MR. ENGLISH:  Objection, Your Honor.  He's asking

17  what she observed.

18            THE COURT:  He can rephrase the question.  I'll

19  sustain it as phrased.  You can rephrase the question.

20  BY MR. STROUSE:

21  Q.    To your knowledge, did Dr. Stewart ever involve herself

22  in your interactions with Dr. More?

23  **A.    Dr. Stewart have never been present in the room with two**

24  **of us at all, so she has not seen interaction with us.  She**

25  **have seen us, like, at department meeting once and several**

1  times at faculty meetings, but we would not interact if in

2  those settings.  So she has no first-hand knowledge of

3  interactions between me and my coauthor, friend, and colleague,

4  Sara More.

5  Q.    To your knowledge, did she have any information or

6  knowledge of any of the complaints that were listed against

7  you?

8  A.    All the complaints that listed in her complaint, they

9  come from the -- they come from the time when Stewart was not

10  even on campus.  She was not provost at McDaniel.  So she has

11  no knowledge of what happened there, and all that she has is

12  hearsay testimony about -- except, perhaps, for the lunch, but

13  she was not part of our lunch conversation.  We discussed this

14  in Sarah's office.  Stewart was not party to those

15  conversations.

16  Q.    If you do, what was Dr. Stewart's involvement with

17  Sergeant Immler, if you know?

18  A.    According to documents that were produced by defense, she

19  was giving him instruction to start investigation report --

20        MR. ENGLISH:  Objection, Your Honor.  He doesn't have

21  any knowledge --

22        THE COURT:  Sustained as to hearsay.  He said he's

23  basing it off documents.  Sustained.

24  BY MR. STROUSE:

25  Q.    Do you know what, if anything, did Sergeant Immler do

1  about his investigation?

2  **A.     He talked to department secretary; he talked to Sarah; he**

3  **talked to, I think, a couple of colleagues.  He did not talk**

4  **to.  Me, and he sent report of some kind to Dr. Stewart, who**

5  **actually is the complainant who started all this.**

6          MR. STROUSE:  I'd like the introduce Title IX.  I

7  believe I already did it.  What number is that?

8          MR. ENGLISH:  The only objection is it's not Title

9  IX.  It's the policy.

10          MR. STROUSE:  The policy on Title IX, Your Honor.

11          THE COURT:  I think 27.

12          MR. STROUSE:  Yes.

13  BY MR. STROUSE:

14  Q.     Now, because of your termination at McDaniel, did you

15  have to set up a second home or apartment?

16  **A.     Yes.  So I only had visiting positions, one year or year**

17  **and a half visiting positions at different places.  So I had to**

18  **move constantly, and I lived, as I mentioned, in the hotel in**

19  **New Jersey.  I lived in a hotel in Bloomington, Illinois.  And**

20  **now I have a small apartment for visiting faculty at Vassar.**

21  Q.     Was there some cost to that?

22  **A.     Well, it's a heavily subsidized apartment, which is much,**

23  **much smaller than the living spaces that I had here in**

24  **Maryland.  She's effectively took that away from me.  Yes,**

25  **there are costs.  They are moderate.  I think it is 700 --**

1  where is document?  I don't remember.

2        (Document handed to the plaintiff.)

3        Yes, so I think I am paying for cable and for internet.

4  It is $676 monthly charge for my current rent, for a small

5  apartment, unfurnished apartment on campus.

6        THE COURT:  Just for the record, what document did

7  you just show him to refresh his recollection?

8        MR. STROUSE:  Plaintiff's 16A, Your Honor.

9        THE COURT:  Is that just for identification purposes

10  or are you --

11        MR. STROUSE:  I'd like to admit it, Your Honor.

12        THE COURT:  Very well.

13  BY MR. STROUSE:

14  Q.    Why did you have to do this.  Why can't your wife

15  accompany you to Vassar?

16  A.    Well, my wife has PhD, and she has a permanent position

17  with U.S. Government.  She works for the United States

18  Geological Survey.  Her position is much more permanent than

19  mine.  I have one year position.  As you know, government jobs

20  are almost tenure.  And also, her pay is much higher than mine.

21  So that would be very destructive for us and for our children

22  if we abandon that major source of income and move to

23  Poughkeepsie.

24  Q.    Do you often travel home at your expense?

25  A.    Yes.  When I lived in New Jersey, I would go home -- it's

1  a five-hour drive -- at night.  My last class would end about

2  9 p.m. on Thursday.  I would jump into the car -- 7:40 it ends.

3  At eight I will be in the car.  Five-hour drive.  At one in the

4  morning I would be in Maryland.  And then on Monday I would go

5  back.

6       When I was in Illinois, that's 12-hour drive.  Elena and

7  girls came to me for spring break.  But I would fly.  I would

8  drive three hours to Chicago International Airport and take a

9  flight on Sprint Air.  Here, I learned that Sprint Air is very

10  unreliable.  But I would come around -- again, very

11  late evening, early in the morning on Saturday morning.  So

12  often it would be late, and I would travel back --

13  Q.    How about when you are at Vassar?

14  A.    We first tried to have three-week cycle, where one week

15  she would go with girls and, afterwards, I will go and,

16  afterward, we have sabbatical.  Well, that didn't work because

17  she has to -- Victoria goes to magnet school.  There's no bus

18  that brings her home, and Elena needs to drive her back from

19  bus about 20 minutes away.  So she has to be there in the

20  morning.  And in the evening she drives from her workplace in

21  Reston, Virginia.  That takes so much time, puts so much stress

22  on her, that she is really very tired, and she was not able to

23  drive to Poughkeepsie as often as we hoped she would.  So now,

24  mostly, she comes for holidays, and I'm driving here about

25  every three weeks.

1          But sometimes it's much more often.  For example, in the

2     beginning of September, Elena went to a conference somewhere in

3     Europe, I believe.  Czech Republic, in Prague.  So I had to --

4     I went there for weekend, for Labor Day weekend, and on Labor

5     Day Monday I drove --

6     Q.     How many times do you go?  Do you go every -- how many

7     times?

8     A.     So that week it was like three and a half times I had to

9     travel back and forth to manage girls here.

10    Q.     Normally?

11    A.     Normally, I try to travel about ever three weeks.

12    Q.     And how many miles is that?

13    A.     I checked with Google maps.  It says that if you go

14    straight, it's 300 miles.  But I never go straight through New

15    Jersey.  There's lots of tolls and it's very slow.  I usually

16    go through Harrisburg and Scranton.  That's about 360 miles

17    from our house in Rockville to my apartment on campus at

18    Vassar.

19    Q.     What about back pay?  Did you lose any pay while you were

20    trying to get a job?

21    A.     Yes, I was not paid from -- so I only was paid for full

22    semester of 2014.  And then the way the colleges pay money,

23    they spread this amount of money far ahead.  There's a letter

24    from the college lawyers that specifically says that you have

25    been paid for the full semester of 2014, and that's all that

1   **you're entitled to.  So from January until almost -- from**

2   **January until the end of August, I was not paid, and this is**

3   **eight months.**

4   Q.    And how much money does that come to, if you know?

5   **A.    Well, I think we computed that.  If you take 77,000,**

6   **divide by 12 and multiply by eight.**

7   Q.    So would you say it's around 51,000?

8          MR. ENGLISH:  Objection, Your Honor.  May we

9   approach?

10         THE COURT:  Sure.

11         (Bench conference not transcribed.)

12         THE COURT:  The objection is sustained.  You can ask

13  the next question.

14         MR. ENGLISH:  Your Honor, I'll also move to strike

15  the answer.

16         THE COURT:  The last answer with the calculation

17  should be stricken.

18  BY MR. STROUSE:

19  Q.    The calculation at seven months is what, if you know?

20  **A.    Well, 77, if you need to take -- I think you need to take**

21  **8/12s, but if you take 7/12ths, 77 --**

22  Q.    45,000?

23  **A.    Something like that, yes.**

24  Q.    With regard to your loss of tenure and specific

25  sabbaticals, how did you lose sabbaticals, if you did?

1  **A.     So at McDaniel, tenured faculty is entitled to**

2  **sabbatical.  This is time away from teaching.  Different people**

3  **use it for different purposes.  I try to build my research, and**

4  **I used it for research.  I had only one opportunity to have**

5  **sabbatical in the fall of 2011, that I mentioned.**

6  **       By becoming now visiting faculty, I'm not entitled to**

7  **sabbaticals anywhere.  Therefore, I don't have this time.  This**

8  **is paid time, one semester paid time, repeated every seven**

9  **years.  I need to come up with a plan to do it, but given that**

10 **I published 60 papers, I don't think that anyone -- in fact,**

11 **the one sabbatical that I had, the college, in its letter, said**

12 **that it's the best achieving sabbatical in the recent history**

13 **of McDaniel, when I gave them list of papers that were**

14 **published and presented in the year with Sara Holbrook and**

15 **other students.**

16 Q.     Now, if it did, how did McDaniel break your contract?

17         MR. ENGLISH:  Objection, Your Honor.

18         THE COURT:  That's a legal conclusion.  Sustained.

19 BY MR. STROUSE:

20 Q.     Do you believe that McDaniel broke your contract?

21 **A.     Yes, I do.**

22 Q.     With regard to a money figure on sabbaticals, how, if

23 anything, do you figure that?

24         MR. ENGLISH:  Objection, Your Honor.

25         THE COURT:  Sustained.

1   BY MR. STROUSE:

2   Q.    How many sabbaticals would you estimate you missed at

3   McDaniel?

4   **A.    Well, I don't drink; I don't smoke.  I know that's**

5   **strange for Russian, but I don't drink; I don't smoke.  I don't**

6   **have any current disease.  So I think I -- and I want to work**

7   **until -- well, as long as I can.  I would always tell Sarah,**

8   **and she liked to quote that I would die of leg board**

9   **(phonetic), if leg board still exists.**

10          MR. ENGLISH:  Objection, Your Honor.

11          THE COURT:  I'm going to overrule.  He can answer

12   this question.

13          THE PLAINTIFF:  So thinking in this terms, I was --

14   in 2011 I was 41.  I should be able to be productive for at

15   least next 40 years.  And every seven years, that's a bit more

16   than five sabbaticals.

17   BY MR. STROUSE:

18   Q.    And what is a sabbatical, if you know?

19   **A.    Again, sabbatical is a time for faculty to step away from**

20   **teaching and work on something else, something that they enjoy**

21   **and something that develops their career.  Not necessarily this**

22   **college, but at other one.  I don't work at particular**

23   **institution.  I work in academia, and I should be able to**

24   **switch positions from one to another.**

25   Q.    And what about becoming a full professor?  Are you

1  currently unable to become a full professor, if you are?

2  **A.      So I am employed as associate professor, visiting**

3  **associate professor.  In fact, when I originally applied for**

4  **position of visiting associate professor, which is lower rank,**

5  **but I initiated to be associate so I don't lose this title, and**

6  **the common practice is that people are not given title in full,**

7  **even visiting full, unless they already get full title**

8  **somewhere with tenure at other institution.  Since I, at this**

9  **point almost four years past, I still remain visiting associate**

10  **professor, it's not clear whenever, if ever, I will have**

11  **tenure, and that would preclude me from getting full professor**

12  **title.**

13  Q.    How do you know you would have been a full professor at

14  McDaniel?  Isn't that -- that's not guaranteed.

15  **A.      Yes.  As I mentioned, I have more publications than any**

16  **other member of my department.  We hired Italo with just 10**

17  **publications and gave him full professor title.  I have 60.**

18  Q.    And if you know, what's the difference at McDaniel

19  between associate and full professor?

20            THE COURT:  What do you mean by difference?

21            MR. STROUSE:  Difference in pay.  I'm sorry.

22            THE PLAINTIFF:  It's a tricky question, but I believe

23  that --

24            MR. ENGLISH:  Objection, Your Honor.

25            THE COURT:  Sustained.

1   BY MR. STROUSE:

2   Q.    Is there a difference between full professors and

3   associate professors in salary?

4   **A.    Of course there is a difference between ranks at McDaniel**

5   **and all other institutions, yes.**

6   Q.    And is this -- would you say it's a relatively large

7   difference?

8           MR. ENGLISH:  Objection, Your Honor.

9           THE COURT:  Sustained.

10  BY MR. STROUSE:

11  Q.    How many years would you expect to become a full

12  professor at McDaniel?

13  **A.    I was promoted and --**

14          MR. ENGLISH:  We're bringing up documents --

15          THE COURT:  I'm going to assume that was an accident.

16          MR. STROUSE:  Yes, it was.

17          THE PLAINTIFF:  I was promoted --

18          THE COURT:  Is this document that's currently on the

19  screen something that you've discussed before?  If not, move it

20  back.

21          MR. ENGLISH:  No, I've never seen it.

22          THE COURT:  Ladies and gentlemen, sometimes technical

23  difficulties happen.  I'm going to ask if you started reading

24  it quickly, I'm going to ask that you disregard the two

25  documents that you just saw on the screen.

1          THE PLAINTIFF:  Could you repeat the question,

2   please.

3   BY MR. STROUSE:

4   Q.    Well, I was asking you whether there was a large

5   difference --

6   **A.    Yes, I believe there is a large difference.**

7          MR. ENGLISH:  Objection.

8          THE COURT:  Sustained.  Let's approach.  Let's

9   approach.

10       (Bench conference not transcribed.)

11  BY MR. STROUSE:

12  Q.    Do you have any other expenses related to this matter?

13  **A.    Yes, I have lots of expenses as a result of this matter**

14  **where -- okay, let's talk with my retirement contributions.  At**

15  **McDaniel --**

16         MR. ENGLISH:  Objection, Your Honor.

17         THE COURT:  Sustained.  Ask him a specific question.

18  If there's a specific --

19  BY MR. STROUSE:

20  Q.    Do you have any specific damages that's related to

21  this --

22         THE COURT:  Counsel, I'm asking you to ask him a

23  specific question as to a type of damage.

24  BY MR. STROUSE:

25  Q.    With regard to any damages, besides what we've gone

1  over -- sabbaticals, full professor, back pay, apartment

2  expense -- are there any other damages that you know about?

3  **A.    Well, I think the damages, that counts my one-bedroom**

4  **apartment in Poughkeepsie is a little bit silly because what**

5  **really -- if you talk about the cost of living, we had a**

6  **four-bedroom house here, with backyard, in a nice neighborhood,**

7  **and up there I'm living as a graduate student.  So I think if**

8  **we talk about damages in terms of housing --**

9          MR. ENGLISH:  Objection, Your Honor.

10         THE COURT:  Sustained.  Next question.

11 BY MR. STROUSE:

12 Q.    With regard to moving expenses, did you have any moving

13 expenses taking these new positions?

14 **A.    Yes.**

15         MR. ENGLISH:  Objection, Your Honor.

16         THE COURT:  Basis?

17         MR. ENGLISH:  We don't have any documents

18 reflecting --

19         THE COURT:  Approach.  Approach.

20     (Bench conference not transcribed.)

21         MR. STROUSE:  I have no further questions, Your

22 Honor.

23         THE COURT:  Let's take our afternoon break at this

24 point.

25     Ladies and gentlemen I'll ask that you be back in the

1    jury room in about 15 minutes, which, according to that clock,

2    would be 3:20.  Please remember not to discuss the case with

3    anyone, including amongst yourselves.  Thank you.

4         (Jury recess.)

5         THE COURT:  Fifteen minutes.  See you then.

6         Sir, while your testimony is ongoing, you're not allowed

7    to discuss this case or your testimony with anyone during the

8    break.

9         THE PLAINTIFF:  That includes my counselor?

10        THE COURT:  That included your counselor.  You cannot

11   discuss anything about your testimony or this case during the

12   break because you're currently on the witness stand.

13        THE PLAINTIFF:  Okay.

14        (Recess taken.)

15             **CROSS-EXAMINATION BY THE DEFENDANT**

16   BY MR. ENGLISH:

17   Q.   Dr. Naumov, good afternoon.

18   **A.   Good afternoon --**

19        THE COURT:  Sir, make sure you continue to speak into

20   the mike.

21        THE PLAINTIFF:  Good afternoon.

22   BY MR. ENGLISH:

23   Q.   A few questions for you.  You testified that it was your

24   impression that there were no problems between yourself and

25   Dr. More; is that correct?

1  **A.      I testified that there were problems that we tried to**

2  **resolve.**

3  Q.      Did you testify that there were problems or not?  Because

4  your testimony is that there were no problems between yourself

5  and Dr. More.

6  **A.      No, I said that I had no problem with Dr. More except**

7  **that she would not tell me what her problem with me is.**

8  Q.      You said you had no problems, right?

9  **A.      Except for this one.**

10  Q.      But you didn't say that she didn't have any problems,

11  correct?

12  **A.      I said that I was asking her what her problem is, and she**

13  **would not tell me.**

14  Q.      And she never told you?

15  **A.      That's correct.**

16  Q.      For the eight years you were there?

17  **A.      I don't believe she had any problems with me until her**

18  **pregnancy.**

19          MR. ENGLISH:  If we could bring up Government's

20  Exhibit 8, please.  Am I able to see it here or no?

21          THE COURT:  It should be there.

22          MR. ENGLISH:  There we go.  I was trying to

23  highlight.  Can you bring it back?

24          THE COURT:  If it's easier, she can sit there, but I

25  know her computer is over there, so whatever works.

1  BY MR. ENGLISH:

2  Q.    I'm highlighting some language here.  Is this a letter

3  from you to Dr. More -- I'm sorry, e-mail from you to Dr. More?

4  **A.    I don't specifically remember if it's e-mail, but it**

5  **looks like something I could have wrote.**

6  Q.    That's your name there, from Pavel Naumov?

7  **A.    It is my name, yes.**

8  Q.    And then it's to SMORE.  Is that to Sara More?

9  **A.    Well, it says here to Sara More, yes.**

10  Q.    August 23, 2012.  Do you remember sending this e-mail?

11  **A.    As I said, I remember sending her e-mail like this from**

12  **Japan.  I don't remember whether it's this exact e-mail or not.**

13  Q.    And there you say, first, you start the letter -- or the

14  e-mail after saying "after talking with you today, I realized

15  how much I miss you."  Is that how you normally spoke to

16  Dr. More?

17  **A.    No, I would not normally -- I do not -- this is not how I**

18  **normally would speak to Dr. More.**

19  Q.    So why are you saying it there?

20  **A.    Well, sir, again, I don't -- because she was going to**

21  **leave and -- as I said, I believe this is e-mail which I sent**

22  **from Japan.  I might be wrong, but after talking to Tom Falkner**

23  **and realizing that there might be something I had done, I sent**

24  **her e-mail saying that I would like to fix our relationship if**

25  **something is broken.**

1  Q.    Well, here you said --

2         THE COURT:  Sir, just make sure you continue speaking

3  into the microphone.

4  BY MR. ENGLISH:

5  Q.    This is August 23, 2012, and school is about to start.

6  Are you in Japan?

7  **A.    It's quite possible.  So I think I was invited to a small**

8  **workshop Tsukuba University in Japan that year, and I remember**

9  **being in Japan and writing e-mail to her.  I don't remember**

10 **specific.**

11        MR. ENGLISH:  I want to get rid of the highlight.

12 How do I do that?  I know this is the fifth time you've shown

13 me this, so it's all on me.

14 BY MR. ENGLISH:

15 Q.    It's in blue, but we'll work with it.

16        And then after you say I realize how much I miss you, you

17 say "if the main reason for you leaving is me, then I want to

18 apologize for whatever I did that led you to consider such a

19 drastic decision."

20        So did you have knowledge that she was -- I mean, you did

21 have knowledge at the time that a reason that she was thinking

22 about leaving at this time was because of you.

23 **A.    No, I said if I'm reason, then I apologize.  I think it**

24 **is courteous thing to say.**

25 Q.    I'm sorry, I didn't understand what you said.

1  **A.     I think it's polite thing to say if somebody is upset**

2  **about something, to approach this person and to say if I did**

3  **something wrong, I am sorry, but I don't know what I did.**

4  Q.     But you had reason to believe at this time that you had

5  done something wrong, right?  You didn't just say that out of

6  nowhere.

7  **A.     No, this is how I was raised.  This is how I was taught**

8  **by my mother, that if there are problems, the first thing is**

9  **suggest you may be wrong.  I don't know what I did wrong, but,**

10  **indeed, I suggested this.**

11  Q.     Okay.

12           MR. ENGLISH:  Let's go to Defendant's Exhibit 9.  If

13  we can just blow up the text part.  There we go.  That's fine.

14  BY MR. ENGLISH:

15  Q.     This is an e-mail from you to -- have you seen this

16  before?

17  **A.     No.**

18  Q.     Okay.  But is this an e-mail from you to Dr. More dated a

19  few days later?  The first one was August 23, 2012, and then

20  this one is August 27th, right?

21  **A.     I believe we produced 8,000 e-mails between me and Sarah.**

22  **Can I read this one?**

23  Q.     This is one of them.  You say --

24           THE COURT:  I'm sorry.  Did you ask if you can read

25  it?

1        THE PLAINTIFF:  Yes.

2        THE COURT:  You can take a minute to read it.

3    BY MR. ENGLISH:

4    Q.    Okay.  Go ahead.  You ready?

5    **A.    That sounds like something I could have written.**

6    Q.    So in the second paragraph, it says "you came to work

7    with me, and I forced you to spend so much of your time and

8    energy on trying to help me get away from you."

9        You acknowledge that you forced her to spend her time and

10   energy to help you get away from her?

11   **A.    Well, so reference here, which might not come from the**

12   **text, is that I -- while working at McDaniel, I also was**

13   **looking at other institutions, in places that have more**

14   **possibility to research.  Sarah knew about this.  Sarah was**

15   **writing reference letters to me.  At some point I felt that we,**

16   **publish a lot and maybe I -- with my focus on research and**

17   **working there, I started to pay less attention to whatever she**

18   **is interested in.  That is after we stopped regularly working**

19   **together, and I was trying to analyze what went wrong and**

20   **that's how I felt at that point.**

21       **What I wanted to do is to sit down and talk and to**

22   **understand what are the issues, and I have never been given a**

23   **chance to do this.**

24   Q.    You want her to spend more time and energy, right?

25   **A.    Sorry?**

1  Q.     You wanted her to spend more time and energy, correct?

2  **A.     No, I don't.  At that time I had several students who had**

3  **been active in publishing.  I think I already started to work**

4  **with Italo Simonelli, and I had plenty of people.  We did**

5  **not -- we didn't resume -- after she came back from her two**

6  **years of absence, we did not resume -- and this is August 12th.**

7  **So it's in the middle -- so at this time we have not been**

8  **working.  Our work ended in spring of 2011.  That's where we**

9  **stopped doing -- she got pregnant, and we stopped working.**

10 Q.     By the way, going back to Exhibit A, the e-mail from

11 August 23, 2012, she never responded to that, did she?  The one

12 where you tell her that you miss her, she never responded to

13 that, did she?

14 **A.      I do not have recollection of 8,000 e-mails that went**

15 **back and forth between us.**

16 Q.     And this e-mail here, Exhibit 9 dated August 27, 2012,

17 where you say that you forced her to spend so much of her time

18 and energy trying to help you get away from her, she never

19 responded to that e-mail either, did she?

20 **A.      She did.  She did.  She did respond to this, and it was**

21 **in person, and she came to me and said I feel that there are**

22 **people who like me here and who want me to stay here, and I**

23 **will stay here.  That was when she didn't go to NSA.**

24 Q.     She didn't respond to this.  She ended up making the

25 decision that she was going to not leave the college at that

1  time --

2  **A.     No, I think that that was direct response when she came**

3  **and said there are people who like me here and who want me to**

4  **stay here, I will stay here, I felt it was in response to my**

5  **suggestion to sit down and talk about problems.**

6  Q.     You felt that she stayed because of this e-mail?

7  **A.     I felt that her saying that there are people who like me**

8  **here and who want me to stay here was response to my e-mail.**

9  **Of course, decision to go to NSA or not to go is a very**

10  **complicated decision in your life, it affects your career and**

11  **everything else, and I hope that she did it looking at many**

12  **other factors.**

13  Q.     I think where we started was you said that you weren't

14  aware that she had any problem with you, right?  Is that

15  correct?

16  **A.     Could you repeat the question?**

17  Q.     Let me just ask you a question.  You weren't aware that

18  she had any issue with your behavior towards her, correct?

19  **A.     I was aware that she had some issues because she**

20  **expressed some unhappiness, but she refused for several years**

21  **to tell me what the source of it here is.  I cannot correct**

22  **something that I don't know what is wrong.  And we grew up in**

23  **different countries, we had different cultural background, and**

24  **we hear differently.**

25  Q.     But here you're saying that you understand you forced her

1  to spend her time and energy to keep you away from her --

2           MR. STROUSE:  Asked and answered, Your Honor.

3  Objection.

4           THE COURT:  I'll overrule the objection.

5  BY MR. ENGLISH:

6  Q.    You can answer.

7  **A.    Could you repeat the question, please?**

8  Q.    Here, you're acknowledging that you force her to spend

9  her time and energy to keep you away from her, yet you're

10 sitting here, telling us that you didn't know that there was a

11 problem; she never expressed it to you?

12 **A.    Once again, a sentence to get away means to find job at**

13 **different institution.  And, yes, in some sense I felt like we**

14 **worked so -- you know, we worked a lot.  I think I was more**

15 **associated, and she was less associated, so there was some**

16 **asymmetry in this, and I felt that this might be problem, and I**

17 **raised it in this e-mail.**

18 Q.    And then on the bottom of this page, there's another

19 e-mail from August 26, 2012, in this string from you to her.

20       There's a poem there, and at the end of the poem you say

21 "Sarah, please stay.  I will make you happy again.  Pavel."

22 You had reason to believe she wasn't happy, right?

23 **A.    Yes.  As I said, she wasn't happy, and I tried to find**

24 **out why.  I suggested to talk to former department chair.  I**

25 **talked to her many times.  I think the way to solve issues is**

1    sit down and to talk and to understand.  I have been married

2    for many, many years, and that's how we do it.  We agreed when

3    we got married that we would never refuse other person a right

4    to say and explain and ask questions and will never shut out.

5    That's why we have been married for soon 28 years.

6              MR. ENGLISH:  Can we go to Defendant's Exhibit 10,

7    please.

8              If I may ask, is the blue color a problem for anyone

9    to see it?

10             THE COURT:  I thought you were going to ask me how to

11   get rid of it, because I would have no idea.

12             MR. ENGLISH:  No, I'm willing to improvise.

13             THE COURT:  I can certainly see it.  I don't know if

14   it's disturbing anyone else.

15             MR. ENGLISH:  I'd rather just keep it rolling as long

16   as everyone can see it.

17   BY MR. ENGLISH:

18   Q.   So here, this is an e-mail from her to you, from Sara

19   More to you, shortly after this e-mail that we just discussed

20   on August 29, 2012.  And there she's telling you that -- in

21   response to you wanting to meet with her, that "90 minutes

22   would be too long for me.  I'm willing to meet with you for 30

23   minutes."

24             Did you understand that she didn't feel like she needed

25   to talk to you for 90 minutes?

1   **A.      No, I felt like she did not have time to talk to me.  I**

2   **actually don't know what this e-mail is about.  Do you mind**

3   **scrolling down so I can see the whole document?**

4                MR. ENGLISH:  Go ahead and scroll down.

5                THE PLAINTIFF:  Actually --

6                MR. ENGLISH:  I don't have a question pending.  We'll

7   go on to Joint Exhibit 8.

8                THE PLAINTIFF:  So you brought this e-mail --

9                THE COURT:  There's no question pending.

10  BY MR. ENGLISH:

11  Q.   I need to ask a question, and then you'll be able to

12  answer.

13               MR. ENGLISH:  Plaintiff's Exhibit 14, same document.

14  Q.

15               THE COURT:  You need to switch it back to the viewer

16  now.  It's harder than it looks, ladies and gentlemen.

17               MR. ENGLISH:  I promise you I've been trained, but.

18  BY MR. ENGLISH:

19  Q.   Okay.  So you testified about what is Plaintiff's Exhibit

20  14.  And here, this is a year later, right?  After the 2012

21  correspondence between you and Sara More, and a year later, on

22  September 9, 2013, you sent her a three-page letter.  This is

23  your three-page letter, right?

24  **A.      That's what you call a three-page letter, yeah.**

25  Q.   What do you call it?

1   **A.      I call it just a letter.**

2   Q.      You hand delivered this letter to Dr. More?

3   **A.      Yeah.**

4   Q.      And in the letter, it starts off by saying "I'm writing

5   this letter to apologize for the mistake that I have made and

6   the pain that it has caused you."

7          You caused her pain, right?

8   **A.      Well, it looked to me.  It looked to me that she was very**

9   **upset, and it was clear that she isn't happy about something,**

10  **so that's my understanding.**

11  Q.      Okay.  And then you say "I think that you will find it

12  hard to believe that it took me seven years to realize my

13  mistake, and I do not know how I can convince you that I,

14  indeed, have not seen the obvious all these years."

15         Didn't you just tell her a year before that you had

16  recognized your mistakes?  Didn't you just tell her, in Exhibit

17  9, Defendant's Exhibit 9, that you had forced her to spend so

18  much of her time and energy keeping you away from her, and now

19  you're saying, a year later, that you're just now realizing

20  your mistakes?

21  **A.      What is the question?**

22  Q.      I'm saying didn't you address this a year prior, in terms

23  of --

24  **A.      No, I did not, because a year prior, I had presented I**

25  **don't know what is wrong.  She never was able to explain to me.**

1   **So I was sitting and trying to come up what else could be**

2   **wrong.  And by 2013, I came to conclusion that we just have so**

3   **much difference in our characters, but I hadn't seen earlier.**

4   **We worked together on all those papers, we applied for**

5   **grants --**

6   Q.    You said you didn't have any idea what was wrong, but you

7   wrote an e-mail a year before this saying that you were wrong

8   because you forced her to spend her time and energy keeping her

9   away from you.  How could you not know what was wrong?

10  **A.    It's absolutely not shown to me that this is something**

11  **which was wrong.  Again, I had hypothesis I tried to run by**

12  **her, and she would never tell me what is wrong.  When I**

13  **suggested to go to our former department chair, at some point I**

14  **said we can talk to anyone, but let's find what the issue is,**

15  **and I still don't know what the issue is.**

16  Q.    But you acknowledge that the issue was that she was

17  spending her time and energy to keep you away from her.  You

18  had that knowledge from somewhere.

19  **A.    No.  That was my hypothesis.  That is a possible**

20  **explanation.  It didn't look like this after year later because**

21  **we have not been working together.  I was not forcing her to**

22  **publish.  Instead, it was she's still unhappy.  So I'm trying**

23  **to understand what went wrong.  And I tried then.  I tried**

24  **already for many years.  I still don't know.  Nobody told me**

25  **what is it that I did wrong.**

1  Q.    And if we go down a little bit, with the paragraph that

2  starts "I think now that."  If we go to the last sentence in

3  that paragraph, it says "it would not have been a problem if I

4  would have seen this difference and adjusted for it in my

5  interactions with you.  Unfortunately, I did not."

6        So you never adjusted, right?  You never changed what you

7  were doing.

8  A.    I was changing all the time, and when she specifically

9  would ask me for something, I would do the way she asked.

10       For example, she asked me not to stand behind her when we

11 have -- sitting somewhere or working on blackboard, sometimes

12 people walk around.  She said I feel uncomfortable when there

13 is somebody behind and I don't see you.  So I started to

14 specifically walk in front of her and problem was solved.

15       I remember there was another date.  I came to her.  She

16 was very sad.  I said, Sarah, did something happen to you; you

17 don't look good.  She said, Pavel, don't tell me that I don't

18 look good because it means there's something there; I don't

19 want to hear about this.  I said, okay, Sarah, I won't do it.

20 The next day, I come, she's all excited.  I said you look good

21 today.  She says don't tell me this either because that means

22 yesterday I do not look good.

23       This is not how I was raised, but I said okay.  I mean,

24 we never discussed why she was in a good mood or a bad mood.

25 So I try to address issues that I know.  But I can't address

1    something that nobody tells me about.  So I have to sit down

2    and guess.

3         Probably, after I wrote this letter, she never complained

4    about anything again.  So maybe it was the right guess.  But I

5    don't see why she cannot sit down and talk with me.  If she's

6    not comfortable sitting one to one, how was she comfortable

7    sitting for many years and discussing things?

8         I suggested that she go to our former supervisor and talk

9    want about whatever issues there are.  I will be happy to

10   correct them, but I cannot fix something that I don't know,

11   that I'm not aware of.

12   Q.   Speaking of that, of you not being aware, she never told

13   you anything, right?  She never communicated it to you?

14   A.   What do you mean?  We sent 8,000 e-mails to each other.

15   Q.   She never communicated her problem.  You said that you

16   didn't know that she had a problem, right?

17   A.   Well, she had lots of problems, medical problems --

18   Q.   Problems with your behavior towards her.  You said that

19   she never communicated to you, the problem with your behaviors

20   toward her?

21   A.   For example, when she said --

22   Q.   No, I'm asking you that question.  It's a yes or no.  Did

23   she communicate her issues with your behavior towards her or

24   not?

25   A.   In very limited amount, and I think I've covered most of

1  **them.**

2  Q.    So if we scroll down to the paragraph that begins "2."

3  You say in the paragraph that begins with 2, the paragraph that

4  starts "looking back."  "Looking back at many cases of the

5  described above situation, I realize that you have not actually

6  been silent.  You did communicate to me your unhappiness."

7        But you just told me that she didn't.

8  **A.    I told you that she did not communicate source of her**

9  **unhappiness.  Not unhappiness.  I said many times I know that**

10 **she was unhappy.  I don't know what the cause of it is, and I**

11 **cannot fix it.**

12 Q.    Even though you acknowledge that that one source of her

13 unhappiness is that she was spending her time and energy to

14 keep you away from her.  Those were your words.

15        MR. STROUSE:  Asked and answered.  Objection, Your

16 Honor.

17        THE COURT:  Overruled.

18 BY MR. ENGLISH:

19 Q.    Even though you acknowledge that she communicated to you

20 that she was using her energy to keep you away from her --

21 **A.    No, I said -- no, I did not acknowledge this.  I said it**

22 **was my hypothesis.  I tried to look for explanations what**

23 **happened.  I don't know what happened.  We stopped working**

24 **together, and she still is unhappy, so I don't know what the**

25 **cause is.**

1  Q.    I'm no scientist, but a hypothesis is based on

2  observations, correct?

3  **A.    Repeat, please.**

4  Q.    I'm not a scientist, but a hypothesis is based on facts,

5  right?

6  **A.    No.   In mathematics, hypothesis are not based on facts.**

7  **      (Court reporter asks witness to repeat answer.)**

8  **BY MR. ENGLISH:**

9  Q.    That's fine.  So let's go down --

10         THE COURT:  Hold on.  Could you repeat that.  You

11  were speaking so fast.

12         THE PLAINTIFF:  I said that I cannot testify to

13  science.  I am not a scientist.  I am a mathematician, and I

14  have training in computer science.  When I use hypothesis, it

15  just --

16         THE COURT:  Sir, I was just asking you to repeat your

17  prior answer, not give a new answer.

18         THE PLAINTIFF:  Oh, okay.  I said that in

19  mathematics, for example, hypothesis are not necessarily based

20  on facts.  It's just something you think of.

21  BY MR. ENGLISH:

22  Q.    And then if we can go down a little bit, right down

23  towards the bottom of the page, there's a paragraph that says

24  "I think you have seen these differences."  So it says "I think

25  you have seen these differences between us from the very

1   beginning, tried to communicate them to me, but I have not been

2   able to hear.  Eventually you gave up."

3          This was your perception, right?

4   **A.     It was my hypothesis again.  I was looking for solution.**

5   **I still don't know what the answer is.  I don't know what it is**

6   **that suddenly changed in her.  I was -- I think that probably**

7   **solution which was closed to -- because, again, after I wrote**

8   **this letter, she never complained to anyone.  She went to**

9   **Stewart, and she said that she had no issues with me for the**

10  **last year.  So that probably was explanation.  If she had given**

11  **me three years earlier, I think we all would be happy, except**

12  **for you, of course.**

13         THE COURT:  Sir, if you can slow down just a little

14  bit.  I apologize for interrupting, but if you could slow down

15  just a little.

16         THE PLAINTIFF:  Yeah.  I said if she would explain to

17  me earlier what the problem is, then I think everyone here,

18  except for lawyers, will be happy.

19  BY MR. ENGLISH:

20  Q.     But you were aware in 2012 she had a problem, right?

21  These August e-mails in 2012, you were aware that you may have

22  been a reason why she was thinking about leaving in 2012,

23  because she was expending her energy trying to keep you away

24  from her --

25         THE COURT:  You have to slow down.

1          MR. ENGLISH:  Sorry.

2     BY MR. ENGLISH:

3     Q.    Right?

4     **A.    Could you repeat the question?**

5     Q.    You just said that you had no knowledge that there was a

6     problem by the time you wrote this letter --

7     **A.    No, I did not.  I said I know there is problem; I just**

8     **don't know what the problem is.**

9     Q.    If we go down a little bit, to the last paragraph of the

10    next page, and there you close the letter by saying "I do

11    understand however, that it is my ignorance that made your life

12    even more unpleasant than mine."

13         So you were aware that you were making her life

14    unpleasant, right?

15    **A.    Again, it is my position that the first step to trying to**

16    **find peace is to assume that there's something that you have**

17    **done wrong.  I don't know what I did wrong, but that's my way**

18    **to open conversation and to say I am not God; there might have**

19    **something I did wrong, but I'm ready to change if you let me**

20    **know what this change should be.**

21    Q.    Let's go to Defendant's Exhibit 11, please.  Let's go

22    down to this e-mail of September 4, 2013, and show that first.

23         So here's an e-mail dated September 4, 2013, from you to

24    Sara More.  I'm going to focus on paragraph 1.  There, you say

25    "so that Thursday issue is never a problem between us again,

1  let's just say that if I did not already schedule something for

2  that day, I will come on Thursday if you just slightly hint me

3  in the most subtle way that you might be marginally interested

4  in me being there."

5      Why does she have to give you a hint?

6  **A.    This is actually e-mail when the new provost, Jeanine**

7  **Stewart, who filed this complaint against me, decided to come**

8  **to campus, I believe.  If you scroll down --**

9  Q.    I asked you a specific question, Dr. Naumov.  Why does

10  she have to give you a hint in the most subtle way that she

11  might be marginally interested in you being at some meeting?

12  **A.    Can I give you an answer?**

13  Q.    You can answer, absolutely.

14  **A.    Because we had issue of when this department meeting will**

15  **be scheduled.  She wanted to schedule it when she can be on**

16  **campus, and I was -- normally would not be on campus that day.**

17  **So we had this confrontation on which day it's going to happen.**

18  **Eventually, I said, okay, I'm giving up; if you really want it**

19  **on this date, just give me hint; we will schedule meeting with**

20  **Jeanine Stewart on that date.**

21  Q.    And then she did respond to this e-mail.  If we go up to

22  paragraph 1.  She responds to your paragraph 1 and says "I

23  don't like the arrangement you're suggesting in 1 below.  Why

24  can't I just express to you what a given situation is and let

25  you decide if you want to be involved in what's happening

1  and/or if you want to postpone an event?  I don't want to play

2  games about giving or interpreting subtle hints.  I prefer to

3  be straightforward about this."

4       Did you understand that she wasn't willing to play games

5  with you?

6  **A.    I understand, but in this case, she wanted me to be more**

7  **straightforward, which I did.  I never sent e-mail like this**

8  **again.**

9  Q.    Defendant's Exhibit 12, please.  If we go down to the

10  first e-mail in the string.

11       There's a September 6, 2013, e-mail from you to Dr. More,

12  and there you're asking her that you want to be able to meet

13  with the door closed, right?

14  **A.    Yes.  That was our common practice when we talk about**

15  **something we don't want students to hear.**

16  Q.    Okay.  Let's move up to the next e-mail in the chain.

17  She says, "Pavel, I don't really want to talk with the door

18  closed and especially not during my office hours.  So now

19  what?"

20       She's informing you there that she doesn't want to meet

21  with the door closed, right?

22  **A.    Right.**

23  Q.    We go to the first page, the top e-mail.  She then tells

24  you that "I'd like to keep the door open enough so that

25  students are aware that I'm in the office.  If that's not okay

1  with you, we can try to talk earlier on Wednesday."

2      So there's she's letting you know that she doesn't want

3  to meet with you behind closed doors, right?

4  **A.    No, it's not right.  She suggested a certain time.  She**

5  **did not want to close the door during office hours when**

6  **students come to see her.**

7      **Again, it was common practice to meet -- when we talk**

8  **about students or any other business, but we felt it's not**

9  **appropriate for students to hear, we would close door.  That**

10 **applies to everyone at McDaniel.**

11 Q.    Let's go to Joint Exhibit Number 4.  And we'll go to the

12 September -- I'm sorry, the May 28, 2013 e-mail, the first page

13 of that e-mail.

14     Here, you are telling -- this is from you to Sara More.

15 You are telling her that you would like to raise an issue with

16 the tone and form of her e-mail.  "After you read it, I had an

17 unpleasant feeling of a door slammed on me."

18     Were you under the impression that she had a problem with

19 your behavior towards her at that time?

20 **A.    No, I had a problem with her behavior.  We agreed to talk**

21 **openly about issues, and this is my e-mail that falls under**

22 **this agreement to forget about the past, start from scratch,**

23 **and talk openly about issues.**

24     **She did something.  I don't even remember what, but she**

25 **did something that I felt unpleasant and, as we agreed, as she**

1  **suggested, I sent e-mail on this.**

2  Q.    If we can go to Defendant's Exhibit 15.  You gave her

3  greeting cards, didn't you?  You testified about that.

4  **A.    Could you repeat the question, please?**

5  Q.    You testified about giving Dr. More greeting cards.

6  **A.    You're asking if I gave Sarah greeting cards?  Yes.**

7  Q.    Were they in connection with any kind of occasion?

8  **A.    Usually.**

9  Q.    This exhibit, Defendant's Exhibit 15, if we can go to the

10  actual card.  Just go to the next page, please.  There, it says

11  "I believe in you being happy here."

12      Was this -- is that your writing?

13  **A.    It looks like mine, yes.**

14  Q.    And this is a card you gave to her?

15  **A.    I believe I gave it to her when she was leaving for NSA,**

16  **and it was part of my interaction where I tried to convince her**

17  **to stay.**

18  Q.    Telling her that you believe in her being happy here?

19  **A.    Yes.**

20  Q.    But it wasn't associated with any occasion or anything.

21  **A.    It was associated with her leaving the job at McDaniel**

22  **and going to National Security Agency.**

23  Q.    And then Defendant's Exhibit 16.  This is another

24  greeting card.  If we go to the first page of it.  Have you

25  seen this greeting card before?  Did you give it to her?

1        We can go to the next page.  It has your writing on it.

2    There it says "thank you for tolerating me for these eight

3    years.  I know it has not always been easy."

4        Those your words?

5    **A.    Yeah.**

6    Q.    You're aware that she was tolerating you for the eight

7    years?

8    **A.    I think it's a nice way to say good-bye to a person.**

9    **This is card when she was leaving finally from McDaniel to**

10   **Johns Hopkins.  Again, I tried to invite her for lunch, and I**

11   **arrange to just give her card.**

12       **She was giving me cards.  She brought me a candle for my**

13   **birthday when she came to -- she and Jesse, her husband, came**

14   **to my, I think, 40th.**

15   Q.    Let's talk about that.  You said that she's visited your

16   home a number of times, right?

17   **A.    Yes.**

18   Q.    And you visited her home a number of times; is that

19   correct?

20   **A.    Yes.**

21   Q.    And isn't it true that she's only been to your house

22   twice?

23   **A.    No, that's wrong.**

24   Q.    Okay.  And is it not true that she came to your house

25   once when she was first hired in 2006 to have dinner?  She came

1   with her husband when she first started there in 2006.  Isn't

2   it true she came at that time?

3   **A.     But it was not only time, yes.**

4   Q.     And isn't it true that the only other time that she came

5   is in 2013 for a department picnic that was held at your house

6   for the entire department?

7   **A.     No, this is not true.  When Sarah got pregnant with her**

8   **first child, that was in 20 -- so she came in 2006.  She got**

9   **pregnant in 2007.  So I'm talking about 2008, I believe,**

10  **January 2008.  It was my 40th birthday, and we invited her and**

11  **Jesse to my birthday, and she came.  It was just close family,**

12  **me, my wife, two of my daughters, she, and her husband.  And**

13  **she was pregnant at the time, and we knew that she will be**

14  **away, and we will not interact, so --**

15  Q.     But wasn't that the first time that she came?

16  **A.     No.  No.  The first time she came was when she was just**

17  **hired, and I think she was not even employed at McDaniel yet.**

18  **We invited her again to meet -- we invited her and Jesse to**

19  **meet us, and we spent a while, I still remember, sitting in the**

20  **living room, talking about each of our families --**

21  Q.     So since 2008 she hasn't been to your house.

22  **A.     No, that's not --**

23  Q.     Since 2008, she hasn't been to your house, correct?

24  **A.     As I said, she came to 2013 picnic, and she brought not**

25  **only her husband but also her three children, and that was in**

1  **2013, yes.**

2  Q.    Other than that, she's never been to your house, correct?

3  **A.    Not that I remember right now.**

4  Q.    And isn't it true that you've only been to her apartment

5  only one time, when she was first hired; isn't that correct?

6  **A.    I have been to her apartment, and I also have been to her**

7  **house, in the apartment where Jesse lived.  I believe it was**

8  **once.**

9  Q.    And you've been to her house?

10  **A.    I have been to her house.  We brought gifts for Brandon**

11  **when he was born.**

12  Q.    Let's talk about policy.  Is it your understanding that

13  if McDaniel became aware of harassment by a professor, that it

14  cannot even investigate unless the victim files a grievance?

15  Is that your understanding?

16  **A.    I think everyone is free to investigate.  I don't think**

17  **what -- I think the policy that you refer to talks about**

18  **specifically grievance procedure, but it should not be elevated**

19  **to this level.**

20  Q.    But you acknowledge that the college can investigate if

21  it becomes aware of harassment, right?

22  **A.    Look, if I come to provost and say somebody harasses me,**

23  **provost would say in which way.  That's investigation.  Of**

24  **course they should.**

25  Q.    So even if the victim isn't willing to go forward with

1  any grievance process, you acknowledge that the college can go

2  forward and investigate, correct?

3  **A.      In a very limited sense.**

4  Q.      In what limited sense?

5  **A.      As I said, you need to listen, you need to talk to other**

6  **person and see if this other person indeed is willing to go**

7  **forward with charges.**

8  Q.      And if they're not able to go forward with charges, it's

9  my understanding that you agree that if the victim or alleged

10 victim is not willing to go forward with charges, that you

11 agree that the college can go forward and investigate the

12 allegations to see if there's a problem.

13 **A.      I think investigation should stop at the moment when**

14 **victim is not ready to go forward.  I think victim should be**

15 **informed about this.**

16         **I actually remember attending Title IX --**

17 Q.      Well, hold on.  Let me ask the question.  So I just want

18 to be clear.  It's your position, your interpretation of the

19 Title IX policy is that the college can't even investigate when

20 the victim is not willing to go forward?

21 **A.      Of course not.  I just said --**

22         MR. STROUSE:  Objection.

23         THE COURT:  Basis?

24         MR. STROUSE:  Yes, it calls for a legal conclusion.

25         THE COURT:  Approach.  Approach.

1    (Bench conference not transcribed.)

2         THE COURT:  The objection is overruled.

3  BY MR. ENGLISH:

4  Q.   So just to ask the question again because you may not

5  remember it.  Your understanding that under the school's Title

6  IX policy, that once the victim says they're, for whatever

7  reason, uncomfortable with going forward, it's your -- let me

8  finish the question -- is it your understanding that the

9  college is not even able to investigate?

10  **A.   May I have a copy of the Title IX policy?**

11  Q.   I didn't hear you.  I'm sorry.

12  **A.   You just referred to document.  Can I have a copy of it?**

13  Q.   A copy?

14  **A.   Yes.**

15  Q.   That's Title IX policy.  It's 27, Joint Exhibit 27.

16         MR. STROUSE:  I have a copy.

17  BY MR. ENGLISH:

18  Q.   My question is your understanding.  What is your

19  understanding?

20  **A.   I have been talking already for four hours.  Can I**

21  **have -- if you give me document, I can give you my**

22  **understanding of it.**

23         (Plaintiff's counsel hands Plaintiff document.)

24         THE PLAINTIFF:  So it is my understanding of the

25  college policy is that this statement is done in the formal

1  hearing part.  So it looks like the limited hearing could be

2  conducted without -- preliminary stage could be conducted

3  without complainant, but you need to have a complainant in

4  order to start formal procedures.  This informal stage, which

5  was never given to me, and the formal stage that was pushed

6  into --

7  BY MR. ENGLISH:

8  Q.    I didn't ask you about the grievance process.  I'm asking

9  you right now about the obligation to investigate, whether you

10  understood whether the college can investigate a claim of

11  harassment if the alleged victim is not willing to go forward.

12  So that's where my question is?  I understand you're talking

13  about the grievance process right now.  I'm asking you about

14  investigate.  What is your understanding --

15  **A.    Could you define investigate?  It seems to be a legal**

16  **term.  I'm not sure I understand what you mean by investigate.**

17  **Talking to somebody is starting investigation.**

18  Q.    I'll move on.  If there are multiple witnesses to the

19  alleged harassment, but the victim is unwilling to go forward,

20  is it your position that McDaniel can't investigate?

21  **A.    I do not know what you mean by investigate.  I think I**

22  **clearly explained that -- investigate is very broad term.**

23  **There's a sense that you can talk to people.  I think you can**

24  **do preliminary hearing, trying to settle things.  But once we**

25  **have no complainant, you cannot go into formal hearing because**

1 **that's what the first paragraph of formal hearing says.**

2 Q.    But as you sit here today, you don't know what the term

3 investigate means.  You have no --

4 **A.    That's why I'm asking, because this document does not**

5 **talk about investigate.  It talks about grievance.  It does not**

6 **talk about investigate.  You bring some term that I don't know**

7 **what exactly you mean by it, and I'm trying to answer**

8 **impossible allegations.**

9 Q.    So if you have -- investigation, let's assume it means

10 talk to witnesses, look into --

11              MR. STROUSE:  Objection, Your Honor.

12              THE COURT:  I'm going to sustain the objection.

13 BY MR. ENGLISH:

14 Q.    You don't know what investigate means, right?

15 **A.    In the precise meaning of what you're trying to use it in**

16 **the courtroom, no, I don't.**

17 Q.    Okay.  And you also don't know that if an alleged

18 harasser, let's say, has harassed hundreds of victims over

19 decades --

20              MR. STROUSE:  Speculation, Your Honor.

21              THE COURT:  I'm going to sustain as to speculation.

22 BY MR. ENGLISH:

23 Q.    What about if victims are no longer actively employed by

24 the college?  Are you saying that they have to be -- that

25 there's a requirement for them to go forward in order for the

1  college to proceed under its policy?

2  **A.     I believe so.  This is what your policy says, yes.**

3  Q.     You believe that the college can proceed?

4  **A.     I believe that it cannot proceed unless there is a**

5  **complainant.**

6  Q.     And so if the victim happens to die during the process,

7  there's nothing that can be done?

8          MR. STROUSE:  Objection, Your Honor.  It's

9  speculation.

10         THE COURT:  I'm going to sustain the objection.

11         THE PLAINTIFF:  I believe even in legal --

12         THE COURT:  Sir, I sustained the objection.

13  BY MR. ENGLISH:

14  Q.     You were the department head for the math and --

15         THE COURT:  Actually, if we're starting to change

16  gears a little bit, now would be a good time to break for the

17  evening, as it's a little bit past 5:00.

18     (Cross-examination of Pavel Naumov suspended, to resume

19  at 10 a.m., January 25, 2018.)

20

21

22

23

24

25

1                      CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Cindy S. Davis, Federal Official Court Reporter in and

4     for the United States District Court for the Southern District

5     of Maryland, do hereby certify that I reported, by machine

6     shorthand in my official capacity, the proceedings had in the

7     case of Pavel Naumov versus McDaniel College, Inc., case number

8     GJH-15-00582, in said court on January 24, 2018.

9          I further certify that the foregoing 88 pages constitute

10    the official transcript of an excerpt of the proceedings

11    consisting of witness testimony, as taken from my machine

12    shorthand notes to the best of my ability.

13         In witness whereof, I have hereto subscribed my name this

14    25th day of January, 2018.

15

16

17

18

19                    *Cindy S. Davis*

20                    _____

21                    **CINDY S. DAVIS, RPR**
                      **FEDERAL OFFICIAL COURT REPORTER**

22

23

24

25