1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF MARYLAND

3

PAVEL NAUMOV,                    )
4                                )
          Plaintiff,             )
5                                )
      vs.                        )     CASE NUMBER 8:15-cv-00482-GJH
6                                )
MCDANIEL COLLEGE, INC.           )
7                                )
          Defendant.             )
8  _____)

9

                    TRANSCRIPT OF PROCEEDINGS
10                      WITNESS TESTIMONY
            BEFORE THE HONORABLE GEORGE J. HAZEL
11           THURSDAY  JANUARY 25, 2018; 10:10 A.M.
                    GREENBELT, MARYLAND
12

FOR THE PLAINTIFF:

13
       James C. Strouse, Esquire
14     STROUSE LEGAL SERVICES
       5401 Twin Knolls Road, Suite 7
15     Columbia, MD  21045

16  FOR THE DEFENDANT:

17     Donald E. English, Jr., Esquire
       Eileen Carr Riley, Esquire
18     JACKSON LEWIS, P.C.
       2800 Quarry Lake Drive, Suite 200
19     Baltimore, MD  21209

20

       Proceedings recorded by mechanical stenography, transcript
21  produced by computer.

22  _____

23
                    CINDY S. DAVIS, RPR
24          FEDERAL OFFICIAL COURT REPORTER
            6500 CHERRYWOOD LANE, SUITE 200
25              GREENBELT, MD  20770

1 <u>I N D E X   O F   W I T N E S S   T E S T I M O N Y</u>

2 JANUARY 25, 2018, Volume 3

3

4 PLAINTIFF'S

5 WITNESSES:_____ DIRECT   CROSS   REDIRECT   RECROSS

6 Pavel Naumov (resumed)        3       33        --        --

7

8 DEFENDANT'S

9 WITNESSES:_____ DIRECT   CROSS   REDIRECT   RECROSS

10 Sara More                    38       58        --        --

11 Eric Immler                  72       92       105        --

12 Thomas Falkner              111      117       127        --

13 Jennifer Glennon            132      164        --        --

14

15

16

17

18

19

20

21

22

23

24

25

1          E X C E R P T   O F   P R O C E E D I N G S

2          (The Plaintiff **PAVEL NAUMOV** previously sworn.)

3          **CROSS-EXAMINATION BY THE DEFENSE (RESUMED)**

4     BY MR. ENGLISH:

5     Q.    Good morning, Dr. Naumov.

6     **A.    Good morning.**

7     Q.    Just a few more follow-up questions for you.  You

8     testified that Dr. More was not involved in the investigation,

9     but you would agree that during the investigation, that she

10    provided information to the college about your behavior towards

11    her.

12    **A.    Your presumptional question is not correct.  I did not**

13    **testify to this.  I testified that she did not file the**

14    **complaint.**

15    Q.    But you agree she was involved in the investigation.

16    **A.    Please define investigation.**

17    Q.    You don't know what investigation means?

18    **A.    I think investigation is a very broad and vague term and**

19    **has very different meanings.**

20    Q.    Okay.  You agree that she provided -- so let's get into

21    what investigation is.  You agree that she provided e-mails and

22    documents that you and I discussed yesterday.  The same e-mails

23    and documents that you and I talked about yesterday, she

24    provided that to the college, right?

25    **A.    I do not know where those documents were -- I believe**

1    e-mails were obtained by your seizure of our e-mail accounts.

2    Dr. Stewart arrested my e-mail account.  She locked the door to

3    my office.  She banned me from coming on campus, and she went

4    through my personal diaries.  She went through all e-mails and

5    found all this stuff.  That's how I understand you got it.  I

6    don't know --

7    Q.    You have no understanding that Dr. More provided e-mails

8    to Dr. Stewart?

9    A.    I think -- I have no idea what happened.  This is just

10   hearsay.

11   Q.    You don't know?

12   A.    I have not seen them -- that was not discussed with me,

13   so I cannot testify to.

14   Q.    And you did know that she was the person who was

15   identified as being the victim of your behavior, right?  That

16   was disclosed to you, correct?

17   A.    No.  Actually, at our regional meeting, which was called

18   informal procedure, when she invited me and said either you

19   resign from McDaniel or we'll start grievance process against

20   you, it was supposed to be informal procedure done by --

21   Q.    I'm asking you a question, because you're going on into

22   some other --

23   A.    Yes, and during this meeting --

24        THE COURT:  I'm sorry, one at a time.  One at a time.

25   Ask your question.

1  BY MR. ENGLISH:

2  Q.    My question is that you knew that it was Dr. More who was

3  the alleged victim of your behavior, correct?

4  **A.    At the time when allegations were made against me, no.**

5  **She did not tell me much of anything.  She said it was a**

6  **complaint against me.  She said that -- I asked her to discuss**

7  **what her issue is.  She said, Pavel, if you still send this**

8  **from a college computer, I will invite you to my office and we**

9  **will talk about this, but those allegations are so serious that**

10 **I, as the provost, cannot discuss it with you.**

11 Q.    It's your testimony that you never knew who the victim

12 was?

13 **A.    What do you mean?  What I knew when?  I don't see how**

14 **somebody is a victim here.**

15 Q.    When did you come to learn who the alleged victim was of

16 your behavior?

17 **A.    Alleged by whom?**

18 Q.    Alleged by the college.

19 **A.    There's no single paper that says that college alleges**

20 **anything.  Those are complaints by Stewart.  I know that those**

21 **guys now are saying we have filed on behalf of the college.**

22 **No.  The papers filed are on behalf of Stewart, not on behalf**

23 **of college.  There's no single place that says on behalf of**

24 **college.**

25 Q.    Dr. Naumov, you're going to tell the jury that you didn't

1  know Dr. More was the alleged victim in this case?

2  **A.     I object to your term victim.  I don't think that she is**

3  **victim.**

4  Q.     I said alleged.

5  **A.     Alleged by whom?**

6  Q.     Okay.

7  **A.     I think many people --**

8         MR. ENGLISH:  There's no question pending.  There's

9  no question pending.  I don't need to ask another question on

10  this issue.

11  BY MR. ENGLISH:

12  Q.     At some point you were the department head of the math

13  and computer science department, right?

14  **A.     Yes, that's correct.**

15  Q.     And isn't it true that while you were the department

16  head, if a student reported harassment to you, that a professor

17  was harassing the student, you'd have to report it, wouldn't

18  you?

19  **A.     I am faculty advisor at college now, and Vassar indeed**

20  **has a policy right now --**

21  Q.     I'm not asking you about Vassar.

22  **A.     Exactly.**

23  Q.     I'm asking you about --

24  **A.     I never heard about this at McDaniel.**

25  Q.     So when you were the department head of the entire math

1  and computer science department at McDaniel College, if a

2  student came to you and said that there's a problem with a

3  professor harassing me, you wouldn't report it?

4  **A.     I would handle this to the best of my knowledge.  I do**

5  **not remember any regulation at McDaniel that would require me**

6  **to report it.**

7  Q.     So you're telling the ladies of the jury that you would

8  not have a requirement to report it if a student came to you

9  and said that a professor is harassing me?

10  **A.     Well, I would listen to the student and see how serious**

11  **those allegations are.  There is no policy at McDaniel, to the**

12  **best of my knowledge, for department chair to report it.  If**

13  **there is such policy -- maybe now they have such policy.  And I**

14  **would, of course, try to protect the victim.  But there is no**

15  **specific policy that I am aware of that would require me, as**

16  **department chair or faculty member, to report harassment**

17  **complaint.**

18  Q.     And if you made the decision that even though it might be

19  significant to the student in this case, you made the decision

20  that it was somehow insignificant, you wouldn't report it,

21  would you?

22          MR. STROUSE:  Asks for speculation, Your Honor.

23          THE COURT:  I'll overrule it.

24          THE WITNESS:  Can you repeat your question?

25  BY MR. ENGLISH:

1   Q.    It's your position that if you determined that the

2   allegations that the student made about the faculty member

3   harassing them, if you made the determination that they were

4   insignificant, you wouldn't report it, right?

5   **A.    So the students come to department chair on regular basis**

6   **with various different complaints about faculty and grades.**

7   **I remember a case when a student complained of faculty**

8   **member, adjunct faculty member wanted to make-up exam at seven**

9   **in the morning, and it was a female student who was**

10  **uncomfortable with this.  I asked secretary to contact adjunct**

11  **faculty, and she talked to him and said this is not really**

12  **common at McDaniel to have make-up exams at seven in the**

13  **morning.  So --**

14  THE COURT:  Sir, you have to slow down.  Sir, all I'm

15  asking you to do is slow down a little bit so we can hear you.

16  THE WITNESS:  Oh.  So as I said, when I was

17  department chair, I had situation when female student

18  approached -- actually, she approached secretary, asking for

19  help, that your professor was adjunct faculty -- temporary

20  adjunct faculty, suggested for the student to make up her

21  individual test very early in the morning, and she was

22  uncomfortable about this, and our secretary talked to me, and I

23  asked secretary to talk to the professor, who changed this, and

24  he said that he didn't realize that this sounds strange, that a

25  student is uncomfortable.

1      So I think there are issues that could be addressed and

2  resolved on the department level, and they should be resolved

3  on the department level, unless there is a policy that says you

4  need to report something.  Like, at Vassar, for example, there

5  is such policy.  But at McDaniel, I am not aware of it.

6  BY MR. ENGLISH:

7  Q.      Prior to this lawsuit, you did not have an understanding

8  of what McDaniel's obligations were when investigating

9  workplace harassment, did you?

10  **A.      I think that I had understanding on the same level as a**

11  **regular citizen of this country.**

12  Q.      So it's your testimony that you did have an understanding

13  of the policy regarding this lawsuit?

14  **A.      No, I was not familiar with McDaniel Title IX policy.  I**

15  **first saw it when I got it as attachment to -- or when I got it**

16  **from Stewart, from when she tried to fire me and she invited me**

17  **to this informal procedure, which she should never have been**

18  **part of.**

19  Q.      So you admit at the time that this contract was

20  presented, when it was rolled out in June of 2014, you had not

21  even read it, right?

22  **A.      So that contract was presented to me --**

23  Q.      Wait a minute.  It's a yes or no question.  You just

24  testified --

25  **A.      Well, that's not a yes or no answer --**

1    Q.    Let me finish my question, sir --

2          THE COURT:  One at a time.  One at a time.

3    BY MR. ENGLISH:

4    Q.    Let me ask the question.  You just testified that you did

5    not see the policy until Dr. Stewart showed it to you after the

6    grievance had started.  My question to you is that then isn't

7    it true that you did not read the policy when it was given to

8    you in June of 2014?

9    A.    It was -- that's what I'm trying to answer, that it was

10   not given to me in June '14.  Faculty at McDaniel have

11   nine-month appointment.  We do not work in summer.  We are not

12   paid for summer.  And so the fact that somebody, in June '14,

13   comes up with new policy, nobody gave me this policy, and I did

14   not read it because I was not under obligation to -- well,

15   first of all, nobody gave it to me, and I was not technically

16   even employed with McDaniel.

17   Q.    We're going to bring up Exhibit 25.  It's your testimony

18   no one gave you the policy in June of 2014?  That's what I just

19   heard.  Is that what you just said?

20   A.    In June of 14, again, I remember in June '14 HR sending

21   e-mails with some informal presentations, and you need to sign

22   up for some kind of seminars, and because I am not employed in

23   June '14, I -- so when semester starts, I will sign up for

24   seminar.  Whether something was mailed to me by e-mail, maybe.

25   I don't remember this.  But I don't remember anyone handing me

1  **in person Title IX policy in June '14.**

2  Q.    So I think we agree.  So you didn't read the policy in

3  June of 2014, correct, because you hadn't seen it.  That's your

4  testimony.

5  **A.    Yes.**

6  Q.    And you hadn't seen the policy until after the grievance

7  had started, correct?  I don't think we disagree.

8  **A.    No, you need to define what means grievance started.**

9  **Grievance started after -- you see, she suspended me from**

10 **campus before she actually filed the complaint.  I was off the**

11 **campus for half a year, and that was all started --**

12 Q.    When did you get the policy?

13 **A.    I got the policy when there was illegal informal hearing**

14 **conducted by Stewart, rather than Jasken, who was supposed to**

15 **do it.  So that's when I was handed the policy.**

16 Q.    Fair enough.  Let's talk about damages.

17 **A.    Yes, let's talk.**

18 Q.    You're currently making -- is it true that you're making

19 $84,430 at Vassar; is that correct?

20 **A.    Roughly, correct.  I don't remember exact number.**

21 Q.    And that's more money than you were making at McDaniel

22 when you left, right?

23 **A.    It depends on how you count it.  At McDaniel, the benefit**

24 **package was significantly better than what I am getting here.**

25 **First year at Vassar, I was not getting any retirement**

1    **contribution at all.  McDaniel, on top of my salary, was paying**

2    **10 percent towards my retirement contribution --**

3    Q.    Dr. Naumov, isn't the retirement benefit at Vassar 12

4    percent?

5    **A.    I was not eligible for retirement benefit at Vassar**

6    **during my first year at Vassar.  But that's not only benefit.**

7    **At McDaniel, I had access to free tuition for my kids.  I no**

8    **longer have it.**

9         MR. ENGLISH:  I would ask to strike that last answer,

10   Your Honor.

11        THE WITNESS:  You cannot compare numbers.

12   BY MR. ENGLISH:

13   Q.    I am asking you about your salary.

14   **A.    Right.**

15   Q.    I'm asking you a simple question.  You make more money at

16   Vassar.  Your salary was higher at Vassar than it was at

17   McDaniel, correct?

18   **A.    My salary is slightly higher at Vassar, but I do not make**

19   **more money.  And I spend much more money now on two households,**

20   **on legal fees, on transportation --**

21   Q.    We're going to talk about that here in a second.  Let's

22   talk about full professor, because you said that you would have

23   made full professor at McDaniel.

24        You were initially denied tenure at McDaniel, correct?

25   **A.    So what happened in 2009 is that semester before -- so I**

1    **came to McDaniel and --**

2    Q.    Dr. Naumov, I'm asking you just a very simple question.

3    Were you denied tenure at McDaniel the first time?

4    **A.    No, I was not.  My decision was postponed by McDaniel by**

5    **two years because of my cancer, my throat cancer.**

6    Q.    And it's your testimony that the only reason that you

7    were, as you say, the tenure was postponed was due to a

8    sickness.  It had nothing to do with the grades you received

9    and the evaluations for your teaching?

10   **A.    Those grades, as I understand, were the result of the**

11   **fact that I was -- had cancer surgery, and I got to teach some**

12   **new classes outside of my area of expertise, where I was asked**

13   **to teach math classes instead of computer science.  So student**

14   **evaluations slipped down a little bit, and McDaniel first,**

15   **indeed, voted, based on teaching level, not to give me tenure.**

16   **After this I talked to them, and they changed their opinion,**

17   **and they gave me extra two years.**

18   Q.    So you agree there was a vote the first time you were up,

19   and you were denied tenure; is that fair to say?

20   **A.    There is a procedure, a very well outlined procedure, and**

21   **the first time around, McDaniel fully followed this procedure,**

22   **and the final decision of the college was to give me extra two**

23   **years, which they gave, and they gave me tenure later on.**

24   Q.    You were also let go by Penn State when you were there,

25   correct?

1  A.     I was not reappointed after four years due to my low

2  research productivity, yes.

3  Q.     Due to your low research productivity?

4  A.     That's correct.

5  Q.     You would not have even been eligible to be a full

6  professor until 2019, correct?  Even if you were to stay at

7  McDaniel until 2019.

8  A.     I believe the promotion to full professor happens six or

9  seven years after -- I need to be read careful handbook, but

10 it's six or seven years after promotion to associate.  I was

11 promoted to associate '11.  Today is year '18.  So I would

12 think that this year I would be eligible to become full

13 professor.

14 Q.     Isn't it eight years that it takes --

15 A.     To the best of my knowledge, it's six or seven years, not

16 eight.

17 Q.     But you had no plans to stay at McDaniel through 2018 or

18 2019, because you were actively looking and applying for jobs

19 to leave McDaniel, right, even before the grievance started.

20 A.     Look, you need to look at life opportunities.  Of course,

21 I was interested to fulfill my -- to leave as extensive life as

22 I can and to do as much as I can.  If there are better

23 opportunities outside McDaniel, as any normal people, I would

24 do it.  I know Stewart came to McDaniel from a different

25 institution.  Casey came to McDaniel from a different

1  **institution.**

2  Q.     My question is you had no plans to stay at McDaniel

3  College through 2019; is that correct?

4  **A.     I did not have -- that is not correct.  Life is**

5  **unpredictable, as I learned recently, and I look at different**

6  **opportunities.  I could stay; I could leave.  I had those**

7  **chances.  You took away my options.**

8  Q.     Okay.  Let's talk about the two residences and the fact

9  that you live in New York.

10  **A.     I would be pleased to.**

11  Q.     You want McDaniel to pay for your housing expenses at

12  Vassar, correct?

13  **A.     No.  No.  I think --**

14  Q.     You don't want McDaniel to pay for the housing expenses

15  that you're incurring at Vassar?

16  **A.     Could you please let me answer your question?  I think**

17  **that I had certain living standards here in Maryland.  I had a**

18  **house.  What we pay for it, $650,000.  I was four-bedroom**

19  **house, with backyard, in a nice neighborhood.  So far, you**

20  **pushed me into living in a shitty apartment on campus, which**

21  **has very different lifestyle.  You took away my living level.**

22  **I don't think that you should pay for -- not only for current**

23  **cost of living, because that's all I can afford after lawyer's**

24  **fees, but I think you should compensate me and bring me to the**

25  **level on which I was before --**

1  Q.    Isn't it true that you have -- the same house that you

2  had while you were at McDaniel, you still have that house,

3  correct?

4  **A.    Except that I don't live there.**

5  Q.    And that's your choice though, isn't it?

6  **A.    If you tell me that I have White House, but I don't live**

7  **there.**

8  Q.    But that's your choice, right?  You choose not to live in

9  Maryland, right?

10 **A.    No, it's not.**

11 Q.    Let's talk about that.  Let's talk about that.

12 **A.    Yes, let's talk about that.  You asked the question about**

13 **my -- no, please --**

14          THE COURT:  One at a time.  Hold on.  So just so

15 everyone understands, in a courtroom, unlike in the real word,

16 we have to get everything down that everyone is saying.  So

17 when you interrupt each other or when you speak too fast, we

18 simply are not able to keep a record.  For that reason, we need

19 to slow down, and I'll ask you both not to interrupt each

20 other.

21     Now, you were giving your answer, so you can finish your

22 answer, and then we'll get the next question.  If you now don't

23 remember what that was, then he can restate the question.

24          THE WITNESS:  Yes, could you please restate the

25 question, the previous one, not new one.

1    BY MR. ENGLISH:

2    Q.    You would agree that a computer science professor with

3    credentials like yours --

4              THE WITNESS:  Your Honor, he's asking different

5    question.

6              THE COURT:  I gave you the opportunity to finish your

7    answer.  If you don't remember, he now gets to restate a

8    question.  It might be a different question.

9              MR. ENGLISH:  I think he answered the question that I

10   asked.

11             THE COURT:  Next question.

12   BY MR. ENGLISH:

13   Q.    You agree that a computer professor like yourself, with

14   the credentials that you have, that you're in high demand?

15   **A.    From what I learned -- no.  With damaged reputation**

16   **produced by your client, I am no longer in high demand.**

17   Q.    But you were able to land a job at one of the top

18   colleges in the nation by teaching at Vassar, right?

19   **A.    It's a temporary one-year appointment, which was extended**

20   **to another year, and I was told that I cannot stay there more**

21   **than six years due to college policy.**

22   Q.    Now, you testified that you applied for 279 jobs,

23   correct?

24   **A.    That was yesterday.  This morning I applied for one more,**

25   **so it's 280.**

1  Q.    What job did you apply for yesterday?

2  **A.    It was this morning at six in the morning.  I was too**

3  **tired yesterday.**

4  Q.    This morning, what job did you apply for?

5  **A.    Some university in Europe.**

6  Q.    In where?

7  **A.    In Finland.**

8  Q.    In Finland.  You didn't apply to anywhere in the DMV

9  area, D.C., Maryland, Virginia area?

10  **A.    There were no vacancies available for my qualification**

11  **and my expertise.  What was available was a position for**

12  **associate professor in artificial intelligence, and that's what**

13  **I applied to.**

14  Q.    And of the 279 jobs that you applied to --

15  **A.    You mean 280.**

16  Q.    I'm sorry, you're right.  I am bad at math.

17  **A.    Yeah, well.**

18  Q.    The 280 jobs that you applied to, and I think you gave us

19  a list, which is Plaintiff's Exhibit 9, of most of those jobs.

20  Only six of those were in the D.C., Maryland, Virginia area,

21  correct?

22  **A.    Exactly, and that shows the extent of the damages.  It's**

23  **very hard to find local job.  There are lots of families,**

24  **academic couples, who have to live on different even**

25  **continents, and that's what you pushed me into doing.**

1  Q.    Despite the fact that there were almost 46 colleges in

2  the D.C., Maryland, Virginia area, you only applied to six of

3  them since 2014, correct?

4  **A.    No, I am not aware of this.  I need to count.  If you**

5  **give me the list, I can count.  But I find it doubtful.**

6  Q.    Well, the list that I have --

7  **A.    Can I see it?**

8  Q.    Well, it's -- these are my --

9  **A.    Well, that's your list.  But if you give me my list, I**

10 **can look at it.**

11 Q.    I'll go to the next question.

12 **A.    Okay.**

13 Q.    You don't deny that you only applied to six colleges in

14 the D.C. area.

15 **A.    It doesn't look right to me, but if you show me the**

16 **document, as you have all opportunities to do, I can count for**

17 **you.**

18 Q.    So we'll look at Exhibit 9, if we can pull that up?

19          THE COURT:  Hold on, Mr. Strouse.  It's his witness.

20 If someone is going to hand him something --

21 BY MR. ENGLISH:

22 Q.    This is your document?

23 **A.    This is my document, and at the top are listed more**

24 **prestigious institutions, and down the list they are less**

25 **prestigious.**

1  Q.    And I don't want to belabor this point, but the only

2  question I have for you is that of the 280 jobs you applied to

3  since the 2014/2015 academic year -- and actually, we can hand

4  him a copy.  If we can give him a copy so he can look at it up

5  here and leaf through it.  There are only six in the D.C.,

6  Maryland area.

7  A.    **Again, you have opportunity to give me list, and I will**

8  **count it for you.**

9  Q.    Okay.  (Document handed to the Plaintiff.

10       THE COURT:  Just for identification purposes, what

11 Exhibit Number is that that was handed to the witness?

12       MR. STROUSE:  Plaintiff's 9.

13       THE WITNESS:  In 2014, I applied to George Mason

14 University.  That's number one.

15       Office of Financial Research is in Washington, D.C.

16 That's number two.

17 Q.    That's not a school, right?

18 A.    **No, because I applied for positions outside academia as**

19 **well.**

20 Q.    I understand.

21 A.    **You don't want me to count those?**

22 Q.    Yeah, you can count them.

23 A.    **University of Richmond in 2014 as well.**

24 Q.    Do you consider that the area?  Would you be able to live

25 in Rockville and work in Richmond?

**A.**    **We would be able to buy a house in the south, south of**

**Washington, and we can compute from -- Elena is in Virginia,**

**and I will be in Richmond.  Yes --**

Q.    So you would have to move.  My question is places that

you applied to where you can keep your one home that you had

while you were at McDaniel.

**A.**    **We can still have one home if I work in Richmond.**

Q.    So you would move.  You wouldn't need to have two houses.

**A.**    **It used to be she would work in Washington I would teach**

**in Harrisburg.  We have house in Frederick.  That commutable**

**distance, 70-some miles one way.  But 360 one way is not**

**commutable.**

**So do you want me to count.**

Q.    Absolutely.  We're at three, correct?

**A.**    **I think we're at three.  UMBC.  This is, if you don't**

**know, University of Maryland, Baltimore County.  Number four.**

Q.    That's four.

**A.**    **William and Mary College.  It's a bit of a stretch, but I**

**think it's still doable.  That's number 5.**

Q.    You would count William and Mary as being in the local

area and not Vassar?  How long does it take you to drive from

Vassar to --

**A.**    **Six hours.**

Q.    And how long does it take to get down to William and

Mary?

1   A.      As I said, it's a stretch.  You need to live halfway

2   between.  I can take your argument and we can count as half.

3   Is that good?

4   Q.      Okay.  Go ahead.

5   A.      So we have four and a half, right?

6   Q.      I'm letting you go through the list that you think that

7   you applied to in the area.

8   A.      University of Maryland.  So that will be -- what is it?

9   Five and a half.

10  Q.      I have five, but go ahead.

11  A.      GWU.  That's -- my count is six and a half; yours is six.

12          NIS, National Institute of Standards.  That's in

13  Gaithersburg.  That's number 7 even under your count.

14          So to answer your question, no, it's not true that I

15  applied to six places.  And if we just look at the first year.

16  I applied to all those places in the first year.  No, to answer

17  to your question, this is not true.

18  Q.      Keep going.  Let's keep going.  How many total.

19  A.      Oh, you want me to count all of them?

20  Q.      Yes.

21  A.      The same year, there was Office of Naval Research.

22  That's number -- what ?  I think it's number 8 and a half by my

23  count.

24          Princeton.  It's a stretch.  I don't know.  Do you count

25  it as half?

1  Q.    Princeton is not in the D.C., Maryland, Virginia area?

2  **A.    Again, I used to teach in Harrisburg when my wife was**

3  **working in D.C.  It was hard times for us, but we managed it.**

4         **QSS.  I don't really remember where it is.  It's some**

5  **kind of business company.  It might be in Virginia, maybe not.**

6  **I don't remember now.  Do you?**

7  Q.    Go ahead.  Is there anywhere else?

8  **A.    Can I count QSS into my list?**

9  Q.    Where is it?  Do you know where it is?

10  **A.    I don't remember.**

11  Q.    Then we can't count it.  If you don't know where it is, I

12  don't know where it is.

13         THE COURT:  Let me just say that I prefer the

14  questions to come from here, and the answers to come from here.

15  BY MR. ENGLISH:

16  Q.    Go ahead.  Is there anywhere else that you applied to

17  that's in the D.C., Maryland, Virginia area?

18  **A.    Let's go to the second year.  Bryn Mar College.  Again,**

19  **it's a stretch, but I think it's doable.**

20         **Buckner, I applied for two positions.  It's probably too**

21  **far.**

22  Q.    Okay.

23  **A.    Elizabethtown College.  That's in Harrisburg.  I used to**

24  **actually teach in Harrisburg, so there is no -- I did commute**

25  **there.**

1          **Franklin and Marshall College.  Gaucher College.**

2    Q.    So let me ask you this.  You named some colleges that you

3    applied to in the area, but during that same time frame, you

4    applied for almost 60 jobs outside of the United States,

5    correct?

6    **A.    Well, I applied for all positions, and I assumed that**

7    **allegations that I have against me outside of United States**

8    **might have lesser weight than inside the United States.**

9    Q.    Be you applied for substantially more opportunities

10   outside the United States than in the D.C., Maryland, Virginia

11   area.

12   **A.    Of course, because outside the United States is much**

13   **larger than this area.  There are many more institutions**

14   **outside of the States than in the D.C. area.**

15   Q.    And it's your testimony that there are no -- the reason

16   that you only applied to a handful of jobs is because there

17   were no job openings, right?

18   **A.    I applied to -- at time when I was sitting with no job at**

19   **all, I was applying to all possible positions in math or in**

20   **computer science which I remotely would fit, including**

21   **positions in industry and government, as you have seen.**

22   Q.    Isn't it true that in the last year, that you've only

23   applied to two positions in the D.C., Maryland, Virginia area,

24   correct?

25   **A.    No, that's not correct either.**

1  Q.    Well, let's go to the last year.  Let's go to --

2  **A.    Yes, let's find it.  Last year means -- you mean this**

3  **year, right?**

4  Q.    This year.  So that's the 2017/2018 academic year.

5  **A.    Yes.  American University.**

6  Q.    That's one?

7  **A.    They had position, and I applied for it.  Again, I**

8  **applied for only positions that are advertised and which are**

9  **available.**

10        **Dickinson College.**

11  Q.    Dickinson is down in North Carolina, right?  Or where is

12  Dickinson?

13  **A.    No.  Dickinson is in Pennsylvania, next to Harrisburg,**

14  **Pennsylvania.  Actually, the guy whose position opened up, he**

15  **died from cancer.  He used to be my colleague at Harrisburg.  I**

16  **know him --**

17  Q.    So you applied to Dickinson College.  So you're going to

18  count that as being in the D.C. area, which wouldn't require

19  you to move or have a second residence.

20  **A.    That's what I have been doing for five years.  We lived**

21  **in Frederick.  I would commute to Harrisburg, and my wife would**

22  **go to Washington.**

23        **Do we want to continue here?**

24  Q.    Where else?

25  **A.    George Mason University.**

1    Q.     George Mason.

2    **A.     So that's three places.  The answer to your question that**

3    **it's two is wrong.**

4    Q.     So you applied to three in a year, correct?

5    **A.     Looks like.**

6    Q.     And that three counts Dickinson College, which is

7    somewhere in Pennsylvania.  I don't know where Dickinson

8    College is.

9    **A.     I would be happy to live with my wife, not spend six**

10   **hours commuting back and forth.**

11   Q.     And the reason that you did not apply to other positions

12   in the local area is, it's your testimony, because there are no

13   openings?

14   **A.     I have not seen advertisement for positions that would**

15   **fit my background and rank and what I am doing.**

16   Q.     And you agree that you used -- based on this document

17   here, you used websites like mathjobs.org for your job search,

18   correct?

19   **A.     No.  This is actually website where you apply for -- so**

20   **it is, like, we have common app for students and now sites**

21   **where you a can apply to multiple institutions.**

22   Q.     My question is this --

23   **A.     No, it's not site where you -- I look at it from time to**

24   **time, but the main goal of mathjobs is to apply, just like**

25   **common application for students.**

1   Q.    But you looked at mathjobs.com, right?  If we go to the

2   last page of this exhibit.

3   **A.    Yeah.  So I don't have a PhD in math.  I applied to a**

4   **very few positions in math which seemed to be connected to**

5   **logic.**

6   Q.    Do you use mathjobs.org to look for openings?

7   **A.    Yes.**

8   Q.    In the area?  Yes?  And you couldn't find any openings in

9   the D.C. area?

10  **A.    So again, mathjobs.org is mostly for people with PhD in**

11  **mathematics, not with PhD in computer science.  I would not**

12  **fit.  Just like you ask me to teach chemistry.  I have no**

13  **qualification to teach chemistry.  I actually tried to apply**

14  **for math positions previously --**

15  Q.    But you monitor mathjobs.com.

16  **A.    Yes, for positions in logic, yes.**

17  Q.    And then you also monitored higheredjobs.com as well?

18  **A.    Yes.**

19  Q.    That's a site you used.  You've been actively looking for

20  jobs in the area?

21  **A.    I was looking at those sites several times a day.**

22  Q.    Several times every single day?

23  **A.    Essentially, yes.  In my browser, I have tab.  If you**

24  **click, it opens all the websites for jobs.  I do it more than**

25  **once a day.**

1  Q.    Okay.  Have you done it in the last week or two?  You

2  said you do it every day, so I'm just asking --

3  **A.    Yeah, I did it yesterday before I went to bed.**

4  Q.    Did you become aware of a department of mathematics and

5  statistics position that is at Georgetown University, that is

6  open, that -- the position title is director of graduate

7  studies, mathematics and statistics.  That job was posted on

8  November 28, 2017.  Did you apply for that job?

9  **A.    That job clearly required PhD in mathematics, which I**

10 **don't have.**

11 Q.    Why would you say it clearly requires a PhD in

12 mathematics?

13 **A.    Can I see the document?**

14 Q.    Sure.

15            THE COURT:  If you're putting it on the monitor, you

16 have to switch it back.  And give it an exhibit number.

17            MR. ENGLISH:  This is going to be Defendant's Exhibit

18 35.

19            THE WITNESS:  No, no.  I need to see the whole

20 advertisement.  You are showing me just -- I want to see

21 description of job and requirements of the job.

22 BY MR. ENGLISH:

23 Q.    Here's a copy of the Exhibit 35.  I'm going to hand it to

24 you.  We'll walk through these job listings.

25            MR. ENGLISH:  I'll give you a copy too, Mr. Strouse.

1      MR. STROUSE:  Thank you.

2  BY MR. ENGLISH:

3  Q.    So this first job --

4      THE WITNESS:  I'm sorry, Your Honor, I need time to

5  read the job announcement.

6      THE COURT:  The witness can have a moment to review

7  the document.

8      THE WITNESS:  So paragraph number 1, 2, 3, 4, 5 -- do

9  you mind scrolling down and showing paragraph number 5,

10  requirements and qualifications?

11  BY MR. ENGLISH:

12  Q.    Where?

13  **A.    Down please.**

14  Q.    Okay.

15  **A.    Very good.  Requirements and qualifications, the first**

16  **sentence, I will read it for you.  It says doctorate degree in**

17  **math and sciences.  I do not have doctorate degree in math and**

18  **science.**

19  Q.    So you wouldn't be qualified for this job.

20  **A.    Exactly, because it requires doctorate degree in**

21  **mathematics.**

22  Q.    So let's go to the next job listing, which is a job for

23  the department of mathematics at the U.S. Naval Academy that

24  was posted on October 23, 2017.  Do you see that?  Did you

25  apply for that job?

A. I need to read announcement, if you don't mind.
Q. Okay.
A. So the announcement says that this is for tenure track assistant professor or higher rank appointment in pure applied mathematics. And if you look down, like, in the middle of announcement, it says qualification must be a U.S. citizen, which is good, and have PhD in appropriate field by 2018. I do not --
Q. You don't have a PhD.
A. -- have PhD in pure applied mathematics. I don't have PhD in those fields.
Q. Then the next one, Loyola University.
A. So why are you bringing math jobs when I have PhD in computer science? I have been teaching computer science for last 20 years. He now wants me to apply for math jobs.
Q. Were any of the jobs you applied for math jobs? Were they all computer science?
A. I think I mostly applied for math jobs which are in logic. I think there is slight chance because logic is in related field. It overlaps with computer science, with math, and philosophy. There's a slight chance of me getting it, and I did apply for those positions. But not positions in pure applied math because I have no training.
Q. So you're not qualified for this job at Loyola?
A. According to this description, no, I do not qualify.

1  Q.    What about the description in the case that you don't

2  qualify for the job?  How do you not qualify?

3  **A.    As I say, I do not have PhD in field of applied**

4  **mathematics that they ask for.**

5  Q.    In the Loyola job?

6  **A.    Yes.  At the top it says appointment for pure**

7  **mathematics, and underneath it, it says --**

8  Q.    It says PhD preferred, right?

9  **A.    Not, it does not.  It says a qualified candidate must be**

10  **a citizen and have a PhD in appropriate field.**

11      **On my list, the next one is U.S. Naval Academy.**

12  Q.    After the Naval Academy.

13  **A.    After the Naval Academy.**

14      THE COURT:  Let me just remind both counsel and the

15  witness.  We really try to keep a record of everything that's

16  said in here.  So we need counsel and the witness not to

17  interrupt each other, and I need the witness to slow down when

18  you're speaking so we can record it.  Do you here me,

19  Dr. Naumov?

20      THE WITNESS:  Yes.

21      THE COURT:  Thank you.

22      THE WITNESS:  So over here it says candidate should

23  have at least a masters degree, PhD preferred, in either

24  mathematics or mathematics education.

25      The defense, again, brings a job where I am not qualified

1    because I don't have degree -- PhD in mathematics.  I have PhD

2    in computer science.  I don't know why he is bringing jobs in

3    mathematics rather than in computer science.

4    BY MR. ENGLISH:

5    Q.    So you didn't want a job in mathematics, but you could

6    have gotten a job in mathematics, correct?

7    **A.    No, I could not because it requires at least masters**

8    **degree in mathematics, which I do not have.**

9    Q.    Okay.

10   **A.    Why don't you bring degrees in biology, jobs in biology?**

11   Q.    You can't ask questions, so.

12   **A.    It was a rhetorical question.**

13   Q.    Okay.  So you were lacking for -- as you've testified,

14   you were looking for jobs while you were at McDaniel, correct?

15   **A.    I was keeping my eye on it.  I did many other things as**

16   **well.  I applied for grants, I published papers, and I was**

17   **looking for job opportunities.**

18   Q.    And you were not going to be at McDaniel long enough to

19   be a full professor, correct?

20   **A.    No, that's not correct.  Life is uncertain, and you need**

21   **to be prepared for everything.**

22   Q.    But you weren't planning on staying there, correct?

23   **A.    That's not correct.  I was planning, but different things**

24   **might happen in my life.  It looked more and more like I would**

25   **stay at McDaniel.**

1          MR. ENGLISH:  Your Honor, I don't think I have

2    anything else.

3          THE COURT:  Redirect?

4          MR. STROUSE:  Yes, just a couple.

5          THE COURT:  Sure.

6              **REDIRECT EXAMINATION BY THE PLAINTIFF**

7    BY MR. STROUSE:

8    Q.    Those jobs in mathematics, you have no background except

9    for an undergraduate degree, is that --

10   **A.    Correct.  I have undergraduate degree in mathematics from**

11   **Moscow University, but I don't have PhD or masters degree in**

12   **mathematics.  Sometimes I list my -- okay, go ahead.**

13   Q.    What about benefits at McDaniel?  You were describing the

14   benefits at McDaniel.

15   **A.    Yeah, benefits at McDaniel are significantly better than**

16   **what I was receiving most of the time over those years.  There**

17   **is --**

18          THE COURT:  Counsel, approach.  Counsel, approach.

19        (Bench conference not transcribed.)

20          THE COURT:  Apologize for the delay.  The objection

21   is overruled.  You may continue.

22   BY MR. STROUSE:

23   Q.    Sir, if you could explain, what benefits did you get at

24   McDaniel?

25   **A.    McDaniel benefits included tuition for children of**

1  faculty.  After certain number of years employment, my two

2  daughters, one of them is turning 18 next month and another is

3  turning 14 this year, they will be able to get free tuition at

4  McDaniel or through program called Tuition Exchange with huge

5  list of colleges outside of McDaniel.

6         For example, the chair of our department, who was here

7  earlier, Robert Boner, he sent his daughter to Franklin and

8  Marshall under this exchange and paid nothing.

9         At Vassar, I am not eligible for those tuitions because I

10  am one-year appointment.  No matter how many times they renew

11  my one-year appointment, I will never be eligible for those

12  tuition benefits.  This is huge amount if you count cost of

13  tuition.

14         Now, McDaniel also said if you go to an alternative place

15  in the United States and enroll your children into program, you

16  will be eligible for some smaller amount of money, but still

17  for some money towards tuition.  I do not have this money

18  anymore.  My daughter applied to 13 different colleges --

19             MR. ENGLISH:  Objection, Your Honor.

20             THE COURT:  Next question.

21  BY MR. STROUSE:

22  Q.    Now, with regard to retirement, what is your benefit at

23  McDaniel?

24  A.    At William Patterson, where I came, I was not eligible

25  for retirement benefits.  I came to Illinois Wesleyan, and they

1  said the salary is low, but we have great retirement benefits.

2  Well, when I came down, and I sat down with HR director at

3  Illinois Wesleyan, she told me you had gap in your employment.

4  You know, for this time when you was fired from McDaniel, you

5  had a gap and, according to our rules, if you come from

6  different institution with that gap in last five years, you

7  will not qualify for retirement benefits.  Because you have a

8  gap, although it's not something that you created, but you had

9  a gap in your economic history, you will not be qualified for

10 retirement benefits at Wesleyan.

11        I was not qualified for retirement benefits at Vassar

12 last year.  If you go into second one-year contract, you can

13 qualify.  So this year I qualify.  But it's only six years max

14 I can stay there.  If I go somewhere else, it will be different

15 rules and, likely, in this situation, I will not qualify for

16 retirement benefits.

17 Q.    With regard to Dr. More, what happened since 2012, if you

18 remember?  Do you remember seeing her much?

19        MR. ENGLISH:  Objection.

20        THE COURT:  Sustained as to form.  Sustained as to

21 the form of the question.

22 BY MR. STROUSE:

23 Q.    Do you remember -- what was your interaction with her, if

24 any, since 2012?

25 A.    So in 2011, I went on sabbatical and she on parental

1    leave.  Afterwards, we were almost two years of very little

2    interaction between us.  And when we -- after my three-page

3    letter, I started to stay as far as I can away from her.  At

4    some point I remember she came to me and said, Pavel, why don't

5    I see you as often as I saw you before.  So we have very little

6    interaction.

7                    MR. ENGLISH:  Objection, Your Honor.

8                    THE COURT:  Overruled.

9    BY MR. STROUSE:

10   Q.     Go ahead.

11   A.     I think I answered your question.

12   Q.     With regard to jobs, why is it so hard for you to find a

13   job?

14   A.     I think the major cause is the damage to my professional

15   reputation.  Everyone who goes on Google or Bing gets all --

16   that article in Carroll County Times that discuss what has

17   happened, how I was fired, this harassment accusations.

18          It doesn't happen every day, but quite often when I type

19   in Google Pavel Naumov, Google has suggested how to finish with

20   credit risk, and it's stalking.  It doesn't happen all the

21   time, but it happens quite often.

22   Q.     Does it come up in your job discussions with --

23   A.     Each time?  Yes, its comes up each time, even when I, up

24   front, tell them in my cover letter look.  In the beginning, I

25   was not telling them, and people always would ask me what

1    **happened, and the conversation would usually stop once they**

2    **hear what I was accused and fired from McDaniel College.**

3    **Nobody wants to deal with issues.  Even when people would**

4    **interview me, very often they'll still ask those questions.**

5    Q.     Thank you very much.  I have no further questions.

6            THE COURT:  Sir, thank you for your testimony.  You

7    may retake your seat.

8            (End of testimony of Plaintiff Pavel Naumov.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(Defense witness SARA MORE sworn.)**

2          THE DEPUTY CLERK:  You can step in the witness box

3    here, please speak loudly and clearly into the microphone, and

4    state your full name for the record and spell your full name,

5    please.

6          THE WITNESS:  Sarah Kendall More, S-a-r-a,

7    K-e-n-d-a-l-l, and M-o-r-e.

8          **DIRECT EXAMINATION BY THE DEFENSE**

9    BY MR. ENGLISH:

10   Q.    Good morning, Dr. More.

11   **A.    Good morning.**

12   Q.    Before we get started, where are you from?

13   **A.    I grew up in Dayton, Ohio.**

14   Q.    And tell us about your educational background.

15   **A.    I have a bachelors degree from the University of Dayton**

16   **in computer science and mathematics, and I have a masters**

17   **degree and a PhD in computer science from University of**

18   **California San Diego.**

19   Q.    If you could tell us about your professional background

20   as well.

21   **A.    After I finished my PhD, I did a post-doctoral teaching**

22   **fellowship there at UCSD for two years.  Then I spent one year**

23   **as an assistant professor at the University of Mary Washington**

24   **in Virginia.  And after that, I spent eight years at McDaniel**

25   **College as both an assistant professor and an associate**

1   professor.  For the last three and a half years, I've been at

2   Johns Hopkins University as an associate teaching professor.

3   Q.    And so you're currently at Hopkins?

4   A.    Yes.

5   Q.    And what's your job title currently at Hopkins?

6   A.    Associate teaching professor.

7   Q.    And what do those duties entail?

8   A.    It's focussed primarily on teaching and service to the

9   department.

10  Q.    And are you at a job where you can achieve tenure at

11  Hopkins?

12  A.    No, my position at Hopkins does not allow tenure.

13  Q.    And during what years were you at McDaniel College?

14  A.    I started there in 2006, in the fall, and I stayed there

15  through the spring/summer of 2014.

16  Q.    And so approximately eight years?

17  A.    Um-hmm.

18  Q.    And what was your job title while you were at McDaniel?

19  A.    Assistant professor until I earned tenure, and then I was

20  associate professor.  I also was chair of the Department of

21  Mathematics and Computer Science for one year.

22  Q.    So how many computer science professors were in your

23  department while you were there?

24  A.    There were just two of us.

25  Q.    And who were those two?

1   **A.      Myself and Dr. Naumov.**

2   Q.      At some point you decided to leave McDaniel?

3   **A.      Yes.**

4   Q.      And did you tell Dr. Stewart or anyone about your

5   intention to leave?

6   **A.      Yes.  I had a meeting with Dr. Stewart to let her know.**

7   Q.      And when was that?

8   **A.      In 2012, I would guess April.**

9   Q.      And do you remember that initial meeting with Dr. Stewart

10  in April of -- you said 2012.  Is it 2014?

11  **A.      I'm sorry, 2014, yes.**

12  Q.      And do you remember that meeting with Dr. Stewart in

13  April of 2014, when you told her that you were leaving?

14  **A.      Yes, in her office.**

15  Q.      What did you tell her?

16  **A.      I told her that I had interviewed for and been offered a**

17  **position at Johns Hopkins, and that I wanted to leave at the**

18  **end of the current academic year to make the switch.**

19  Q.      Did you give her a reason why you were leaving?

20  **A.      I was a leaving for a number of factors, and I believe I**

21  **told her that.  I was looking for, you know, a good work-life**

22  **balance.  I had -- while at McDaniel, I had three children and,**

23  **obviously, they were still small at that time, and this was**

24  **going to allow me to work closer to my home.**

25  Q.      And then did she ask you if there were any personnel

1   issues that you were concerned with?

2   **A.      She did.**

3   Q.      What did you tell her?

4   **A.      I told her that the working conditions were oftentimes**

5   **uncomfortable for me; that, in particular, working with**

6   **Dr. Naumov was an uncomfortable situation.**

7   Q.      Did she ask you if working with Dr. Naumov was a factor

8   in your analysis to leave the college?

9   **A.      I believe she did.**

10  Q.      And what did you tell her?

11  **A.      I told her yes.  I mean, there were a number of factors,**

12  **but that certainly was on my mind.**

13  Q.      Did Dr. Stewart want to discuss this issue with you

14  further?

15  **A.      Yes.  She asked me to come back -- I don't know -- a week**

16  **or two later.  I'm not sure of the time.**

17  Q.      Did you have a second meeting with her?

18  **A.      Yes.**

19  Q.      Was that sometime in, I guess, early May?

20  **A.      That sounds right.**

21  Q.      And during that meeting in early May, the second meeting,

22  did you tell Dr. Stewart more specifics about the issues that

23  you just talked about with Dr. Naumov?

24  **A.      Yes, she had asked for some more details.**

25  Q.      And after she asked you, you told her the details?

1   A.      Um-hmm.

2   Q.      Is that a yes?

3   A.      Yes.

4   Q.      And what details did you tell her?

5   A.      Well, I mentioned that over the course of the eight years

6   that I had been there, there were -- well, there were a number

7   of different things, and they, you know, sort of came to my

8   mind as we were talking.  It wasn't as if I had prepared a long

9   list, but one of the items early on was that Dr. Naumov

10  continually walked me to my car, after I asked him to stop, and

11  I said I don't want to be walked to my car; there's not a

12  safety issue, and I'm fine.  It took a couple requests for him

13  to stop doing that at the end of each workday.

14          There were also occasions where he gave me cards and

15  letters of a very personal nature that I thought crossed

16  professional boundaries.

17          There were comments that he made about my appearance

18  repeatedly, that I had to ask him to stop.  One time, in

19  particular, I know I had a sweater on that had circles on the

20  chest, and he looked right at me and said -- you know, looked

21  at my chest, and then said, "You're going to have me thinking

22  about circles all day," which made me really uncomfortable.

23          There also were times where he would sit in the common

24  room outside of my office.  All of our offices were clustered

25  around a common area, and he would sit in sort of direct eye

1  contact, so that when I was sitting at my desk, he was right

2  there, staring at me, or at least it felt that way to me.  On

3  some occasions I could just shut my office door and eliminate

4  the problem, but at other times I had to leave it open because

5  I was waiting for students to come see me during office hours,

6  so I didn't have a chance to get out of that situation, and

7  that made me uncomfortable.

8          And then there was one other comment that really stuck

9  with me from -- I can't even place the timing exactly at this

10  point, but he had said to me that he thought we got along

11  really well, and if he wasn't married, he would marry me, and I

12  felt that that was really inappropriate.

13  Q.    Okay.  What did you tell More, if anything, about how you

14  wanted these allegations to be handled?

15          THE COURT:  What did you tell Stewart or --

16  BY MR. ENGLISH:

17  Q.    Oh, sorry, Dr. Stewart.  You're right.

18  A.    I told her that I wasn't really there to make

19  allegations, and I wasn't trying to make a complaint, and I

20  really didn't want to pursue a formal complaint.

21  Q.    So why didn't you want to pursue a formal complaint?

22  A.    So at that point I had secured the job at Hopkins, and I

23  knew I was getting out of this uncomfortable situation, and I

24  just wanted to move on with my life.  I didn't want to be drawn

25  into formal hearings or a trial, ironically.

1  Q.     A federal case.

2  **A.     A federal case, for example.  I was concerned about what**

3  **his -- what Dr. Naumov's reaction might be.  I didn't like --**

4  **at that point I knew I was leaving, but I would have a little**

5  **bit more time there before I left.  I also was unsure what the**

6  **ramifications would be professionally.  We have contacts -- we**

7  **have published papers together, and we have contacts outside of**

8  **McDaniel, for example, and I didn't know what implications**

9  **would come of that.**

10       **I also just -- as a woman in a science career, I didn't**

11  **want the stigma attached to me that goes along with being a**

12  **female scientist who has complained about interactions with a**

13  **male coworker.  It just wasn't something that I wanted attached**

14  **to me professionally as I moved forward.**

15  Q.     Is your career field a male dominated career field?

16  **A.     Yes, absolutely.**

17  Q.     What was your understanding from Dr. Stewart about the

18  college's responsibility to move forward?

19  **A.     She told me at that time that the college had to move**

20  **forward with an investigation based on what she had learned.**

21  Q.     And then was there -- so that's the second meeting with

22  Dr. Stewart.  Was it your understanding that an investigation

23  was going to start by the college?

24  **A.     Yes.**

25  Q.     Were you contacted by the college's investigator?

1  A.     I was.

2  Q.     Was that person Detective Eric Immler?

3  A.     Yes.

4  Q.     Did you agree to meet with Detective Immler?

5  A.     Yes.

6  Q.     And if you can remember, when did that meeting occur?

7  A.     It was within several weeks.  It was during, I think, May

8  2014.

9  Q.     And what did you talk to Detective Immler about?

10  A.     I believe that I gave him sort of the same indication,

11  that my interactions with Pavel made me uncomfortable and kind

12  of went through that same list of events.

13  Q.     So did you give him the same specifics -- I won't make

14  you testify about it again, but the same list of specifics that

15  we just talked about?

16  A.     I believe that I did, yes.

17  Q.     Did you have a conversation -- when you were interviewed

18  by Detective Immler, what, if anything, did you tell him about

19  any discussions that you may have had with McDaniel leadership

20  about Dr. Naumov?

21  A.     So in addition to the conversation with Dr. Stewart, I

22  mentioned that several years prior, so 2012, I had had a

23  meeting with then-Provost Tom Falkner, where, again, he asked

24  similar questions, and I gave him similar information about how

25  this working environment was a little uncomfortable.

1  Q.    And did you tell Dr. Falkner some of the same information

2  that you had provided to Dr. Stewart?

3  **A.    Yes, similar kinds of examples.  I can't say exactly**

4  **which things had happened by that point or not, but those were**

5  **things that were on my mind, certainly.**

6  Q.    And then was there a subsequent meeting between -- did

7  Dr. Falkner and the president, Roger Casey, also meet with you

8  on this issue back in 2012?

9  **A.    Yes.  After that first meeting, Dr. Falkner told me that**

10  **Dr. Casey wanted to speak with me as well.  So the three of us**

11  **met.**

12  Q.    What did you say to Dr. Casey and Dr. Falkner in that

13  meeting in 2012?

14  **A.    I again reiterated that the environment was uncomfortable**

15  **for me but, also, that I didn't want to make a formal**

16  **complaint, and I wanted to stay out of it as much as I could.**

17  Q.    And you had mentioned that during this time frame in 2012

18  you were thinking about leaving, is that --

19  **A.    I don't think I mentioned it yet.**

20  Q.    Were you thinking about leaving in 2012?

21  **A.    I was.  I was looking into other possible positions.**

22  Q.    Was Pavel Naumov a factor in your analysis to consider

23  leaving in 2012?

24  **A.    I think whenever you leave a job, you have to look at the**

25  **current environment versus the possible new environment and,**

1    **certainly, it was part of the current environment.  So yes.**

2    Q.    Did you tell Detective Immler about whether Dr. Naumov

3    addressed your concerns about the environment in 2012?

4    **A.    Are you asking me about Detective Immler --**

5    Q.    Detective Immler.  So did you talk to him about whether

6    or not, in 2012, when you brought your concerns to Dr. Casey

7    and to Dr. Falkner, whether or not Dr. Naumov had addressed

8    those concerns?

9    **A.    I believe that -- I don't remember exactly what I told**

10   **Detective Immler at the time, but there were times during the**

11   **course of these eight years where I would bring up a concern,**

12   **and he might address that concern, but that didn't make the**

13   **uncomfortableness of the environment go away.**

14   Q.    During that time frame, did he come up with three rules

15   for you?  Did Mr. Naumov come up with three rules?

16   **A.    At some point in the eight years he gave me -- showed me**

17   **a list of three rules he had written down, which were about how**

18   **to make Sarah happy.**

19   Q.    And how did you feel about those rules?

20   **A.    I found it incredibly creepy that someone would do that,**

21   **and I really was sort of shaken by it because it feels really,**

22   **really beyond professional boundaries.**

23   Q.    Did you talk to Detective Immler about your observations

24   of Dr. Naumov's behavior towards anyone else, anyone other than

25   you?

1  A.     I told him that I was on alert about his behavior in

2  particular towards students, just because I felt sort of a

3  duty, as the other faculty member in computer science, to sort

4  of watch what was happening there.  But in sort of keeping that

5  extra close eye on it, I didn't see any inappropriate behavior

6  toward students.

7  Q.     Did you see any inappropriate behavior towards any

8  faculty?

9  A.     I didn't see any inappropriate behavior towards faculty.

10  There were some unusual interactions with faculty candidates

11  that we had brought in to hire for a mathematics position.  I

12  believe I mentioned to him an e-mail that I had received from

13  one of them, who was declining a position, that seemed a bit

14  inappropriate.  Not the e-mail that the candidate wrote, but

15  the appended e-mail below which had originated from Dr. Naumov.

16  Q.     Did other members, other colleagues at McDaniel also have

17  the same concern as you did as to whether his communications

18  with those candidates were appropriate?

19  A.     Yes.  So the other people in the department who saw it

20  expressed their concern.

21  Q.     What did you tell Detective Immler about you being

22  involved in a grievance?

23  A.     I told him I wasn't interested in being involved.  I

24  didn't want to sign a document on the line next to complainant

25  because I didn't want to formally make a complaint.

1  Q.    Did you tell him the same reasons as to why you didn't

2  want to go forward?

3  **A.    Yes.  Especially, again, I was now several weeks away**

4  **from literally leaving my office for the last time, and I just**

5  **didn't want to stir anything up that didn't need to be stirred**

6  **up.**

7  Q.    In light of your concerns about the grievance, you going

8  forward with a grievance and how that may impact you, did you

9  ask for any accommodations with respect to the investigation

10  that the college was conducting?

11  **A.    I believe I asked him to, you know, wait on as much of**

12  **the investigation as possible until after I was gone.**

13  Q.    Did you have a third meeting with Dr. Stewart?

14  **A.    Yes.  She asked me to come back just to check in after I**

15  **had talked to Detective Immler.**

16  Q.    Was this in late May of 2014?

17  **A.    That sounds right.**

18  Q.    What was the purpose of that meeting?

19  **A.    She asked me -- she wanted to check in, and she also**

20  **asked me if I would be willing to show her some of the personal**

21  **cards or letters that I received from Dr. Naumov.**

22  Q.    Did you bring those documents with you to the meeting?

23  **A.    Yes.**

24  Q.    And what documents were those?

25  **A.    I believe there were two greeting cards and one typed**

1  letter that was about three pages long.

2  Q.    Were there any e-mails?

3  A.    Oh, I think maybe the e-mail from that faculty candidate

4  who had declined the position.

5  Q.    Did you bring any 2012 e-mails with you between yourself

6  and Dr. Naumov?

7  A.    Right, there were a couple -- more than a couple.  There

8  was a weekend, I think, where maybe there were 12 or 13 e-mails

9  from him to me.  I'm ball-parking that number, but some of them

10 were, again, way past professional boundaries, in my opinion,

11 and I thought I was worthwhile to let her see what I was faced

12 with.

13 Q.    So you had a number of e-mails, 12 or 13 in a weekend,

14 that you thought were inappropriate?

15 A.    Yes.

16 Q.    We'll talk about a couple of those e-mails in a second.

17       Let's talk about the -- let's put up the three-page

18 letter.  I forgot the exhibit number.

19       All right, so this is Exhibit Number Plaintiff's 14.  Is

20 this one of the documents that you provided to Dr. Stewart?

21 A.    Yes.

22 Q.    And did Dr. Stewart read this letter?

23 A.    Yes.

24 Q.    And how did you receive this letter initially?

25 A.    I believe Dr. Naumov hand delivered it to me.

1   Q.    And the letter starts off, and it says, "I'm writing this

2   letter to apologize for the mistake that I made and the pain

3   that it caused you.  I think that you will find it hard to

4   believe that it took me seven years to realize my mistake, and

5   I do not know how I can convince you that I indeed am not" --

6           MR. STROUSE:  I would object.  The letter stands for

7   itself.

8           THE COURT:  He can ask her about it.  Overruled.

9   BY MR. ENGLISH:

10  Q.    "That I indeed have not seen the obvious in all these

11  years."

12          The question for you is do you agree that Dr. Naumov

13  caused you pain for the seven years that you worked with him?

14  **A.    I wouldn't call it pain.  We had a professional**

15  **relationship.  I felt discomfort.  I was uncomfortable around**

16  **him, but it wasn't a personal relationship that caused me pain.**

17  Q.    Was it presumptuous for him to assume that he could cause

18  you pain?

19  **A.    I suppose so.**

20  Q.    Dr. Naumov says in the letter -- one second -- that "I

21  admit a mistake, concluding that we are similar in all other

22  ways as well."  Did you have a personal connection with

23  Dr. Naumov?

24  **A.    Not really a personal connection.  We were colleagues.**

25  **We worked together.  We worked on similar topic area.  So we**

1  had a professional connection in that sense, but I wouldn't

2  call it a personal connection.

3  Q.    Did you ever visit Dr. Naumov's home?

4  A.    I did.  Early on in the -- when I began working at

5  McDaniel, in fact, perhaps right before I began working there,

6  he invited my husband and me to his house for dinner.

7  Q.    And you went to his house for dinner?

8  A.    Um-hmm.  Yes.  There may have been a second time soon

9  after that, in the first year, when we were working together

10  but, again, with my husband.

11  Q.    It was a professional dinner?

12  A.    Yes.

13  Q.    And then was there any other time that you --

14  A.    There was a department picnic where all members of the

15  department in math and computer science were invited with our

16  families to come to his house.

17  Q.    Did you ever give Dr. Naumov gifts?

18  A.    No.

19  Q.    Was he your friend?

20  A.    He was my coworker.

21  Q.    He goes on to say in this letter that "I realize that you

22  have not actually been silent.  You did communicate to me your

23  unhappiness, but in a gentle way that I ignored due to my

24  expectation that you will express yourself in the same loud

25  manner that I normally do."

1          Do you agree with Dr. Naumov that you communicated your

2     objection to his behavior, but he ignored it?

3     **A.     I definitely communicated my objections.  There were some**

4     **objections which he, I think, was aware of and reacted to and**

5     **some which he ignored.**

6     Q.     Dr. Naumov -- if we go to the end of the leather -- he

7     closes by saying, "I am very sorry about this.  Please forgive

8     me."  Did Dr. Naumov change his behavior after he wrote this

9     letter to you?

10    **A.     I don't believe that there was any significant change in**

11    **his behavior.**

12    Q.     What did you tell Dr. Stewart about your feeling about

13    this letter?

14    **A.     Once again, it seems creepy and way beyond professional**

15    **boundaries.  It just made me uncomfortable.**

16    Q.     Let's talk about some of the 2012 e-mails.  If we can

17    pull up Defendant's Exhibit 8.  We're showing you what's been

18    marked Defendant's Exhibit 8.  Is this one of the e-mails that

19    you shared with Dr. Stewart?

20    **A.     Yes, I believe so.**

21    Q.     Is this one of the dozen or so e-mails that was sent to

22    you around that same time?

23    **A.     Yes.**

24    Q.     And there he says, "After talking with you today, I

25    realize how much I miss you.  If the main reason for you

1    leaving is me, then I want to apologize for whatever I did to

2    lead you" -- "whatever I did that led you to consider such a

3    drastic decision.  I'm ready to do whatever it takes to fix

4    what is broken."  Then it goes on to say, "Maybe we can sit

5    down with Tom and find a solution."

6         What does he mean by miss you?

7    A.    I'm not sure what he means.  We had not been working as

8    closely in that time period due to various leaves, sabbatical

9    leaves and my parental leave.  So I think that he's saying that

10   he missed me because we weren't working closely together

11   anymore.

12   Q.    Was that an appropriate comment to make to you, that he

13   misses you?

14   A.    Given the context of his behavior towards me, it felt

15   uncomfortable.

16   Q.    Do you know, when he talks about sitting down with Tom,

17   is he talking about Tom Falkner?

18   A.    I would expect so.

19   Q.    And you testified that you did talk to Dr. Falkner about

20   Naumov's behavior, correct?

21   A.    Right, and that, I think, would have been prior to this

22   letter.  I'm not 100 percent on the timing.

23   Q.    Did Dr. Naumov do whatever he needed to do, as he said in

24   the letter, to address your concerns?

25   A.    No.  I was still feeling uncomfortable about his behavior

1    **towards me after this time frame.**

2    Q.    Let's go to the next e-mail, which was a few days later.

3    That's Plaintiff's Exhibit 9.  In that e-mail, in the second

4    paragraph, it says, "You came to work with me, and I forced you

5    to spend so much of your time and energy on trying to help me

6    get away from you.  Looking back, I am surprised that you had

7    allowed this to run so long.  I am sorry for hurting you."

8          Again, do you know what he meant by saying that he was

9    hurting you?

10   **A.    I think that's his interpretation of me saying I don't**

11   **like your behavior.**

12   Q.    Did you work on research publications with Dr. Naumov?

13   **A.    Yes.**

14   Q.    And did you eventually stop working with him?

15   **A.    Yes.**

16   Q.    When did you stop working with him?

17   **A.    I think that was approximately 2011.**

18   Q.    Why did you stop working with him?

19   **A.    I told him I didn't enjoy working with him on those**

20   **research projects that we were doing, and when he asked me to**

21   **start up again with him soon after, I said no, I don't want to**

22   **work with you on this.**

23   Q.    Did you tell him why?

24   **A.    Because he made me uncomfortable.**

25   Q.    Let's go to the cards.  Those are Exhibit 16.  Let's

1  start with 15.  Is this one of the cards that you provided to

2  Dr. Stewart?

3  **A.    Yes.**

4  Q.    And do you know why he gave you these cards?

5  **A.    I don't recall.**

6  Q.    And what was your reaction -- was there any occasion

7  associated with it?

8  **A.    I don't remember this particular card.  Maybe the inside**

9  **would --**

10  Q.    Let's go to the inside.  So there he says, "I believe in

11  you being happy here."

12  **A.    I expect it was 2012, when I was considering leaving, and**

13  **he was in the middle of trying to convince me to stay.**

14  Q.    Let's go to the next one, which is 16.  We'll go to the

15  inside of the card.  Did you receive this card from Dr. Naumov?

16  **A.    Yes.**

17  Q.    And you showed this card also to Dr. Stewart?

18  **A.    Yes.**

19  Q.    And there he says, "Thank you for tolerating me these

20  eight years.  I know it has not always been easy."  Do you know

21  when you received this card?

22  **A.    Given that it says eight years, it would have been near**

23  **the time of my departure from McDaniel.**

24  Q.    Do you agree with him that it hadn't been easy?

25  **A.    Right, it hadn't been easy.**

1  Q.    Let's go to the report.  I'm going to hand this to you so

2  you can look through it.  It's Joint Exhibit 4.

3        So I'm handing you what's been marked Joint Exhibit 4.

4  Have you seen this document before?

5  **A.    Yes.**

6  Q.    And specifically, have you read the portions of the

7  report on pages 2 through 3 -- and you can look through it --

8  and pages 5 through 7 and pages 16 through 17, that refer to

9  your conversations with Dr. Stewart in your interview with

10 Detective Immler?

11 **A.    You said two through three and --**

12 Q.    Yep, two through three.

13 **A.    And what was next?**

14 Q.    And pages 5 through 7.  And then pages 16 through 17.

15 **A.    Yes, I reviewed these pages.**

16 Q.    Okay.  And is there anything in Detective Immler's report

17 that you read that does not accurately reflect your

18 communications to Dr. Stewart and Detective Immler?

19 **A.    I don't believe so.**

20 Q.    Last question.  Were the issues that you discussed with

21 the college about Dr. Naumov upon your departure insignificant

22 to you?

23 **A.    No, they were significant to me.  It was an eight year**

24 **span of time, where my only coworker in computer science was**

25 **repeatedly crossing professional boundaries and making me feel**

1  **uncomfortable.**

2          MR. ENGLISH:  No further questions, Your Honor.

3          THE COURT:  Cross, Mr. Strouse.

4          MR. STROUSE:  Yes, thank you, Your Honor.

5          THE COURT:  Do you need a short break to set up or --

6          MR. STROUSE:  No, Your Honor.  I think we're okay.

7          THE COURTROOM DEPUTY:  Give me one second.

8                    **CROSS-EXAMINATION BY PLAINTIFF**

9  BY MR. STROUSE:

10  Q.    Good morning, Dr. More.

11  **A.    Good morning.**

12  Q.    I know you didn't want to be part of this case, so I'll

13  try and be brief and to the point.  You didn't have to write

14  papers with Dr. Naumov, did you?

15  **A.    I did not have to write papers.  I had to publish papers**

16  **in order to earn tenure and keep my position.**

17  Q.    And you did write 12 papers with him, didn't you, over

18  eight years?

19  **A.    Something like that number is correct.  We were the only**

20  **two computer scientists at the college, so if I was going to**

21  **work with anyone else there, he was the natural choice.**

22  Q.    Weren't you friends?

23  **A.    I don't think I would characterize it that way.  We were**

24  **professional colleagues.**

25  Q.    Did you discuss family problems and the like?

1   **A.    Sometimes, as one often does with a coworker.**

2   Q.    Now, you were not the complainant in this action, were

3   you?

4   **A.    I did not.**

5   Q.    And you refused to be the complainant, didn't you?

6   **A.    That's right, I did not put my signature on the**

7   **document --**

8   Q.    You didn't want your name used --

9          THE COURT:  You have to let her finish her answer.

10         MR. STROUSE:  I'm sorry, Your Honor.

11         THE WITNESS:  I did not agree to step forward as a

12  complainant.

13  BY MR. STROUSE:

14  Q.    And you didn't want your name used at all.

15  **A.    That was my preference because I wanted to avoid all the**

16  **baggage that comes along with doing so.**

17  Q.    Why did you complain on Dr. Naumov in the first place?

18  **A.    I felt a duty to answer their questions honestly, and I**

19  **was concerned about, if I were leaving, for example, who was**

20  **coming in to take my place and what might they be subjected to.**

21  Q.    Did you want to destroy Dr. Naumov's career?

22  **A.    That was never my goal.**

23  Q.    He never approached you sexually, did he?

24  **A.    He never explicitly discussed sex with me.**

25  Q.    He never touched you or --

1  **A.     He never touched me.**

2  Q.     -- or harassed you in any way.

3  **A.     I said he never touched me.**

4  Q.     Okay.  Now, with regard to the lunch invitations, do you

5  remember that?

6  **A.     There were probably a lot of lunch invitations.  Can you**

7  **be more specific?**

8  Q.     Yeah.  When you were leaving, I believe you took issue

9  with him inviting you to lunch when you were leaving for Johns

10 Hopkins.

11 **A.     He did invite me to lunch, just the two of us.**

12 Q.     And did you know that he tried to arrange for a

13 department luncheon, but no one else would go?

14 **A.     I wasn't aware of that.  His indication to me was that it**

15 **was a lunch for the two of us to celebrate what he had done in**

16 **the computer science program.**

17 Q.     And how was that inappropriate, if it was?

18 **A.     Given the context of his behavior toward me, it made me**

19 **uncomfortable.**

20 Q.     Wasn't it nice of him to do so and say good-bye after

21 eight years?

22 **A.     I don't see a problem with a coworker saying good-bye,**

23 **but once boundaries have been crossed, additional invitations**

24 **like that aren't really welcome.**

25 Q.     Now, you mentioned, I believe on direct, that he sent

1  e-mails over the weekend.  Is that true?

2  **A.     Sure.**

3  Q.     And wasn't this proper?  I mean, didn't you know he was

4  working on the weekends, doing research?

5  **A.     I don't have any objection to receiving an e-mail or two**

6  **over the weekend.  I send some over the weekend myself.  It was**

7  **the scale and intensity and personal nature of the e-mails that**

8  **I received that I felt was inappropriate.**

9  Q.     Weren't most of the e-mails about research that you were

10  doing, the 12 papers?

11  **A.     Certainly, there were e-mails about that.  I didn't count**

12  **them all, and I can't say how many were which, but there were**

13  **definitely some that were very personal.  Please, I can make**

14  **you happy again, those kinds of themes, rather than this is**

15  **research only.**

16  Q.     Now, what about walking you to the car?  He did this a

17  couple times; is that right?

18  **A.     For multiple weeks when I first started.  It wasn't just**

19  **a couple times.**

20  Q.     And when you said, Dr. Naumov or Pavel, I don't want you

21  to, he stopped, didn't he?

22  **A.     Not the first time, but after repeated requests, yes.**

23  Q.     In fact, he changed his schedule so that he wouldn't

24  leave at the same time, didn't he?

25  **A.     I don't have any knowledge of that.  I know he made fun**

1   of me when I brought I up one time and laughed and said, oh,

2   I'm not supposed to walk out when you do.

3   Q.    And the cards.  What's wrong with sending you cards

4   thanking you or saying please stay or I believe in you?  Isn't

5   that normal?  Doesn't he normally send cards?

6   A.    I've not received personal cards like that from any

7   colleague in my professional career other than him.

8   Q.    But you worked together with him for eight years, didn't

9   you?

10  A.    Yes, I did.

11  Q.    Did you work with anyone else for eight years?

12  A.    All the other people in my department.

13  Q.    Did you publish any papers with them?

14  A.    No.  They were mathematicians.

15  Q.    With regard to appearances, he said something about your

16  sweater.  He testified on direct that he doesn't remember

17  saying anything.  In fact, the only time he said that he

18  mentioned --

19          MR. ENGLISH:  Objection, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. STROUSE:

22  Q.    With regard to your sweater, what was so bad about saying

23  to you you looked nice in the sweater?

24  A.    It was the implication that he was staring at my chest

25  and saying you're going to have me thinking about -- okay, he

1  said circles, but to me it seemed a little less appropriate

2  than -- it didn't seem that circles was what he meant that he'd

3  be thinking about all day.  I found it uncomfortable.

4  Q.    You also complained about longer-than-needed

5  conversations, didn't you?

6  A.    Yes.  He would plant himself in my office sometimes, the

7  first year, before I was comfortable enough to speak up and say

8  we're done here; I don't have time for this.

9  Q.    Didn't you say that was cultural?

10 A.    I think I wondered at first if it was cultural.

11 Q.    Didn't you say Dr. Zirpoli once said it was -- or

12 Dr. Falkner said that he thought it was cultural?

13 A.    I don't recall.

14 Q.    Okay.  These charges, walking to the car, giving you

15 cards, talking about your sweater once, I mean, these are

16 nebulous charges over eight years, aren't they?

17 A.    I'm not making charges.  I was just describing off the

18 top of my head during a meeting what uncomfortable behavior I

19 recalled.  I certainly didn't go about making a list of all the

20 uncomfortable behaviors because I wasn't wanting to make a

21 complaint.

22 Q.    Before Dr. Naumov was terminated, didn't Dr. Casey ask

23 you to come back to McDaniel?

24 A.    I'm sorry, could you repeat the question?

25 Q.    Before Dr. Naumov was terminated, didn't Dr. Casey ask

1   you to stay at McDaniel or come back to McDaniel?

2   **A.     Dr. Casey never asked me to come back.**

3   Q.    He never said that?  Okay.  Didn't you get a leave of

4   absence from McDaniel?

5   **A.     I did.  Perhaps you're thinking of Dr. Stewart rather**

6   **than Dr. Casey.**

7   Q.    I'd like to put up an e-mail you sent to -- oh, I did

8   want to ask you about how often have you interacted with

9   Dr. Naumov since around 2012, the two years before this

10  incident occurred?

11  **A.     During 2012 through 2014, we were still the only two**

12  **people working to deliver the computer science program.  So we**

13  **were interacting probably on a daily basis.  There were some**

14  **times where there were leaves.**

15  Q.    Weren't you on sabbatical?

16  **A.     I was on a sabbatical and parental leave at some point**

17  **around that time.**

18  Q.    And wasn't he on sabbatical?

19  **A.     Yes, at some point.**

20  Q.    And didn't you say to him once, "Gee, Pavel, we don't see

21  each other much anymore, do we"?

22  **A.     I don't remember that comment, but I could imagine that**

23  **during the course of polite conversation.**

24  Q.    Now, I'd like to put up number 26 --

25          THE COURT:  Is that Defendant 's 26?

1          MR. STROUSE:  No, it's Plaintiff's 26, Your Honor.

2          THE COURT:  Thank you.  I'm sorry.  Of course,

3   Plaintiff's 26.  Apologize.

4   BY MR. STROUSE:

5   Q.    Could you read this -- well, read it over.  Now, what's

6   the date of that e-mail?

7   **A.    May 4, 2014.**

8   Q.    And this was right before all these events happened,

9   wasn't it?

10  **A.    I'm not sure which exact events you're speaking of.**

11  Q.    All the talks with Dr. Stewart.

12         MR. ENGLISH:  Objection.  That's not the testimony.

13         THE COURT:  She can answer the question.

14         THE WITNESS:  I don't recall the exact date.  It's

15  right around the same time that I spoke with Dr. Stewart.  I

16  think maybe my first meeting with her was in April, though I

17  don't recall exactly.

18  Q.    So you say, "I think it would be fine if you prepared a

19  note for her," Dr. Stewart, "from you as I really don't have a

20  formal say in what happens after I leave.  I can also

21  informally plant this seed when she and I speak, and then you

22  can send it right after I give my formal notice.  Does that

23  sound okay?"

24         So you're asking him to do something for you, aren't you?

25  **A.    I would need to see the bottom of this page to understand**

1  **the context.  But it's my reading of that that I'm doing**

2  **something for him.**

3          MR. ENGLISH:  Objection.  Can she read the e-mail?

4          MR. STROUSE:  How do you scroll down.

5          THE COURT:  Or somebody can give her a hard copy.

6          MR. ENGLISH:  I've got a hard copy I can give to her.

7      Jim, I'm going to give her a hard copy, okay?

8          MR. STROUSE:  Okay, fine.

9          THE WITNESS:  Thank you.

10          MR. STROUSE:  Thank you, Don.

11  BY MR. STROUSE:

12  Q.    Were you able to read that?

13  **A.    I've read it.**

14  Q.    Okay, fine.  This is a rather pleasant e-mail, right

15  before you make all these terrible allegations against

16  Dr. Naumov, isn't it?

17  **A.    I aimed to stay professional through my entire time**

18  **there, and I think this is a professional e-mail.**

19  Q.    And it was right before you had these discussions with

20  Dr. Stewart, wasn't it?

21  **A.    I believe it was in the middle of these discussions.**

22  Q.    I see.  Now, this is another e-mail saying just two

23  things.

24          MR. ENGLISH:  What's the number?

25          MR. STROUSE:  I'm sorry.  Fifteen.

 1 | BY MR. STROUSE:

 2 | Q.    Here, on this e-mail --

 3 |            MS. RILEY:  What's the number of this exhibit?

 4 |            MR. STROUSE:  Fifteen.

 5 |            MR. ENGLISH:  Plaintiff's 15.

 6 |            MR. STROUSE:  Fifteen, yes, Plaintiff's 15.

 7 | BY MR. STROUSE:

 8 | Q.    Could you read that e-mail briefly?

 9 | **A.    I'm sorry, could you say that again?**

10 |            THE COURT:  Actually, can you hold on?  There seems

11 | to be some confusion as to whether that's 15.  I know it's in

12 | evidence.

13 |            MR. ENGLISH:  It is in evidence.  I don't know if

14 | we're referring to the right number, but could we give her a

15 | hard copy?

16 |            MR. STROUSE:  Oh, certainly.

17 |            MR. ENGLISH:  It's Joint Exhibit 19.

18 |            MR. STROUSE:  Oh, you got it?  Thank you.

19 |            MR. ENGLISH:  Joint 19.

20 |            MR. STROUSE:  Joint 19.

21 | BY MR. STROUSE:

22 | Q.    Could you read for the jury what you say in response to

23 | this e-mail?

24 | **A.    You want me to read my entire e-mail or just the**

25 | **highlighted portion?**

1          MR. ENGLISH:  Objection, Your Honor.  If he wants to

2    ask her a question about the e-mail, that's fine.

3          THE COURT:  You're objecting to her reading it?

4          MR. ENGLISH:  Reading it out loud to the jury.  She

5    can read it to herself, but it's not a question to ask her to

6    read her e-mail.

7          THE COURT:  Overruled.

8    BY MR. STROUSE:

9    Q.   Could you read for the jury your response to Pavel Naumov

10   in relation to this "Just Two Things" e-mail?

11   **A.   So I said, "Pavel, thank you for the reminder about the**

12   **external review.  In response to your other item, I don't**

13   **really feel the need to discuss all the events of the last**

14   **seven years.  I prefer to just discuss any issues that arise**

15   **going forward."**

16   Q.   So why didn't you do it?

17   **A.   Why didn't I do what?**

18   Q.   You deliberately went back over eight years and made

19   complaints to Dr. Stewart about him walking you to the car,

20   about lunch, about him having extended conversations.  Why did

21   you do that?

22   **A.   I had already discussed with him behaviors over that**

23   **seven-year period which I found uncomfortable.  I didn't want**

24   **to rehash all of those at that point.  This was not at the same**

25   **time that I was going through everything with Dr. Stewart.**

1  **This was a year prior, and I was trying to focus on getting the**

2  **work done that needed to be done and not getting sucked back**

3  **into discussions of this uncomfortable situation I had been in.**

4  Q.    Did you know about the outcome of your staying out of

5  this case?

6  **A.    At the time of this e-mail, I didn't know there was a**

7  **case.**

8  Q.    Okay.  You mentioned that you went to Johns Hopkins based

9  on a number of factors, not because you were uncomfortable with

10  Dr. Naumov; isn't that true?

11  **A.    There were a number of factors.**

12  Q.    You wanted to live in Baltimore where -- I mean, you do

13  live in Baltimore, where Johns Hopkins is; isn't that true?

14  **A.    I do live in Baltimore.**

15  Q.    And wasn't it easier for child care with your three small

16  children?

17  **A.    I was closer to my children, who were in preschool or**

18  **daycare.**

19  Q.    And wasn't there more money involved as well?

20  **A.    The position that I took did pay better than McDaniel**

21  **College.**

22  Q.    And weren't the students -- or didn't you comment that

23  you thought the students might be a little bit better?

24  **A.    I think typically, the students at Johns Hopkins are**

25  **stronger than the typical McDaniel student, that's true.**

1    Q.    Okay.  Now, this three-page letter that you talked about,

2    wasn't Dr. Naumov trying to resolve your differences?  Didn't

3    he feel like there were some differences, and he wanted to work

4    things out with you?

5              MR. ENGLISH:  Objection.  He's asking her what

6    Dr. Naumov felt, instead of asking her what she felt.

7              THE COURT:  I think you did as well, so I'm going to

8    overrule it.

9              THE WITNESS:  I don't know what he was feeling when

10   he wrote that letter.

11   BY MR. STROUSE:

12   Q.    Okay.  But you took the letter and said what?

13   **A.    I took the letter and, after he walked away, I read it.**

14   **I don't remember discussing it with him after.  I certainly**

15   **wouldn't have gone in to initiate a conversation about it.**

16   Q.    Isn't it true that you once gave a gift to Dr. Naumov and

17   his wife, a candle with Einstein's picture on it?

18   **A.    I have no recollection of giving a gift like that.**

19              MR. STROUSE:  I have no further questions, Your

20   Honor.

21              THE COURT:  Sure.  Redirect.

22              MR. ENGLISH:  I don't have any redirect, Your Honor.

23              THE COURT:  Ma'am, thank you so much for your

24   testimony.  Please don't discuss your testimony with anyone

25   else until the trial has been completed, and please enjoy the

1  rest of your day.

2          (End of testimony of Defense Witness Sara More.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (**Defense Witness ERIC IMMLER** sworn.)

2          THE COURTROOM DEPUTY:  Please enter the witness box,

3   please speak loudly and clearly into the microphone and state

4   your full name for the record.

5          THE WITNESS:  Eric David Immler, E-r-i-c, D-a-v-i-d,

6   I-m-m-l-e-r.

7                **DIRECT EXAMINATION BY THE DEFENDANT**

8   BY MR. ENGLISH:

9   Q.    Good afternoon.

10  **A.    Good afternoon.**

11  Q.    Do you have a rank?

12  **A.    Currently, it's chief.**

13  Q.    Currently, it's chief.  Chief Immler, what's your current

14  job and what are your duties in connection with that?

15  **A.    Currently, I am the chief and director of campus safety**

16  **and security at the Garrison Forest School in Owings Mills,**

17  **Maryland.**

18  Q.    What are your duties with that job?

19  **A.    I oversee the campus safety department and all facets of**

20  **safety and security for the school.**

21  Q.    What are your duties with that job?

22  **A.    I oversee the campus safety department and all facets of**

23  **safety and security for the school.**

24  Q.    And then can you just briefly summarize what your

25  education background is?

1  A.    Yes.  I graduated from Westminster High School.  I

2  attended Carroll Community College.  I attended the Consortium

3  of Universities Campus Public Safety Institute in Washington,

4  D.C.  I'm a graduate of the Maryland Police Training Commission

5  police academy.

6  Q.    Can you give us some brief background about your

7  professional history?

8  A.    Yes.  After completing police academies, I've worked with

9  the Maryland Capital police, the Westminster Police Department,

10  McDaniel College Department of Campus Safety, ranging anywhere

11  from patrol officer, shift supervisor, investigations manager.

12  I was the detective for several years with the Westminster

13  Police Department.  At McDaniel College I was investigations

14  manager, promoted to deputy chief of police, and at one point i

15  was the acting chief of police for the college.

16  Q.    And during what time frame were you employed by McDaniel

17  College?

18  A.    Two periods:  2001 to 2006 and then 2013 to 2017.

19  Q.    And what were your duties in 2014?

20  A.    In 2014, I was a shift supervisor and the investigation

21  manager for the department of campus safety.  I was also a

22  Title IX investigator for the college.

23  Q.    And were you also a special policeman while you were at

24  McDaniel College?

25  A.    Yes, I was.

1  Q.    What does it mean to be a special policeman?

2  **A.    Special police officer in the State of Maryland has the**

3  **same police authority as any police officer; it's simply**

4  **limited to the specific property that's cited for your**

5  **employment.   In this case, it would be all properties owned by**

6  **McDaniel College.**

7  Q.    So at McDaniel College, you were a police officer?

8  **A.    Yes.**

9  Q.    And have you had any training in Title IX?

10  **A.    Yes, I have.**

11  Q.    What training have you had on Title IX?

12  **A.    So I've attended several courses over the course of**

13  **several years.   Specifically, through Dolores Stafford and**

14  **Associates was a week-long course on investigating Title IX**

15  **related complaints, to include sexual assault, sexual**

16  **harassment, and anything within the realm of Title IX.**

17  **I attended a course put on by the Office of Civil Rights**

18  **down in Washington, D.C., which was specific on the enforcement**

19  **of Title IX policies.**

20  Q.    Did you have any training that was provided by the

21  college?

22  **A.    Yes.   Annually, training was provided by the college to**

23  **include several webinars.   And all of these courses that I**

24  **attended was put through McDaniel College.**

25  Q.    Now, you mentioned the Office of Civil Rights, and just

1    for the jury's purposes, is that the Equal Employment

2    Opportunity Commission?

3    **A.      Yes, that is correct.**

4    Q.    You went through training with the Equal Employment

5    Opportunity Commission?

6    **A.      Correct.**

7    Q.    And did those trainings that you mentioned cover --

8            MR. STROUSE:  I'd object, Your Honor.  Office of

9    Civil Rights is not Equal Employment.  It's with --

10           THE COURT:  Well, if your quibbling with his answer,

11   you can cross him on that.

12           MR. STROUSE:  Okay.

13           THE COURT:  Overruled.

14   BY MR. ENGLISH:

15   Q.    Did those trainings that you just talked about -- did you

16   go through those trainings while you were at McDaniel College?

17   **A.      Yes, I did.**

18   Q.    Did those trainings cover the college's duty to proceed

19   with a grievance?

20   **A.      Yes, they did.**

21   Q.    And did those trainings cover whether there is a duty to

22   proceed even if the victim does not want to proceed?

23   **A.      Yes, that is correct.**

24   Q.    And what did those trainings say about that duty?

25   **A.      So as a part of guidance provided by the Office of Civil**

1  **Rights, colleges and universities can be obligated to**

2  **investigate matters that are brought to their attention,**

3  **regardless of a victim or survivor wanting to pursue a case.**

4  Q.    Are you familiar with the Dear Colleague letter?

5  **A.    Yes.**

6  Q.    Do you remember the 2011 Dear Colleague letter?

7  **A.    Yes.**

8  Q.    Did those trainings cover the Dear Colleague letter?

9  **A.    Yes, they did.**

10  Q.    And what did those trainings say about the Dear Colleague

11  letter?

12  **A.    Again, a lot of the guidance that was put forward by the**

13  **Office of Civil Rights was in reference to the Dear Colleague**

14  **letter.  Specifically, the course I went to in D.C. covered**

15  **elements of that Dear Colleague letter, to include when**

16  **colleges and universities are mandated to pursue grievances**

17  **that are brought forth.**

18  Q.    Was it your understanding that the McDaniel Title IX

19  policy was consistent with that Dear Colleague letter?

20  **A.    It was my understanding, yes.**

21  Q.    At some point in 2014, you were asked to investigate --

22  or were you asked to investigate allegations involving

23  Dr. Sara More?

24  **A.    Yes, I was.**

25  Q.    And how did this start?

1  **A.    I received a call from the academic affairs office to**

2  **meet with Jeanine Stewart in reference to a complaint that she**

3  **had received from Sara More.**

4  Q.    And what was your understanding as to what the nature of

5  the complaint was?

6  **A.    It was my understanding from that initial meeting with**

7  **Dr. Stewart that Ms. More had brought forth allegations of a**

8  **series of, over time, issues that had been brought forth to her**

9  **by Dr. Naumov, behavior that he had enacted towards her.**

10  Q.    And then did you end up doing investigation?

11  **A.    Yes, I did.**

12  Q.    Did you end up completing a report?

13  **A.    Yes, I did.**

14  Q.    Let's put up the report, please.  It's Joint Exhibit 4.

15       We're not going to go through it page by page, but is

16  that the report that you completed?

17  **A.    Yes, it is.**

18  Q.    And to your knowledge, do you know what the report was

19  used for?

20  **A.    This report was used for the college to decide if they**

21  **were going to continue with a grievance procedure based on the**

22  **allegations that were brought forth.**

23  Q.    There is a document there that you can look through, so

24  you don't have to look at the screen.  Here's your report.

25  **A.    Thank you.**

1    Q.    When did your investigation start?

2    **A.    The investigation started on May 12th of 2014.**

3    Q.    And when did the investigation end?

4    **A.    I believe it was July 9th of 2014.**

5    Q.    And what was your understanding of the nature of the

6    investigation?

7    **A.    I was to investigate the allegations that were brought**

8    **forth by Ms. More.  Specifically, the correspondence from**

9    **Dr. Naumov towards her, the e-mails and conversations that were**

10   **had between her and Dr. Naumov over the course of several**

11   **years.**

12   Q.    Who did you talk to in conducting your investigation?

13   **A.    I interviewed several witnesses -- Dr. Stewart,**

14   **Dr. More --**

15   Q.    You can look at your report.  You don't have to -- this

16   isn't a quiz.

17   **A.    That's probably a little bit easier.  Tom Zirpoli, Janet**

18   **Medina, Kathy Saghy, Spencer Hamblen, Italo Simonelli.  I**

19   **believe that is everybody that I spoke with.**

20   Q.    And did you take notes while you were conducting those

21   interviews?

22   **A.    Yes, I did.**

23   Q.    And did you summarize those notes in this report?

24   **A.    Yes, I did.**

25   Q.    And does your report actually capture those interviews

1  that you took?

2  **A.    Yes, it does.**

3  Q.    Do you think that the witnesses that you interviewed that

4  you just mentioned, did you have any reason to believe they

5  were not credible?

6  **A.    No.   I believed them all to be credible.**

7  Q.    You said you interviewed Dr. More?

8  **A.    I did.**

9  Q.    Did you find her statement to you to be credible?

10  **A.    Yes, I did.**

11  Q.    What about Dr. Stewart's statement to you?  Did you find

12  her statement to be credible?

13  **A.    Yes, I did.**

14  Q.    Why did you find Dr. More and Dr. Stewart's statements to

15  you to be credible?

16  **A.    Much of the information that was brought forward in those**

17  **two interviews was corroborated through e-mails and subsequent**

18  **witness interviews that were conducted.**

19  Q.    Did you review documents in connection with your

20  investigation?

21  **A.    I did.**

22  Q.    And what documents did you review?

23  **A.    Several e-mails on the McDaniel e-mail server through**

24  **Dr. Naumov's e-mail account.**

25  Q.    Were those documents shared with McDaniel as a part of

1  this report?

2  **A.      Yes, they were.**

3  Q.      You didn't interview Dr. Naumov, did you?

4  **A.      I did not.**

5  Q.      Why?

6  **A.      When this complaint was brought forward, it was May.  The**

7  **college school year ends shortly thereafter.  Dr. More was**

8  **adamant that she was willing to speak with me but did not want**

9  **to be a part of any continued grievance.**

10       **She also specifically asked that -- she was leaving in**

11  **June or at the end of May.  I don't know the exact date.  But**

12  **she specifically asked that we did not begin any other witness**

13  **interviews, should the college move forward with it, until she**

14  **had left the school.**

15  Q.      And then did you honor that request?

16  **A.      I did.**

17  Q.      I guess we're now into the summer semester.  Did you

18  start interviewing other witnesses after she left?

19  **A.      Correct.  Once she left, I began interviewing witnesses.**

20  **During the summertime, it's extremely difficult at a college to**

21  **connect with faculty members, as their employment season has**

22  **ended, essentially.  Many of them are not around.  So once I**

23  **completed interviewing the witnesses, I had learned that**

24  **Dr. Naumov was out of the country.  So I was unable to connect**

25  **with him at that time.**

1  Q.    What's your normal practice in terms of the normal order

2  of witnesses that you interview when you're conducting an

3  investigation?

4  **A.    So typically, we start off with, of course, the original**

5  **source of the complaint.  Through that, you would identify any**

6  **witnesses that would be relevant, with relevant information for**

7  **the investigation.  Once you have gathered all that**

8  **information, typically you would then go to, in this case, a**

9  **respondent to interview them.  That would be the last step in**

10 **any investigative process.**

11 Q.    So Dr. Naumov would have been the last step in the

12 investigative process?

13 **A.    That is correct.**

14 Q.    And you can look at your report.  When was the last

15 witness that you interviewed?

16 **A.    On July 9th I interviewed Italo Simonelli.**

17 Q.    And was it your understanding that, by then, Dr. Naumov

18 was out of town?

19 **A.    Yes.**

20 Q.    Do you know if he was out of the country?

21 **A.    I believed him to be out of the country.  That's what I**

22 **was told.**

23 Q.    Does not talking to the accused compromise the

24 investigation?

25 **A.    No, not necessarily.  All of the facts and information**

1   **gathered specifically in this instance are what they are.  It**

2   **doesn't change the information that was received and documented**

3   **in the investigation.**

4   Q.    Had there been some e-mails that were directly from

5   Dr. Naumov that substantiated Dr. More's allegations?

6   **A.    Yes.  Those were gathered within the course of the**

7   **investigation, and they had come directly from his e-mail**

8   **account.**

9   Q.    Would you consider those e-mails to be hearsay, or are

10  they direct words from the accused?

11  **A.    Provided it was his specific --**

12          MR. STROUSE:  Objection, Your Honor.

13          THE COURT:  Sustained.

14  BY MR. STROUSE:

15  Q.    So you said you completed the investigation on July 9,

16  2014.  At that point did you conclude that there were elements

17  of possible violations of the policy that required action by

18  McDaniel?

19  **A.    Yes, I did.**

20  Q.    Did you make substantive determination as to whether or

21  not there was sexual harassment or not at that time?

22  **A.    No, I did not.**

23  Q.    What was your determination?

24  **A.    My determination at that point is that there were**

25  **possible elements that there was a policy violation that had**

1   **occurred.  It's my job to find, gather information, and forward**

2   **that to the college for them to determine further processes to**

3   **continue.**

4   Q.    And what was the basis for your conclusion that there

5   were elements of the policy that may have been violated?

6   **A.    So again, as much information that was gathered initially**

7   **from Ms. More was corroborated through witness interviews and**

8   **through some of these e-mail correspondence that were**

9   **documented in the investigation.  Hence, it appeared that there**

10  **was potential -- a possibility that there were violations that**

11  **did occur.**

12  Q.    Were you able to make that determination as you were

13  preliminarily going through the investigation?  Was there a

14  point in time, maybe before July 9th, where you were able to

15  determine that there are some possible elements of a violation?

16  **A.    Yes.  Through the course of the investigation, as I spoke**

17  **with, you know, every person that came through, as things were**

18  **corroborated, it was clear that there was the possibility that**

19  **violations did occur.**

20  Q.    What's your understanding of the threshold under --

21  because you've been trained in Title IX, and you were the

22  investigator for the college.  What is your understanding of

23  the threshold of information that would require the college

24  to --

25          MR. STROUSE:  I'd like to object, Your Honor.

1          THE COURT:  I haven't heard the whole question yet.

2   BY MR. ENGLISH:

3   Q.    That would require the college to at least investigate

4   the allegations?

5          THE COURT:  I'll overrule the objection.

6          THE WITNESS:  I'm sorry, Your Honor.  You said

7   overruled?

8          THE COURT:  You may answer the question.

9          THE WITNESS:  The threshold for that is very low.

10  You receive the complaint and look into those initial

11  allegations.  And again, information that was corroborated in

12  this case, it was clear that there was the possibility of

13  violations that did occur.

14  BY MR. ENGLISH:

15  Q.    So we talked about the low threshold to trigger the

16  investigation.  What about the trigger to going forward after

17  you find evidence that there's possible violations?

18  **A.    Sure, that would be a decision made by college**

19  **administration.  Once that initial point is triggered, that**

20  **would be their decision of how to move forward with whatever**

21  **grievance procedure would be appropriate.**

22  Q.    Do you know who made the decision to move forward with

23  the grievance?

24  **A.    Specifically, no.  I would assume administration levels**

25  **within HR, the president, provost's office.**

1    Q.    Was your investigation autonomous?

2    **A.    Yes.**

3    Q.    Did anyone influence your investigation?

4    **A.    No.**

5    Q.    Did Dr. Stewart influence your investigation?

6    **A.    No.**

7    Q.    Did she run your investigation?

8    **A.    No.**

9    Q.    Did you make any -- I've asked you this, but did you make

10   any conclusions or recommendations as to whether the policy had

11   actually been violated?

12           MR. STROUSE:  Asked and answered, Your Honor.

13           THE COURT:  Sustained.

14   BY MR. ENGLISH:

15   Q.    Your first interview was with Dr. Stewart; is that right?

16   **A.    Correct.**

17   Q.    And did Dr. Stewart -- and you can look at your report.

18   Did she tell you what her concerns were?

19   **A.    Yeah.  Let me --**

20   Q.    If we can go to page 2 of the report.

21   **A.    Sure.  So Dr. Stewart had several concerns, all of which**

22   **were, of course, brought to her by Sara More.**

23           THE COURT:  Sir, can you just make sure you're

24   speaking up and into the microphone.

25           THE WITNESS:  I'm sorry, Your Honor.  Specifically,

1  actions and statements made to More by Dr. Naumov, there was

2  mention of -- let's see -- a three page typed letter that

3  Naumov had given to Dr. More.  This was kind of around -- I

4  believe it was around the time where Dr. More was considering

5  leaving McDaniel, and Dr. Naumov had said to More "I've been

6  good, haven't I?  I'll be better."  As though he was kind of

7  claiming responsibility for her wanting to leave in those

8  cases.

9       This letter also had indicated kind of a -- and this was

10  through Sara More -- personality assessment of sorts, which, in

11  Sarah's mind, had crossed a professional boundary and was

12  inappropriate in the workplace.

13       There were several cards that were given to Ms. More,

14  which were unwelcomed.

15       Specific behaviors by Dr. Naumov to include continually

16  waiting for her after work and walking her to her car, even

17  though, several times, she had politely asked him not to, up

18  and to the point where she had to tell him to stop doing that

19  action, which he then did.

20       She had mentioned specifically a time where she was

21  wearing a certain sweater with some circle-type shapes on it,

22  and she indicated that Dr. Naumov was staring at her chest and

23  mentioned that he would be seeing circles all day.

24       Other comments that he had made, "if you weren't married,

25  I would marry you," and things of that nature that were

1  continuing to be uncomfortable for her.

2  BY MR. ENGLISH:

3  Q.    And you talked to Dr. More, right?

4  **A.    Correct.**

5  Q.    And did she tell you about the same concerns that

6  Dr. Stewart had reiterated to you?

7  **A.    Yes.  These things that Dr. Stewart had initially told**

8  **me, Dr. More echoed.**

9  Q.    Did she tell you anything about three rules?

10  **A.    Yes.**

11  Q.    What did she tell you about that?

12  **A.    She told me that Dr. Naumov had relayed to her that he**

13  **has three rules.  The first rule would be make Sarah more**

14  **happy.  The second rule she could not remember.  And the third**

15  **rule was see rule one.**

16  Q.    Did she tell you about anything with any discomfort that

17  she had or concern that she had about Dr. Naumov's interaction

18  with other individuals other than herself?

19  **A.    Yes.  There was a hiring process conducted for an**

20  **associate professor.  At the time, Dr. Naumov was the chair of**

21  **the department.  The three top finalists for the position were**

22  **female candidates, and the candidate -- the female candidate**

23  **that initially offered the position had declined the job.**

24  **Several professors, actually, that were part of that committee**

25  **received an e-mail from her, indicating that she was not taking**

1   **the position.   In the body of that e-mail, there was an e-mail**

2   **that Dr. Naumov had sent to this female candidate, that Sara**

3   **More had said that she felt that it was inappropriate for that**

4   **context, of a hiring process.**

5   Q.   Did you think that it crossed any lines, in your opinion?

6   **A.   It appeared to be outside the normal bounds of a hiring**

7   **process.**

8   Q.   Did Dr. More tell you why she did not want to go forward

9   with a grievance?

10   **A.   She indicated that she was afraid of Dr. Naumov, that he**

11   **would retaliate in some way against her.**

12          MR. STROUSE:   Objection, Your Honor.   Pure hearsay.

13          THE COURT:   Overruled.

14   BY MR. ENGLISH:

15   Q.   Did she tell you anything else?

16   **A.   I would have to specifically look at the report.**

17   Q.   If that's your answer.   I'm not suggesting there is

18   anything else, because you weren't finished before the

19   objection.

20   **A.   No.   She said she was essentially afraid of retaliation.**

21          THE COURT:   And just to be clear, it's not for the

22   truth of the matter but just that it was reported.   That's why

23   I overruled the hearsay objection.

24   BY MR. ENGLISH:

25   Q.   Did you ask her if she would have left the college if

1  Dr. Naumov was not still at the college?

2  **A.     I did.**

3  Q.     And what did she say to that?

4  **A.     She said that she would stay at the college if it were**

5  **not for Dr. Naumov and the actions of the prior several years.**

6  Q.     Did you talk to a -- oh, by the way, did you inform

7  Dr. More at that time that the college had a responsibility to

8  move forward, even though she did not want to move forward with

9  the grievance?

10 **A.     I did.**

11 Q.     And she didn't ask the college not to move forward,

12 right?

13 **A.     No, she did not.**

14 Q.     And did you talk to a Kathy Saghy?

15 **A.     I did.**

16 Q.     And who is Kathy Saghy?

17 **A.     Kathy Saghy is the department secretary for the math and**

18 **computer science.**

19 Q.     And did she verify what Dr. More and Dr. Stewart told

20 you?

21 **A.     She did.**

22 Q.     What did she verify?

23 **A.     She verified that Dr. Naumov would pay -- give more**

24 **attention to Dr. More than other colleagues.  She indicated**

25 **unique behavior, such as -- one of the elements -- actually,**

1   let me go back.

2        One of the elements that Dr. More had indicated was she

3   felt that Dr. Naumov would watch her while she was in her

4   office.  The way the office is laid out, there is essentially a

5   waiting area in the main hub, with a perimeter of offices.

6   Dr. More felt that Naumov would be sitting on a couch in that

7   area, which had a direct line of sight to her office, and she

8   felt watched in those circumstances.  That's one of the

9   elements that Ms. Saghy had confirmed during the interview.

10  Q.    So she told you that she saw Dr. Naumov in front of her

11  office in that area?

12  A.    Yes.

13  Q.    Did she say anything about him blocking her doorway?

14  A.    Yes.  Another element that Dr. More had --

15            MR. STROUSE:  Testimony, Your Honor.

16            THE COURT:  Approach.  Approach.

17        (Bench conference not transcribed.)

18  BY MR. ENGLISH:

19  Q.    We'll talk about one last witness, Spencer Hamblen.  Did

20  you talk to Spencer Hamblen?

21  A.    I did.

22  Q.    Who is he?

23  A.    Spencer Hamblen is a professor in the math and computer

24  science department.

25  Q.    Did Spencer Hamblen have any knowledge about Naumov's

1   communications with the candidates for the associate professor

2   job that you talked about?

3   **A.      Yes, he had confirmed some of those e-mails that were**

4   **previously documented with that applicant.**

5   Q.      Did he express concern about whether those e-mails were

6   appropriate?

7   **A.      Yes, he indicated that he felt it was inappropriate,**

8   **again given the context of an employment search.**

9   Q.      What did he tell you about his observations between

10  Dr. More and Dr. Naumov?

11  **A.      I believe -- you said Hamblen, correct?**

12  Q.      Hamblen, yes, Spencer Hamblen.  I'm direct you.  That's

13  going to be on page 21 of 41 of your report.  If you go one,

14  two, three, four paragraphs down, and it says there "Hamblen

15  stated specifically that Naumov's treatment of Sara More has

16  been poor."  Do you see the paragraph I'm talking about?  It

17  starts off "Hamblen stated that the majority of the faculty and

18  staff" --

19  **A.      Correct.**

20  Q.      And then there, it says "Hamblen stated specifically that

21  Naumov's treatment of Sara More has been poor."  And at the end

22  of that paragraph, it says "Hamblen described Naumov to stand

23  in the doorway, blocking the door to get her attention or force

24  a discussion that is on his mind, not taking her schedule

25  priorities into consideration."  Do you see that?

1   **A.      Yes, I do, yes.**

2   Q.     Is that your recollection of what Dr. Hamblen told you?

3   **A.      Yes.**

4          MR. ENGLISH:  I don't have any more questions.

5          (A lunch recess was taken from 1:00 p.m. to 2:00 p.m.)

6          (The jury returned to the courtroom at 2:05 p.m.)

7          THE COURT:  You may all be seated.  Good afternoon.

8   I home everyone enjoyed lunch.  I think we had Detective Immler

9   on the stand, so you can retake the stand, and I believe we

10  were about to start cross.

11         So it's your witness, Mr. Strouse.

12         MR. STROUSE:  Thank you, Your Honor.

13                **CROSS-EXAMINATION BY THE PLAINTIFF**

14  BY MR. STROUSE:

15  Q.     Good afternoon, Sergeant.

16  **A.      Good afternoon.**

17  Q.     Sergeant, did you ever read Title IX?

18  **A.      The entire thing?**

19  Q.     Yes.  It's 20 pages --

20         THE COURT:  Just so we're clear, are we referring to

21  the statute Title IX or the policy?

22  BY MR. STROUSE:

23  Q.     The Title IX policy at McDaniel.

24  **A.      Yes.**

25  Q.     Okay.  And where in this document does it say that

1    someone can stand in for a complainant?

2    **A.     Specifically, off the top of my head, I do not know.**

3    Q.     On page 11, it says, does it not -- do you have it?  Do

4    you need a copy?

5    **A.     I don't believe there's a copy up here.  No.  (Document**

6    **handed to the witness.)**

7         **Thank you.**

8    Q.     Go to the bottom of this page.  Doesn't it say if the

9    complainant won't go forward, the matter must be dropped?

10        MR. ENGLISH:  I'm going to object.  It's not quoting

11   the language.

12        THE COURT:  Approach.  Approach.

13        (Bench conference not transcribed.)

14        THE COURT:  The objection is sustained.  Counsel can

15   ask a new question.

16   BY MR. STROUSE:

17   Q.     Now, on page 11, toward the end of that page, on the

18   bottom of that paragraph that starts with "formal hearing."  It

19   says "in the event that complainant is unwilling to be

20   identified, the formal hearing will be dismissed and no action

21   will be taken and no report of any action will be held."  Isn't

22   that true?

23   **A.     That is what it states right there, yes.**

24   Q.     And where in that document, if you know, does it say that

25   there can be someone to stand in for that complainant?

1  **A.     Again, off the top of my head, I --**

2  Q.     You don't know because it's not there.

3  **A.     I can't answer.**

4  Q.     Well, you read the document, didn't you?

5  **A.     I did.  I did not memorize every piece of it.**

6  Q.     Well, didn't you testify that a third person could stand

7  in for the complainant?

8  **A.     Yes.**

9  Q.     Well, where does it say in Title IX policy at McDaniel?

10 **A.     I can't say to that, but it's guidance by the Office of**

11 **Civil Rights, as far as Title IX is concerned, that third**

12 **parties can put forth a grievance.**

13 Q.     Have you read that guidance?

14 **A.     Yes.**

15 Q.     And do you recall in that guidance it says that it's only

16 on sexual violence?

17 **A.     I do not.**

18 Q.     You don't know that every page was marked with sexual

19 violence?

20 **A.     Violence and harassment, was my understanding.**

21 Q.     Now, with regard to OCR, didn't it say on page 6 of OCR

22 that if the complainant won't come forward, then the matter

23 must be dismissed and no action --

24          THE COURT:  Are you referring to the Dear Colleague

25 letter?

1          MR. STROUSE:  The Dear Colleague letter, yes, Your

2    Honor.

3          THE COURT:  Thank you.  Which exhibit number was

4    that?

5          MR. ENGLISH:  While he's doing that, I'm going to

6    object because, again, he's trying to paraphrase the letter

7    without quoting the exact language.

8          THE COURT:  That's fine.  The witness can answer yes

9    or no.  I understand the objection.  I'll overrule it.

10          Ladies and gentlemen of the -- Ladies -- they

11    actually put a note here in front of me now, and it still

12    didn't work.

13        The ladies of the jury will be instructed that an

14    attorney's question is not evidence; the answer is evidence.

15    So just keep that in mind whenever hearing questions and

16    answers.

17    BY MR. STROUSE:

18    Q.    On page 6.

19          MR. ENGLISH:  Page 6?

20          MR. STROUSE:  Page 6.  I'm sorry, page 5.

21    BY MR. STROUSE:

22    Q.    I'm sorry, this sentence.

23    **A.    This one, "if a complainant"?**

24    Q.    Yeah.

25          THE COURT:  Just so the record is clear, this is the

1  Dear Colleague letter?

2        MR. STROUSE:  This is the Dear Colleague letter.

3        THE COURT:  Very well.

4        THE WITNESS:  If a complainant insists that his or

5  her name, or other identifiable information not be disclosed to

6  the alleged perpetrator, the school should inform the

7  complainant that it's ability to respond may be limited.

8  Q.    Okay.  So you don't have the ability, do you, to go

9  forward with the Office of Civil Rights.

10  **A.    I'm sorry, I didn't hear you.**

11  Q.    You don't have the ability to go forward with a complaint

12  with the Dear Colleague letter.

13  **A.    That stated that it may be limited.**

14  Q.    Now, where in Title IX is -- you know that this is an

15  advisory letter, don't you?

16  **A.    Yes.**

17  Q.    Where in Title IX does it quote the Office of Civil

18  Rights letter?

19        MR. ENGLISH:  Objection.  The reference to Title IX,

20  are we referring to the policy or the statute?

21        MR. STROUSE:  I was referring to the policy at

22  McDaniel.

23  BY MR. STROUSE:

24  Q.    Where in the Title IX policy at McDaniel does it refer in

25  any way to the OCR, Office of Civil Rights, Department of

1  Education advisory letter?

2  **A.      I do not know.**

3  Q.      You don't know?

4  **A.      I don't know.**

5  Q.      It doesn't, does it?

6  **A.      I don't know.**

7  Q.      Okay.  Now I'd like to refer you to this letter.  Can you

8  see this letter?

9  **A.      I can.**

10  Q.      Can you identify this letter?

11  **A.      It appears to be an e-mail from Jeanine Stewart to me.**

12  Q.      I see.  And doesn't it -- if you would just look over

13  that letter for a moment.

14        Isn't she giving you instructions on what to do with the

15  investigation?

16  **A.      No.  It appears that she's giving me the information that**

17  **she's received.**

18  Q.      Doesn't she say what you should evaluate and look at with

19  regard to this complaint?

20  **A.      That may have been her opinion, but that wouldn't dictate**

21  **exactly how I handle an investigation.**

22  Q.      I see.  I'd like you to look at this part of an e-mail --

23            THE COURT:  I'm sorry, what was the Exhibit Number

24  for the previous document?

25            MR. STROUSE:  That was, I believe, number 18, Your

1   Honor.

2          THE COURT:  Plaintiff's 18?  Thank you.

3   BY MR. STROUSE:

4   Q.   Now, isn't it true Plaintiff's Number 19 -- I don't have

5   it on the screen yet.  Plaintiff's Number 19, if I could

6   present it to you.

7   **A.   Thank you.**

8   Q.   Could you identify that e-mail?

9   **A.   It appears to be an e-mail from Jeanine Stewart to me.**

10  Q.   And isn't it true that she's giving you more direction in

11  finding out what, if anything, this investigation should -- how

12  this investigation should take place?

13  **A.   Again, she seems to be providing me with her opinion, but**

14  **that would not necessarily dictate how I would conduct an**

15  **investigation.**

16  Q.   I see.  And this e-mail which is on the screen right now,

17  it's from -- I'm sorry.  It's from Jeanine Stewart to you, and

18  it says "Eric, thank you for your work related to my complaint

19  and for this confirmation of findings."  Isn't that true?

20  **A.   Yes, that is true what it says.**

21  Q.   Doesn't this mean, essentially, that she was directing

22  the investigation?

23  **A.   I never took it as that.**

24  Q.   She was telling you what to do, wasn't she?

25  **A.   I never took it as that, sir.**

1  Q.    Now, you talked about who substantiated Dr. More's

2  complaints.  You have one person, as I recall, and that's

3  Ms. Saghy, the secretary, who says sometimes he'll stand in the

4  doorway and sometimes he has long conversations.

5        Who else confirmed any of the allegations purportedly

6  that were made against Dr. Naumov?

7  **A.    I'd have to go back and double check --**

8  Q.    Was it Dr. Simonelli?

9  **A.    I would have to go back and double check the --**

10 Q.    Isn't it true that no one confirmed it?

11 **A.    I don't believe so.**

12 Q.    Now, Sergeant, you did the investigation, didn't you?

13 **A.    I did.**

14 Q.    And you did it without conferring or talking or even

15 approaching Dr. Naumov, didn't you?

16 **A.    Correct.**

17 Q.    And you knew, didn't you, that he was on campus or in the

18 area for May and June, didn't you?

19 **A.    I don't recall where he was at that time.**

20 Q.    Did you try to find out?

21 **A.    The body of the investigation did not begin for some time**

22 **after the date of the initial complaint.**

23 Q.    Didn't it start in May, when you had a letter from

24 Dr. Stewart?

25 **A.    May 12th is when it formally started, yes --**

1   Q.    So you had all -- go ahead.

2   **A.    But the interviews did not commence until several weeks**

3   **later.**

4   Q.    So you had all of May and all of June and even part of

5   July when Dr. Naumov was in the area, wasn't he?

6   **A.    The investigation was held off at the request of**

7   **Dr. More, which is a common practice in these types of**

8   **investigations, depending on the circumstances.**

9   Q.    But she had left the campus, didn't she?  She was going

10  to Johns Hopkins.

11  **A.    That was her next place of employment.  I do not recall**

12  **her specific last date at this time.**

13  Q.    Didn't she leave after the last semester in 2014?

14  **A.    Yes.  After the spring semester?  Yes.**

15  Q.    Don't you know that the semester ends in May?

16  **A.    It does.**

17  Q.    How long you been working at McDaniel?

18  **A.    A total of nine years.**

19  Q.    And you don't know when the spring semester ends?

20  **A.    Yes, sir, I do know when the spring semester ends --**

21  Q.    Thank you.  When does it end?

22  **A.    -- I do not know when Ms. More's last day of employment**

23  **with the college was, off the top of my head now.**

24  Q.    How could you do a balanced investigation without talking

25  to Dr. Naumov?

1  **A.    Normal course of investigation, as I testified earlier,**

2  **would be receive the complaint, identify witnesses and**

3  **evidence, and then conduct an interview with the respondent as**

4  **the last step of the investigation.  I was not able to do that.**

5  Q.    You were not able to do it because you didn't try, did

6  you?

7  **A.    No.**

8  Q.    Did you call him?

9  **A.    No.**

10  Q.    Did you e-mail him?

11  **A.    No.**

12  Q.    Did you try to Skype with him, wherever he was?

13  **A.    No.**

14  Q.    Why not?

15  **A.    At the point when I was prepared -- I finished the**

16  **interviews, and I was prepared to make contact with Dr. Naumov.**

17  **He was out of the country at that point or out of the area, and**

18  **my plan was, when he returned, to contact him and conduct that.**

19  Q.    Why, if it was important -- it was important, wasn't it?

20  **A.    It could be.**

21  Q.    It's important to Dr. Naumov, wasn't it?

22  **A.    I don't know.  I don't know what's important to him.**

23  Q.    Why didn't you contact him by e-mail?  Did you ever try

24  e-mail?

25  **A.    Again, at the point where the investigation was, when I**

1   **was prepared to -- planned to connect with him, that's when I**

2   **was advised that the college was going to proceed from there.**

3   Q.    They were going to proceed without any input from

4   Dr. Naumov.

5   **A.    So the way the grievance procedure works is that**

6   **Dr. Naumov would have ample opportunity to review everything**

7   **and provide any information that he would want.  So there would**

8   **still be ample opportunity for him to provide everything that**

9   **he needed.**

10  Q.    You were providing information on which this grievance

11  would go forward, and you didn't have any information from the

12  main perpetrator of this matter at all, did you?

13  **A.    As a matter of fact, no, I did not --**

14  Q.    How could you make a judgment then --

15          THE COURT:  He was still answering.

16          THE WITNESS:  I'm finished.  Go ahead.

17  BY MR. STROUSE:

18  Q.    I'm sorry, what did you say?

19  **A.    I'm finished.**

20  Q.    How could you make a judgment then?

21  **A.    I don't make any judgments in these situations.**

22  Q.    How would you make a recommendation then?  Don't you make

23  recommendations?

24  **A.    I don't make recommendations.  I provide them with**

25  **information that I received through the investigation.  It's up**

1   **to the college to then determine how to proceed from there.**

2   Q.    You've gotten training in Title IX, don't you?

3   **A.    Yes, sir.**

4   Q.    And where does it say in Title IX training that you

5   shouldn't involve the person who perpetrates the alleged

6   activity?

7   **A.    I don't believe it says anywhere specifically that you**

8   **shouldn't do that.**

9   Q.    Isn't it a biased investigation without Dr. Naumov's

10  input?

11  **A.    Again, the way the entire procedure works, Dr. Naumov**

12  **would have ample opportunity to provide any information,**

13  **regardless of speaking with me about it.**

14  Q.    Regardless of your investigation.

15  **A.    No, regardless of him specifically speaking with me, not**

16  **regardless of the information that I documented in the**

17  **investigation.**

18  Q.    So he can go to the grievance committee without you even

19  talking to him, and you did the investigation; is that right?

20  **A.    Without me talking to him?  Yes.**

21  Q.    What about lunch?  Did that ever come up, about him

22  inviting Dr. More to lunch?  Who corroborated that, if it came

23  up?

24  **A.    I believe Dr. More did -- that does sound familiar that**

25  **Dr. More did mention several lunch invites, which she turned**

1  down.

2  Q.    Who corroborated it?

3  A.    I do not know.

4  Q.    Standing in the doorway, who corroborated that?

5  A.    I believe Kathy Saghy and Spencer Hamblen, possibly.

6  Q.    How about e-mails on the weekend, who corroborated that?

7  A.    Any e-mails would have been taken from the McDaniel

8  College server, and any dates and things like that would

9  have --

10  Q.    Who corroborated it?

11  A.    Again, that would not be a who.  That would be a matter

12  of the computer system.

13  Q.    The computer system corroborated it?

14  A.    Any dates on any e-mails would corroborate that.

15  Q.    How about longer than needed conversations?  Who

16  corroborated that?

17  A.    I wouldn't have any specific information on that.

18  Q.    Walking to the car, who corroborated that?

19  A.    Again, that would be something that Dr. Naumov would --

20  in the grievance procedure would have opportunity to address.

21  Q.    Comments on the sweater, who corroborated that?

22  A.    Again, that would be something that could be addressed

23  further in the grievance procedure.

24  Q.    So you had no corroboration or very little corroboration;

25  isn't that true?

1    **A.      I don't believe so.**

2    Q.      Well, you just said you don't know who, except Dr. More.

3    Who corroborated Dr. More's allegations?

4    **A.      Again, much of the information was corroborated through**

5    **the witness interviews.**

6    Q.      I've just asked you who on each specific item, and you

7    haven't come up with anything except one, standing in the

8    office door; isn't that true?

9               MR. ENGLISH:  Objection, Your Honor.  That's

10   mischaracterizing the testimony.

11              THE COURT:  Overruled.  He can respond.

12              THE WITNESS:  I'm sorry.  Could you repeat that for

13   me?

14   BY MR. STROUSE:

15   Q.      I've repeated the alleged allegations, and only on one

16   have you corroborated that someone said something similar to

17   Dr. More.

18   **A.      So in the interviews that were conducted with the**

19   **witnesses, they did corroborate the behavior that was outlined**

20   **by Ms. More.**

21              MR. STROUSE:  I have no further questions, Your

22   Honor.

23              THE COURT:  Redirect?

24              MR. ENGLISH:  I've got some follow-up questions.

25              **REDIRECT EXAMINATION BY THE DEFENDANT**

1    BY MR. ENGLISH:

2    Q.    Chief Immler, if you could turn to page 4 of the policy

3    that you have before you, which is Joint Exhibit 27.

4    **A.    Yes.**

5    Q.    I'm looking here at the second paragraph there on the

6    policy against sexual assault and sexual violence, and it says

7    "if the college becomes aware of incidents of sexual

8    harassment, sexual violence, or sexual assault, the college

9    will take immediate action to eliminate the sexual harassment,

10   sexual violence, or sexual assault, prevent its recurrence, and

11   address its effects."

12        You were asked where did you get your understanding that

13   the college could move forward without the victim, and you

14   weren't asked specifically about the policy.  You couldn't just

15   remember in your head where to point it out.  Does that refresh

16   your recollection?

17   **A.    Yes.**

18   Q.    And what is your understanding as to that language as it

19   relates to the college's responsibility to act?

20   **A.    I understand it to be exactly what the college did, was**

21   **to look into the allegations and proceed from there.**

22   Q.    And is it your understanding that when it says in that

23   sentence that the college will take immediate action, that it's

24   not up to a third party or a victim for the college to enforce

25   its own policy, that the college has the responsibility to act?

1    **A.     Correct.**

2    Q.     You were also asked about page 11, some language on page

3    11 of the policy.  And you were also referred to the Dear

4    Colleague letter, as to the victim willing to be identified and

5    how, if the victim is not identified, that it was Mr. Strouse's

6    opinion that a complaint can't go forward.  Do you remember

7    those questions?

8    **A.     I do.**

9    Q.     Was the victim identified here?

10   **A.     Yes.**

11   Q.     She participated in the investigation?

12   **A.     She did.**

13   Q.     She provided an interview?

14   **A.     She did.**

15   Q.     She provided documents to Dr. Stewart, as far as you

16   know?

17   **A.     Yes.**

18   Q.     She indicated that she would cooperate with the

19   investigation?

20   **A.     She indicated that she would be willing to sit down with**

21   **me for an interview.**

22   Q.     But she just didn't want to go forward with the

23   grievance.

24   **A.     She didn't want to continue with anything beyond that.**

25   Q.     Now, Mr. Strouse spent some time on the confirmation of

1  the conduct.  Was it your job to confirm the conduct, in terms

2  of the investigation, to confirm the allegations?

3  **A.    No.  It was my job to, again, gather facts and document**

4  **it to move forward for the college to decide how to proceed.**

5  Q.    Did you gather facts that there were inappropriate

6  comments made to Dr. More about her appearance?

7  **A.    Yes.**

8  Q.    Did you gather facts that there were invasions of

9  Dr. More's personal space?

10  **A.    Yes.**

11  Q.    Did you gather facts that there were inappropriate

12  e-mails sent to Dr. More?

13  **A.    Yes.**

14  Q.    Did you gather facts that there were inappropriate

15  e-mails and contact with applicants for a female professor

16  position?

17  **A.    Yes.**

18  Q.    Did you gather facts as to inappropriate comments, like I

19  would marry you if I wasn't married -- if I wasn't already

20  married?

21  **A.    Yes.**

22  Q.    Were you able to gather e-mails?

23  **A.    Yes, I was.**

24  Q.    Were those e-mails the words of Dr. Pavel Naumov?

25  **A.    Yes.**

1  Q.    And were you able to read the worths of Dr. Pavel Naumov

2  as to some of the admissions he made, like saying that I'm

3  sorry for forcing you to spend time having to get me away from

4  you and things like that?  Were those some of the comments that

5  you read from him?

6             MR. STROUSE:  Objection, Your Honor.

7             THE COURT:  I'm going to overrule that objection.  I

8  am going to ask you to slow down a little bit.

9             MR. ENGLISH:  Sorry about that, Your Honor.

10 BY MR. ENGLISH:

11 Q.    You can answer.

12 **A.    Yes.**

13 Q.    Now, you did an initial investigation, which was the

14 gathering of the facts.  Was it your understanding that after

15 the investigation, that there would be a more formal process

16 where both sides can tell their story?

17 **A.    Yes.**

18 Q.    And was it your understanding that after you gathered

19 facts, that there was a point where there were enough facts --

20 even without talking to Dr. Naumov, that there were enough

21 facts to go forward with that formal process?

22 **A.    Yes.**

23 Q.    And was it your understanding that in that formal

24 process, that Dr. Naumov would be interviewed and would be able

25 to tell his side of the story?

1  **A.    Yes.**

2  Q.    Did that factor into your decision not to interview him?

3  **A.    Yes.**

4        MR. ENGLISH:  No further questions.

5        THE COURT:  Sir, thank you for your testimony.  You

6  may be excused at this time.

7        MR. STROUSE:  I'd like some redirect, Your Honor.

8        THE COURT:  Approach.  Approach.

9     (Bench conference not transcribed.)

10        THE COURT:  You are excused at this point.  Please

11  don't discuss your testimony with anyone else until the trial

12  has been completed and with that, please enjoy the rest of your

13  day.

14        THE WITNESS:  Yes, sir, thank you.

15     (End of testimony of Eric Immler.)

16

17

18

19

20

21

22

23

24

25

1              **(Defense Witness THOMAS FALKNER sworn.)**

2              THE COURTROOM DEPUTY:  Thank you.  You may be seated

3    in the witness box.  Please speak loudly and clearly into the

4    microphone and state your full name for the record and spell

5    your name, please.

6              THE WITNESS:  And spell my --

7              THE COURTROOM DEPUTY:  Entire name.

8              THE WITNESS:  My name is Thomas Michael Falkner,

9    T-h-o-m-a-s, M-i-c-h-a-e-l, F-a-l-k-n-e-r.

10             **DIRECT EXAMINATION BY THE DEFENDANT**

11   BY MR. ENGLISH:

12   Q.    Dr. Falkner, good afternoon.  Thanks for coming.  If we

13   could start off with your background and tell us what your

14   current position is.

15   **A.    My current position is professor of classics at McDaniel**

16   **College.  My educational background is in the field of**

17   **classics.  I took a bachelors degree in classics in 1969.  I**

18   **took a masters degree and a PhD in classics in 1973 and 1975,**

19   **respectively.**

20   Q.    And if you can give us your professional history, just in

21   terms of where you've been throughout your career.

22   **A.    Sure.  My field of specialization as a scholar is ancient**

23   **Greek literature.  On getting my PhD, I taught for several**

24   **years at Georgia State University.  Then I taught for 27 years**

25   **at the College of Wooster in Ohio, where I also served in a**

1  **number of administrative positions.  And then I came to**

2  **McDaniel College in 2004.**

3  Q.    Was there ever a time where you were the provost of

4  McDaniel College?

5  **A.    Yes.  I came to McDaniel as the provost and dean of the**

6  **faculty in 2004.**

7  Q.    And so you were provost and dean of faculty starting in

8  2004.  How long were you in that position?

9  **A.    Eight and a half years, until December of 2012.**

10  Q.    And during that time while you were the provost, did you

11  form an understanding of the Title IX policy?

12  **A.    I did, yes.**

13  Q.    And what was your understanding of the college's duty to

14  pursue a grievance if the victim is unwilling to bring a

15  complaint under the McDaniel policy?

16  **A.    My understanding is that the college must act if, in**

17  **fact, it became aware of harassment or of other violations of**

18  **the school's policy, even if, in fact, the victim was unwilling**

19  **to file a complaint.**

20  Q.    And where did you form that understanding from?

21  **A.    It was based on my reading of the text of the policy**

22  **itself, and also in my conversations as a professional at**

23  **professional meetings.  I would call it pretty much the**

24  **standard practice in higher education.**

25  Q.    When you say the standard practice in higher education,

1  are you referring to conversations you've had with other

2  provosts and their standard practice?

3  A.    **Absolutely.  We had any number of workshops, especially**

4  **after the Dear Colleague letter came out, and that idea, again,**

5  **that colleges had a responsibility to pursue these matters was**

6  **coin of the realm.**

7  Q.    Was it your understanding that -- how you described the

8  policy and the ability of the college to go forward without the

9  victim being the complainant, is that the standard in higher

10  education as you understand it?

11  A.    **As I understood it, yes.**

12  Q.    And that was your understanding in 2012, while you were

13  provost, your last year while you were the provost?

14  A.    **That's correct.**

15  Q.    Are you familiar with the Dear Colleague letter?

16  A.    **I am.**

17  Q.    And what's your understanding of that letter?

18  A.    **My understanding of the Dear Colleague letter is that it**

19  **states clearly that all institutions of higher education,**

20  **again, are required to take action if they become aware of**

21  **instances of harassment or sexual assault, and that they're**

22  **required to do that whether or not, in fact, the victim files a**

23  **complaint.**

24  Q.    Let's fast forward to 2012 and your interaction with

25  Dr. Move.  While you were the provost, did you receive any

1  complaint from Dr. More?

2  **A.     Dr. More came to see me in late -- oh, 2004?**

3  Q.     2012.  I'm sorry.  2012, yes.

4  **A.     Yeah, she came to see me late in about August of 2012.**

5  **She was thinking about leaving the college, and we talked about**

6  **that, and she had some problems with Professor Naumov.**

7  Q.     What was your understanding of the problems that she had

8  with Professor Naumov?

9  **A.     Well, my understanding is that she found that his**

10  **behaviors sort of crossed over, I guess I would say,**

11  **professional boundaries of behavior, and it was my belief that**

12  **that was at least one of the things that was making her think**

13  **about leaving the institution.  She was clear that she found at**

14  **least some of these behaviors both, I would say, unwelcome and**

15  **persistent.**

16  Q.     Did you escalate it, elevate it to anybody?

17  **A.     I reported it to the president, as I do with all**

18  **important matters at the college, and he and I scheduled a**

19  **meeting with Dr. More.**

20  Q.     And what occurred during this meeting that you had with

21  Dr. More, you and Dr. Casey?

22  **A.     My understanding is that in his conversations with her,**

23  **he heard the same issues about Pavel Naumov's behavior.**

24  Q.     Did she, during that meeting, indicate whether she wanted

25  to proceed with a grievance at that time?

1   **A.      At that time she indicated that she did not want to**

2   **proceed with a grievance.  By the time we had that**

3   **conversation, she had already decided to remain at the college.**

4   **We had sort of come to some new terms of contract and, frankly,**

5   **it would have been difficult for her to continue serving at the**

6   **college and to continue to work in a small program like the**

7   **department of computer science, which is basically a two**

8   **faculty member program.**

9   Q.      So did the college end up making a decision to go forward

10  even without her?

11  **A.      No, we did not.  We decided not to go forward, and that**

12  **was based, in part, on the fact that we did not have access to,**

13  **I guess, the kind of specific information that I gather came**

14  **out later.**

15  Q.      And we'll talk about that in a second.  But if you had

16  made the decision to go forward, who would have been the

17  complainant?

18  **A.      I believe that I would have been the complainant.  I**

19  **believe that as provost and dean of the faculty, it would be my**

20  **role to serve in that capacity.**

21  Q.      If you had more specific information, would you have gone

22  forward without her?

23  **A.      Absolutely.  We were -- again, we were lacking the**

24  **information that we needed to go forward.**

25  Q.      Was it a close call at that time?

1  **A.      It was a close call, it really was.  I think that, again,**

2  **if we had had some body of specific information, we would have**

3  **proceeded.**

4  Q.    So let's talk about a couple of the e-mails.  We'll go to

5  the August 23, 2012 e-mail, please.

6  **A.      Is that something that I have here?**

7  Q.    It's going to be in front of your screen there in a

8  second.

9       This is one of the e-mails that you had not -- that

10  wasn't shared with you.  You've seen this e-mail before though,

11  right?

12  **A.      Only in the last several days.**

13  Q.    It says "after talking to you, I realize how much I miss

14  you.  If the main reason for you leaving is me, then I want to

15  apologize for whatever I did that led you to consider such a

16  drastic decision."

17       MR. STROUSE:  Objection, Your Honor.  He's seen it

18  only as a result of him showing it --

19       THE COURT:  Sustained.

20  BY MR. ENGLISH:

21  Q.    Move to the next exhibit.  Do you see in this e-mail,

22  this is exhibit --

23       MR. STROUSE:  Same objection, Your Honor.

24       THE COURT:  Approach.

25       (Bench conference not transcribed.)

1          THE COURT:  The objection is sustained.

2    BY MR. ENGLISH:

3    Q.    Just one final question, Dr. Falkner.  Do you have an

4    opinion on whether the college acted properly in pursuing the

5    grievance without Dr. More being the complainant in 2014?

6    **A.    I believe that the college did act properly in doing so.**

7    **As I said earlier, I think the college was required, once it**

8    **had, again, clear evidence of harassment, to take action, and I**

9    **think that they were required by both the college's policy and**

10   **by Title IX.**

11         MR. ENGLISH:  No questions.

12         THE COURT:  Cross.

13         MR. STROUSE:  Yes, Your Honor.

14         THE COURT:  I don't know if you need to switch

15   computers.

16               **CROSS-EXAMINATION BY THE PLAINTIFF**

17   BY MR. STROUSE:

18   Q.    This is the letter that you sent to -- to whom did you

19   send this letter?

20   **A.    That was in October 2014.  It says so at the bottom.  And**

21   **I received a request from Jenny Glennon, the director of human**

22   **resources, to sort of, again, summarize my best recollection at**

23   **the time of what had happened in the late summer and early fall**

24   **of 2012.**

25         THE COURT:  What exhibit number is this, sir?

1          MR. STROUSE:  This is -- what Exhibit Number is that?

2    It's 21, Your Honor, Plaintiff.

3          THE COURT:  Plaintiff's 21.  Thank you.

4          MS. RILEY:  No, it's not.  Twenty-seven.

5          MR. ENGLISH:  Twenty-seven, Your Honor.

6          MR. STROUSE:  Twenty-seven.  Oh, okay.

7          THE COURT:  Thank you.

8    BY MR. STROUSE:

9    Q.    So you didn't go forward with this complaint, did you?

10   **A.    I beg your pardon?**

11   Q.    You didn't go forward with the complaint.

12   **A.    That's correct.**

13   Q.    And you say you studied Title VII?

14         THE COURT:  Title IX.

15   BY MR. STROUSE:

16   Q.    I mean Title IX of the -- the policy.

17   **A.    Largely through the Dear Colleague letter, which was sort**

18   **of a guidance document for the implementation of Title IX in**

19   **cases of sex discrimination, sexual harassment, and sexual**

20   **assault.**

21   Q.    Where or when or whenever -- where was Dr. Naumov accused

22   of sexual harassment?

23   **A.    Well, again, he wasn't at the time.  Right.  You just**

24   **asked me if we proceeded with the matter, and we didn't.  I**

25   **heard everything that was said to me, and we decided not to**

1   **proceed with the matter.**

2   Q.    How about in this case?  Where was he charged with sexual

3   harassment or sexual violence?

4            MR. ENGLISH:  Objection.

5            THE COURT:  Sustained for lack of foundation.  He

6   wasn't -- well, sustained for lack of foundation.

7   BY MR. STROUSE:

8   Q.    Now, with regard to the OCR advisory committee, doesn't

9   that involve sexual violence each and every time?

10  **A.    You know what?  As I understand the document and, again,**

11  **I struggled like everyone with it, there was kind of three**

12  **levels of it.  The broad umbrella category is sexual**

13  **discrimination.  Then, under sexual discrimination, there is**

14  **sexual harassment.  And sexual violence and assault are**

15  **actually kind of a form, a subcategory of sexual harassment.**

16  **So I believe that Title IX is really about all forms of sexual**

17  **discrimination, harassment and, again, violence.**

18  Q.    Was Dr. Naumov ever charged with sexual violence or

19  sexual harassment in this matter?

20           MR. ENGLISH:  Objection.

21           THE WITNESS:  Well, again, I don't know about --

22           THE COURT:  Hold on.  There's been an objection.

23       He can testify to whether or not he was charged with

24  those things during his tenure.  If that's his question, then

25  the objection is overruled.

1          THE WITNESS:  During my tenure, no, he was not.

2  BY MR. STROUSE:

3  Q.    If you can, I believe the Title IX policy of McDaniel is

4  up in front of you.

5  **A.    No, this is still the summary statement that I sent to**

6  **Jennifer Glennon.**

7          THE COURT:  I think he's referring to one of the

8  physical documents in --

9          THE WITNESS:  Oh, okay.  Do you mean the college's

10  Title IX statement here?

11  BY MR. STROUSE:

12  Q.    Yes.  If you would look at page 11, under "formal

13  hearing."  Could you read that last sentence in that formal

14  hearing, first paragraph.

15  **A.    Yes.  "In the event that the complainant is unwilling to**

16  **be identified, the formal hearing will be dismissed, no action**

17  **will be taken, and no report of any action will be filed."**

18  Q.    Doesn't that mean that no one can stand in the place, and

19  for a formal hearing to go forward, you must have the

20  complainant?

21  **A.    I think it means that there has to be a complainant.  But**

22  **again, in the case, again, that I was not involved in later in**

23  **this situation, right, the complainant and the victim were not**

24  **the same person.**

25  Q.    Well, doesn't this mean that the complainant must be the

1  same person?

2  A.     That's not what I'm reading here.  I'm reading in the

3  event that the complainant is unwilling to be identified.  And

4  I believe, again -- and again, remember, I'm talking here about

5  some matters in which I was no longer involved.  My

6  understanding is that the victim, it was always clear who the

7  victim was, and she was identified by name, and it was always

8  clear who the complainant was, and she was present and

9  identified by name.

10  Q.     But she was standing in for the victim, wasn't she?

11  A.     I'm not sure I would describe it that way.  Once again,

12  this is not where I was directly involved.  But I wouldn't

13  describe it that way.  I would describe it as that she was

14  representing the college in taking action that she was required

15  to take.

16  Q.     Where does it say in the Title IX booklet that the

17  college can enter as a third party if a complainant does not

18  come forward?

19  A.     I think if the college is required to take action, and I

20  think sometimes it says immediate action, and if, in fact, the

21  situation is such that the victim is unwilling to participate

22  and, yet, the college still is legally required to take action,

23  that someone -- I'm just sort of following logic 101 -- someone

24  has to serve that role.  I think in this case, the provost and

25  the dean of the faculty is the right person to assume that

1  **responsibility.**

2  Q.    Does not say in that booklet, does it, that a college can

3  go forward without the complainant?

4  **A.    It doesn't say it explicitly, correct.**

5  Q.    And it doesn't refer in that booklet to the OCR, the

6  Office of Civil Rights, Department of Education, advisory

7  letter, does it?

8  **A.    The college's -- not the portion that you have me**

9  **reading, no.**

10  Q.    In the entire booklet, do you know of anyplace where it

11  is mentioned that the Dear Colleague letter of April 2011 is

12  footnoted, is mentioned, is relied on, or any of the like in

13  Title IX policy of McDaniel?

14  **A.    Well, the policy itself is called Title IX.  I believe**

15  **that the policy was certainly amended in view of the Dear**

16  **Colleague letter.**

17  **        So again, I was not a part of the formulation of the**

18  **policies, but it certainly seems clear to me that the Title IX**

19  **and the Dear Colleague letter talked at length about having**

20  **certain kinds of procedures in place that would meet the**

21  **standards and the requirements that they had, that this was the**

22  **college's attempt to implement in a -- again, in a complete way**

23  **the expectations of the Dear Colleague letter and Title IX.**

24  Q.    But it's not mentioned at all in the Title IX policy; is

25  it?

1   **A.    What is not mentioned?**

2   Q.    The Dear Colleague letter --

3   **A.    Again, I would have to sit with this and go through it.**

4   **It's 20 pages or something, but, again, I don't --**

5   Q.    And the Dear Colleague letter focuses on sexual violence,

6   doesn't it?

7   **A.    Well, once again, my understanding of the Dear Colleague**

8   **letter is that it treats all forms of -- Title IX is all about**

9   **sexual discrimination.  And so there's sex discrimination,**

10  **there's sexual harassment, there's sexual violence.**

11      **So again, I stand to be corrected on this, and I'm not an**

12  **expert on Title IX, but I believe that the document itself**

13  **means to take a position on all of those issues.**

14  Q.    Now, you've read the Dear Colleague letter, haven't you?

15  **A.    I have.**

16  Q.    Yes.  I'm going to show you the Dear Colleague letter,

17  which is Plaintiff's 25.  I was wondering if you could read

18  that last sentence in the second paragraph.

19  **A.    Okay, on page 5, the last sentence in the second**

20  **paragraph.  "The school should also tell the complainant that**

21  **Title IX prohibits retaliation, and that school officials will**

22  **not only take steps to prevent retaliation but also take strong**

23  **responsive action if it occurs."**

24  Q.    I'm sorry.  It was the one above.

25  **A.    Okay.**

1  Q.    If you would read that.

2  A.    **"If a complainant insists that his or her name, or other**

3  **identifiable information, not be disclosed to the alleged**

4  **perpetrator, the school should so inform the complainant that**

5  **its ability to respond may be limited."**

6  Q.    Doesn't that mean to you, Dr. Falkner, that the school

7  can't go forward?

8  A.    **Well, I guess I'm a little confused because, again, the**

9  **complainant -- to the best of my understanding of what happened**

10  **after I left office, my understanding is that, again, both the**

11  **victim and the complainant were identified throughout.  So**

12  **there would have been no need to -- again, to talk about the**

13  **nondisclosure of either of those to the alleged perpetrator.**

14  Q.    But the complainant has to be a person against whom the

15  behavior is directed, doesn't it?

16  A.    **You want to say, normally, yes, unless you are in a**

17  **situation that the college was in, and which I am sure happens**

18  **in other cases, where, again, the college must take action, as**

19  **stated in both Title IX and in the college's policy itself, and**

20  **the victim is unwilling to become the complainant.  In that**

21  **case, the college assumes the role of being the complainant.**

22  Q.    But the Title IX doesn't say that, does it?

23  A.    **Again, I don't have all of Title IX committed to memory.**

24  Q.    Dr. Falkner, what does it say at the top of each page?

25  A.    **This says "Dear Colleague letter, sexual violence."**

1   Q.      On each and every page, doesn't it?

2   **A.      Well, let's see.  It does.**

3   Q.      And so it refers to sexual violence, doesn't it?

4   **A.      That's -- yes, that's one of the -- remember, I sort of**

5   **tried to sort out three different levels that I -- and again,**

6   **my feeling is that Title IX is about all three of those levels,**

7   **sexual discrimination, sexual harassment, and sexual violence.**

8   Q.      Now, you were provost before Dr. Stewart, as you

9   testified; is that correct?

10  **A.      That's correct.**

11  Q.      And you never charged anyone with Title IX violations,

12  did you?

13  **A.      No.  It was my good fortune that there were no Title IX**

14  **violations that came to my desk in my eight and a half years as**

15  **provost.**

16  Q.      And as you just testified, Title IX must have some sexual

17  or gender discrimination; isn't that right?

18  **A.      Yes, I believe that, again, the overarching category is**

19  **sex discrimination.  So I would believe that, again, charges**

20  **would have to relate to that.**

21  Q.      Well, you knew Dr. Naumov, didn't you?

22  **A.      Yes, I did.  I hired him.**

23  Q.      You hired him.  Oh, good.  And you knew Dr. More, didn't

24  you?

25  **A.      I hired her as well.**

1  Q.    And you know that, together, they produced 12 papers;

2  isn't that correct?

3  **A.    That sounds like a good number.**

4  Q.    And you knew that was an excellent production, especially

5  at McDaniel, which is a teaching college.

6  **A.    Exactly.  That's good research productivity.**

7  Q.    Were you aware, if you were, that Sergeant Immler, the

8  investigator, never interviewed Dr. Naumov?

9  **A.    I'm not aware.**

10           MR. ENGLISH:  Objection.

11           THE COURT:  Sustained.

12           THE WITNESS:  I'm learning this from you right now.

13  No, I'm completely unaware.

14           THE COURT:  Sir, I sustained the objection.  That

15  means you don't have to answer.

16           THE WITNESS:  Oh.

17  BY MR. STROUSE:

18  Q.    Now, with regard to the complaints that indicate some

19  kind of sexual harassment or sexual violence, is asking her to

20  lunch when she's leaving, is that a sexual violent act?

21           MR. ENGLISH:  Objection, Your Honor.

22           THE COURT:  Sustained.

23  BY MR. STROUSE:

24  Q.    Were you aware, if you were, of the specific complaints

25  that Dr. More made of Dr. Naumov?

1          THE COURT:  During which time frame?

2  BY MR. STROUSE:

3  Q.    During the time frame --

4          THE COURT:  Hold on.  He has to now clarify the

5  answer.  During which time frame are you referring to?

6  BY MR. STROUSE:

7  Q.    During the time when she was talking with Dr. Stewart?

8  **A.    Oh, no, I am not.**

9  Q.    You're not.

10  **A.    No.**

11  Q.    Okay.  Would you consider inviting somebody to lunch a

12  significant event?

13          MR. ENGLISH:  Objection.

14          THE COURT:  Sustained.

15          MR. STROUSE:  I have no further questions, Your

16  Honor.

17          THE COURT:  Redirect.

18          **REDIRECT EXAMINATION BY THE DEFENDANT**

19  BY MR. ENGLISH:

20  Q.    Okay, Dr. Falkner, just a couple of follow-up questions.

21  You were kind of asked on the spot to be able to point out

22  where the policy, the college's Title IX policy specifically

23  says that the college must go forward, and I want to refresh

24  your recollection.  It's on page 4 of the policy, and there's

25  language there that says "if the college becomes aware of

1    incidents of sexual harassment, sexual violence, or sexual

2    assault, the college will take immediate action to eliminate --

3            THE COURT:  Slow down, please.

4    BY MR. ENGLISH:

5    Q.    Sorry.  "The college will take immediate action to

6    eliminate the sexual harassment, sexual violence, and sexual

7    assault, prevent its recurrence, and address its effects."

8    Does that refresh your recollection?

9    **A.    That's the very passage I was trying to remember when I**

10   **quoted the phrase "immediate action."  Because, again, there's**

11   **an urgency to act, where the college is required to act, and**

12   **there's a dilemma when, in fact, the victim is not willing to**

13   **cooperate.**

14   Q.    And here, this reaffirms and is it consistent with your

15   understanding of the Dear Colleague letter that you discussed,

16   that this language tracks with that requirement from the Dear

17   Colleague letter?

18   **A.    It tracks very closely if not identically.**

19   Q.    And there was some discussion about if the victim is not

20   identified or the complainant is not identified.  Is it correct

21   that both the victim and the complainant, to your

22   understanding, were identified in 2014 to Dr. Naumov?

23   **A.    It is my understanding that both were known and named and**

24   **identified.**

25   Q.    You were asked to point out in the Dear Colleague letter,

1  which is Defendant's Exhibit 2, language as to -- there was the

2  suggestion that it only applied to sexual violence, and I

3  wanted to -- and you had mentioned that you had read the letter

4  before, right?

5  **A.     Uh-huh.**

6  Q.     Is that a yes?

7  **A.     That's a yes.**

8  Q.     Okay.  And you mentioned your recollection that it

9  applied to more than just sexual violence.  I direct your

10  attention to the highlighted portion, where it says "Title IX

11  of the education amendments," and there's the cite, "and its

12  implementing regulations, prohibit discrimination on the basis

13  of sex in education, activities operated by recipients of

14  federal financial assistance, sexual harassment of students,

15  which include acts of sexual violence as a form of

16  discrimination prohibited by Title IX."  Does that refresh your

17  recollection as to where it specifically covers sexual

18  harassment?

19  **A.     Yes, that's exactly the passage.**

20  Q.     Then you were asked -- hold on.  You were asked to find

21  where, in the Dear Colleague letter, does it say -- I'm on page

22  4 of the Dear Colleague letter -- where does it say that a

23  college must act even if the victim does not want to go forward

24  with the grievance, and there in the highlighted paragraph that

25  says "regardless of whether a harassed student, his or her

1   parent, or a third party files a complaint under the school's

2   grievance procedure or otherwise requests action on the

3   student's behalf, a school that knows, or reasonably should

4   know, about possible harassment must promptly investigate to

5   determine what occurred and then take the appropriate steps to

6   resolve the situation."

7          Does that refresh your recollection as to where in the

8   Dear Colleague letter that it -- where it discusses the

9   college's duty to act when the victim does not want to

10  participate in the grievance?

11  **A.     Yes, this is certainly one such passage.**

12  Q.     And is it your understanding that the Title IX policy is

13  consistent with that Department of Education guidance?

14  **A.     That the college's Title IX policy?**

15  Q.     Yes.

16  **A.     Yes.**

17  Q.     Lastly, you were -- I know technology is great, but this

18  thing is better than all of it; it works.  (Referring to ELMO.)

19         You were asked about Defendant's Exhibit 5, which is your

20  memo capturing your conversation with Sara More, and there in

21  the memo you say that you met with her about a number of

22  concerns that she had about the behavior of Dr. Naumov.

23         In the latter regard -- and I assume the redacted version

24  says Dr. More -- reported to me a series of incidents and

25  patterns of behavior that were in the category of unwanted

1   attentions, expressions of interest that made her

2   uncomfortable, that she believed went beyond normal collegiate

3   behavior, and suggested to her that Dr. Naumov was interested

4   in a relationship that went beyond an appropriate professional

5   one.  These behaviors, as I recall, were largely verbal, spoken

6   and written in nature, together with the concerns regarding

7   physical proximity, sitting and standing closer than was

8   comfortable for her, and more frequent visits to her office

9   than she believed were called for.  There was no direct

10  physical contact alleged."

11       Does that now refresh your recollection as to what

12  Dr. More told you about the unwanted behavior by Dr. Naumov?

13  **A.    That's exactly right.**

14           MR. ENGLISH:  I don't have any further questions.

15           THE COURT:  Sir, thank you so much for your

16  testimony.  You are excused.  Please don't discuss your

17  testimony with anyone until the trial has been completed, and

18  please try and enjoy the rest of your day.

19       (End of testimony of Thomas Falkner.)

20           **(Defense witness JENNIFER GLENNON sworn.)**

21           THE COURTROOM DEPUTY:  And please speak loudly and

22  clearly into the microphone, state your full name for the

23  record and spell your name, please.

24           THE WITNESS:  My name is Jennifer Lorraine Glennon,

25  J-e-n-n-i-f-e-r. L-o-r-r-a-i-n-e, G-l-e-n-n-o-n.

1                    **DIRECT EXAMINATION BY THE DEFENSE**

2     BY MS. RILEY:

3     Q.    Good afternoon, Ms. Glennon.  How are you employed?

4     **A.    I am currently the director of human resources, the Title**

5     **IX coordinator, and also an adjunct professor at McDaniel**

6     **College.**

7     Q.    And when were you hired for these various positions at

8     McDaniel College?

9     **A.    I started in 2001 as an adjunct lecturer in the human**

10    **resources graduate program, and then I served as the program**

11    **coordinator for that graduate program in 2013 --**

12           (Court reporter instructs witness to speak slower.)

13           THE WITNESS:  Sorry.  And then in January of 2014, I

14    was appointed as the interim director of human resources, also

15    still teaching in the program.  And then in June of 2014 I was

16    appointed as director of human resources and also the Title IX

17    coordinator.

18    Q.    Can you briefly describe for the jury your educational

19    background?

20    **A.    Sure.  I have a bachelor's degree in sociology from York**

21    **College of Pennsylvania.  I also have a masters degree in human**

22    **resource development from McDaniel College.**

23    Q.    And do you have any certifications related to your

24    employment?

25    **A.    Sure, I have two.  The first is a PHR, and that stands**

1  for Professional in Human Resources, and that is offered

2  through the Human Resources Certificate Institute.  And I also

3  have something called the SHRM-CP, which is offered through the

4  Society of Human Resource Managers, and it's another

5  professional designation.

6  Q.    Now, one of the current positions you mentioned was that

7  of Title IX coordinator.  If I could ask, just briefly, when

8  you refer to Title IX, what is Title IX?

9  A.    Title IX is a federal regulation that applies to all

10 institutions in the United States that receive federal

11 financial funding.  It provides protection against

12 discrimination under gender and sex harassment.

13 Q.    As part of your job at McDaniel, as part of your job as

14 the Title IX coordinator, have you received any training on

15 Title IX?

16 A.    Yes.  I've attended numerous trainings over the years.

17 Currently, we are -- McDaniel is part of a nine-school

18 consortium that received a rather sizable grant from the

19 federal government, the Department of Justice, Office of

20 Violence Against Women, and we're required to attend a number

21 of five-day institutes.  So I've completed four of those

22 five-day institutes.  Additionally, we are required to do

23 monthly webinars.

24       I've also attended a number of trainings from various

25 professional groups, including the Association for Title IX

1 **Coordinators.  Also, Society for Human Resource Managers.  I've**

2 **also attended trainings through the Colleges and Universities**

3 **Professional Groups for Human Resources, the Cleary Group**

4 **(phonetic), and a number of trainings.**

5 Q.    In addition to the formal training, how do you stay

6 current on the changes in the law with respect to Title IX?

7 **A.    I am a member of a number of list serves through the**

8 **Department of Education, through professional groups such as**

9 **the Association of Title IX Coordinators, like I mentioned.  As**

10 **part of the grant, we also receive periodic correspondence**

11 **regarding Title IX.**

12 Q.    Now, you also mentioned, in addition to your Title IX

13 position, that you serve as a faculty member at McDaniel.  What

14 is it that you teach?

15 **A.    I teach a varied course load in the Human Resource**

16 **Development Group.  This past fall I taught human resource**

17 **management.  I've also taught human resource development,**

18 **organizational development, ethics, and other courses.**

19 Q.    Is the Title IX of the Education Amendments among the

20 laws that you cover in this class?

21 **A.    In this past fall, I absolutely did.  We have covered**

22 **various employment laws.**

23 Q.    Based upon your training, do you know if Title IX, the

24 federal Title IX law applies to McDaniel College?

25 **A.    It does.  We receive federal financial aid.**

1  Q.    Now, based upon your training, who, within your college

2  community, does the Title IX law actually apply to?

3  **A.    It applies to students, faculty, staff, visitors, and**

4  **volunteers.**

5  Q.    Now, in addition to the Title IX statute which we

6  mentioned at the outset, are you aware of any guidance that is

7  available to schools about how they are expected to respond to

8  allegations of sexual harassment?

9  **A.    Sure.  The Department of Education pushes out periodic**

10  **pieces of guidance, sometimes referred to as Dear Colleague**

11  **letters.  They're considered sub-regulatory guidance, meaning**

12  **that schools are obligated to abide by whatever information is**

13  **pushed out.**

14  Q.    Now, you, as well as witnesses before you, have referred

15  to these letters as Dear Colleague letters.  Do you know where

16  that -- what's that reference to?  What does that title refer

17  to?

18  **A.    Typically, at the beginning of these guidance documents,**

19  **it simply starts as "Dear Colleague."**

20  Q.    How are these letters promulgated to the general public

21  or to schools?

22  **A.    They are listed publicly on the Department of Ed's**

23  **website, and they are also pushed out through the list serves**

24  **to anybody who has elected to be part of their list serve.**

25  Q.    And do you personally receive guidance letters from the

1  Department of Education to your computer at McDaniel College?

2  **A.     Yes, I am a recipient.**

3  Q.     Now, in addition to the Dear Colleague letters which

4  you've referenced, does the Department of Education publish any

5  other guidance for schools?

6  **A.     Sure.   Through the years they've pushed out revised**

7  **guidance in 2001.   They pushed out questions and answers in**

8  **2014 and a Dear Colleague letter in 2011.**

9  Q.     Now, why should a college such as McDaniel be concerned

10  about these Dear Colleague letter that are posted on the

11  Department of Education's website?

12  **A.     Well, they contain some regulatory guidance.   So that**

13  **means that it provides mandates that schools have to implement**

14  **in order to be in compliance with Title IX.**

15  Q.     Now, when you assumed the position of the Title IX

16  coordinator at McDaniel College in June of 2014, was there any

17  existing guidance on Title IX from the Department of Education?

18  **A.     Yes.   At that time the 2014 question and answers were**

19  **out.   The 2011 Dear Colleague letter was out and, also, the**

20  **2001 revised guidance on sexual harassment was out.**

21  Q.     I'd like to spend a few moments with you discussing the

22  April 2011 Dear Colleague letter.

23  **A.     Okay.**

24  Q.     That letter has previously been identified as -- I guess

25  Plaintiff's Exhibit 25.   I'll make it a Defendant's Exhibit

1  also.

2      Now, Ms. Glennon, I left a copy of the Dear Colleague

3  letter up on the -- up at the top.  Ms. Glennon, up on the top

4  left.

5  **A.    Oh, I'm sorry.  Thank you.**

6  Q.    You have a document in front of you dated April 4, 2011,

7  do you not?

8  **A.    Yes.**

9  Q.    And what is that document?

10  **A.    This is the April 4, 2001, Dear Colleague letter that was**

11  **issued from the Department of Education.**

12  Q.    Based upon your training and experience, did this

13  particular Dear Colleague letter make any changes in how a

14  college was expected to address sexual harassment?

15  **A.    It did, it changed a couple of things.**

16  Q.    If you could, explain to the jury what changes were

17  implemented in this April 2011 letter.

18  **A.    Sure.  The first is that they requested that schools**

19  **accelerate adjudication of these kinds of complaints, and they**

20  **recommended that schools adjudicate complaints within 60 days.**

21      **They also changed the standard of evidence that was to be**

22  **used when schools adjudicate these kinds of claims.  They**

23  **changed it to a preponderance of evidence.**

24      **They also strongly discouraged schools from allowing, in**

25  **their procedures, victims to be cross-examined.  And they also**

1  **mandated that schools build within their procedures an**

2  **opportunity for a victim to appeal a decision of either not**

3  **responsible or not guilty, depending on what the school's**

4  **language was.**

5  Q.      Now, the jury will note, when they get an opportunity to

6  review this April 11th Dear Colleague letter, that it refers to

7  the protection of students and the rights of students, the

8  rights they have to receive an education free from

9  discrimination.  Is that your observation also, that it refers

10  to students?

11  **A.      Yes.**

12  Q.      And based upon your experience and training, do you know

13  if Title IX only applies to students?

14  **A.      It does not.**

15  Q.      What do you base that upon?

16  **A.      If you look at the guidance, indicated on page 4, if you**

17  **go to the bottom, footnote 11.**

18  Q.      What does footnote 11 say?

19  **A.      It states that "Title IX also protects third parties from**

20  **sexual harassment or violence in a school's education programs**

21  **and activities.  For example, Title IX protects a high school**

22  **student participating in a college's recruitment program and a**

23  **visiting student athlete and a visitor in the school's**

24  **on-campus residence hall.  Title IX also protects employees or**

25  **a recipient from sexual harassment."**

1   Q.    Thank you.  Now, does the April 2011 letter explain to

2   schools some of the kinds of conduct which Title IX prohibits?

3   **A.    It does.**

4   Q.    Where do you find that guidance?

5   **A.    If you go to the first page, the second full paragraph.**

6   Q.    And what does the language there provide?

7   **A.    "Title IX of the Educational Amendments of 1972," and**

8   **there's a citation, "and it's implementing regulations," and**

9   **there's another citation, "prohibit discrimination on the basis**

10  **of sex in education programs or activities operated by the**

11  **recipients of federal financial assistance.  Sexual harassment**

12  **of students, which includes acts of sexual violence, is a form**

13  **of sexual discrimination prohibited by Title IX."**

14  Q.    Now, according to that same letter that you have in your

15  hand, the April 2011 letter, does Title IX prohibit any other

16  kind of harassment?

17  **A.    It does.**

18  Q.    And what kind of harassment is that?

19  **A.    It prohibits gender-based harassment.**

20  Q.    Where do you find support for that understanding?

21  **A.    If you go to page 3 and footnote 9.**

22  Q.    What does that provide?

23  **A.    "Title IX also prohibits gender-based harassment, which**

24  **may include acts of verbal, nonverbal, or physical aggression,**

25  **intimidation, or hostility, based on sex or sex stereotyping,**

1  **even if those acts do not involve conduct of a sexual nature.**

2  **The Title IX obligations discussed in this letter also apply to**

3  **gender-based harassment."**

4  Q.    Now, Ms. Glennon, does the Dear Colleague letter of 2011

5  contain any discussion of what a school is to do when it is

6  faced with a reluctant witness?

7  **A.    It does.**

8  Q.    Where can we find that language?

9  **A.    If you go to page 4.**

10  Q.    If you wait just a moment, we'll pull that up on the

11  screen.

12  **A.    The bottom paragraph.**

13  Q.    What does it provide there?

14  **A.    "Regardless of whether a harassed student, his or her**

15  **parent, or a third party files a complaint under the school's**

16  **grievance procedures, or otherwise requests action on a**

17  **student's behalf, a school that knows, or reasonably should**

18  **know, about possible harassment must promptly investigate it to**

19  **determine what occurred and take appropriate steps to resolve**

20  **the situation."**

21  Q.    Now, Ms. Glennon, that language that you just read, does

22  it appear to be limited only to cases of sexual violence?

23  **A.    No.  It also includes harassment as well.**

24  Q.    As Title IX coordinator, what was your understanding of

25  the school's obligation if it became aware of possible

1  harassment?

2  **A.    Once the school is aware of any potential harassment, we**

3  **are obligated to investigate, redress the effects of any**

4  **harassment, and stop it or prevent it from happening again.**

5  Q.    Now, this duty that you've just described to us, was this

6  duty first imposed on schools for the first time in 2011?

7  **A.    No.  It's been in existence at least since 2001.**

8  Q.    And what's your reason for saying the duty has been in

9  existence since at least 2001?

10  **A.    Well, if you look at the guidance, the 2011 guidance, it**

11  **references the 2001 guidance several times throughout.**

12  Q.    I'm going to draw your attention to Defense Exhibit 4,

13  and ask you to take a look at that, which is also in front of

14  you.  What is this document that you have -- this has been

15  marked as Defense Exhibit 4.  What is this document that's in

16  front of you?

17  **A.    These are the revised sexual harassment guidance**

18  **principles that were issued by the Department of Ed. on Title**

19  **IX in January of 2001.**

20  Q.    And is this the document which was referred to so many

21  times in the 2011 Dear Colleague letter?

22  **A.    Yes.**

23  Q.    In looking at the 2001 guidance, has this been part of

24  your training, this 2001 guidance?

25  **A.    Yes.**

1  Q.    And for you, what is the primary take-away message that's

2  found in this 2001 guidance?  And what page could we find it

3  on?

4  **A.    If you go to Roman numeral page III, the first paragraph.**

5  Q.    What does that paragraph provide?

6  **A.    "A critical issue under Title IX is whether the school**

7  **recognized that sexual harassment has occurred and took prompt**

8  **and effective action calculated to end the harassment, prevent**

9  **its recurrence --**

10         THE COURT:  Slow down just a little, please.

11         THE WITNESS:  Sorry.  "And as appropriate, remedy its

12  effects.  If harassment has occurred, doing nothing is always

13  the wrong response."

14         MR. STROUSE:  Sorry, what page was that?

15         MS. RILEY:  Roman numeral III.

16  BY MS. RILEY:

17  Q.    Ms. Glennon, directing your attention to page 14 of that

18  document -- and I apologize; it's quite a hefty document --

19  does the Department of Education discuss the consequences if a

20  school knows or should know of hostile environment and fails to

21  act?

22  **A.    It does.**

23  Q.    What does it provide?

24  **A.    The first full paragraph, "If a school otherwise knows,**

25  **or reasonably should know, of a hostile environment and fails**

1  **to take prompt and effective corrective action, a school has**

2  **violated Title IX, even if the student has failed to use the**

3  **school's existing grievance procedures or otherwise inform the**

4  **school of the harassment."**

5  Q.    Once again, Ms. Glennon, even though this policy refers

6  to students, what is your understanding with regard to whether

7  that same policy language applies to others within your

8  institution?

9  **A.    Well, based on the 2011 guidance, we know that it applies**

10 **to faculty and staff and other third parties.**

11 Q.    Now, are you familiar with the term "responsible

12 employee" as it has been used in the Department of Education

13 guidance?

14 **A.    I am.**

15 Q.    And I'd invite your attention to page 13 of the guidance

16 that you have in your hand.  Does the Department of Education

17 describe who a responsible employee is?

18 **A.    It does.**

19 Q.    Who is a responsible employee under the understanding of

20 the Department of Education?

21 **A.    "A responsible employee would include any employee who**

22 **has the authority to take action to redress the harassment, who**

23 **has the duty to report to appropriate school officials sexual**

24 **harassment, or any other misconduct by students or employees or**

25 **an individual who a student could reasonably believe has this**

1  **authority or responsibility."**

2  Q.    Based upon your training, do you consider the provost of

3  the college, any provost of the college at McDaniel College, to

4  be a responsible person or responsible employee who has an

5  obligation to report a Title IX complaint?

6  **A.    I do.**

7  Q.    Now, when you became the McDaniel Title IX coordinator,

8  did the college have any policy to address discrimination,

9  harassment, sexual assault, and sexual violence?

10  **A.    It did.**

11  Q.    What was that policy known as?

12  **A.    It was the Title IX policy.**

13  Q.    By that, you mean the McDaniel College Title IX policy?

14  **A.    Yes.**

15  Q.    And if you recall, when did the college adopt its first

16  stand-alone Title IX policy?

17  **A.    It adopted the first stand-alone one in September of**

18  **2013.**

19  Q.    And before 2013, how had the school enforced the federal

20  Title IX law?

21  **A.    The policies appeared under the college's affirmative**

22  **action policy.**

23  Q.    But you're saying the beginning of 2013 --

24  **A.    Prior to 2013.**

25  Q.    But then after that, they made a separate Title IX

1  policy?

2  **A.    That is correct.**

3  Q.    Which Title IX policy was in effect when you became the

4  Title IX coordinator on June 1, 2014?

5  **A.    The one that went into effect June 1, 2014.**

6  Q.    Do you have a copy of that in front of you, what's been

7  marked as Joint Exhibit 27?

8  **A.    I do.**

9  Q.    Ms. Glennon, did the issuance of the June 1, 2014, policy

10 coincide with your appointment as the Title IX coordinator?

11 **A.    It did.**

12 Q.    Is that why your name appears prominently on the first

13 page?

14 **A.    It does.**

15 Q.    Now, as the new coordinator for Title IX for McDaniel

16 beginning June 1, 2014, did you provide sexual harassment and

17 Title IX training to the faculty and staff of McDaniel College?

18 **A.    I did.**

19 Q.    And why did you undertake training as one of your,

20 perhaps, first acts as the Title IX coordinator?

21 **A.    The Department of Ed. mandated us to provide training to**

22 **faculty and staff.  It's difficult to uphold a policy if you**

23 **don't know what you're supposed to do.**

24 Q.    Was this the first such Title IX training at McDaniel, to

25 your knowledge?

1  **A.     It was the first mandatory training.  There was previous**

2  **trainings offered.**

3  Q.     How did you go about implementing, providing this

4  training to faculty and staff at McDaniel?

5  **A.     We utilized an online training module.**

6  Q.     And who at McDaniel College did you provide the training

7  to?

8  **A.     All faculty and staff.**

9  Q.     And was that training for faculty and staff optional or

10  mandatory?  What was the nature of the training?

11  **A.     It was mandatory.**

12  Q.     Now, how did you inform faculty and staff of this

13  mandatory training?

14  **A.     I used the faculty list serve, via e-mail, to inform the**

15  **faculty and staff of this training requirement.**

16  Q.     And how many times, if you recall, did you inform faculty

17  and staff of this requirement?

18  **A.     I sent out at least four e-mails in June of 2014 and July**

19  **of 2014.**

20  Q.     And what did you tell the faculty and staff in your

21  e-mails?

22  **A.     I informed them that this training was available and it**

23  **was mandatory, and I also directed their attention to where**

24  **they could find a copy of the college's Title IX policy that**

25  **was in effect.**

1   Q.    And your reference to the college's Title IX policy, how

2   many of your e-mails, your June and July e-mails, did you

3   include references to the college's own Title IX policy?

4   **A.    At least four times.**

5   Q.    Did you keep track of who complied with your training

6   requirement?

7   **A.    I did.**

8   Q.    Ms. Glennon, where, actually, was the college's Title IX

9   policy available to faculty and staff?

10  **A.    It was available on the human resources portal page, as**

11  **well as our external website.**

12  Q.    Now, did the plaintiff in this case, Dr. Pavel Naumov,

13  did he ever approach you in June of 2014, early July, when you

14  were sending out these four announcements, and tell you that he

15  had any difficulty understanding the sexual harassment training

16  or the Title IX policy?

17  **A.    No, he did not.**

18          MR. STROUSE:  Hearsay, Your Honor.

19          THE COURT:  Overruled.

20  BY MR. STROUSE:

21  Q.    Ms. Glennon, you said you kept track of who attended the

22  training.

23  **A.    Yes.**

24  Q.    And how is it that you kept track of who actually took

25  the training?

**A.    As part of the training module, individuals that took it**

**had to register.  And so they had to register name, e-mail**

**address.  And so I was able to download reports of who**

**completed the training.**

Q.    And have you referred to that list to determine whether

Dr. Naumov completed that training?

**A.    I did, and his name was not included.**

Q.    Who was the target audience for that sexual harassment

and Title IX training?

**A.    Faculty and staff.**

Q.    And was this training different than what was provided to

students?

**A.    It was.**

Q.    And why would you provide a different kind of training to

students than you would provide to faculty?

**A.    Faculty and staff have an additional responsibility that**

**when they learn of incidents of harassment or discrimination,**

**that they need to bring it forward to appropriate college**

**personnel.**

Q.    And are you suggesting that students don't have that same

reporting requirement?

**A.    We encourage them to bring reports forward, but they're**

**not required to.**

Q.    Did you yourself take the McDaniel 2014 Sexual Harassment

and Title IX training?

1  **A.    I did.**

2  Q.    And was there any discussion in that training that the

3  college could not or should not pursue a Title IX grievance

4  without the victim serving as the complainant?

5  **A.    It did not.**

6  Q.    Now, directing your attention to Joint Exhibit 27.  I'd

7  ask that you turn to the second page of that policy.  What is

8  the title that's found on the top of page 2?

9  **A.    This is the policy against discrimination and harassment.**

10  Q.    In your assessment, is there a topic sentence in that

11  policy that summarizes the entire policy?

12  **A.    Sure.**

13  Q.    And what is that?

14  **A.    "Discrimination and harassment, including sexual**

15  **harassment and sexual assault, are reprehensible wrongs that**

16  **violate another person's rights and are unacceptable**

17  **behaviors."**

18  Q.    And based upon that statement, what do you understand to

19  be the relationship between harassment and sexual harassment in

20  the McDaniel policy?

21  **A.    Harassment is an overall category of behaviors that are**

22  **prohibited, and then sexual harassment is a subcategory of**

23  **harassment.**

24  Q.    If I could direct your attention further down in that

25  same page, is there a second heading?

1   **A.      Yes.**

2   Q.      What is the second heading?

3   **A.      "Policy against stalking and relationship violence."**

4   Q.      Does that second heading also include a topic sentence,

5   as it were?

6   **A.      Yes.**

7   Q.      What is that?

8   **A.      "Stalking and relationship violence are behaviors**

9   **prohibited by McDaniel College."**

10  Q.      And I'm going to ask that you now direct your attention

11  to page 4 of the policy.  Does that page contain yet another

12  title heading?

13  **A.      Yes.  This is the policy against sexual assault and**

14  **sexual violence.**

15  Q.      And does that section also contain a summary sentence?

16  **A.      Yes.**

17  Q.      And what is that?

18  **A.      "If the college becomes aware of incidents of sexual**

19  **harassment, sexual violence, or sexual assault, the college**

20  **will take immediate action to eliminate the sexual harassment,**

21  **sexual violence, or sexual assault, prevent its recurrence, and**

22  **addresses its effects.**

23  Q.      Now, I note that the language that you just read is in

24  the section, policy section on sexual assault and sexual

25  violence; is it not?

1  **A.      It is.**

2  Q.      And is the language that you just read, however, limited

3  to just cases of sexual violence and sexual assault?

4  **A.      No.**

5  Q.      And why do you say that?

6  **A.      Because the sentence includes sexual harassment.**

7  Q.      Now, the language that you just read, that is highlighted

8  on the screen, about the college becoming aware, does that

9  language contain any exceptions?  Does it state that there are

10  any exceptions in the policy?

11  **A.      There are not.**

12  Q.      Does the policy state anywhere, for example, that the

13  college will not take these immediate actions if a victim has

14  left the college?

15  **A.      No.**

16  Q.      Does the policy contain any exceptions that the college

17  cannot go forward, for example, if a victim has died?

18  **A.      No.**

19  Q.      Does the policy contain any direction, one way or the

20  other, about whether the college can take these actions if, for

21  example, a complaint has come in through social media?

22  **A.      No.**

23  Q.      Does the policy state that the college will not take

24  these immediate actions if the victim is afraid to sign a

25  complaint form?

1  **A.      No.**

2  Q.      Now, earlier in the trial when you were not here,

3  Ms. Glennon, Mr. Strouse had a slide called "the Rules of Title

4  IX, Four Rules."  Does McDaniel College have any so-called

5  rules of Title IX, a list of four rules, bullet rules?

6  **A.      Not to my knowledge.**

7  Q.      You are the Title IX coordinator.  You're not aware of

8  any such rules, are you?

9  **A.      No, I'm not.**

10  Q.      I invite your attention to get away from the policy for

11  just a moment, to the spring of 2014.  Did there come a time

12  when you became aware of a complaint that had been made by

13  Dr. Sara More?

14  **A.      Yes.**

15  Q.      And how did you learn of Dr. More's complaint?

16  **A.      I learned about her complaint through Dr. Jeanine**

17  **Stewart.**

18  Q.      Once you learned of Dr. More's complaint, what was your

19  role as the Title IX coordinator?

20  **A.      Well, I wasn't the Title IX coordinator when I learned of**

21  **it.**

22  Q.      So shortly after you learned of her complaint, you became

23  the Title IX coordinator, correct?

24  **A.      That's correct.  Approximately six weeks later.**

25  Q.      Okay.  Once you became the Title IX coordinator, what

1  then was your role as the Title IX coordinator with regard to

2  her complaint or anyone else's complaint?

3  **A.    My role is to ensure that the process is followed.**

4  Q.    Was it ever your role to decide whether Dr. More's

5  allegations against Dr. Naumov were true?

6  **A.    No.**

7  Q.    Now, to your knowledge, other than informing you, did

8  Dr. Stewart inform anyone else of the complaint?

9  **A.    Yes, she informed one of our Title IX advisors, Dr. Julia**

10 **Jasken.**

11 Q.    And did she inform anyone else in administration?

12 **A.    Also our president, Dr. Casey.**

13 Q.    And who is Dr. Julia Jasken?

14 **A.    She's one of the Title IX advisors identified in our**

15 **policy.**

16 Q.    And what is her role in this process?

17 **A.    So Title IX advisors have -- they're the ones that**

18 **receive the information, and then they can look at the**

19 **complaint and see if it rises to the policy -- or it falls**

20 **under the policy.**

21 Q.    To your knowledge, what role did Dr. Jasken play in this

22 process?

23 **A.    After hearing the nature of Dr. More's concerns, she felt**

24 **that it could be adjudicated under this policy.  So she**

25 **contacted the chief of campus safety to initiate an**

1  **investigation.**

2  Q.    And was an investigation, in fact, commenced?

3  **A.    It was.**

4  Q.    And do you know who the investigator was?

5  **A.    Yes.**

6  Q.    And who was that?

7  **A.    Eric Immler.**

8  Q.    And to your knowledge, did Dr. More meet with the

9  investigator?

10  **A.    Yes.**

11  Q.    Now, were you ever informed of the results of Detective

12  Immler's investigation?

13  **A.    I was.**

14  Q.    And did you discuss the results of that investigation

15  with anyone?

16  **A.    I did.**

17  Q.    And who did you discuss them with?

18  **A.    We discussed -- I discussed them with counsel, Al**

19  **Mezzanotte, Dr. Stewart, and Dr. Casey.**

20  Q.    Was there any decision made on the basis of that

21  investigation of the facts that Eric Immler had gathered?

22  **A.    Yes.  It confirmed the concerns that she had did fall**

23  **under the Title IX policy, and it seemed as if there was enough**

24  **information that we needed to go forward with the procedures.**

25  Q.    Who ultimately, I guess, made that ultimate decision to

1  go forward with the actual Title IX procedure?

2  **A.    It was myself, Dr. Casey, and also under the advice of**

3  **counsel, Al Mezzanotte.**

4  Q.    Once you made the decision to move forward with that

5  policy, how did you deal with the fact that you knew you had a

6  reluctant witness in Dr. Sara More?

7  **A.    Well, we had to evaluate who could fill the role of the**

8  **complainant.  So we decided -- again, Dr. Casey and Al, based**

9  **on the policy, that Dr. Stewart was the most appropriate**

10 **person.  She was the one who initially took the complaint from**

11 **Dr. More, and she was also the direct supervisor of Dr. More as**

12 **well.**

13 Q.    And who ultimately made the decision that it was going to

14 be Dr. Stewart who served in this capacity?

15 **A.    Dr. Casey.**

16 Q.    Was it ever the college's intention that Dr. Stewart

17 would be the decision-maker as to whether or not there had been

18 harassment?

19 **A.    No.**

20 Q.    And to your knowledge, did the Department of Education

21 Dear Colleague letter allow schools to bring claims when they

22 had a reluctant witness?

23 **A.    It was our obligation to do so.**

24 Q.    I'm not going to ask you very many questions about the

25 actual process, except for just a few.  Was a grievance

1   committee actually appointed to consider the allegations

2   against Dr. Naumov?

3   **A.     Yes, I appointed one.**

4              MR. STROUSE:  Scope, Your Honor.  Objection.

5              THE COURT:  It's her witness.  What do you mean

6   scope?  You can approach if you need to.

7              MR. STROUSE:  Out of the scope of --

8              THE COURT:  Relevance, is that it?

9              MR. STROUSE:  Relevance, Your Honor.  Sorry.

10             MS. RILEY:  I'll withdraw the question.

11  BY MS. RILEY:

12  Q.    Ms. Glennon, was a finding ultimately made as to whether

13  or not Dr. Naumov had violated the college's Title IX policy?

14  **A.     Yes.**

15  Q.    And what was that finding?

16  **A.     He was found responsible for harassment and responsible**

17  **for a hostile work environment.**

18  Q.    And what sanction was awarded to Dr. Naumov?

19  **A.     Termination.**

20  Q.    Do you know which body ultimately made that final

21  decision?

22  **A.     Dr. Casey made the recommendation, and then it went**

23  **through a couple different layers of review --**

24  Q.    I don't need to know about that.  I just wanted the

25  ultimate finding.

1  **A.     Oh.  The board of trustees.**

2  Q.    And while Dr. Naumov was participating in this Title IX

3  process throughout the fall of 2014, what was his pay status?

4  **A.     He was on paid leave.**

5  Q.    Following the action by the board, the ultimate action

6  you've just described, when was Dr. Naumov's employment

7  terminated?

8  **A.     I believe it was January 31, 2015.**

9  Q.    Now, turning back to the policy for just a moment.  Joint

10  Exhibit 27, the McDaniel College policy.  I'm going to direct

11  your attention to page 11 of the complaint, the section marked

12  "formal hearing."

13          THE COURT:  Did you say page 11 of the policy?

14          MS. RILEY:  Excuse me, page 11 of the policy.

15  BY MS. RILEY:

16  Q.    It's the highlighted language.  We've had it read several

17  times, so if you could read it to yourself.

18  **A.     "If a formal hearing is instituted, the name of the**

19  **complainant will be disclosed to the grievance committee.**

20  **However, the hearing may be postponed until such a time as the**

21  **complainant was willing to be identified.  For example, until**

22  **final grades are in or appointment renewals are made at the**

23  **discretion of the chair person and the grievance committee.  In**

24  **the event that the complainant is unwilling to be identified,**

25  **the formal hearing will be dismissed, no action will be taken,**

1    **and no report of any action will be filed."**

2    Q.    Ms. Glennon, in the case regarding Dr. Naumov, was the

3    identity of Dr. More made known to the grievance committee?

4    **A.    Yes.**

5    Q.    Was the identity of Dr. More made known to Dr. Naumov?

6    **A.    Yes.**

7    Q.    And to his faculty ombudsman?

8    **A.    Yes.**

9    Q.    Was the identity of Dr. Stewart, who signed as the

10   complainant, made known to the grievance committee?

11   **A.    Yes.**

12   Q.    And made known to Dr. Naumov?

13   **A.    Yes.**

14   Q.    If a case were to go to the grievance committee, it gets

15   to that stage, and the victim still remained anonymous, what

16   does your policy require the college to do in those instances?

17   **A.    It would dismiss it.**

18   Q.    And why would the formal hearing be dismissed in such

19   cases?

20   **A.    Because without the complainant's -- I'm sorry, the**

21   **victim's identity, it would be difficult for the respondent to**

22   **put together a case to defend him or herself.**

23   Q.    So in the event that there was a truly anonymous victim,

24   you would dismiss under those circumstances?

25   **A.    Yes.**

1  Q.    Does your policy mandate anywhere that the victim must

2  testify at a formal hearing?

3  **A.    No.**

4  Q.    Does your policy state anywhere that just because the

5  victim does not testify, that the case must be dismissed?

6  **A.    No.**

7              MS. RILEY:  Give me just a moment.

8  BY MS. RILEY:

9  Q.    Ms. Glennon, I'm going to have you turn back to page 9 of

10 the policy.  This is a section entitled "Grievance Procedures

11 for Complaints Alleging Discrimination, Harassment or Sexual

12 Assault Against a College Employee."  What does this procedure

13 provide on page 9 with regard to reporting grievances?

14 **A.    "Anyone in the college community who is approached by**

15 **someone claiming to have been discriminated against or harassed**

16 **is encouraged to direct or accompany the complainant to meet**

17 **with one of the designated advisors.**

18 Q.    Ms. Glennon, in your understanding, who is this section

19 directed to?  Who is it speaking to?

20 **A.    Anyone in the college that's experienced discrimination**

21 **or harassment.**

22 Q.    So would this section apply to students?

23 **A.    Yes.**

24 Q.    Is this section describing a responsible employee within

25 the university?

1  **A.    No.  They have additional responsibilities.**

2  Q.    Now, in your experience as Title IX coordinator, who is

3  the most typical complainant under your policy?

4  **A.    Well, complaints come in a variety of different ways to**

5  **us.  It can be the victim, the person that experienced the**

6  **harassment or the discrimination.  They may come forward and**

7  **wish to adjudicate a complaint.**

8      **Sometimes it is the friend of a colleague who's**

9  **experienced it, and then they report it to the appropriate**

10 **people within our school.  Sometimes it's the friend of a**

11 **student.**

12     **I've also had situations where I've received anonymous**

13 **information.  We have interoffice mail.  So I have received**

14 **screen shots of harassing images that were communicated over**

15 **social media, Facebook, Snapchat, Twitter, etc.  It's a variety**

16 **of different ways.**

17 Q.    It sounds like over the last 20 years, probably the ways

18 that you can receive criminal complaints has changed

19 exponentially.

20 **A.    Yes.**

21 Q.    So when you receive a complaint, such as one you get a

22 Snapchat left on your desk, what do you understand the

23 college's obligation to do, even if you at that point don't

24 even know who the victim might be?

25 **A.    We're obligated to investigate and stop whatever**

1    **harassment is happening and redress it's impact.  Typically,**

2    **that information, if it's enough for me to understand who the**

3    **victim is, we can certainly reach out to them, and we do**

4    **because we're obligated to.**

5    Q.    Does the college interpret the language on page 9, that

6    you just read, to state that only victims are allowed to be

7    complainants?

8    **A.    No.**

9    Q.    Does the college understand the language on page 9 to

10   mean that only if the victim complains can the college pursue

11   the grievance?

12   **A.    No.**

13   Q.    Ms. Glennon, in front of you also is a copy of a document

14   that has not yet been used, which is Joint Exhibit 28.  Do you

15   have that in front of you?

16   **A.    Yes, I do.**

17   Q.    And what is that document?

18   **A.    This is Dr. Naumov's W-2 for 2014.**

19   Q.    And looking at Joint Exhibit 28, how much was Dr. Naumov

20   last earning at McDaniel College in 2014?

21   **A.    His gross pay was $78,830.**

22   Q.    And at McDaniel College, does the college contribute

23   towards an employee's retirement?

24   **A.    Yes.**

25   Q.    And what is the maximum amount that the college

1  contributes?

2  **A.     Ten percent of the base gross earnings.**

3  Q.     And if you could explain how that 10 percent is broken

4  down.

5  **A.     Sure.  So once a college employee is eligible to receive**

6  **the match, we contribute a base, five percent.  And then if the**

7  **employee also contributes, we will match an additional five**

8  **percent.  So if you put those together, you get 10 percent.**

9  Q.     Has the retirement match changed at all since the time

10  that Dr. Naumov was terminated from the college?

11  **A.     No.**

12  Q.     Going back just a moment to the salary piece.  Has the

13  salary level at McDaniel College changed since the time that

14  Dr. Naumov was terminated?

15  **A.     We have not had a cost-of-living increase.  We did have a**

16  **special pay in December of 2017.**

17  Q.     And how much was the special pay in 2017?

18  **A.     It was equal to two percent of your gross earnings for a**

19  **six-month period, which was projected June -- I'm sorry,**

20  **January 1, 2018 to June 30, 2018.**

21  Q.     You've lost me.

22  **A.     I'm sorry.  The board of trustees authorized a two**

23  **percent increase beginning January 1st.  So what we did was**

24  **allowed for their employees to be paid up front so they could**

25  **have a Christmas bonus.  So we projected what their earnings**

1  **would be January 1, 2018, to June 30, 2018, and gave them two**

2  **percent of that in the -- I think it was the December 15th pay.**

3  Q.    So basically a two percent bonus based on the --

4  **A.    Based on the base wages, yes.**

5  Q.    Okay.  Other than that bonus, has there been a pay

6  increase across the board through today?

7  **A.    No.**

8  Q.    To your knowledge, how does McDaniel College's 10 percent

9  retirement match compare to the match offered by Vassar

10  College?

11  **A.    It's less.**

12  Q.    And what does Vassar College match by way of retirement?

13  **A.    Vassar has a system in which they contribute various**

14  **amounts --**

15         MR. STROUSE:  Objection, Your Honor.

16         THE COURT:  Sustained; basis of knowledge.

17  BY MS. RILEY:

18  Q.    Ms. Glennon, what is your basis for knowing what the

19  Vassar College retirement match that's available to its faculty

20  is?

21  **A.    They have their benefits summary online.**

22         THE COURT:  Counsel, approach.  Can you take down the

23  document, please.

24      (Bench conference on the record.)

25         THE COURT:  So I confess I didn't confirm this before

1   having you take it down but --

2           MS. RILEY:  There's no social security on there.

3   It's never been on there.

4           THE COURT:  I thought we saw it on there, but maybe

5   not.

6           MS. RILEY:  I'll show you the document.

7           THE COURT:  Well, check again before you put it pack

8   up.

9           MS. RILEY:  It's not.  It's never been on there.  We

10  took it off two years ago.

11          THE COURT:  Okay.

12      (End of bench conference.)

13  BY MS. RILEY:

14  Q.   Ms. Glennon, does McDaniel College provide housing for

15  its faculty?

16  **A.   It does not**.

17          MS. RILEY:  I have no further questions of this

18  witness.

19          THE COURT:  Cross.

20          **CROSS-EXAMINATION BY THE PLAINTIFF**

21  BY MR. STROUSE:

22  Q.   Good afternoon, Ms. Glennon.

23  **A.   Hi**.

24  Q.   Hi.  Let me ask you a question about this grievance form.

25  Do you recognize this grievance form?

1  **A.    It appears to be the grievance form that I received from**

2  **Dr. Stewart.**

3  Q.    What was the charge against Dr. Naumov, if anything?

4  **A.    It was a complaint of a policy violation under**

5  **harassment, hostile environment, and stalking.**

6  Q.    It just says stalking and relationship violence, doesn't

7  it, in the red box?

8  **A.    Yes, but if you look above, at the nature of the**

9  **complaint, you can see that it's harassment, hostile**

10  **environment, and stalking is what's indicated.**

11  Q.    Where does it say this is a Title IX form?

12  **A.    This is the grievance form that's attached to the policy.**

13  Q.    Does it say a Title IX form though?

14  **A.    No, but it's attached to the policy.**

15  Q.    Isn't it true that there was no sexual harassment, sexual

16  violence, or gender discrimination charged against Dr. Naumov?

17  **A.    No.**

18  Q.    I'm sorry, it's not true?

19  **A.    He was charged with a complaint of harassment and hostile**

20  **environment and stalking.**

21  Q.    But no sexual violence at all, was there?

22  **A.    Not sexual violence, no.**

23  Q.    And isn't it true that you need -- in this OCR booklet,

24  do you have that OCR booklet from 2001?

25          THE COURT:  Is that the Dear Colleague letter?

1          MR. STROUSE:  It is a booklet from 2001 on a Dear

2    Colleague letter.

3    BY MR. STROUSE:

4    Q.    If you turn to page 2, what is number 2?

5          MS. RILEY:  Is this Defendant's Exhibit 4?

6          THE COURT:  Let's clarify some exhibits.  First,

7    what's the exhibit number of the document that's on the screen

8    right now, Mr. Strouse?

9          MR. STROUSE:  This one is -- I can't seem to find it,

10   Your Honor.

11         THE COURT:  Just remember to make sure we get a

12   record of what exhibit number this is later.

13         MR. STROUSE:  Yes, Your Honor.

14         THE COURT:  And we can move forward for now.

15         MR. ENGLISH:  It's Plaintiff's 23, Your Honor.

16         THE COURT:  Plaintiff's 23?

17         MR. STROUSE:  Thank you.

18         THE COURT:  Now, which exhibit number are you asking

19   her to look at now?

20         MR. STROUSE:  This is Title IX harassment, revised

21   sexual harassment guidance.

22         MR. ENGLISH:  It's Defendant's 4, Your Honor.

23   BY MR. STROUSE:

24   Q.    Defendant's 4, January, 2001; is that correct?

25   **A.    Yes, I think.**

1  Q.    On page 2 --

2  **A.    Two or Roman numeral II?**

3  Q.    Two -- regular two.

4  **A.    Okay.**

5  Q.    Number 2(ii), it says "sexual harassment is unwelcome

6  conduct of a sexual nature.  Sexual harassment can include

7  unwelcome sexual advances, requests for sexual favors, or other

8  verbal/physical contact of a sexual nature."

9       Dr. Naumov was never charged with anything sexual, was

10 he?

11 **A.    He was charged with harassment, and sexual harassment is**

12 **a subcategory of harassment.**

13 Q.    Sexual harassment is a subcategory of harassment?

14 **A.    Yes, it is.  It's a type of it.**

15 Q.    Isn't it true that Title IX in your booklet talks about

16 sexual harassment and sexual violence almost exclusively?

17 **A.    Are we still on the same --**

18 Q.    No.

19 **A.    Sorry.**

20 Q.    Title IX, the policy Title IX, do you have that in front

21 of you?

22 **A.    The college's policy?**

23 Q.    Yes, the college's policy.  Doesn't Title IX, the

24 college's policy, talk exclusively about sexual harassment,

25 sexual violence, and the like?

1   **A.      No.   If you look at page 2, it defines discrimination,**

2   **harassment, and you can see that sexual harassment is a**

3   **subcategory of harassment.**

4   Q.      It defines sexual harassment specifically, doesn't it?

5   **A.      It does.**

6   Q.      Now, with regard to page 11 of that document, could you

7   turn to page 11?

8   **A.      Yes.**

9   Q.      Under formal hearing, in the last sentence, it says "in

10  the event that the complainant is unwilling to be identified, a

11  formal hearing will be dismissed, no action will be taken, and

12  no report of any action will be filed."  But the complainant in

13  this case was Dr. More, wasn't it?

14  **A.      She was the victim.**

15  Q.      She was the victim, but she was also the person to whom

16  the behavior was geared; is that right?

17  **A.      She was the victim.**

18  Q.      And how does this allow anybody in the university

19  community to come forward in her stead?

20  **A.      It doesn't say that the complainant has to be the victim.**

21  Q.      Where does it say that the complainant is not the victim?

22  **A.      It doesn't state one way or another.**

23  Q.      Well, isn't the assumption on something like this that

24  it's the complainant that has to be the victim if it doesn't

25  say otherwise?

1   **A.     No.  If you look at page 4, go to the second paragraph,**

2   **"If the college becomes aware of incidents of sexual**

3   **harassment, sexual violence, or sexual assault, the college**

4   **will take immediate action to eliminate the sexual harassment,**

5   **sexual violence, or sexual assault, prevent its recurrence, and**

6   **address its effects."  It's silent on who can act as a**

7   **complainant.**

8   Q.     But it says sexual harassment, sexual violence, and

9   sexual assault.  Or gender violence for that matter.  It does

10  not say -- it does not apply to Dr. Naumov, does it?

11  **A.     It does apply.**

12  Q.     How can it apply if he's not accused of anything sexual?

13  **A.     He was accused of sexual harassment.**

14          MS. SAFIROVA:  No.  No.

15          THE COURT:  Ma'am, one more time.

16  BY MR. STROUSE:

17  Q.     Now, when you took over as the person in charge of Title

18  IX, when you became the director of human resources and Title

19  IX coordinator, you took over in 2014; is that right?

20  **A.     In June of 2014.**

21  Q.     Right.  So the training would not apply to any kind of

22  behavior before that, would it?

23  **A.     My training?**

24  Q.     No, the training outlined in Title IX.

25  **A.     I don't understand the question.  I'm sorry.**

1   Q.    Let me go on to another question then.  Where in this

2   booklet -- did you write this booklet, by the way, the booklet

3   on Title IX?

4   **A.    No, I did not write it.**

5   Q.    Okay.  But you are very familiar with it, as we've seen.

6   **A.    Yes.**

7   Q.    Yes.  Where in Title IX -- where in this -- I've already

8   done that.

9         Where in this booklet does it mention the Office of Civil

10  Rights, Department of Education advisory letter?

11  **A.    I'm sorry, I don't understand the question.**

12  Q.    The Office of Civil Rights advisory letter of April 2011,

13  you've mentioned that, and you've said, in effect, that that

14  applies to McDaniel.

15  **A.    It does.**

16  Q.    Now, where does it say in the Title IX booklet that the

17  Office of Civil Rights letter applies?

18  **A.    The college put together this policy to uphold its**

19  **responsibilities under Title IX, which includes using guidance**

20  **through the Dear Colleague letters and any other guidance that**

21  **the Department of Ed. pushes out on Title IX.**

22  Q.    Where does it say anything to that effect, either in a

23  footnote or in the document itself ?  It doesn't say so, does

24  it?

25  **A.    It does reference guidance from the U.S. Department of**

1   **Education on page 15, and that would include all of the**

2   **guidance that we've been discussing today.**

3   Q.    On page 15, where does it say that?

4   **A.    In the middle of the page, "Due to the sensitive nature**

5   **of sexual assault incidents and guidance, the United States**

6   **Department of Education."  So we reference it there.**

7   Q.    It says "additional considerations are afforded to the

8   complainant and respondent;" is that right?

9   **A.    That is what it says.  And additionally, the title of the**

10  **policy is Title IX.  So we're referencing the regulations that**

11  **we're upholding.**

12  Q.    Okay.  With regard to OCR, doesn't it say in the April

13  11th document on page 6 -- if you would look at that.  If you

14  would look at page 6.

15         I can't find the place.

16         THE COURT:  Take a moment.  Take your time.

17  BY MR. STROUSE:

18  Q.    Now, you let Dr. Stewart do the informal process, didn't

19  you?

20         MS. RILEY:  Objection, Your Honor.  May we approach?

21         THE COURT:  Sure.

22         (Bench conference not transcribed.)

23  BY MR. STROUSE:

24  Q.    Just turning your attention back to the Department of

25  Education advisory letter.  And it is advisory, right?  It's

1   not mandated.

2   **A.      Which one?**

3   Q.      The Department of Education 2011.  Turning your attention

4   to page 11 of that, the second paragraph, what does it say?

5   The second sentence.

6   **A.      "The complainant and the alleged perpetrator must be**

7   **afforded similar and timely access to information that will be**

8   **used at the hearing."**

9   Q.      Was this done with Dr. Naumov?

10          MS. RILEY:  Objection, Your Honor.

11          THE COURT:  Sustained.

12  BY MR. STROUSE:

13  Q.      Now, if you would look on each and every page -- you

14  don't have to look at each and every page, but if you would

15  look at several of the pages, at the top of the page, what does

16  it say on the Dear Colleague letter?  At the top of the page.

17  **A.      It has the page numbers and then Dear Colleague letter,**

18  **sexual violence.**

19  Q.      Each and every page says sexual violence, doesn't it?

20  **A.      It does.**

21  Q.      Okay.  Now, when did you determine that somebody else

22  could stand in the way -- in the stead of Dr. More?

23  **A.      Well, under the guidance from the Department of Ed., we**

24  **had an obligation to move forward a complaint.  So we had to**

25  **figure out how we were going to adjudicate it.**

1  Q.    Why would you put the provost in charge of the entire

2  operation?  Isn't that a bias towards the process?

3  **A.    She wasn't in charge.**

4  Q.    She wasn't in charge, but she gave various letters of

5  what she heard or what she took down from Dr. More, didn't she?

6  **A.    She did.**

7  Q.    And so didn't she Sergeant Immler?

8  **A.    Direct him to do what?**

9  Q.    Do the investigation, as to what to look for and the

10 like.

11 **A.    She provided information to Detective Immler.**

12 Q.    Okay.  This is an e-mail from you to Dr. Casey, isn't it?

13 **A.    Yes.**

14 Q.    And in that e-mail, you said that there is a complication

15 to deal with.

16 **A.    Yes.**

17 Q.    And it says, "the respondent is a tenured faculty member

18 and there is a reluctant witness who is critical to this

19 situation."  You were talking about Dr. More, weren't you?

20 **A.    Yes, she was the reluctant witness.**

21 Q.    And you said that you were stepping in or Jeanine Stewart

22 was stepping in to be the complainant; isn't that right?

23 **A.    I said yes, that she would be named as the complainant.**

24 Q.    And you also go on to say, "recognizing the dual role

25 that Jeanine has in this situation."  What is the dual role

1    that she has in this situation?

2    **A.     She is the supervisor, and she's also acting as the**

3    **complainant.**

4    Q.     She's the supervisor of the faculty; isn't that right?

5    **A.     That is correct.**

6    Q.     Wouldn't that be a bias of the process, if it were?

7    **A.     No, because I was the person that was adjudicating the**

8    **process.**

9    Q.     And so why did you write this note to Dr. Casey?

10   **A.     Because I wanted his confirmation and his input that**

11   **Jeanine should serve as the complainant.**

12   Q.     Did he agree?

13   **A.     He did.  He, advice of counsel, Al Mezzanotte, and I all**

14   **agreed that this was the best way forward to honor our**

15   **obligations under Title IX.**

16   Q.     Wasn't Julia Jasken supposed to be the Title IX advisor?

17   **A.     She is.  Or at the time she was our Title IX advisor.**

18   Q.     Wasn't she supposed to direct the investigation?

19   **A.     She was -- she informed and requested for the**

20   **investigation, but she wasn't in charge of the investigation,**

21   **no.**

22   Q.     Well, wasn't she supposed to set up the investigation?

23   **A.     She is the one that requested that the investigation be**

24   **completed.**

25   Q.     Dr. Stewart didn't do that?

1  **A.      Not to my knowledge.  It was my understanding that**

2  **Dr. Jasken is the one that asked.**

3  Q.    Now, with regard to the charges against Dr. Naumov --

4            THE COURT:  I'm sorry.  First, two things.  One, what

5  was the exhibit number for the document that was just up?  Now

6  a different document is up.  What's the exhibit number for

7  that?

8            MR. STROUSE:  This exhibit is exhibit number --

9            THE COURT:  Since we're getting close to the end of

10 the day, I'll let you keep going, but at the end of the day we

11 need to make sure we get the exhibit numbers for everything

12 you've used.

13            MR. STROUSE:  I'd have to look for it, Your Honor.

14            THE COURT:  That's fine.

15            MR. ENGLISH:  Which document?

16            THE COURT:  The one that's on the screen currently.

17            MR. ENGLISH:  We'll find it, Your Honor.

18            MR. STROUSE:  I have it under Sergeant Immler.

19            THE COURT:  To move things along, we can get it after

20 we're done.

21            MR. STROUSE:  Okay.

22 BY MR. STROUSE:

23 Q.    So all faculty reported to Dr. Stewart; is that right?

24 **A.      That's correct; she was the provost and dean of faculty.**

25 Q.    And didn't she recuse or take out two of the members of

1    the Faculty Affairs Committee?

2              MS. RILEY:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. STROUSE:

5    Q.    Wasn't Dr. Stewart fired sometime after this matter was

6    filed?

7    **A.    She resigned.**

8    Q.    And wasn't that a forced resignation by Dr. Casey?

9    **A.    She resigned.**

10   Q.    And none of the charges against Dr. Naumov have ever been

11   sexual, have they?

12   **A.    He was charged with harassment, and a subcategory of**

13   **harassment is sexual harassment.**

14   Q.    And he was never charged with sexual discrimination as

15   well, was he?

16   **A.    His charges -- do you have the form that Dr. Stewart**

17   **completed?  Yep.  So he was charged with harassment, hostile**

18   **environment, and other employment-related stalking.**

19   Q.    Now, do you recall what the exact items were with regard

20   to charges against Dr. Naumov?

21   **A.    Are you talking about the complaint that doctor -- the**

22   **concerns that Dr. More brought forward?**

23   Q.    Yes.

24   **A.    I have a general idea.**

25   Q.    Do you recall that he was charged with asking her to

1  lunch when she was leaving?

2  **A.      I would have to look at the specific complaint.**

3  Q.    Oh, okay, you're not familiar with that?  Now, all of the

4  charges were very insignificant, weren't they?

5  **A.      No.**

6  Q.    Which charge, if you remember, was very harsh or --

7  **A.      They were all charges that could fall under the Title IX**

8  **policy related to harassment, hostile environment, and**

9  **stalking.**

10 Q.    Stalking was thrown out, wasn't it, right away?

11 **A.      He was -- the grievance committee found him not**

12 **responsible for stalking.**

13         MR. STROUSE:  I have no further questions, Your

14 Honor.

15         THE COURT:  Hold on.  You can --

16         MR. STROUSE:  Oh, I'm sorry.

17         THE COURT:  -- talk to your client.

18     (Counsel confers with Plaintiff; puts document on ELMO.)

19 BY MR. STROUSE:

20 Q.    There's a --

21         MS. RILEY:  Your Honor, I can't read the document.

22         THE COURT:  Approach, and take the document down

23 while we discuss it.

24     (Bench conference not transcribed.)

25         THE COURT:  The objection is sustained.

1          MR. STROUSE:  I have no further questions, Your

2    Honor.

3          THE COURT:  Redirect.

4          MS. RILEY:  Just briefly, Your Honor.

5       On further thought, there will be no further redirect.

6          THE COURT:  Okay.

7          MS. RILEY:  Thank you.

8          THE COURT:  Ma'am, thank you so much for your

9    testimony today.  Please don't discuss your testimony with

10   anyone else until the trial has been completed.  You are

11   excused, and please enjoy the rest of your day.

12         THE WITNESS:  Thank you.

13       (End of testimony of Jennifer Glennon.)

14       (End of witness testimony.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Cindy S. Davis, Federal Official Court Reporter in and

4   for the United States District Court for the Southern District

5   of Maryland, do hereby certify that I reported, by machine

6   shorthand in my official capacity, the proceedings had in the

7   case of Pavel Naumov versus McDaniel College, Inc., case number

8   GJH-15-00582, in said court on January 25, 2018.

9        I further certify that the foregoing 178 pages constitute

10  the official transcript of an excerpt of the proceedings

11  consisting of witness testimony, as taken from my machine

12  shorthand notes to the best of my ability.

13       In witness whereof, I have hereto subscribed my name this

14  13th day of February, 2018.

15

16

17

18

19            *Cindy S. Davis*

20            _____

21            **CINDY S. DAVIS, RPR**
             **FEDERAL OFFICIAL COURT REPORTER**

22

23

24

25