1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF MARYLAND

3

PAVEL NAUMOV,              )
4                          )
           Plaintiff,      )
5                          )
       vs.                 )     CASE NUMBER 8:15-cv-00482-GJH
6                          )
MCDANIEL COLLEGE, INC.     )
7                          )
           Defendant.      )
8    _____ )

9

                    TRANSCRIPT OF PROCEEDINGS
10                      WITNESS TESTIMONY
              BEFORE THE HONORABLE GEORGE J. HAZEL
11          FRIDAY, JANUARY 26, 2018; 9:10 A.M.
                    GREENBELT, MARYLAND
12

FOR THE PLAINTIFF:
13
       James C. Strouse, Esquire
14     STROUSE LEGAL SERVICES
       5401 Twin Knolls Road, Suite 7
15     Columbia, MD  21045

16  FOR THE DEFENDANT:

17     Donald E. English, Jr., Esquire
       Eileen Carr Riley, Esquire
18     JACKSON LEWIS, P.C.
       2800 Quarry Lake Drive, Suite 200
19     Baltimore, MD  21209

20
       Proceedings recorded by mechanical stenography, transcript
21  produced by computer.

22  _____

23
                    CINDY S. DAVIS, RPR
24          FEDERAL OFFICIAL COURT REPORTER
            6500 CHERRYWOOD LANE, SUITE 200
25              GREENBELT, MD  20770

1          I N D E X   O F   W I T N E S S   T E S T I M O N Y

2                    JANUARY 26, 2018, Volume 4

3

4    DEFENDANT'S

5    WITNESSES:_____   DIRECT   CROSS   REDIRECT   RECROSS

6    Roger Casey                    3       18        30        --

| | |
|---|---|
| 1 | E X C E R P T   O F   P R O C E E D I N G S |
| 2 | **(Defense witness DR. ROGER CASEY sworn.)** |
| 3 | THE COURTROOM DEPUTY:  You may be seated here in the |
| 4 | witness box.  Please speak loudly and clearly into the |
| 5 | microphone and state your full name for the record. |
| 6 | THE WITNESS:  Roger Neal Casey. |
| 7 | THE COURTROOM DEPUTY: |
| 8 | THE WITNESS:  R-o-g-e-r, N-e-a-l, C-a-s-e-y. |
| 9 | **DIRECT EXAMINATION BY THE DEFENSE** |
| 10 | BY MR. ENGLISH: |
| 11 | Q.    Good morning, Dr. Casey. |
| 12 | **A.    Good morning.** |
| 13 | Q.    Thank you for coming this morning.  You are our final |
| 14 | witness.  Dr. Casey, what is your current job title? |
| 15 | **A.    I'm the president of McDaniel College.** |
| 16 | Q.    And for those of us that don't know what that means, tell |
| 17 | us what the duties and responsibilities of the president of |
| 18 | McDaniel College are. |
| 19 | **A.    The president is essentially the chief executive officer** |
| 20 | **of the college.  I'm appointed by a board of trustees, roughly** |
| 21 | **40 in number, and I'm ultimately responsible for all aspects of** |
| 22 | **the college, both the financial side of the college and the** |
| 23 | **academic side of the college.** |
| 24 | Q.    Could you summarize your education? |
| 25 | **A.    I am a first generation college student.  I grew up in a** |

1  small town in South Carolina.  I went to Furman University, a

2  small liberal arts school there, received a bachelors degree in

3  education.

4       Following that, I went to graduate school at Florida

5  State University in Tallahassee.  I earned a masters degree

6  there and then a PhD.  Both of those were in American

7  literature.

8  Q.    Could you also tell us about your professional career?

9  A.    I began my professional career teaching as an adjunct

10  instructor at Florida State when I completed my degree, and

11  then I had a tenure-track appointment as a professor at

12  Birmingham Southern College in Alabama.  I was there for about

13  10 years.  I became a tenured faculty member and an

14  administrator and an associate dean.

15       Following that, I became the dean of faculty and then the

16  provost at Rollins College in Winter Park, Florida, in Orlando,

17  and I did that job for 10 years.

18       And then in 2010 I became the president of McDaniel

19  College in Westminster.

20            THE COURT:  Sir, if I could ask you just to slow down

21  just a little just to make sure we can get everything down that

22  you say.

23            THE WITNESS:  Certainly.

24  BY MR. ENGLISH:

25  Q.    Dr. Casey, can you tell us about McDaniel College?

1  A.     So McDaniel College is celebrating its 150th year this

2  year.  We were founded in 1867.  We were the first college

3  founded south of the Mason-Dixon Line that was coeducational.

4  So from our beginning, we have given equal opportunity to both

5  men and women to receive a college education.

6         We are a residential liberal arts college primarily, so

7  our focus is on developing the whole student and working with

8  them not just in the classroom but in trying to create citizens

9  who are responsible and will be valuable, contributing members

10 of society.

11        And we also have a thriving graduate program;

12 predominately, a masters in education.

13        The real focus of our college is focussing on changing

14 lives.  We're in a book called "Colleges That Change Lives."

15 There are only 40 colleges in the country that are part of that

16 organization, and we have been recognized particularly for our

17 work with students who have high economic need.  Last year the

18 college gave away over $35 million in financial aid.  So we

19 really focus on trying to create access and opportunity for

20 families who, otherwise, could never have an opportunity for

21 the kind of education that we have.

22 Q.     Now, Dr. Casey, you mentioned that you had worked for

23 other colleges and universities.  Have you had experience with

24 Title IX at any of those places?

25 A.     I have at all of them.

1   Q.    And what type of experience have you had?

2   **A.    First of all, as a faculty member, I was made aware of**

3   **Title IX and the rules and regulations there.  And then when I**

4   **became an administrator, I had increasing sets of**

5   **responsibility over governing the institution's policies**

6   **related to Title IX.**

7       **And I also have experience through various professional**

8   **organizations in which I belong.**

9   Q.    Have you yourself had Title IX training?

10  **A.    I have.**

11  Q.    What Title IX training have you had?

12  **A.    In addition to the training that the college provides for**

13  **all of its employees, and I've gone through that, I have been**

14  **part of trainings that are in various professional**

15  **organizations to which I belong.**

16  Q.    So you mentioned that you belong to various professional

17  organizations.  What organizations are those?

18  **A.    Predominantly, one of them is MICUA, the Maryland**

19  **Independent College and University Association.  This is a**

20  **collection of all of the private and independent higher**

21  **education entities in the State of Maryland, and I'm now**

22  **actually the chair of that group.  I've been in that role for**

23  **three years.**

24      **I am on the national board of NAICU, the National**

25  **Association of Independent Colleges and Universities.  This is**

1   the predominant lobbying arm in Washington for independent

2   higher education.  So I sit on that board and have had

3   experience in training there.

4          And I have been on various steering boards for the

5   Counsel of Independent Colleges, and this is the academic arm

6   that brings together all of the small colleges in the country.

7   So roughly, colleges that are 5,000 students or less, and there

8   are about 600 of those.

9   Q.    In connection with your involvement with these

10  organizations, have you had Title IX experience and experience

11  with issues involving Title IX with those organizations?

12  A.    I have.

13  Q.    What experience have you had?

14  A.    Those organizations bring in outside experts,

15  predominantly, to talk to college presidents and provosts about

16  issues related to Title IX.  They bring case studies to us, so

17  we find out what's happening in other institutions, how are

18  other people responding to the federal mandates related to

19  Title IX.

20         And particularly, probably most importantly, we have

21  open-mike sessions often for college presidents at these

22  meetings.  So these are closed-door sessions where college

23  presidents can tell their stories about experiences that they

24  have on their campuses with Title IX cases, and they can talk

25  openly and honestly amongst their colleagues, and they don't

1  have to worry about being surrounded by the press or other

2  people coming in.  So people tell very honest stories about

3  what they had and how those cases went, and the goal is that we

4  all learn from each other as part of that practice.

5  Q.    So in terms of learning from each other and as a college

6  president and member of these organizations, what is your

7  understanding of the obligations of colleges to comply with

8  Title IX?

9  A.    It's a federal mandate.  It's not a choice that we have.

10  We are required to comply if we are going to be a college that

11  accepts federal funds, and McDaniel is one of those colleges.

12  Q.    Based on your experience with these organizations and

13  your experience as a president, is the victim required in order

14  for a college to move forward with its grievance process?

15  A.    No.

16  Q.    And is this the standard in higher education?

17  A.    In all of the colleges that I'm aware of, if any college

18  becomes aware of a potential violation of Title IX, they are

19  required to investigate, regardless of whether there is a

20  victim coming forward in person or not.

21  Q.    Why?

22  A.    Well, because two reasons.  One is Title IX essentially

23  says that we want to create in higher education a workplace and

24  an atmosphere that is free of discrimination and is free of

25  harassment.  So that anyone who is a member of the college

1   community, regardless of their gender, regardless of their

2   background, those individuals have a right to either -- as a

3   student or as an employee or as a faculty member, to come to

4   work and work in an environment that is free of discrimination

5   and free of harassment.  So that part is the federal law.

6          The second part, though, which I think is equally

7   important, is it's part of the mission of who we are and who we

8   define ourselves as a college.  And I think not only is that

9   true at McDaniel, but I think it's true in all of higher

10  education.  We want to create an atmosphere where people do not

11  feel that they are oppressed, harassed, where they're free to

12  be themselves and work in an environment in which they are not

13  bothered by someone who is essentially violating their rights.

14  Q.    Dr. Casey, are you aware of some of the concerns with

15  harassment and discrimination in higher education that

16  currently are going on?

17  A.    I am.

18  Q.    And what has McDaniel done with respect to some of those

19  public concerns?

20  A.    We have tried to enact policies and procedures in

21  education for our employees and for our students so that they

22  are aware of what the federal mandates are, and they're aware

23  of behaviors that they should not engage in or behaviors, if

24  they witness, that they should make others aware of so that we

25  can act.

1 Q.    Has McDaniel provided training to its staff with respect

2 to harassment discrimination?

3 **A.    We have.**

4 Q.    And does that training provide that McDaniel has a duty

5 to investigate and bring a grievance if it becomes aware of

6 harassment?

7 **A.    Yes, it does.**

8 Q.    And was that training provided in June of 2014, to your

9 knowledge?

10 **A.    It had been by that time, yes.**

11 Q.    You were the president.  Was that training mandatory for

12 you?

13 **A.    It was.  In fact, I remember when I went through the**

14 **online training, my wife and I, who is an employee at the**

15 **college, watched the videos and did this at the same time.**

16 Q.    Was it mandatory for all faculty and staff?

17 **A.    Yes, it was.**

18 Q.    Let's go back to 2014.  What was the general tone with

19 respect to harassment at the colleges in 2014?

20 **A.    There had been a significant amount of coverage in the**

21 **news at that point in time, predominantly because of the**

22 **situation at Penn State, the Jerry Sandusky case, which I think**

23 **virtually everyone in the country had heard of.**

24 Q.    And have you read the Dear Colleague letter?

25 **A.    The Dear Colleague letter of 2011?**

1   Q.    The one of 2011.

2   **A.    Yes, I have.**

3   Q.    And what's your understanding of that letter?

4   **A.    This was a letter that went out under the Obama**

5   **Administration's department of higher education -- Department**

6   **of Education, sorry, essentially making colleges even more**

7   **aware of the duties under Title IX.  And while I would probably**

8   **argue that this letter did not really necessarily change any**

9   **aspects of the policy, what this letter clearly said to all**

10  **colleges is if you are aware of violations of Title IX and you**

11  **do nothing about it, in other words, if you don't investigate,**

12  **or if you don't create policies to enforce this federal**

13  **mandate, the Office of Civil Rights is going to investigate**

14  **you, and you are going to be held accountable.**

15  Q.    What was the impact of that letter on higher education?

16  **A.    It started a tremendous amount of conversation amongst**

17  **higher education administrators trying to make sure that we had**

18  **in place practices and procedures that would ensure that if we**

19  **learned of cases or found out or someone reported, that we had**

20  **a means of investigating and then a very clear directive to act**

21  **afterwards.**

22  Q.    Let's change gears.  Do you know Dr. Sara More?

23  **A.    Yes, I do.**

24  Q.    What's your opinion of Dr. Sara More as a professor?

25  **A.    I held a very high opinion of her as a professor, as did**

1    her colleagues.  When I very first came to the college in 2010,

2    I was aware that she had been elected to some fairly important

3    college committees, even though she was young in her career.  I

4    wanted to establish an advisory group of faculty to essentially

5    assist the new president as you come to understand the culture

6    of a new place.  I asked a number of colleagues in the faculty

7    who would be good faculty to help serve on this.  She's one of

8    the people whose name consistently came up from her colleagues.

9    Q.    And in 2012, did you become aware of an issue between

10   Dr. Naumov and Dr. More?

11   A.    I did.

12   Q.    And what did you become aware of?

13   A.    Through the provost at that time, Dr. Tom Falkner, he

14   came to talk to me about a case.  My recollection is,

15   initially, he did not disclose the name of the faculty member,

16   but he told me that we had a female faculty member --

17            MR. STROUSE:  Objection, Your Honor.  It's all

18   hearsay.

19            THE COURT:  Overruled.  It just goes to what

20   knowledge he was given.  Overruled.

21   BY MR. ENGLISH:

22   Q.    You can answer.

23   A.    He came to me and told me that a faculty member had come

24   to him and was considering even leaving the college at that

25   point in time because of, predominantly, a series of incidents

1    that had occurred from unwanted actions from another faculty

2    member.  We discussed the case.  Specifically, I asked him

3    about would this faculty member, did she want to come forward;

4    did she want to launch a complaint; do we want to begin an

5    investigation at that this point in time.  He reported that at

6    that point in time she did not.

7            Eventually, I came to know that the faculty member was

8    Dr. Sara More, and I asked Dr. Falkner if she would speak to me

9    about the situation.  Eventually, that did happen.  She came to

10   me and she shared some aspects of her concerns with me.

11   Q.    And after that conversation, did you consider whether the

12   college would proceed with the grievance process at that time?

13   A.    I did.

14   Q.    And did the college end up pursuing a grievance?

15   A.    We did not at that time.

16   Q.    And was it a close call?

17   A.    It was an extremely close call.  I really questioned,

18   looking back, whether or not I made the right decision at that

19   point in time.  But at that point in time, Dr. More was not

20   willing to come forward as a witness.  And frankly, Dr. Falkner

21   and I were really trying to save her as a faculty member.  We

22   didn't want her to leave, and I think we were very much guided

23   at that point in time by what she wanted to do in the case.

24   Q.    So then let's fast forward to 2014.  In 2014 did you

25   become aware that there were any other issues between

1  Dr. Naumov and Dr. More?

2  **A.     So in 2014 we had a change of provosts.  Dr. Falkner had**

3  **retired at that point in time from his administrative position.**

4  **We had a new provost who was in place, Dr. Jeanine Stewart.**

5  **She came to me and, very similarly to the situation when**

6  **Dr. Falkner first came to me, articulated the story of a female**

7  **faculty member and the concerns that she had talked about in**

8  **relation to the behavior of one of her colleagues.**

9  **      When it became known to me that the colleague was**

10 **Dr. More, I informed Dr. Stewart of what had happened in 2012**

11 **and how at that point in time we had not moved forward with an**

12 **investigation.**

13 Q.    At that time in 2014, was it your understanding that

14 Dr. More was still reluctant to file a grievance?

15 **A.     She was very reluctant to file a grievance.  And in fact,**

16 **it seemed to me, I would characterize it as she was afraid to**

17 **file a grievance.**

18 Q.    And then what was the next step?

19 **A.     At that point in time, I discussed this case with the**

20 **provost, with our director of human relations, Jennie Glennon,**

21 **who was also the Title IX coordinator at the college, and we**

22 **also brought in the advice of our counsel at the college to**

23 **talk about what actions should we take.**

24 Q.    And then at some point was there a decision made as to

25 whether or not to go forward with an investigation?

**A.    Yes.  Following the consultation with those parties, we**

**made a decision that, given the knowledge we had and the length**

**of time that these alleged incidents had been occurring, that**

**it was appropriate for us to launch an investigation.**

Q.    And when you say "we" made the decision, who made the

decision?

**A.    Ultimately, that decision rests with me.  I consulted our**

**director of HR, our counsel, and then our provost.**

Q.    And were you kept up to date with the status of the

investigation as it went forward?

**A.    I was.  I was not kept up to date necessarily with the**

**specifics of the investigation and what it uncovered,**

**particularly because of the role the president plays later on**

**in our Title IX process, but I was kept completely up to date**

**with where the process was and what next steps were going to**

**happen in that process.**

Q.    At some point was there a decision that was made to go

forward with the grievance process?

**A.    Yes, there was.**

Q.    And who made that decision?

**A.    That's ultimately my decision as well.  Again, I sought**

**the counsel of the other individuals, but it appeared that,**

**clearly, we had enough evidence that had been gathered that**

**action needed to be taken in this case.**

Q.    And what is your understanding as to who was going to be

1  the named complainant since Dr. More was not willing to go

2  forward with the process?

3  **A.    We had considerable discussion about that issue and,**

4  **ultimately, decided that the most appropriate person to move**

5  **forward with the complaint would be the dean of faculty.  We**

6  **have a joint title at the college.  The provost also serves as**

7  **dean of faculty, and the job of the dean of the faculty is to**

8  **represent the interests of the faculty, in a similar way that**

9  **the dean of students represents the interests of students.**

10        **So if you do not have a complainant willing to come**

11  **forward with the direct personal experience in this particular**

12  **case, given that she shared that with her supervisor, in**

13  **Dr. Stewart, we all felt like Dr. Stewart then is the**

14  **appropriate person to actually move this forward in our**

15  **grievance process.**

16  Q.    Who was Dr. Stewart acting on behalf of?

17  **A.    She was technically acting on behalf of the college.  It**

18  **is the college that is -- the college's rules that are**

19  **violated, essentially, in a Title IX case and, therefore, the**

20  **best interests of the institution were being represented by**

21  **Dr. Stewart.**

22  Q.    Switching gears a little bit.  Let's talk about full

23  professor status at McDaniel College.  What does it mean to be

24  a full professor at McDaniel?

25  **A.    A full professor is essentially the highest rank for a**

1    faculty member.  As a faculty member, you go through a series

2    of evaluations and steps.  First, you're an assistant

3    professor.  And then after about seven years, at most

4    colleges -- it's true at McDaniel -- you go through an

5    evaluation process by your department and your peers and the

6    administration, and they then make a recommendation to the

7    board as to whether or not you can become tenured.  And at that

8    time, usually, you're also appointed as an associate professor.

9         So when you become a tenured associate professor, you

10   then serve another period of time, seven to eight years in that

11   rank, and you're eligible at that point in time to come forward

12   for another evaluation process, at the end of which your desire

13   and your hope, obviously, is that you're promoted to full

14   professor.

15        So you're recommended by your department, you're

16   recommended then by an evaluation committee of your peers.

17   That recommendation goes to me and to the provost.  If we

18   agree, we carry it forward to the board of trustees and,

19   ultimately, our board of trustees is the authority that can

20   grant full professorship.

21   Q.    What is the criteria for being a full professor?

22   A.    The criteria varies from institution to institution, but

23   at McDaniel there are three main areas in which you are

24   evaluated.  The first one is the quality of your teaching, the

25   second one is the quality and volume of your scholarship, and

1  **the third one is your service to the community.  And at**

2  **McDaniel, to be a full professor, you have to achieve the**

3  **highest standard of evaluation in all of those categories.**

4  Q.    Were you familiar with Dr. Naumov while he was employed

5  by McDaniel?

6  **A.    Yes, I was.**

7  Q.    And do you have an opinion on whether he would have made

8  full professor?

9  **A.    I never evaluated him directly for such a promotion**

10  **because he was not at the point of coming up for --**

11            MR. STROUSE:  Speculation, Your Honor.

12            THE COURT:  Sustained.  Sustained.

13            MR. ENGLISH:  I have no further questions, Your

14  Honor.

15            THE COURT:  Cross.

16            MR. STROUSE:  Yes, Your Honor.

17            THE COURT:  Just to be clear, ladies and gentlemen,

18  so you should disregard the portion of the answer that was

19  given.

20            **CROSS-EXAMINATION BY THE PLAINTIFF**

21  BY MR. STROUSE:

22  Q.    Plaintiff's Number 27, I'd like to show you this,

23  Dr. Casey.  Can you read that sentence that's highlighted under

24  "formal hearing."

25  **A.    There's a lot highlighted.  What would you like for me to**

1  **read?**

2  Q.    Just this, this sentence.

3  **A.    Okay.**

4          THE COURT:  Is that the Title IX policy?

5          MR. STROUSE:  That is the Title IX policy of

6  McDaniel, 2014, June, Your Honor.

7          THE WITNESS:  "In the event that the complainant is

8  unwilling to be identified, the formal hearing will be

9  dismissed, no action will be taken, and no report of any action

10 will be filed."

11 BY MR. STROUSE:

12 Q.    This is Title IX policy of McDaniel; is that right?

13 **A.    Yes.**

14 Q.    And so this says you can investigate all you want, but in

15 terms of a formal hearing, you can't go forward unless you have

16 a complainant, the complainant to the behavior that was given,

17 isn't it?

18 **A.    That's what the text says.**

19 Q.    Now, I'd like to show you this Dear Colleague letter that

20 comes up again and again, and on page 5 -- you're aware of the

21 Dear Colleague letter, aren't you?

22 **A.    The April '11 Dear Colleague letter.**

23 Q.    April '11, 2011, yes.  If you would just read this

24 sentence on the Dear Colleague letter.

25 **A.    "If a complainant insists that his or her name or other**

1  **identifiable information not be disclosed to the alleged**

2  **perpetrator, the school should inform the complainant that its**

3  **ability to respond may be limited."**

4  Q.    Right.  Then up here at the top, doesn't it say sexual

5  violence?  Wasn't this about sexual violence, this Dear

6  Colleague letter?

7  **A.    This Dear Colleague letter is about harassment of**

8  **multiple forms in the work place, for students and for the**

9  **workplace in higher ed.**

10  Q.    Doesn't this say, on the top of every page, sexual

11  violence?

12  **A.    It does say that as a header at the top of those pages.**

13  Q.    Right.  So this doesn't prevent you from investigating,

14  does it?

15  **A.    What is the "this" you're referring to?**

16  Q.    This policy doesn't prevent you from investigating any

17  complaint, does it?

18  **A.    I would say this policy mandates we investigate a**

19  **complaint.**

20  Q.    But when you have a formal charge, then you have to stop

21  because you need the complainant; isn't that right?

22  **A.    Yes, and in the case we had, we had a complainant,**

23  **Dr. Stewart.**

24  Q.    But Dr. Stewart was standing in for Dr. More, wasn't she?

25  **A.    Dr. Stewart was representing the college.**

1  Q.    She was standing in for Dr. More as the complainant.  She

2  was the formal complainant on the matter, wasn't she?

3  **A.    She was the formal complainant on the matter, yes.**

4  Q.    And what right did she have to stand in according to your

5  own policy?  Where does it say that anyone can stand in for

6  another person to whom the behavior is given?

7  **A.    The fundamental umbrella of our policy indicates that any**

8  **violation of discrimination and harassment at McDaniel College**

9  **should lead to an investigation.**

10  Q.    Where does it say that in Title IX?

11  **A.    Where does it say that in Title IX?**

12  Q.    Yes.

13  **A.    That is the essence of the Title IX policy itself.**

14  Q.    Then it has to say it, Dr. Casey.  You can't say that it

15  says something different than what it says.  It is the policy,

16  is it not?

17  **A.    I would argue there's absolutely nothing in our policy or**

18  **in Title IX that would prevent us from moving forward in the**

19  **matter in which we conducted our investigation and grievance.**

20  Q.    So you can make up anything in Title IX policy and decide

21  to go forward?

22  **A.    That's not what I said.  The umbrella of Title IX**

23  **mandates that any institution in which there is a report of or**

24  **suspicion of discrimination or harassment, we have to act, as**

25  **an institution, to investigate that practice.  If it turns out**

1  **to be true, we move through a grievance process.**

2  Q.    Investigate it, yes.  But not through the grievance

3  process.  It's clear in what you already read from the Title IX

4  policy of McDaniel that you cannot go forward without a valid

5  complainant, and that's what it says in the booklet right now

6  that you've read.

7  **A.    And we had a valid complainant.**

8  Q.    And you had a valid complainant to whom the behavior was

9  made; is that right?

10  **A.    We had a valid complainant who was representing the**

11  **interests of the Title IX policy at the college.**

12  Q.    You fired Dr. Naumov, didn't you?

13  **A.    I made a recommendation that his employment be**

14  **terminated.  That ability to fire rests with our board of**

15  **trustees.**

16  Q.    You fired him for moral turpitude and violations of the

17  rights of fellow faculty members; is that right?

18  **A.    That's what our letter to him indicated, yes.**

19  Q.    Where does this occur or where is this allegation ever

20  made against Dr. Naumov?

21  **A.    That language was chosen by our counsel because of his**

22  **violations of Dr. More's rights and of the college's practice**

23  **and principles in accordance with our Title IX policy.**

24  Q.    What moral turpitude is involved here?  How do you

25  describe moral turpitude?

1    **A.     In the judgment of his peers, of Dr. Naumov's peers, in**

2    **the judgment of an appellate group, in my judgment, in the**

3    **judgment of the faculty evaluation committee, and in the**

4    **judgment of the board of trustees, all of whom looked at the**

5    **facts in this case, our conclusion was his behavior and morals**

6    **in this case were a violation of our institution policies.**

7    Q.    What moral turpitude did he do?

8    **A.     He harassed a faculty member to the point --**

9    Q.    How?  How --

10              THE COURT:  Sir, you have to let him finish his

11   answer.

12              MR. STROUSE:  I'm sorry, Your Honor.

13              THE WITNESS:  He harassed a faculty member to the

14   point that she made a decision that leaving the college was her

15   only choice in order the get away from his behavior.

16   BY MR. STROUSE:

17   Q.    Well, that's not what Dr. More said yesterday.  Dr. More

18   said she left because she lived in Baltimore and wanted to --

19              MR. ENGLISH:  Objection.

20              THE COURT:  Sustained.  He wasn't here for Dr. More's

21   testimony.

22              MR. ENGLISH:  That's not what she said, Your Honor.

23              THE COURT:  Well, putting that aside, sustained

24   because he wasn't here for it.

25   BY MR. STROUSE:

1  Q.    Were you aware that there was an investigation with

2  regard to Dr. Naumov?

3  **A.    Yes.**

4  Q.    Were you aware that Dr. Naumov was never interviewed by

5  Sergeant Immler at any given time to get his side of the story?

6  **A.    At the time of the grievance process, I was not aware of**

7  **that.**

8  Q.    You were not aware of that?  Don't you think it's a

9  little bit unfair for the so-called perpetrator of this

10 behavior to not be interviewed for an investigation that goes

11 on to be given to you and Dr. Stewart and Ms. Glennon and the

12 like?

13 **A.    I don't know that that's necessarily critical in a case,**

14 **depending on the materials that were brought forward as**

15 **evidence.**

16 Q.    It's not critical to interview the perpetrator of the

17 event?

18 **A.    I don't know that it would necessarily be critical given**

19 **the nature of the evidence that's brought --**

20 Q.    Well, what kind of investigation would you want?  You

21 want an investigation of just one side?  Is that fair?

22 **A.    If my investigation brought forth a considerable amount**

23 **of written text, if I had photographs, if I had an ample amount**

24 **of evidence, I might not need to interview all the parties that**

25 **were involved.**

1    Q.    We're not talking about all the parties.  We're talking

2    about Dr. Naumov.  He's the one that Dr. More allegedly said he

3    harassed her.  And we'll go over the harassment that Dr. More

4    mentions specifically.  Why wouldn't he be interviewed?  It's

5    unfair, isn't it?

6    **A.    It is not necessarily unfair, and it would not be my**

7    **decision as part of the policy that we have at the college.**

8    **That decision would have been made by other groups of people**

9    **who stood in judgment.**

10   Q.    It's not your decision to have a fair investigation; is

11   that correct?

12   **A.    That's not what I said.**

13   Q.    I'm sorry.  What did you say?

14   **A.    I said that the decision to investigate or interview a**

15   **particular individual at certain points in the process might**

16   **not necessarily be my decision because I am not the party at**

17   **that particular point in time determining here are the facts**

18   **that we want presented, here's what we want investigated.  So I**

19   **can easily see in multiple cases where you might not**

20   **necessarily have to talk to one of the parties that were**

21   **involved, depending on the nature of the evidence that's**

22   **brought forth against them.**

23   Q.    We're not talking about a multiple killer here, are we?

24   **A.    I'm not sure what relevance that question has.**

25   Q.    Let's move on.  Are you aware that he and Dr. More

1  published 12 papers together?

2  **A.     I'm not aware of the number.  I do know that they worked**

3  **together.**

4  Q.     And they worked together to produce enough papers so they

5  were both given promotion at the same time.  Are you aware of

6  that?

7  **A.     I'm also aware that on his first try at promotion,**

8  **Dr. Naumov was not approved for tenure.**

9  Q.     That was based on a two in teaching or not sufficient

10  teaching evidence; is that right?

11  **A.     It was prior to my time as president, but I believe that**

12  **is correct, that his teaching was deemed to be deficient.**

13  Q.     Now, you know, and do you acknowledge, that Dr. Naumov

14  was never charged with any kind of sexual violence or sexual

15  harassment or gender discrimination; isn't that right?

16  **A.     He was charged with harassment.**

17  Q.     Now, are you aware of the actual specific charges that

18  Dr. More made in this case?

19  **A.     I'm not sure what you mean by that question.**

20  Q.     Are you aware that she complained about him asking her to

21  lunch when she was leaving for Johns Hopkins?

22  **A.     Yes, I am aware of those things.**

23  Q.     I see.  And what's wrong with asking her to lunch, if you

24  know?

25  **A.     It would probably, again, depend on the context of how it**

1  **was done, was it done repeatedly, was this something that she**

2  **did not want to be asked out -- I mean, those are the kind of**

3  **questions you would be asking in a harassment case.  So the**

4  **answer to my question probably is it would really depend.**

5  Q.    Okay.  And if it was at the end of her term at McDaniel,

6  before she left for Johns Hopkins, to say good-bye after eight

7  years, wouldn't that be appropriate?

8  **A.    Fundamentally, it's not for me to say.  It would be for**

9  **Dr. More to say, because it would be her perspective, her**

10  **rights, in terms of whether or not these approaches were**

11  **deserved or warranted.**

12  Q.    Have you ever said good-bye to a staff person?

13  **A.    I have.**

14  Q.    And did you ever take that person to lunch or have a

15  luncheon in that person's honor?

16  **A.    I have.**

17  Q.    How about walking to the car?  She complained about

18  walking to the car.  Now, Dr. Naumov, in each and every one of

19  these cases, he stopped doing it as soon as she complained.

20  But he walked her to the car a few times.  What's wrong with

21  that?

22  **A.    If a person wants to be walked to a car by someone,**

23  **there's nothing wrong with that.  If they don't want to be,**

24  **there's everything wrong with that.**

25  Q.    What about when they're working during the January

1  semester, when there's no students there or hardly any anyhow?

2  Wouldn't that be appropriate for someone to walk somebody to

3  their car because of the empty parking lot and the like?

4  **A.    It would be appropriate if that individual wanted to be**

5  **walked to the car.**

6  Q.    What about e-mails over the weekend?  Did you ever send

7  e-mails over the weekend?

8  **A.    I have.**

9  Q.    Do you find that objectionable?

10 **A.    It would depend upon the nature of those e-mails.**

11 Q.    And if the e-mails were about, primarily, research

12 efforts, wouldn't that be appropriate for one colleague to send

13 it to another colleague?

14 **A.    If they were primarily professional in nature, it could**

15 **be appropriate.**

16 Q.    How about longer-than-needed conversations?  What does

17 that mean?

18 **A.    Again, it's the eye of the beholder here that is the most**

19 **important issue when it comes to answering that question.**

20 Q.    And if somebody gets a complaint and then makes amends or

21 tries to stop doing it, shouldn't that end the matter?

22 **A.    It may not.**

23 Q.    How is it harassing though?

24 **A.    If a member of my community at McDaniel, a female member**

25 **of my community at McDaniel, were to report that an individual**

1   **has consistently sent them unwanted information, keeps**

2   **contacting them, follows them, goes to their car, if someone**

3   **reports that this is happening, and they do not want this to be**

4   **happening, this is inappropriate behavior.**

5   Q.    But if it stopped immediately upon request, the matter

6   should be over, shouldn't it?

7   **A.    Again, I would say that depends.**

8   Q.    How about working in the common area?  Are you familiar

9   with their office, their office --

10  **A.    I'm somewhat familiar.**

11  Q.    There's a sitting area in there, and she said -- she

12  complained about Dr. Naumov working in the common area, having

13  students there and often having office hours.  How is that

14  harassing?

15  **A.    Again, it would depend upon the nature of how someone is**

16  **hanging out in that common area.  And if it were making someone**

17  **uncomfortable, if it was unduly long, those are the kinds of**

18  **things that might cause someone to feel uncomfortable if**

19  **behavior like that continued.**

20  Q.    You fired Dr. Stewart, didn't you?

21  **A.    No, I did not.  Dr. Stewart resigned from her position.**

22  Q.    After one year as provost; is that right?

23  **A.    Actually, I'm not sure the length of time.  I think it**

24  **was two years.**

25  Q.    It's a little unusual for someone to leave even after two

1   years, isn't it, as provost?

2   **A.     Not necessarily.**

3   Q.     Not necessarily?

4   **A.     Yeah.   In higher education, short tenures, they're less**

5   **the norm, but it does happen at institutions.**

6   Q.     But it's unusual.  Dr. Falkner was there for, I think, 12

7   years?

8   **A.     He was.**

9   Q.     And Dr. Stewart was just there for two years.

10  **A.     Yes.**

11          MR. STROUSE:  I have no further questions, Your

12  Honor.

13          THE COURT:  Redirect.

14                **REDIRECT EXAMINATION BY THE DEFENSE**

15  BY MR. ENGLISH:

16  Q.     Dr. Casey, you were asked a couple of questions about

17  where in the policy does it say that the college is required to

18  act even if the complainant -- even if the victim doesn't want

19  to be the complainant.

20          Let me refer you to page 4 of the policy.  I have it on

21  your screen that's in front of you, and there it says "if the

22  college becomes aware of incidents of sexual harassment, sexual

23  violence, or sexual assault, the college will take immediate

24  action to eliminate the sexual harassment, sexual violence, or

25  sexual assault, prevent its recurrence, and address its

1  effects."

2      Do you know -- as I just showed you that document, do you

3  know where it says in the policy -- is that where it says in

4  the policy that the college is required to act?

5  **A.  Absolutely.**

6  Q.  And when it says -- the first part of that sentence, it

7  says "if the college becomes aware of incidents of sexual

8  harassment," does that refer to the investigation?

9  **A.  Anyone in our community could report or make us aware**

10  **that something is going on which either that individual or**

11  **others would consider to be harassment.**

12  Q.  And then if you investigate and become aware of it, then

13  that's when the college would become aware, whether it's

14  somebody reporting it or there's an independent investigation?

15  **A.  That's correct.**

16  Q.  And then the second apartment of that sentence says once

17  we become aware, "the college will take immediate action to

18  eliminate it, prevent its recurrence, and address its effects."

19  In your opinion, does that refer to the grievance process?

20  **A.  It does.**

21  Q.  Does that refresh your recollection as to where in the

22  policy, specifically, it provides that the college must act,

23  even if the victim does not want to go forward with the

24  grievance?

25  **A.  It does.  And as I was answering the question earlier,**

1   **this to me is the umbrella over which all of our decisions**

2   **about what we do related to Title IX occur.**

3   Q.    You were asked a couple of questions about -- you were

4   put -- this passage was put in front of you about the formal

5   hearing process and about the complainant being willing to be

6   identified.  To your knowledge, putting aside the word

7   "complainant," was the victim identified to Dr. Naumov in this

8   process?

9   A.    **Absolutely.  In fact, he self-identified the victim even**

10  **when that name had not been given.**

11  Q.    In your opinion, is this identification issue, is it even

12  an issue since she was identified?

13  A.    **It was not in this case.**

14  Q.    And the actual complainant, who was Dr. Stewart, the

15  actual named complainant, that was identified as well?

16  A.    **Yes, from the beginning of the process.**

17  Q.    You were also asked about the Dear Colleague letter, and

18  you were asked where in the Dear Colleague letter did it allow

19  for the college to move forward without the victim being the

20  complainant.

21        Here, which is at the bottom of page 4, it says

22  "regardless of whether a harassed student, his or her parent,

23  or a third party files a complaint under the school's grievance

24  procedure, or otherwise requests action on the student's

25  behalf, a school that knows or reasonably should know about

1   possible harassment must promptly investigate to determine what

2   occurred and then take appropriate steps to resolve the

3   situation."

4        You were asked to point this out.  Is this where the Dear

5   Colleague letter mandates that the college must take action

6   even if the faculty member in this case doesn't come forward

7   with a grievance?

8   A.    Yes, it is.

9   Q.    To your understanding, is the June 2014 Title IX policy

10  of McDaniel College consistent with this language?

11  A.    It absolutely is.  I mean, these policies and our

12  interpretation of those at McDaniel clearly state if we become

13  aware of someone who is harassing someone or there is

14  discrimination going on because of this, we have to do

15  something; we must do something.

16  Q.    You were asked a bunch of questions about the

17  investigation, Dr. Casey, and about whether the investigation

18  was fair.  At the investigation stage, is there any

19  determination being made, as to the merits, as to whether or

20  not there was a violation or not?

21  A.    No.  Facts are being gathered to present to, essentially,

22  a jury, who will then look at those facts and make a

23  determination.

24  Q.    And when that process goes forward, does the alleged

25  harasser get an opportunity to then state their case?

1   **A.      They can.**

2   Q.      And they then present their evidence?

3   **A.      Yes.**

4   Q.      And they get interviewed at that point?

5   **A.      They can, yes.**

6   Q.      One last question.  In your opinion, did McDaniel respond

7   appropriately to Dr. More's complaints?

8   **A.      I have no doubts about the fact that we responded**

9   **appropriately by conducting an investigation and then by that**

10  **investigation being examined by multiple constituencies at our**

11  **college, all of whom came to the same conclusion, that**

12  **Dr. Naumov was guilty and that the college needed to take**

13  **action to ensure that this kind of behavior never happened**

14  **again from him.**

15  Q.      Thank you, Dr. Casey.

16  **A.      Thank you.**

17          THE COURT:  Sir, thank you for your testimony.  You

18  are excused.  Please don't discuss your testimony with anyone

19  until the trial has been completed, and enjoy the rest of your

20  day.

21          THE WITNESS:  Thank you.

22          (End of testimony of Roger Casey.)

23          (End of all witness testimony.)

24

25

CERTIFICATE OF OFFICIAL REPORTER

   I, Cindy S. Davis, Federal Official Court Reporter in and for the United States District Court for the Southern District of Maryland, do hereby certify that I reported, by machine shorthand in my official capacity, the proceedings had in the case of Pavel Naumov versus McDaniel College, Inc., case number GJH-15-00582, in said court on January 26, 2018.

   I further certify that the foregoing 34 pages constitute the official transcript of an excerpt of the proceedings consisting of witness testimony, as taken from my machine shorthand notes to the best of my ability.

   In witness whereof, I have hereto subscribed my name this 14th day of February, 2018.

*Cindy S. Davis*

_____
**CINDY S. DAVIS, RPR**
**FEDERAL OFFICIAL COURT REPORTER**